HBGAAROSF—CORRECTED        Jury Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        10 Cr. 431 (LAK)

5   JAMES J. ROSEMOND,

6                  Defendant.

7   ------------------------------x

8                                       New York, New York
                                        November 16, 2017
9                                       9:30 a.m.

10

    Before:
11
                        HON. LEWIS A. KAPLAN,
12
                                        District Judge
13

14                      APPEARANCES

15  JOON H. KIM
         Acting United States Attorney for the
16       Southern District of New York
    BY:  SAMSON ENZER
17       DREW JOHNSON-SKINNER
         ELIZABETH HANFT
18       Assistant United States Attorneys

19  DAVID TOUGER
    JONATHAN EDELSTEIN
20       Attorneys for Defendant

21  ALSO PRESENT:

22  NYPD Detective Steven Smith
    Nicholas Pavlis, Paralegal (USAO)
23

24

25

1    (Trial resume; Witness and jury present)

2    THE COURT:  Good morning, all.

3    Defendant and the jurors all are present.

4    The witness is reminded he is still under oath.

5    Mr. Skinner.

6    MR. JOHNSON-SKINNER:  Thank you, judge.

7  JOHN HEINTZ,

8      called as a witness by the Government,

9      having PREVIOUSLY been duly sworn, testified as follows:

10  CONTINUED DIRECT EXAMINATION

11  BY MR. JOHNSON-SKINNER:

12  Q.  Good morning, deputy.

13  A.  Good morning.

14  Q.  Yesterday after I read that stipulation we were talking

15  about the phone records that were in the stipulation.  Did you

16  review view that phone data?

17  A.  Yes, I did.

18  Q.  Remind us where you got that information from.

19  A.  The information was received from the various phone

20  companies for the phones involved with this case.

21  Q.  I'll show you what's in evidence through that stipulation

22  as Government Exhibit 501.

23    Did you review this chart before testifying today?

24  A.  Yes, sir.

25  Q.  Is it an accurate listing of the phone numbers in the case

1  as reflected in those records?

2  A.  Yes, it is.

3  Q.  And then let me also show you what's in evidence through

4  that stipulation as Government Exhibit 502, also in the folder

5  in front of you.  Did you review that chart before testifying

6  today?

7  A.  Yes, sir.

8  Q.  Is that an accurate summary of the call detail records

9  between relevant phone numbers in this case?

10  A.  Yes, it is.

11  Q.  In addition to getting the phone data and location data,

12  did you get any other information from the government in this

13  case?

14  A.  I was given certain dates and times to look at call

15  records.

16  Q.  In general, what was your involvement in this

17  investigation?

18  A.  I was first contacted by Detective Steve Smith of the NYPD

19  back in late December 2009.  He told me that he had a case in

20  which he had three sets of phone records.  He asked me if I'd

21  be able to assist him in analyzing the phone records helping

22  him with his investigation.  It was right around the holidays,

23  so we didn't got a chance to meet until January of 2010 is when

24  he first brought me three sets of records for three different

25  phones and that was the beginning of this telephone

1    investigation.

2    Q.  Did you end up looking at more phone records as this case

3    went on?

4    A.  As the case went on and progressed, yes, more phones were

5    involved.

6    Q.  What did you do to start analyzing that phone data?

7    A.  We utilized a program.  It's a telephone analytical program

8    called Pinlink.  And it's specifically used to import records

9    into the program and you can run various different reports.

10   And from those reports we then take that information and we

11   transfer it into a mapping program.

12   Q.  Before you in that folder is what's been marked for

13   identification as Government Exhibit 510.  Do you recognize

14   that?

15   A.  Yes, sir.

16   Q.  What is that?

17   A.  This is a map for the Theresa Buckson phone and it's the

18   main cell site area for the phone during the time period in

19   which we received records.

20   Q.  Before we do that what's the whole exhibit, Government

21   Exhibit 510?

22   A.  These are all of the various maps that I produced from the

23   phone records from the carriers for certain dates that are

24   relevant in the case.

25   Q.  You did that after analyzing the cell site data that you

1   received?

2   A.  Yes, sir.

3   Q.  Is that fair and accurate representation of your analysis

4   of the cell site date?

5   A.  Yes, it is.

6        MR. JOHNSON-SKINNER:  We'll offer Government Exhibit

7   510.

8        THE COURT:  Received.

9        (Government's Exhibit 510 received in evidence)

10       MR. JOHNSON-SKINNER:  Before we get that to that

11  exhibit, let's look at the first row of Government Exhibit 501.

12  If we do could put that up on the screen.

13       (Pause)

14  Q.  So who is the subscriber for this phone?

15  A.  The subscriber for this phone is Theresa Buckson.

16  Q.  What was the service provider?  What was the company?

17  A.  The provider was AT&T Wireless Services.

18  Q.  What is a subscriber for a phone?

19  A.  Subscriber is the customer name that's given when the

20  account is established.

21  Q.  Is a user of a phone always the same as the subscriber?

22  A.  No, it's not.

23  Q.  Did these -- the records that you got for this phone

24  number, did these include both calls and text messages?

25  A.  Yes, sir.

1  Q.  And do the call records for this phone, do they come with

2  that cell site data information?

3  A.  Yes, they did.

4  Q.  What about for the text messages?

5  A.  For the text messages back in this period of time in 2009,

6  the phone company only stored them for a short period of time.

7  When we served the court order for the cell site records the

8  timeframe had expired cause they didn't store the messages that

9  long period of time, the cell sites for the text messages.

10 Q.  So you didn't end up with the cell sites for the text

11 messages?

12 A.  No, sir, just the voice calls.

13 Q.  You mentioned before a main cell site area.  What is that?

14 A.  One of the reports that this program Pinlink enables us to

15 do is to look at the history of all the cell sites for the

16 timeframe which we're running the reports, the dates.  And what

17 we do is we look at the most common cell sites.  It would give

18 us a hierarchy of the most common cell sites to the least

19 common cell sites that the phone was in.  And usually when I'm

20 doing an investigation I'll look at where the phone is first

21 thing in the morning and where the phone is when it goes to

22 sleep so to say at nighttime.  And based upon that that's where

23 I come up with my analysis of where the main cell site is.

24 Q.  Did you analyze the records for this Theresa Buckson phone

25 to find the main cell site area for that phone?

1    A.  Yes, sir, I did.

2           MR. JOHNSON-SKINNER:  Let's look at page one of

3    Government Exhibit 510.  Blow that up.

4           (Pause)

5    Q.  And just to orient the jury, what are the red pins that we

6    see on this map?

7    A.  The red pins on this particular map are the cell towers.

8    What happens is we get the list from the cell towers from the

9    carrier.  Then we import, I imported the list into a program

10   called Mapquest -- Map Point -- excuse me -- to a Microsoft

11   program.  And based upon the latitude and longitude we'll plot

12   the cell sites into the mapping program.

13   Q.  What were the main cell site areas for this Buckson phone?

14   A.  For the timeframe that we got the records the main cell

15   site area was on the upper west side of Manhattan in the 60s.

16   Q.  And looks like it's hitting a cell tower on West End Avenue

17   and about 65 Street; is that right?

18   A.  Yes.  And also one on 205 West 61 Street.

19   Q.  Did you look -- what time period are we talking about?

20   What time period were the records for this phone,

21   approximately?

22   A.  From May 5, 2009 through September 25, 2009.

23   Q.  Did you look to see whether that phone hit cell towers in

24   the Metro Washington D.C. or Maryland area during that time?

25   A.  Yes, sir.

1    Q.  Did it?

2    A.  Couple of times.

3    Q.  When you say "a couple", how many?

4    A.  Two or three occasions.

5    Q.  Just for example, how many times did it hit that cell tower

6    at 205 West 61 Street?

7    A.  51 times from 5/5/09 to 8/22/09.

8    Q.  I am going to read a stipulation.  It's stipulation 1370.

9             It is hereby stipulated and agreed --

10            MR. TOUGER:  I missed that answer.  Could we have that

11   answer read back?

12            THE WITNESS:  Excuse me?

13            THE COURT:  Could you read the last answer, please.

14            (Read back)

15            THE COURT:  Go ahead, Mr. Skinner, please.

16            MR. JOHNSON-SKINNER:  Government Exhibit 1370.

17            It is hereby stipulated and agreed that the records

18   marked as Government Exhibit 520 are records of regularly

19   conducted business activity of AT&T within the meaning of

20   Federal Rule of Evidence 8036.

21            Government Exhibit 520 contains subscriber information

22   for a cellular telephone with the number, (973)901-2076, with a

23   listed subscriber, Mohammed Stewart, 103 Chancler Avenue,

24   Newark, New Jersey 07112.

25            The records marked as Government Exhibit 521 are

1    records of regularly conducted business of Verizon within the

2    meaning of Federal Rule of Evidence 8036.

3         Government Exhibit 521 contains subscriber information

4    for a telephone number, (212)414-2483, with a listed subscriber

5    Czar Entertainment, 11 West 25th Street, New York, New York

6    10010.

7         It is stipulated and agreed that Government Exhibit

8    520 and 521 in this stipulation as Government Exhibit 1370 are

9    admissible in evidence as Government Exhibits at trial and we'd

10   offer all those exhibits.

11        THE COURT:  1370, 520 and 521 are received.

12        (Government's Exhibits 1370, 520 and 521 received in

13   evidence)

14   Q.  Now, Deputy Heintz, that number that I just read with the

15   subscriber information, Mohammed Stewart, based on your

16   analysis, did the Buckson phone communicate at all with that

17   Mohammed Stewart phone during that time period we're talking

18   about?

19   A.  Yes, sir.

20   Q.  About how many communications did it have?

21   A.  They are in excess of 360.

22   Q.  Were they mostly texts or mostly calls?

23   A.  I believe the majority of them were texts.  I think about

24   ten or 11 were actual voice calls.

25   Q.  That number that I read for Czar Entertainment, did the

1   Buckson phone have any communication with that Czar

2   Entertainment phone during that time period?

3   A.  Yes, sir.

4   Q.  Just looking for a moment at Government Exhibit 502, that's

5   the chart.  And we can also see the phone number on Government

6   Exhibit 501, the McCleod Phone One, the Thibedeaux Ingam.  Did

7   the Buckson phone have any communications with that phone,

8   McCleod Phone One during that time period?

9   A.  Yes, sir.

10  Q.  About how many did it have?

11  A.  I believe it was about 70.

12  Q.  OK.  Looking back now at Government Exhibit 501, what is

13  the second row of that chart tell us.

14  A.  Second row is it's a phone with a subscriber name of

15  Thibedeaux Ingram.  It was a Metro PCS phone.  The phone number

16  (347)785-7207 and it's called the McCleod Phone Number One.

17  Q.  Thinking back to 2009, did cell phone companies always

18  verify subscriber information when a person signed-up for a

19  phone?

20  A.  No, they didn't.  There is two types of accounts.  You can

21  have a regular monthly account and you can also get a prepaid

22  account with some of these carriers.  The Thibedeaux Ingam

23  phone was a prepaid Metro PCS phone.

24  Q.  Did the messages include call and text?

25  A.  Calls and text.  For the Thibedeaux Ingam phone, primarily

1    calls.

2    Q.  Why would a company only give you calls for a certain

3    phone?

4    A.  During that timeframe some companies didn't store the text

5    messages.

6    Q.  As part of your analysis, did you try to determine the main

7    cell site area for a Thibedeaux Ingam phone?

8    A.  Yes.

9    Q.  We'll look at Government Exhibit 510.  What does this map

10   tell us?

11   A.  This is the main cell site map for the Thibedeaux Ingam

12   which would be the McCleod One Phone.  And the main cell site

13   area for this phone was the East New York area Brooklyn and the

14   main cell tower was 120 Sector One.

15            MR. JOHNSON-SKINNER:  Go to the third row of

16   Government Exhibit 501.

17   Q.  What kind of phone is this phone?

18   A.  This is a (347)901-2165.  It's an AT&t wireless phone.  The

19   subscriber is Stacy King and this would be the McCleod Phone

20   Number Two.

21   Q.  As part of your analysis, did you compare the locations of

22   the McCleod Phone One and the McCleod Phone Two?

23   A.  Yes, sir.

24   Q.  What, if anything, did you learn from that?

25   A.  What I learned is that when the first phone call when this

1   Stacy King phone was activated, it was in the middle of the

2   night.  It was in East New York, Brooklyn and there was, there

3   appeared to be a text message to the Lowell Fletcher phone as

4   the first activity with that phone when was activated.

5           The second one was to the Thibedeaux Ingram phone and

6   the Thibedeaux Ingram phone was in the same area as the Stacy

7   King phone.  During that particular call and during almost

8   every other call direct to the Stacy King phone compared to the

9   McCleod phone.

10          MR. JOHNSON-SKINNER:  If we could put up page 14 of

11  Government Exhibit 510.

12  Q.  What does this show?

13  A.  This is the main cell site area for the Stacy King phone

14  which is the McCleod Number Two Phone.  And like I just stated,

15  the very first call made on this phone on 9/25/09 at four a.m.

16  in the morning was to the Thibedeaux Ingam phone.  That was the

17  first voice call.  The first actual transaction on that phone

18  appeared to be a text message to the Lowell Fletcher phone.

19          MR. JOHNSON-SKINNER:  OK.  Let's go now to the fourth

20  row of Government Exhibit 501.

21  Q.  What kind of phone is this?

22  A.  This is an AT&T phone.  It's phone number (917)456-2489.

23  The subscriber is Jason Williams.  It's a monthly account.  And

24  it's the Williams phone.

25          MR. JOHNSON-SKINNER:  OK.  Then let's go to page three

1   of Government Exhibit 510.

2   Q.   What does this show?

3   A.   There is a map that depicts the main cell site area for the

4   Jason Williams phone which is up in the upper west side of

5   Manhattan.  It's actually the east side.

6   Q.   We see two cell towers there in the vicinity of Lennox and

7   about 145 Street?

8   A.   That's correct.

9        MR. JOHNSON-SKINNER:  Let's go to the fifth row of

10  Government Exhibit 501.

11  Q.   What does that row tell us?

12  A.   This is a Verizon Wireless phone.  The subscriber is a

13  monthly account was to an Emily Richardson.  The phone number

14  is (917)767-5460.  That is known as the Grant phone.

15       MR. JOHNSON-SKINNER:  Let me read a stipulation here.

16  It's Government Exhibit 1373.

17       It is hereby stipulated and agreed that if called to

18  testify, Emily Richardson will testify that she is about

19  64-years-old and worked for Verizon in New York City for over

20  34 years.  She is the mother of Michelle Bryant who is about

21  35-years-old.

22       In 2009 Emily Richardson lived in a private

23  multifamily house located 1792 East 174th Street in the Bronx,

24  New York.  In 2009 her daughter, Michelle Bryant, lived in an

25  apartment in the basement of that house.  The house is pictured

1    in Government Exhibit 610B.

2             In 2009 Michelle Bryant had a cellular phone that was

3    registered to Emily Richardson under a family cellular phone

4    plan.  Emily Richardson gave that cellular phone to Michelle

5    Bryant and it was Michelle Bryant's only cellular phone.  On

6    multiple occasions when Emily Richardson called her daughter's

7    phone Derrick Grant answered the cellphone.

8             Derrick Grant who is pictured in Government Exhibit

9    Five was a friend of Michelle Bryant.  When Emily Richardson

10   first met Derrick Grant, Grant was with Michelle Bryant in her

11   basement apartment.  Emily Richardson does not know whether or

12   not her daughter's relationship with Derrick Grant became

13   romantic.

14            It is further stipulated and agreed that this

15   stipulation, Government Exhibit 1373, is admitted in evidence

16   as a Government Exhibit at trial and we offer that.

17            THE COURT:  Received.

18            (Government's Exhibit 1373 received in evidence)

19   Q.  As part of why you analysis, did you try to determine the

20   main cell site area for that Emily Richardson phone?

21   A.  Yes, sir.

22   Q.  Let's look at page four of Government Exhibit -- what does

23   this show?

24   A.  This is a map which shows the main cell site area are for

25   the Emily Richardson phone or the Grant phone.  And that phone,

1    the main cell tower was up in the Parkchester section of the

2    Bronx in the vicinity of Derrick Grant's residence.

3    Q.  Let's look at the sixth row of Government Exhibit 501.  Who

4    is the subscriber for that phone?

5    A.  The subscriber on this phone was a Lowell Fletcher.

6    Q.  And if we could pull up Government Exhibit 516A.  What is

7    this?  This is in evidence through the stipulation.

8    A.  This is a subscriber sheet from Metro PCS for telephone

9    number (347)737-5264.

10           MR. JOHNSON-SKINNER:  Zoom-in on the subscriber detail

11   portion in the middle there.

12   A.  The subscriber is Lowell Fletcher.

13   Q.  What was the activation date for this phone?

14   A.  9/13/2009.

15           MR. JOHNSON-SKINNER:  Let's go to the seventh row of

16   Government Exhibit 501.

17           (Pause)

18   Q.  The Leslie Pretty who is the subscriber of this phone?

19   A.  Subscriber for this phone was Leslie Pretty.

20   Q.  What kind of phone was this?  Who was the provider?

21   A.  I believe it was a Verizon.  I would have to check my notes

22   but I believe it was a Veri -- excuse me -- I think it was a

23   Sprint.

24   Q.  And in the stipulation I read yesterday, 1305, about the

25   phone records, Leslie Pretty was Rodney Johnson's mother; is

1   that right?

2   A.   That's correct.

3   Q.   As part of your analysis did you try to determine the main

4   cell site area for this phone?

5   A.   Yes, sir.

6          MR. JOHNSON-SKINNER:  Let's look at page five of

7   Government Exhibit 510.

8   Q.   What does this show?

9   A.   This is a map which those shows the main cell site area for

10  the Leslie Pretty phone or the Johnson phone.  And the main

11  cell site area's in the upper west side of Manhattan in the

12  vicinity of 147 Street.

13  Q.   So that red pin there is an address at 201 West 147 Street,

14  right?

15  A.   That was Rodney Johnson's address.

16  Q.   And the green circle above it, that's the cell site you

17  indicated as the main cell site area?

18  A.   Yes, sir.

19         MR. JOHNSON-SKINNER:  Go to the eighth row of

20  Government Exhibit 0501, Mike Tony.

21  Q.   Who is the subscriber of that phone?

22  A.   Mike Tony.  It was a Nextel prepaid phone.  Phone number

23  was 347-923-2806, known as the Johnson phone too.

24         MR. JOHNSON-SKINNER:  Page six of Government Exhibit

25  510.

1   Q.  What does this show?

2   A.  This is a map that shows the main cell site area for the

3   Mike Tony phone or the Johnson Phone Two.  It is also in the

4   vicinity of West 147 Street.

5   Q.  And here it's the blue circle that's the cell tower; is

6   that right?

7   A.  That's correct.

8   Q.  As part of your analysis did you compare the locations of

9   the Johnson Phone One and Phone Two at various times?

10  A.  Yes, I did.

11  Q.  What, if anything, did you learn from doing that?

12  A.  I noticed that on numerous dates both of these phones

13  appeared to be in the same locations.  They would get phone

14  calls around the same time from each other and they would be in

15  similar locations.  Also, I believe a Nextel phone had a number

16  in common with Rodney Johnson's girlfriend.

17  Q.  And then looking at the chart 501, those Robert Macedonio

18  phone numbers, those are numbers that I read in that

19  stipulation yesterday?

20  A.  That's correct.

21  Q.  And the Khalil Abdullah phone is another one that I read

22  yesterday, right?

23  A.  Correct.

24          MR. JOHNSON-SKINNER:  I want to focus your attention

25  now on September 2009.  Let's look at Government Exhibit 502.

1    Q.  On September 10, 2009 did the Buckson phone exchange any

2    text messages with that McCleod Phone One and the Ingram phone?

3    A.  Yes, sir.

4    Q.  About how many text messages?

5    A.  About seven.

6    Q.  What's the first one?

7    A.  The first one is at 7:11 p.m. and it's a text from the

8    Buckson phone to the McCleod phone.

9    Q.  Did you prepare any maps related to cell site activity on

10   September 11, 2009, the next day?

11   A.  September 11, yes, sir.

12       MR. JOHNSON-SKINNER:  So we'll look at page seven of

13   Government Exhibit 510.

14   Q.  What phone number does this refer to?

15   A.  The map?

16   Q.  Yes.

17   A.  This is a map that shows the whereabouts of the McCleod

18   Thibedeaux Ingam phone from nine a.m. to ten a.m. on

19   September 11, 2009.

20   Q.  And what are those different locations that have the text

21   boxes next to them?

22   A.  Those are cell sites.

23   Q.  Are those cell sites that this phone hit on that day?

24   A.  Yes.  These are cell sites that the phone hit between nine

25   a.m. and ten a.m.

1    Q.  What's the first one that it hit during the time period

2    that you looked at?

3    A.  The first one is nine 9:06 a.m. hitting the cell tower 120

4    Sector One.

5    Q.  That's indicated in about the bottom middle of your screen?

6    A.  Yes.  That was the main cell site for the Thibedeaux phone

7    or McCleod Phone One.  That's in the vicinity of the halfway

8    house that Brian McCleod lived in.

9    Q.  What's the next location that the phone hit?

10   A.  The next location is at 9:41 a.m. and also 9:45 a.m.  The

11   phone has traveled north up into the Jamaica, Queens area.

12   Q.  What's the next one after that?

13   A.  At 9:54 and it ends -- I believe it's same call -- it ends

14   over in cell site 31 which is over in Sunnyside.  So the phone

15   appeared to be moving west through Queens.

16   Q.  By the way, looking at that call at the bottom, the one in

17   cell site 120, who was that call with?

18   A.  That was a call -- that phone was in contact with the Jason

19   Williams phone.

20   Q.  Let's go to the next page, page eight.  What does this

21   slide show?

22   A.  This is a map for September 11, 2009 for the Jason Williams

23   phone between nine a.m. and ten a.m. and it is in East New

24   York, Brooklyn.  It's in the vicinity of Brian McCleod's

25   halfway house.

1  Q.  OK.  Let's go to the next page, page nine.  What phone

2  first does this slide refer to?

3  A.  This is the Thibedeaux Ingam McCleod Phone One.

4  Q.  What date and time period are we looking at now?

5  A.  September 11, 2009 between ten a.m. and 11:30 a.m.

6  Q.  OK.  And what's the first time of the call reflected on

7  there?

8  A.  10:07 a.m.

9  Q.  The one on the bottom, right?

10  A.  Yes, sir.

11  Q.  Then we see activity from 10:13 to 10:30 a.m. at that

12  tower, a little bit north that's labeled the Queensborough

13  Correctional Facility?

14  A.  That's correct.

15  Q.  Have you ever been there by the way, to the Queensborough

16  Correctional Facility?

17  A.  Yes, sir.

18         MR. JOHNSON-SKINNER:  Let's put up what's already in

19  evidence Government Exhibit 685A.

20  Q.  Is that a picture of that facility?

21  A.  Yes, it is.

22  Q.  OK.  Let's go to Government Exhibit 510 page 10.  What

23  phone does that relate to?

24  A.  This is the Jason Williams phone.  On September 11, 2009

25  between the hours of ten a.m. and 11:30 a.m.

HBGAAROS1                    Heintz - Direct

1   Q.   The same time period we were just looking at for that last

2   slide for the McCleod phone?

3   A.   Yes, sir.

4   Q.   Where does that show us about where, if anything, that

5   phone is?

6   A.   This phone is over in the Long Island City area and it's in

7   the vicinity of the Queensborough Correctional Facility on Van

8   Dam.

9   Q.   And it locks like there's activity at 10:28 a.m. about the

10  same as the time as the activity for the McCleod phone; is that

11  right?

12  A.   Yes, sir.

13           MR. JOHNSON-SKINNER:   OK.   Let's look at Government

14  Exhibit 502 now, that chart of phone calls.

15  Q.   On September 11, 2009 did the McCleod Phone One exchange

16  any calls with the Robert Macedonio Law Firm on that day?

17  A.   Yes, sir.

18  Q.   About when was it?

19  A.   The McCleod Phone One at 11:03 a.m. called Macedonio Law

20  Firm.

21  Q.   And then we see a call from the Macedonio cellphone at

22  11:06 back to that McCleod Phone One?

23  A.   That is correct.

24  Q.   And what's the thing in the second call and from the right,

25  the one where it says 1-31 at the top; what does that indicate?

1    A.  Can you repeat that?

2    Q.  Just looking at the headers of this chart and the numbers

3    on the right 1-31 and what's that column?

4    A.  The call duration?

5    Q.  The "call duration" you said?

6    A.  Yes.

7    Q.  So that call with the cellphone to the McCleod Phone One,

8    the duration was about three minutes and two seconds?

9    A.  Yes, sir.

10   Q.  OK.  Looking at this same chart going ahead a little bit

11   now to September 24, 2009, did the Buckson phone communicate

12   with the McCleod Phone One at all on this day?

13   A.  Yes, it did.

14   Q.  What kinds of communications did it have?

15   A.  Both text and voice calls.

16   Q.  About how many calls and texts, approximately?

17   A.  About eight.

18   Q.  OK.  Let's look now at Government Exhibit 510 page 11.

19   What phone number and date does this chart relate to?

20   A.  This is for September 24, 2009.  It's the McCleod Phone One

21   from ten a.m. to 12:30 p.m. and it's in the vicinity of 59

22   Street and Columbus Circle in Manhattan.

23   Q.  And what does this chart show about what cell towers it's

24   hitting when?  Is it hitting all the cell towers that had the

25   text boxes next to them?

1   A.  Yes, sir.  It's hitting these towers from 10:19 a.m.

2   through 12:22 p.m.

3          MR. JOHNSON-SKINNER:  Let's look now at page 12 of

4   Government Exhibit 510.

5   Q.  First, what phone does this slide relate to?

6   A.  This is account Theresa Buckson phone for September 24,

7   2009, between the hours of 10 a.m. and 12:30 a.m.

8   Q.  About the same time period that we were just looking at?

9   A.  Yes, sir.

10  Q.  And what does it show, if anything, about where this phone

11  was on that day and time?

12  A.  This phone shows that it was in the vicinity of 59 street

13  and Columbus Circle.

14  Q.  And the text box indicates that it had activity sometime

15  during the period of 10:43 to 11:23 a.m. in that location; is

16  that right?

17  A.  That's correct.

18         MR. JOHNSON-SKINNER:  Let's look at page 13 now of

19  Government Exhibit 510.

20  Q.  What phone does this relate to?

21  A.  This is the Jason Williams phone on September 24, 2009

22  between ten a.m. and 12:30 a.m.

23  Q.  Same time again?

24  A.  Yes, sir.  This phone is in the vicinity of 59 Street and

25  Columbus Circle and cell sites 15398, 15392 and 15399.

1  Q.  What was the exact time period for that activity as

2  reflected in that box?

3  A.  From 11:12 a.m. through 12:07 a.m.

4         MR. JOHNSON-SKINNER:  Let's full up now Government

5  Exhibit 513A.

6  Q.  First what is this?

7  A.  This is the subscriber sheet for the Stacy King phone, and

8  AT&T prepaid phone number (347)901-2165.

9  Q.  When was this phone activated?

10  A.  It was activated on 9/24/009.

11  Q.  That was the same day we were just looking at in those

12  charts that had the three phones at about Columbus Circle?

13  A.  Yes, sir.

14  Q.  And what was listed as the subscriber's address when this

15  phone was activated?

16  A.  304 West 58 Street, New York, New York.

17  Q.  Where is that in relation to the Columbus Circle?

18  A.  Columbus Circle is 59.  This is on 58 Street.

19  Q.  Then you mentioned this before but let's look at Government

20  Exhibit 502 on September 25.  What was the first communication

21  for that McCleod Phone Two or Stacy King phone?

22  A.  First communication was at 2:59 a.m. to the Fletcher phone.

23  Q.  Let's go ahead to the next day September 25, 2009.  Look at

24  this chart.  Did the Buckson phone communicate with the McCleod

25  Phone One on that day, September 25?

HBGAAROS1                    Heintz - Direct

1    A.  Yes, sir.

2    Q.  Fair to say there are more than 20 texts or calls that day

3    between those two phones?

4    A.  That is correct.

5           MR. JOHNSON-SKINNER:  Let's look now at Government

6    Exhibit 510 page 15.

7    Q.  What phone does this relate to?

8    A.  This is the McCleod Phone Number One for September 25, 2009

9    from 7 p.m. to 8 p.m. and it's in the vicinity of Houston's

10   Restaurant.

11   Q.  About what time does it have activity there?

12   A.  7:27 p.m.

13          MR. JOHNSON-SKINNER:  OK.  Let's look at page 16 now

14   of this slide.

15   Q.  What phone does this relate to?

16   A.  This is September 25, 2009.  It's the Theresa Buckson

17   phone.

18          MR. JOHNSON-SKINNER:  Zoom-in on this.

19   Q.  Same time period?

20   A.  7 p.m. to 8 p.m. in the vicinity of Houston's restaurant.

21   Q.  Just to orient the jury, the red pins are cell site towers?

22   A.  That's correct.

23   Q.  The Houston's Restaurant label you've drawn a back arrow to

24   approximately the location of Houston's?

25   A.  That's correct.

HBGAAROS1                    Heintz - Direct

1    Q.  At what time period did this Buckson phone have

2    communications with cell towers that night in this area?

3    A.  At 7:27 p.m., 7:30 p.m.

4    Q.  Does that mean that the phone was only in that area for

5    three minutes that night?

6    A.  You only get cell sites when there's activity on phones.

7    Q.  Those are just the times that the phone was being used in

8    this area that night; is that right?

9    A.  That is correct.

10   Q.  Let's look at page 17 now of this exhibit.  What phone does

11   this relate to?

12   A.  This is September 25, 2009 from seven p.m. through 8 p.m.

13   This is the Jason Williams phone.  This phone is in the

14   vicinity of Houston's Restaurant.  There's activity on the

15   phone at 7:24 p.m. and it's in cell sites 13548 and it's 11979.

16   Q.  That's the red pin that's at the end of that text box in

17   the middle of our screen; is that right?

18   A.  That's correct.

19   Q.  And the time there was 7:27 p.m. you said, right?

20   A.  Yes, sir.

21   Q.  I'm sorry.  24?

22   A.  "24".

23   Q.  Are you familiar, deputy, with the intersection of Mount

24   Eden Avenue and Jerome Avenue in the Bronx?

25   A.  Yes, I am.

HBGAAROS1                    Heintz - Direct

1    Q.  I'll show you what's in evidence as Government Exhibit 141

2    A.  Do you recognize that?

3    A.  Yes, sir.

4    Q.  Is that that intersection?

5    A.  That's the intersection of Mount Eden and Jerome under the

6    "L" Line.

7              MR. JOHNSON-SKINNER:  OK.  Let's look at page 18 of

8    Government Exhibit 510.

9    Q.  What phone number does this relate to?

10   A.  This is the McCleod Phone Number One for September 26, 2009

11   between 11 p.m. and 11:30 p.m.

12             MR. JOHNSON-SKINNER:  All right.  Let's zoom if on

13   that.

14   Q.  We see Mount Eden and Jerome over there on the left by that

15   blue circle; is that right?

16   A.  That's correct.

17   Q.  OK.  And what's the first cell tower in this area that

18   McCleod Phone One hits that night during this time period?

19   A.  The first cell tower is cell tower 758 which is the one in

20   the upper left-hand corner.

21   Q.  And about what time does it hit that?

22   A.  That is about 11:01 p.m.

23   Q.  OK.  Based on your experience is what's label as "95"

24   there, the Cross Bronx Expressway, is that within the range of

25   that cell tower at 758?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes.

2   Q.  And then what's the next cell tower that that phone hits

3   that night?

4   A.  The next tower is 743.  That's east in the Bronx and that's

5   when the call ends.  It was about a ten minute and 54 second

6   phone call.

7   Q.  So the same call but it was passed between that one tower

8   on the left and the other tower on the right?

9   A.  Correct.  Which indicates to me that this phone during that

10  ten minute timeframe was traveling from west to east in the

11  Bronx.

12  Q.  OK.  Let's look at page 19 of Government Exhibit 510.

13  Whose phone does this relate to?

14  A.  This is for September 26, 2009.  It's Jason Williams phone

15  from 11 p.m. to 11:30 at 11:02 p.m. the Jason Williams phone is

16  in cell site 52032 which is in the vicinity of Park Avenue and

17  the Cross Bronx.

18  Q.  Does it cover the Cross Bronx Expressway, the range of that

19  tower?

20  A.  Yes, sir.

21  Q.  That's about the same time period as the slide we were just

22  looking at for the McCleod Phone One, right?

23  A.  That is correct.

24          MR. JOHNSON-SKINNER:  Let's look at Government Exhibit

25  502 now, that chart of phone calls on September 27, 2009.  Did

HBGAAROS1                     Heintz - Direct

1    the Buckson phone communicate with the McCleod Phone One at all

2    that day?

3    A.  Yes, it did.

4              MR. JOHNSON-SKINNER:  Look at the page we're at now.

5    Q.  Is it right that there is a text from the McCleod Phone One

6    to the Buckson phone at 3:28 p.m. on that day?

7    A.  Yes, sir.

8              MR. JOHNSON-SKINNER:  Let's go to the next page now.

9    Zoom in on the top part of these records.

10   Q.  Starting at 5:54 p.m. what does it show there?

11   A.  It shows the Buckson phone contacted the McCleod Phone

12   Number One with a text message.

13   Q.  What happened next?

14   A.  5:58 p.m. the McCleod Phone Number One contacted the

15   Buckson phone with a text message, 5:59 the McCleod Phone One

16   contacted Buckson phone with a text message, 6:58 p.m. the

17   Buckson phone contacted the McCleod phone with a text message.

18             MR. JOHNSON-SKINNER:  OK.  Let's look now at page 20

19   of Government Exhibit 510.

20   Q.  Whose phone does this relate to?

21   A.  This is for September 27, 2009.  This is Lowell Fletcher's

22   phone from 8 p.m. to 9:30 p.m.  This phone during that

23   timeframe was in the vicinity of Mount Eden and Jerome Avenue.

24   Q.  So the phone hit that cell tower there labeled "756", is

25   that right, on the left of our screen?

1   A.  That's correct.

2   Q.  And is Mount Eden between Inwood and Jerome within the

3   coverage area of that cell site?

4   A.  Yes, sir.

5   Q.  What times did it hit that tower?

6   A.  8:43 p.m., 8:53 p.m.

7   Q.  Who is the phone communicating with?

8   A.  This phone was communicating with the Stacy King phone.

9   Q.  That's the McCleod Phone Two?

10  A.  Yes, sir.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Let's look now at page 21 of Government Exhibit 510.

2           What date and time period are we looking at here?

3   A.  This is September 27, 2009.  This is the McCleod phone No.

4   1 between the hours of 8 p.m. and 9:20 p.m.  This phone is in

5   the vicinity of Mt. Eden and Jerome Avenue in the Bronx.

6   Q.  About the same date and time we were looking at before?

7   A.  Yes, sir.

8   Q.  Now, just to orient us, the blue circle.  That's Mt. Eden

9   and Jerome, right?

10  A.  Yes, it is.

11  Q.  What are these five red triangles with the text boxes

12  around them?

13  A.  These are the various cell towers that this phone was in

14  contact with during the time frame.

15  Q.  Remind us, what kind -- who is the provider for this phone,

16  McCleod phone 1?

17  A.  McCleod phone 1 is a Metro PCS phone.

18  Q.  Looking at that text box on the left, what does that list?

19  A.  This is a list of various calls that were made by the

20  McCleod phone 1 during this timeframe while it was up in that

21  area.

22  Q.  OK.  Let's start first actually with the last thing in that

23  text box.  It says at 9:18 p.m. in cell site 762 and 758

24  incoming from the Mike Tony phone, is that right?

25  A.  That's correct.

1  Q.  Where are cell sites 762 and 758?

2  A.  762 is at 1751 Jerome Avenue.  758 is at 1751 Jerome

3  Avenue.  The reason being is, as I explained yesterday, that

4  when Metro PCS was rolling out these cell towers, they were

5  doing it fast because they were new customers coming into the

6  market what they were doing is they were putting them on top of

7  antennas and they were putting them on top on top of light

8  poles.  The actual cell sites come back by the longitude and

9  latitude, but they are assigned to the same tower, so the

10  address will come up the same, even though they are different

11  locations.  But they are actually plotted by the latitude and

12  longitude.  So the cell site is known as 1751 Jerome Avenue,

13  but they are omni points, and they are scattered about that

14  area.

15  Q.  Even though those two cell towers have the same address you

16  know exactly where the towers are because you know the latitude

17  and longitude, is that right?

18  A.  Yes.  As I was saying earlier, the cell sites that we get

19  from the carriers have the latitude and longitude, and that's

20  the basis for where these cell towers apply it when it's

21  inputted into the map.  Not the actual address, but the

22  longitude and longitude that the cell tower supplies.

23  Q.  That is where you put the pins in the map, right?

24  A.  I don't put the pins in the map.  The pins get generated

25  automatically when that is entered into the data program.

Q.  Those two towers, that was for a call at 9:18 p.m. to the
Mike Tony phone, is that right?

A.  That's correct.

Q.  That's the last call that is listed during this time period
between 8:02 and 9:18, right?

A.  Correct.

Q.  For all those other calls between 8:02 and 9:11 p.m. what
towers was the McCleod phone 1 hitting off of during that time?

A.  You want me to read all of these?

Q.  Well, is it right that the phone number McCleod phone 1 was
hitting these three towers 756, 7571, and 7576 for all those
other calls?

A.  Correct.

Q.  It is later on that it is hitting all of these towers that
are a little bit farther east, right?

A.  That is correct.

Q.  OK.  Let's look now at page 22 of Government Exhibit 510.

        What phone does this relate to?

A.  This is for September 27, 2009.  It's the Stacy King phone,
or the McCleod 2 phone, between the hours of 8 p.m. and 9:20
p.m.

        This phone is a AT&T Wireless prepaid.  It is in the
vicinity of Mt. Eden and Jerome.

Q.  Looking first at the text box on the left, 8:02 p.m. to
8:48 p.m., who is it communicating with, the Stacy King phone?

1  A.  There were three phone calls between this phone and the

2  Lowell Fletcher phone.

3  Q.  And at that time it's hitting that cell tower that's down

4  there in the bottom left of this map, is that right?

5  A.  Yes.  It is hitting the tower that's down in an area like

6  170 and Jerome.

7  Q.  Is the area around Mt. Eden and Jerome within the coverage

8  area of that tower?

9  A.  Yes.

10  Q.  And then what about at 8:53 p.m.?

11       What tower is it hitting then?

12  A.  8:53 it's in 3 -- it is in 51096.

13  Q.  That is the one immediately to the left of the red pin that

14  is indicating Mt. Eden and Jerome?

15  A.  That's correct.

16  Q.  And what phone is it communicating with at 8:53 p.m.?

17  A.  Lowell Fletcher phone.

18  Q.  Let's just go back for one second to slide 21, the one we

19  were just looking at.  We just looked at a call at 8:53 p.m.

20  between McCleod phone 2 and Lowell Fletcher.  After 8:53 p.m.

21  what is the next call for the McCleod phone 1?

22  A.  At 8:55 p.m., McCleod phone 1 calls the Grant phone or the

23  Emily Richardson subscriber.

24  Q.  When it makes that call what cell site is it in?

25  A.  7562.

Hbgnros2                    Heintz - direct

1    Q.   That's the tower that is immediately to left of Mt. Eden

2    and Jerome?

3    A.   That's correct.

4    Q.   Let's go to page 23.  Government Exhibit 510 now.

5            What phone does this relate to?

6    A.   This is the Jason Williams phone for September 27, 2009,

7    between 8 p.m. and 9:20 p.m.  This is in the vicinity of Mt.

8    Eden and Jerome in the Bronx.

9    Q.   And what phone number is the Jason Williams phone

10   communicating with during that time that it's near Mt. Eden and

11   Jerome?

12   A.   It's communicating with the Thibedeaux Ingam phone, which

13   would be the McCleod phone No. 1.

14   Q.   Let's go to page 24 now of Government Exhibit 510.

15           What phone does this relate to?

16   A.   This phone is the Emily Richardson phone or the Grant phone

17   for September 27, 2009 between 8 p.m. and 9:20 p.m.

18   Q.   What location is this phone in during that time?

19   A.   This phone is in the vicinity of Mt. Eden and Jerome Avenue

20   in the Bronx.

21   Q.   Now, on those other maps we were looking at, we saw a lot

22   of cell towers.  Why does this one only have a few green dots

23   on it?

24   A.   AT&T Wireless and AT&T and Metro and Sprint, their networks

25   weren't back then as robust as Verizon.  Verizon works off of

1    an 850 band frequency, which is a stronger signal, so they

2    didn't require as many towers in the area as the other carriers

3    did.

4    Q.  So is Mt. Eden and Jerome Avenue within the coverage area

5    of that tower indicated by the green circle on the left?

6    A.  Yes, sir.

7    Q.  And what phones is the Derrick Grant phone communicating

8    with during that time period?

9    A.  It's communicating with the Thibedeaux Ingam or the McCleod

10   phone 1 and also the Jason Williams phone.

11   Q.  Let's look at page 25 of Government Exhibit 510.

12           What phone does this relate to?

13   A.  This is the Leslie Pretty phone or the Johnson phone 1 on

14   September 27, 2009, between 8 p.m. and 9:20 p.m., and it is in

15   the vicinity of Mt. Eden and Jerome Avenue in the Bronx.

16   Q.  Is it hitting actually that same tower that we just looked

17   at for the Derrick Grant phone?

18   A.  Yes, sir.

19   Q.  What phones is this Johnson phone communicating with during

20   that time?

21   A.  It is communicating with the Thibedeaux Ingam phone or the

22   McCleod phone 1.

23   Q.  Let's look at page 26 now of Government Exhibit 510.

24           Which phone does this relate to?

25   A.  This is the Mike Tony phone or the Johnson phone 2 on

1    September 27, '09, between 8 p.m. and 9:20 p.m., and this phone

2    is in the vicinity of Mt. Eden and Jerome Avenue during that

3    time frame.

4    Q.  Who is it communicating with, that phone?

5    A.  It is communicating with the Ingam phone or the McCleod

6    phone No. 1.

7    Q.  So this map shows us that at 8:49 p.m., this phone calls

8    the Ingam phone, is that right?

9    A.  8:49 and 8:56 p.m.

10   Q.  Let's just go back for one minute to the previous slide.

11   Can we just zoom in on that box.

12          Is it right that the McCleod phone 1 or the Ingam

13   phone called the Johnson phone 1 at 8:45 p.m.?

14   A.  Yes, sir.

15   Q.  And then we saw that call back from Johnson phone 2 to the

16   McCleod phone at 8:49 p.m., right?

17   A.  That is correct.

18   Q.  Let's go to page 27 of Government Exhibit 510.

19          Now, first, what day and time period are we looking at

20   now?

21   A.  This is September 27, '09.  This is the McCleod phone No. 1

22   from 9:20 p.m. to 10:30 p.m.  This phone is up in the area of

23   West 147th Street.

24   Q.  OK.  Let's look at the map.

25          So now after the period we were just looking at, now

1   the McCleod phone 1 is hitting a tower near 147th Street,

2   right?

3   A.   That's correct.

4   Q.   Is 147th Street within the coverage area of that tower,

5   that address on 147th?

6   A.   Yes, it is.

7   Q.   Let's look at page 28 of Government Exhibit 510.

8           What phone are we looking at here?

9   A.   This is the Jason Williams phone for September 27, '09,

10  between 9:20 p.m. and 10:30 p.m.  This phone is in the vicinity

11  of West 147th Street in Manhattan.

12  Q.   The same area we were just looking at.

13  A.   Yes, sir.

14  Q.   Who was it communicating with during that time period?

15  A.   This phone is in communication with the McCleod phone No.

16  1.

17  Q.   Let's look at page 29 of this the exhibit.  What phone are

18  we looking at here?

19  A.   This is the Johnson phone No. 2, the Mike Tony phone, on

20  September 27, '09 between the hours of 9:20 p.m. and 10:30

21  p.m., and this phone is in the vicinity of West 147th Street.

22  Q.   OK.  Did you look at the records for the Buckson phone to

23  determine where it was on September 27, 2009 during about the

24  time of the murder of Lowell Fletcher?

25  A.   Yes, sir.

1    Q.  Let's look at Government Exhibit 511B, on page 30 to 31.

2           Let's start at September 27, 2009 at 5:48 p.m.

3           MR. JOHNSON-SKINNER:  If you could highlight that.  I

4    think it's line 951, a couple of lines below that you can go

5    to.

6    Q.  So first, remind us, what records are we looking at here?

7    A.  These are the cell phone records for the AT&T Theresa

8    Buckson phone.

9    Q.  What is that line 9/27/09 5:48 p.m., what, if anything,

10   does that show us about the location of the phone?

11   A.  If you look all the way to the far right, you will have

12   cell site and the lat.  That's the 11992 and the 15615.  That

13   is actual cell site.  The latitude and longitude would be the

14   negative 73 and then the 40.  That is the latitude and

15   longitude where the actual cell site is located where it would

16   plot on the map.  Negative 73 with a 40 is the New York City

17   area.

18   Q.  That is at 9/27/09 at 5:48 p.m.?

19   A.  Correct.

20   Q.  What is the next time you have any cell site location

21   information for this phone available?

22   A.  The next cell site information is on 9/28/09 at 0842 a.m.,

23   which is, based on the latitude and longitude, which is the

24   actual cell site address, that phone is in latitude and

25   longitude of negative 80 and 25.  That corresponds to the Miami

1    area of Florida.

2    Q.  OK.  So Miami, Florida, on 9/28/09 at 8:42 a.m.?

3    A.  Right.

4    Q.  All right.  I want to direct your attention now to October

5    1, 2009.

6           Are there any phone calls for this phone on October 1,

7    2009.

8           MR. JOHNSON-SKINNER:  And we can look at the next

9    page.

10   A.  There are no phone calls, but I believe there was a text

11   message on the 1st.

12   Q.  Do you have cell site information for text messages?

13   A.  No, sir.

14   Q.  Remind us why not.

15   A.  Because back in 2009 the cell sites for texts were not

16   stored for a long period of time, and by the time we requested

17   these records they were already purged from their system.

18   Q.  Thinking just about October 1, 2009, based on the phone

19   information, do you know one way or the other where the phone

20   was at that time, the Buckson phone?

21   A.  I had no way of telling where that phone was for the 1st.

22   Q.  When is the next time you do have location information for

23   this phone?

24   A.  The next time is on the 2nd.

25   Q.  Is that at 10:17 a.m. in line 978?

Hbgnros2                    Heintz - direct

1   A.  That is correct.

2   Q.  Looking at the latitude and longitude, where was the phone

3   at that time?

4   A.  Based on the latitude and the longitude, the negative 73

5   and the 40, it's back in the New York area.

6   Q.  Looking just at the most recent time we do have

7   information, 9/30/09 at 9:33 p.m., the line right above that,

8   was it still in Miami at this point?

9   A.  Yes.

10  Q.  And then 10/2/09 back in New York?

11  A.  Right.

12  Q.  Let's look at page 30 of Government Exhibit 510.

13          Whose phone does this relate to?

14  A.  This is Khalil Abdullah's phone on October 1, 2009.  It is

15  in the vicinity of 125th Street and Mobay Restaurant.

16  Q.  Let's look at the map.  So let's start first with the cell

17  tower indicated on the left and looking at that text box.

18          The first call during that time is at 9:42 p.m., is

19  that right?

20  A.  Correct.

21  Q.  What cell tower does it hit?

22  A.  It is in cell tower 217.

23  Q.  That is the one on the far left?

24  A.  Correct.

25  Q.  Near about Amsterdam and 128th?

1    A.  Correct.

2    Q.  Is that -- is Mobay in the coverage area of that tower?

3    A.  It is not the main serving cell, no.

4    Q.  It is a little farther away from Mobay, right?

5    A.  That's correct.

6    Q.  A little bit west?

7    A.  That's correct.

8    Q.  What is the next information you have for that phone?

9    A.  At 10:14 p.m. the phone is in cell tower 137, sector 3.

10   That tower is located off of Lenox Avenue and about 131st

11   Street.

12   Q.  Does the area of that tower cover Mobay Restaurant?

13   A.  Yes, sir.

14   Q.  By the way, did you look at the main cell site area for the

15   Khalil Abdullah phone?

16   A.  Yes, I did.

17   Q.  Just generally, where was it?

18   A.  It was over in, I think close to New Jersey over by Fort

19   Lee.

20           MR. JOHNSON-SKINNER:  OK.  Let's look at page 31 of

21   Government Exhibit 510.

22   Q.  First, what phone are we looking at here?

23   A.  This is the Jason Williams phone for October 1, 2009,

24   between 10:59 and 11:15 p.m.

25   Q.  About the same time period we were just looking at, right?

Hbgnros2                    Heintz - direct

1    A.  Yes.

2           MR. JOHNSON-SKINNER:  Let's zoom in on this map.

3    Q.  What is the first call shown on this map?

4    A.  I have a different slide here.  It is out of order.  The

5    first call is at 9:38 p.m.  It is in the vicinity of 29th

6    Street.

7    Q.  OK.  First, what's that -- do you see LaGuardia Airport on

8    this map?

9    A.  LaGuardia Airport is to the right of that text bubble.

10   Q.  The airport indicated there above the highway on the --

11   A.  Right.  Where it says Long Island, over --

12   Q.  Yes.  Do you recognize that highway that runs right below

13   LaGuardia Airport?

14   A.  It's the Grand Central.

15   Q.  That cell site that Jason Williams' phone hits at 9:38

16   p.m., does that cover the Grand Central Parkway?

17   A.  Yes, sir.

18   Q.  Based on -- how long have you lived in New York City,

19   Detective Heintz?

20   A.  At the time, I was living -- 35 years.

21   Q.  Can you take Grand Central Parkway to get to LaGuardia

22   Airport?

23   A.  Sure.

24   Q.  What is the next call that is shown on this map?

25   A.  The next call is at 10:46 p.m., and it's in cell site

1  24368.  That cell tower is up in Edgewater, New Jersey, on

2  River Road.

3  Q.  What is the coverage area for that cell site tower?

4  A.  Like I was saying yesterday in my prior testimony, there

5  are different things that amplify cell phone signals, and water

6  is one of them.  Typically, especially in this part of

7  Manhattan and New Jersey, phones can contact cell towers on

8  both sides of the river, depending upon where they are.  The

9  phone could be in New Jersey and hit a tower on the New York

10 side that is right on the river or vice versa.

11 Q.  I don't know if it's going to work, but try indicating on

12 the screen about where 125th Street is in Harlem on this map.

13 Try touching the screen and see if it works.  No?  OK.  I'm

14 going touch it and you tell me if it's about right.

15       Is that about 125th Street?

16 A.  Yeah.  If you see where that text bubble is, that's the

17 Grand Central, and it dumps into the Triboro, which goes right

18 across to 125.

19 Q.  Looking at that text bubble on the right, following the

20 Grand Central up, that's the Triboro Bridge, right?

21 A.  Correct.

22 Q.  Then it dumps over into Manhattan.  What street does that

23 come onto?

24 A.  One of the exits is 125.

25 Q.  Following 125th Street across Manhattan, the area on the

1   far west side of Manhattan on 125th Street, is that within the

2   coverage area of that River Road cell tower?

3   A.  Yes, sir.

4   Q.  Based on your time living in New York City, if you were

5   actually on the highway, on Grand Central Parkway where that

6   cell tower is on the bottom right, about how long would it take

7   to get to Manhattan?

8          MR. TOUGER:  Objection, your Honor.

9          THE COURT:  Overruled.

10         Just about how long would it take if you were to

11  drive -- if you are on that highway -- to Manhattan.

12  A.  From the Grand Central into Manhattan, the west side of the

13  Manhattan.

14  Q.  Or even the east side?

15  A.  To the east side?  15 -- 10 or 15 minutes --

16  Q.  OK.

17  A.  -- to get to the bridge.

18  Q.  It depends on the traffic, right?

19  A.  It depends on the traffic the time of day.

20  Q.  This is at 9:38 p.m. is when that cell phone is down there?

21  Is that right?

22  A.  That's correct.

23         MR. JOHNSON-SKINNER:  Let's look at page 32 of

24  Government Exhibit 510.

25  Q.  What phone is this first?

1    A.  This is the Jason Williams phone, October 1, 2009, from

2    10:59 p.m. through 11:15 p.m.

3    Q.  A little bit later than the time period we were just

4    looking at, right?

5    A.  That's correct.

6    Q.  What cell towers does the phone hit here?

7    A.  At 10:59 and 11:15 p.m. it hit cell tower 26063.

8           MR. JOHNSON-SKINNER:  OK.  And then let's just go back

9    to page 1 of this exhibit.  If you could blow that up.

10   Q.  This exhibit indicated the main cell site areas for the

11   Theresa Buckson phone, is that right?

12   A.  That's correct.

13   Q.  That cell site at the top, 26061 through 26069, is that the

14   same cell site that we were just looking at the Jason Williams

15   phone hit on October 1, 2009?

16   A.  Correct.  This particular phone service provider, AT&T,

17   back in 2009 it had two different types of protocols that it

18   utilized.  It utilized a protocol called GSM and a protocol

19   called UMTS.  They were two different technologies, and each

20   one of those technologies had an 850 megahertz band and a 1900

21   megahertz band.  So the phone could go back and forth between

22   technologies, and also between frequencies.

23          Each frequency on each technology has a separate cell

24   site number, but they are all located at that same address, and

25   they go from 26061 through 26069, depending upon what frequency

Hbgnros2                    Heintz - direct

1    and technology that phone was on during that call.

2    Q.  That's why all of those numbers are -- but they are all at

3    that location right there, right?

4    A.  They are all located at that location.

5    Q.  West End and 65th Street?

6    A.  Yes.

7           MR. JOHNSON-SKINNER:  OK.  Let's look now at

8    Government Exhibit 502, page 6.  That's the phone chart

9    information.

10   Q.  I'm going to direct your attention to October 2, 2009.

11          Did the Buckson phone communicate with the McCleod

12   phone 1 at all on that day, October 2?

13   A.  Yes, it did.

14   Q.  About how many communications did it have?

15   A.  Approximately 12.

16   Q.  Let's go to page 33 of Government Exhibit 510.

17          What date and time are we looking at here?

18   A.  This is the McCleod phone No. 1 on 10/2/2009.  And it's

19   between the hours of 10 a.m. and 12 p.m., and it's in the

20   vicinity of Columbus Circle in Manhattan.

21   Q.  Let's look at the map.

22          What time is it in that area?

23   A.  11:13 and 11:48.

24   Q.  OK.  Do you see the cell tower at the top, 726?

25   A.  Yes, sir.

1   Q.   Broadway and about 75th Street?

2   A.   Yes.

3   Q.   What is the coverage area of that cell tower?

4   A.   The coverage area on that tower, based upon where it is on

5   Broadway and based upon the fact that, you know, on Broadway as

6   you're going southbound there's numerous high buildings that

7   just line Broadway, that tower is right on Broadway.  So the

8   coverage tower on that -- the coverage tower could be as far

9   down as the 50s.

10  Q.   It would look right down Broadway to Columbus Circle,

11  right?

12  A.   Right.  It's a radio frequency, and a lot of times under

13  elevated lines, subway lines, if you have -- like up in the

14  Bronx, for instance, on the Grand Concourse there's nothing but

15  apartment buildings, and if you have a tower that is on the

16  Grand Concourse, that energy can channel straight down between

17  those buildings, so the coverage is a little bit further.

18  Q.   And this McCleod phone 1 hit these other towers that are a

19  little bit closer to Columbus Circle during that period?

20  A.   That's correct.

21       MR. JOHNSON-SKINNER:  Let's go to the next slide, page

22  34.

23  Q.   What phone are we looking at here?

24  A.   This is the Theresa Buckson phone from 10 a.m. to 12 p.m.

25  on October 2, 2009.  It is in the vicinity of Columbus Circle.

Hbgnros2                    Heintz - direct

1   Q.  What time period does it hit there?

2   A.  It is there at 10:23 a.m., and it also there at 11:02 a.m.

3   Q.  It is hitting that cell tower that is right on Columbus

4   Circle?

5   A.  That's correct.

6   Q.  Let's go to page 35.

7        What phone are we looking at here?

8   A.  This is the Jason Williams phone for October 2, 2009,

9   during the time frame 10 a.m. through 12 p.m., and that phone

10  is in the vicinity of Columbus Circle.

11       MR. JOHNSON-SKINNER:  Let's just look at the map

12  briefly.

13  Q.  About what time is the activity there?

14  A.  At 10:48, there is a communication with tower 23344.

15  Q.  It is a little bit to the west of Columbus Circle, right?

16  It's 10th Avenue and about 60th -- 58th Street?

17  A.  That's correct.

18       MR. JOHNSON-SKINNER:  OK.  Let's go to page 36 of this

19  slide.

20  Q.  What phone are we looking at here?

21  A.  This is the McCleod phone No. 1 for October 2, 2009,

22  between 12:25 p.m. and 2:05 p.m., and it is up in the South

23  Bronx area.

24  Q.  This is a little bit after the time period we just looked

25  at at Columbus Circle, right?

1    A.  Yes, sir.

2    Q.  Do you know what, if anything, is at 82 Lincoln Avenue

3    that's indicated there at the bottom?

4    A.  New York State parole office.

5    Q.  The McCleod phone 1 hit this cell tower 7195?

6    A.  Yes.

7          MR. JOHNSON-SKINNER:  Let's now go to page 37 of this.

8    Q.  What phone are we looking at here?

9    A.  This is the McCleod phone No. 1 for October 2, 2009,

10   between 2 p.m. and 3 p.m., and it is in the vicinity of West

11   147th Street.

12   Q.  This is a little bit after that time we were just looking

13   at the Bronx parole office, right?

14   A.  That's correct.  At 2:28 p.m. and 2:42 p.m., there were --

15   there was activity on this phone which put it in sector 1 of

16   cell site 316.

17   Q.  Let's look now -- by the way, is the coverage area of that

18   tower within -- is 201 West 147th Street within the coverage

19   area of that tower?

20   A.  Yes, sir.

21          MR. JOHNSON-SKINNER:  Let's look at page 38 of this

22   exhibit.

23   Q.  What phone are we looking at here?

24   A.  This is the Johnson phone No. 1, the Leslie Pretty phone,

25   on October 2, 2009 between 2 p.m. and 3 p.m.  And this phone is

Hbgnros2                    Heintz - direct

1    in the vicinity of West 147th Street.

2    Q.  The same time period we were just looking at for the

3    McCleod phone?

4    A.  Yes, sir.

5           MR. JOHNSON-SKINNER:  Just a few last things.

6    Q.  I just want to show you now what is Government Exhibit

7    511A.

8           MR. JOHNSON-SKINNER:  Can we just zoom in first to the

9    top.

10   Q.  What are we looking at here?

11   A.  This is a subscriber sheet from AT&T Wireless for the

12   Theresa Buckson phone.

13   Q.  OK.  Looking about in the middle of the page, if we could

14   blow that up, do you see where it says MS ISDN active?

15   A.  Yes.

16   Q.  What does that mean?

17   A.  That is the time that this account or this phone number was

18   active with the carrier.  Usually there is further customer

19   notes which will explain that further.

20   Q.  OK.  Just first, before we do that, what was the end date

21   of the activity period for this phone number, the Buckson phone

22   number?

23   A.  This phone number appeared to end on October 2, 2009.

24   Q.  If we could just look a little bit further down on the

25   page.

1    What does this reflect?

2    A.  This is the status change or the history of the phone

3    number.  And the first line says "customer request" and the

4    second line "customer request" on 10/2/09.  So this appears to

5    me that the customer requested to turn that number off.

6    Q.  Have you ever shown any of the cell phone records in this

7    case or the location information that you worked on to any of

8    the cooperating witnesses?

9    A.  No, sir.

10           MR. JOHNSON-SKINNER:  No further questions, Judge.

11           THE COURT:  Thank you.  Folks, we are going to take

12   our morning break.

13           MR. TOUGER:  Your Honor, I'm going to be very short.

14           We can probably finish, if you want.

15           THE COURT:  OK.

16   CROSS EXAMINATION

17   BY MR. TOUGER:

18   Q.  Good morning, sir.

19   A.  Good morning, sir.

20   Q.  Would you agree with me that you can't pinpoint exact

21   locations from cell site data?

22   A.  Exact locations, no.

23   Q.  It can vary from across the rivers, as you said, 20 blocks

24   on Broadway, right?

25   A.  The vicinity of the cell tower, yes.

Hbgnros2                    Heintz - cross

1   Q.  And the vicinity could range from across the river to 20

2   blocks, right?

3   A.  Depending upon the geographical area, yes.

4           THE COURT:  Excuse me.

5           Is that true all the time or is that true on

6   occasions?

7           THE WITNESS:  It is true on occasions, as far as how

8   far a tower goes out.  It all depends upon the environment.

9   BY MR. TOUGER:

10  Q.  There are many conditions?

11  A.  There are different variables, yes.

12  Q.  During your whole entire investigation in this case, were

13  you ever given that Mr. Rosemond lived in the area of 63rd and

14  West End Avenue?

15  A.  Yes, sir.

16  Q.  And so it's not unusual that his phone was concentrated in

17  the area where he lived?

18  A.  Correct.

19  Q.  I think you testified on direct that during the period from

20  May 5, 2009, to August 22, 2009, the Buckson phone which you

21  testified about had 51 times it was hit in that area?

22  A.  On that one particular slide, yes.

23  Q.  Yes.  So if we're about a three A half month period, that

24  phone was used 51 times in the area where he lived?

25  A.  I believe there was another slide that showed 26

Hbgnros2                    Heintz - cross

1   additional.

2   Q.  So 75 approximate times that that phone was used in that

3   time period.

4   A.  For voice calls.

5   Q.  Yeah.  That's --

6   A.  Voice calls.

7   Q.  Did you ever find any communication in all your

8   investigation between the Buckson phone and the phones that you

9   have targeted to Rodney Johnson?

10  A.  No, sir.

11  Q.  And did you ever find any phone calls in your entire

12  investigation between the Buckson phone and the Emily

13  Richardson phone which you targeted to Derrick Grant?

14  A.  No, sir.

15  Q.  Now, there is communication between the Thibedeaux phone --

16          Which you have designated to Mr. McCleod, right?

17  A.  Yes.

18  Q.  -- and the Buckson phone on September 11, correct?

19  A.  Yes, sir.

20  Q.  And this is all about '09, just so we are clear?

21  A.  2009, correct.

22  Q.  And the next time those two phones get together isn't until

23  September 15, 2009, the am I correct?

24  A.  What do you mean "get together"?

25  Q.  Either text or telephone.

Hbgnros2                    Heintz - cross

1    A.  Yes, sir.

2    Q.  Were you ever asked by the prosecution to verify a meeting

3    between the Stacy King phone and the Buckson phone in the area

4    of Central Park?

5              THE COURT:  A meeting?

6              MR. TOUGER:  That the Stacy King phone and the Theresa

7    Buckson were together in the area of Central Park.

8    A.  I was never asked specific phones.  I was given dates and I

9    was asked to see if any of these phones were in certain areas

10   on certain dates that were brought through with the

11   investigation.

12   Q.  Was there any time where you found that the Buckson phone

13   and the Thibedeaux -- the Stacy King phone, excuse me, the

14   Buckson phone and the Stacy King phone were together near

15   Central Park?

16   A.  I do not believe so.

17   Q.  And am I correct in saying that you verified that the

18   Buckson phone was in Miami Florida as of September -- before

19   September 29?  On September 28 I believe?

20   A.  Yes, sir.

21   Q.  Excuse me.

22   A.  I think it was the 29th.

23   Q.  The 29th.

24   A.  Yes.

25   Q.  The next detectable event, meaning the next telephone call

1   or a text on the Buckson phone wasn't until October 2, 2009?

2   A.  That is correct.

3   Q.  Would I be correct in saying that on September 27, there

4   are no calls between the Rodney Johnson phones and the Lowell

5   Fletcher phones?

6   A.  On the 27th between the Rodney Johnson and the Lowell

7   Fletcher?

8   Q.  Right.

9   A.  I don't believe there are any calls between Johnson and

10  Fletcher.

11  Q.  And there are no text messages either?

12  A.  No, sir.

13  Q.  Would I also be correct in saying that on September 27,

14  2009, there is no evidence that the Leslie Pretty phone, which

15  is the Rodney Johnson phone, had any contact with the Jason

16  Williams phone?

17  A.  I would have to check the records here.

18  Q.  Would you do so, sir?

19  A.  Sure.  What was the date again, sir?

20  Q.  September 27, 2009.

21  A.  The two phones in question?  I'm sorry.

22  Q.  The Jason Williams phone and the Leslie Pretty phone, which

23  is the Rodney -- you've targeted as the Rodney Johnson phone.

24  A.  On this chart there are no calls.

25  Q.  Right.  Would I also be correct in saying that there's no

1   contact between the Rodney Johnson phone and the Emily

2   Richardson phone on September 27?

3   A.  Again, I would have to refer to the slide.

4   Q.  Go ahead.

5   A.  Theres no contact between those phones.

6   Q.  And the Emily Richardson phone is the Derrick Grant phone?

7   A.  That is correct.

8   Q.  Finally, there is no contact between the phone you

9   designated to Brian McCleod and the Leslie Pretty phone on that

10  date also, correct?

11  A.  Again, can I check my records?

12  Q.  Go right ahead.

13  A.  That is correct.

14  Q.  Would I also be correct in saying that there's no contact

15  between the Rodney Johnson phone and the Buckson phone?

16  A.  For that date?

17  Q.  Any date.

18          THE COURT:  He can't answer as to any date because he

19  looked at records only for a finite period of time.

20  Q.  In the time period that you investigated.

21  A.  Again, I would have to check all the dates on this chart.

22          THE COURT:  Anything else, Mr. Touger?

23          Oh, you're waiting on the witness?

24          MR. TOUGER:  I'm waiting for the answer.

25          THE COURT:  Yes.

1    A.  For the calls on this chart, no, sir.

2    Q.  Would I be also correct in saying that there is no contact

3    between the Leslie Pretty phone -- excuse me, between the

4    Buckson phone and the Emily Richardson phone?

5    A.  Again, on this chart?

6    Q.  Yes.

7    A.  Sure.  For the calls on this chart, no.

8    Q.  Finally, referring to the Stewart phone and the Buckson

9    phone, I believe you testified that there were in the entire

10   part of your investigation -- that three-month period, right?

11   A.  That is the time frame for the records.

12   Q.  Right.  There were 367 phone -- excuse me, communications

13   between the Stewart phone and the Buckson phone.

14   A.  That is correct.

15   Q.  And the vast majority of -- 360 of those were text

16   messages, correct?

17   A.  I believe most of them, with the exception of about 11.

18   Q.  Would I also be correct that of the 11 phone calls, seven

19   or eight of them had zero length in time?

20   A.  The zero for AT&T Wireless means, if you look at the actual

21   calls, you go further over in the call detail records, there is

22   a designation that says M2M.  That means mobile to mobile.  As

23   I testified yesterday, the phone companies keep track of

24   records for billing purposes --

25   Q.  Right.

1  A.  -- so that people don't go over their minutes.

2          AT&T Wireless phones that talk to each other are not

3  billable calls.  They don't care how long an AT&T Wireless

4  phone talks to another AT&T Wireless phone because they don't

5  bill the customer.

6          In this particular case the Stewart phone and the

7  Buckson phone are two AT&T phones, so those are actual phone

8  calls, because M2M means there is a phone call that's

9  connected, a voice call, but they do not document the seconds

10 or the minutes because they don't care about the billing.

11 Q.  Thank you for anticipating my next question.

12          My final question in that area is you have no idea how

13 long those phone calls lasted?

14 A.  That I do not.

15 Q.  It could have lasted second; it could have lasted 20

16 minutes?

17 A.  It lasted enough for AT&T to determine that it was a voice

18 call that was connected.

19 Q.  That is it?  That is all you know?

20 A.  Yes, sir.

21 Q.  Are some durations of seven or eight seconds, though, of

22 phone calls between those two phone numbers, correct?

23 A.  Again, for those calls where there's durations, you will

24 see an M2M and there will be a DIR or a VMB.  VMB means it was

25 sent to voicemail.  So it will document that short duration for

1    that handoff to the voice mail platform.  If it says M2M DIR

2    that means that the phone was on and the person didn't accept

3    the call.

4    Q.  Again, thank you for anticipating my next question.

5         The final question is, the three phone calls that had

6    seven or eight seconds, from your expert opinion two people did

7    not talk to each other?

8    A.  Correct.  Based upon the information given for those

9    particular calls.

10   Q.  Right.  So the only calls where two people could possibly

11   have spoken to each other were those seven or eight of the zero

12   duration?

13   A.  That is correct.

14        MR. TOUGER:  Nothing further, your Honor.

15        THE COURT:  All right.

16        Is there redirect?

17   REDIRECT EXAMINATION

18   BY MR. JOHNSON-SKINNER:

19   Q.  He was asking about those seven or eight calls.

20        Were there also text messages between the Stewart

21   phone and the Buckson phone.

22   A.  There are over 349, I believe.

23        MR. TOUGER:  No further questions.

24        THE COURT:  I just want to clarify something in my own

25   mind, please.

Hbgnros2                     Heintz - redirect

1          The time period during which you looked at calls began

2   with August 19 and ended with October 3, is that correct?

3          THE WITNESS:  Depending on the phone.  There were

4   various phones and different dates.

5          THE COURT:  I see.

6          Were there any that were earlier than August 19 that

7   you looked at?

8          THE WITNESS:  That I looked at, no.

9          MR. TOUGER:  Your Honor --

10         MR. JOHNSON-SKINNER:  Could I ask a clarifying

11  question about that?

12         THE COURT:  You will get your chance.

13         Sit down, please.

14         THE WITNESS:  That I looked at during the whole course

15  of the investigation?

16         THE COURT:  I'm sorry.

17         Had you finished your answer?

18         THE WITNESS:  I was trying to clarify your question.

19         THE COURT:  All right.

20         THE WITNESS:  You are talking about the whole course

21  of the investigation?

22         THE COURT:  Let's take it one step at a time.

23         Government Exhibit 502, the call chart, starts with a

24  call on August 19 and ends with a call on October 3.

25         Is that the universe from a time period point of view

1   that you looked at with respect to those phones that you have

2   talked about here this morning?

3            THE WITNESS:  The phones that I spoke about this

4   morning, that was the time frame, yes.

5            THE COURT:  So, just to pick two names at random off

6   this, if there was a call from the McCleod phone 1 to the

7   Williams phone on August 14, 2009, you don't know.  It is not

8   on the chart, it is not within the time period you looked at

9   for those phones, is that accurate?

10           THE WITNESS:  Yes.

11           This chart was prepared by the prosecutor's office on

12  the dates that they were interested in.

13           Again, without having the records in front of me, I

14  looked at calls from early in the summer of 2009 on some

15  phones, some phones, different dates.

16           THE COURT:  All right.

17           Do counsel want to inquire further?

18           MR. JOHNSON-SKINNER:  Just to clarify one thing.

19  REDIRECT EXAMINATION

20  BY MR. JOHNSON-SKINNER:

21  Q.  You said that chart Government Exhibit 502 was prepared by

22  the government, you said?

23  A.  Yes, sir.

24  Q.  Did you review that chart against the phone records to make

25  sure it was all accurate?

Hbgnros2                    Heintz - redirect

1   A.  Yes, sir.

2   Q.  And that chart reflects phone calls between phones relevant

3   in this case for a certain time period, right?

4   A.  That's correct.

5   Q.  But, for example, did you look at other phone records, for

6   example, to look at the main cell site area for certain phones

7   that were outside that time period?

8   A.  During this investigation, there were phones that were

9   developed as the investigation went along.  So there were

10  different timeframes that we received records from some of --

11  because some of the accounts might not have been established at

12  the same time as the other one.  They might have been

13  established earlier or later, so there is a general time frame.

14  So, some of them might have been before and some of them might

15  have been afterwards, depending upon the time frame that the

16  records were requested.

17  Q.  For example, if we look at page 1 of Government Exhibit

18  510 --

19          MR. JOHNSON-SKINNER:  Could you zoom in on that again.

20  Q.  For example, to look at the main cell site area for this

21  Buckson phone, you looked at records back through at least May

22  2009, right?

23  A.  That is correct.

24          MR. JOHNSON-SKINNER:  OK.  That's it.

25          MR. TOUGER:  That is what I wanted to verify.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1        THE COURT:  Just hold on a minute, Mr. Touger.

2        MR. TOUGER:  Sure.

3        THE COURT:  The other question that I neglected to ask

4   you but that was in my mind was this:

5        You were asked at least some questions, and I think it

6   was in the context of whether two particular phones in the time

7   period you looked at were in the vicinity of Central Park.

8        Do you remember that?

9        THE WITNESS:  Yes.

10       THE COURT:  Is my understanding correct that you could

11  have determined from the records that a phone was in the

12  vicinity of Central Park on whatever the time period in

13  question was if and only if that phone made a call from that

14  location or was called at while it was at that location, is

15  that right?

16       THE WITNESS:  That is correct.  I can only tell when

17  there was a communication with that phone and that phone was

18  talking to the strongest cell tower.

19       THE COURT:  So, does it follow that even if two people

20  with two different phones, each one with a separate phone, that

21  were phones of interest here were standing in Central Park

22  talking to each other even for a protracted period of time,

23  that would have shown up on the phone billing records only if

24  there was a telephone call connected to both phones while they

25  were in the same place, not one call, but a call to each of

Hbgnros2                    Heintz - redirect

1    them, or by each of them?

2              THE WITNESS:  Correct.

3              For instance, some of these calls -- I mean, when you

4    look at them, when you are looking at two phones, you have

5    records of both phones.  Sometimes you will see on a case when

6    you are looking at an outgoing call from one phone, you will

7    see that it won't show as an inbound on the other.

8              That could be simply that the person started to dial

9    and stopped the phone call.  And the originating carrier is

10   going to capture that initial call.  However, if it didn't go

11   through the network, the terminating number will not capture on

12   the billing records.

13             THE COURT:  But just to draw a box around it and let

14   the lawyers ask whatever they want, if person A has cell phone

15   A and person B has cell phone B, and the two of them are

16   standing in Central Park together --

17             THE WITNESS:  Yes.

18             THE COURT:  -- from the phone records, you couldn't

19   tell that either phone was in Central Park or that vicinity

20   during that period of time unless that particular phone A made

21   or received a call, and you couldn't tell that they were both

22   there at that time unless both of them made and received calls

23   while they were there together?

24             Is that right?

25             THE WITNESS:  Correct.  Both phones would have to have

 1    been on some type of communication with the network, whether it

 2    be a voice call a text call or a data session.

 3                THE COURT:  Thank you.

 4                Mr. Skinner, anything?

 5                MR. JOHNSON-SKINNER:  Nothing from me.

 6                THE COURT:  Mr. Touger?

 7                MR. TOUGER:  Very briefly.

 8    RECROSS EXAMINATION

 9    BY MR. TOUGER:

10    Q.  I just want to clarify.

11                You looked at the Buckson phone from May 5, 2009,

12    through August 22, 2009 also, right?

13    A.  I think it was September 25.

14    Q.  Right.  But I am saying from May 5.  You started looking at

15    the Buckson phone from May 5, 2009?

16    A.  Correct.

17    Q.  Not on August 5?

18    A.  May 5.

19    Q.  The 70 -- I think you said 79 phone calls were from May 5,

20    2009, to your ending date?

21    A.  Phone calls, correct.

22    Q.  Yes.  Along with what the judge was just asking you about,

23    when you were testifying about the different phones, when you

24    testified about Mr. McCleod's phone going to the area of the

25    Mobay Restaurant and the area of Houston's Restaurant, there

1    were text messages during those meetings prior to that or phone

2    calls prior to that between the McCleod phone and the Theresa

3    Buckson phone, correct?

4            MR. JOHNSON-SKINNER:  Objection to form.

5            THE COURT:  Rephrase it, please.

6    BY MR. TOUGER:

7    Q.  You were asked to look at certain locations the Mobay

8    Restaurant location.

9            Do you remember that?

10   A.  Yes, sir.

11   Q.  And the Houston's Restaurant location.

12           Do you remember that?

13   A.  Yes, sir.

14   Q.  And you were asked to look at those locations on a specific

15   date.

16           Do you remember that?

17   A.  Yes.

18   Q.  And you were asked to look at the Buckson phone and the

19   McCleod phone communicating with each other on those dates,

20   correct?

21           MR. JOHNSON-SKINNER:  That misstates the testimony,

22   Judge.

23           THE COURT:  I will let the witness answer.

24   A.  I was asked -- I was given specific --

25   Q.  I will withdraw that question and ask you this question.

1270

Hbgnros2                    Heintz – recross

1   Did you find that the Buckson phone and the McCleod phone

2   communicated with each other on those dates?

3   A.   Which dates, sir.

4   Q.   The dates in the Mobay Restaurant and the dates of the

5   Houston restaurant location?

6   A.   I would have to look at the records and the dates.  If you

7   give me the two dates, sir.

8   Q.   I believe -- October 1, sir, for the Mobay.  And on

9   September 25 for Houston's.

10  A.   You are asking the Buckson phone and which phone?

11  Q.   And the McCleod phone.

12  A.   On October 1?

13  Q.   On October 1 and September 25.

14          THE COURT:  What is the question about them?

15          MR. TOUGER:  Did they communicate with each other.

16          THE COURT:  On either date or on both dates?

17          MR. TOUGER:  On both dates.

18  A.   On 10/1 at 6:20 p.m. there is a text message between these

19  two phones.

20  Q.   On September 25, is there communication?

21  A.   Yes, sir.

22          MR. TOUGER:  Nothing further, your Honor.

23          MR. JOHNSON-SKINNER:  No questions, Judge.

24          THE COURT:  OK.  The witness is excused.

25          Thank you.

Hbgnros2                    Heintz - recross

1          THE WITNESS:  Thank you.

2          (Witness excused)

3          THE COURT:  Mr. Skinner?

4          MS. HANFT:  Your Honor, at this time we have two

5   additional stipulations.

6          THE COURT:  All right.

7          MS. HANFT:  The first stipulation:

8          The parties agree that, if called to testify, Officer

9   James Gonzalez of the New York City Police Department would

10  testify as follows:

11         Since early 2006 Officer Gonzalez has been assigned to

12  the traffic enforcement unit in the 44th Precinct of the New

13  York City Police Department.

14         In the evening on September 26, 2009, Officer Gonzalez

15  conducted a traffic stop of a vehicle bearing New Jersey plate

16  No. WKB 675 in the vicinity of Jerome Avenue and the Cross

17  Bronx Expressway in the Bronx, New York.

18         After stopping the vehicle, Officer Gonzalez issued a

19  traffic summons to a passenger of the vehicle identified as

20  Brian McCleod for not wearing his seat belt.  McCleod was

21  seated in the front passenger's seat of the vehicle.  The

22  driver of the vehicle was wearing his seat belt.

23         Officer Gonzalez did not observe any firearms or other

24  weapons in the vehicle.

25         According to the traffic summons written by Officer

1    Gonzalez, the stop occurred at approximately 11:59 p.m. on

2    September 26, 2009.

3          Officer Gonzalez cannot recall whether or not anyone

4    besides McCleod and the driver were in the vehicle during the

5    traffic stop.

6          Officer Gonzalez also does not recall what, if

7    anything, was discussed with McCleod during the traffic stop.

8          It's further stipulated and agreed that this

9    stipulation as Government Exhibit 1355 is admissible in

10   evidence as a government exhibit at trial.

11         And the government offers Government Exhibit 1355.

12         THE COURT:  Received.

13         (Government's Exhibit 1355 received in evidence)

14         MS. HANFT:  Finally, it is agreed between the parties

15   that, if called to testify, parole officer Dennis Kilcoyne of

16   the New York State Department of Corrections and Community

17   Supervision would testify as follows:

18         Since 2006, Parole Officer Kilcoyne has been assigned

19   to the parole office located at 82 Lincoln Avenue in the Bronx,

20   New York.

21         In 2009, Parole Officer Kilcoyne supervised

22   approximately 50 to 60 individuals, known as parolees, who had

23   been released on parole by the New York State Parole Board from

24   prisons located in New York State.

25         One of the parolees whom Officer Kilcoyne supervised

1   in 2009 was an individual named Brian McCleod.

2           On August 10, 2009, Brian McCleod was released on

3   parole from a prison in New York State.

4           On August 26, 2009, Parole Officer Kilcoyne made a

5   home visit to Brian McCleod at the halfway house where McCleod

6   was living on New Lots Avenue between Jerome and Warwick

7   Streets in Brooklyn New York.

8           On September 16, 2009, Parole Officer Kilcoyne made

9   another home visit to Brian McCleod at the halfway house on New

10  Lots Avenue.

11          On October 2, 2009, Brian McCleod made a parole office

12  visit to Parole Officer Kilcoyne at the parole office at 82

13  Lincoln Avenue in the Bronx, New York.

14          At this office visit McCleod was given permission to

15  travel to Maryland so that he could have his parole supervision

16  transferred to Maryland.

17          This office visit on October 2, 2009 was McCleod's

18  only parole office visit at 82 Lincoln Avenue after September

19  27, 2009, and it was the last time Parole Officer Kilcoyne met

20  with McCleod.

21          Following Brian McCleod's October 2, 2009, office

22  visit at 82 Lincoln his parole supervision was transferred to

23  Maryland.

24          It is further stipulated and agreed that this

25  stipulation as Government Exhibit 1365 is admissible in

1    evidence as a Government Exhibit at trial.

2           The government offers Government Exhibit 1365, as well

3    as Government Exhibit 54, which was previously offered subject

4    to connection, your Honor.

5           THE COURT:  That was the photograph of Dr. Buckson?

6           MS. HANFT:  Correct.

7           THE COURT:  Received.  Both.

8           (Government's Exhibits 54 and 1365 received in

9    evidence)

10          THE COURT:  OK.

11          MS. HANFT:  One moment, your Honor.

12          At this time the government rests.

13          THE COURT:  All right.  Thank you.

14          Members of the jury, I am going to have you take a

15   break for what I think will be a very short period.  Go back

16   into the jury room, please.

17          (Jury not present)

18          THE COURT:  Please be seated, folks.

19          Let's hold the motion for a minute.

20          Is there going to be a defense case?

21          MR. TOUGER:  No, your Honor.  The defense will not --

22          THE COURT:  I can't understand whatever came after

23   "No, your Honor."

24          MR. TOUGER:  No, your Honor.  The defense will not be

25   presenting any evidence.

1      THE COURT:  All right.

2      Mr. Rosemond, I remind you of our conversation at the

3  beginning of the trial.  You have the right to testify if you

4  wish to do so, regardless of whether Mr. Touger agrees with

5  such a decision.  You have the right to his advice about

6  whether you should testify.  He's obliged to have given it to

7  you.

8      Without telling me what he said, have you been advised

9  by Mr. Touger with respect to his views on whether you should

10  testify?

11      It is a yes-or-no question.

12      THE DEFENDANT:  Yes.

13      THE COURT:  All right.  Do you have any need for any

14  further discussion with him on that subject?

15      THE DEFENDANT:  Not at all.

16      THE COURT:  OK.

17      Understanding that the decision is yours alone to

18  make, do you wish to testify in this case in your defense?

19      THE DEFENDANT:  No, I don't.

20      THE COURT:  All right.  I'm going to bring the jury

21  back.  I will reserve the defense motion until after they

22  leave.  No sense holding them.  Then I will hear any motion

23  that the defense would like to make.

24      Bring the jury back, please.

25      (Jury present)

1    THE COURT:  OK.

2         Mr. Touger, does the defense wish to present any

3    evidence?

4         MR. TOUGER:  The defense rests, your Honor.

5         THE COURT:  Thank you.

6         Members of the jury, that concludes the presentation

7    of evidence in this case.  You are now off until 9:30, Tuesday

8    November 28.  I remind you that you are not to discuss this

9    case with anybody, not among yourselves, not over the

10   Thanksgiving turkey, not at all.

11        I'm sure all your relatives are going to want to know

12   where you have been for the last two weeks and what's going on

13   and all of that.  You've got to resist the temptation.

14        When you come back on the 28th you will hear closing

15   arguments, and, depending on how long they take, you will

16   probably receive my instructions and hopefully get the case to

17   decide in the afternoon sometime on November 28.  And if it

18   takes longer, it takes longer.

19        Oh, yes.  Andy is reminding me, quite properly, to

20   remind you don't look at any press reports.  Don't look at

21   anything on the internet.  You heard all those instructions

22   before.  They still apply.  They apply to all of you.

23        I know that somebody has a travel commitment, I think

24   it's Alternate No. 4, at the end of the week of November 27.  I

25   wouldn't worry too much about it at the moment.  Beyond that I

1    can't say.

2         OK.  I hope you all have a great Thanksgiving.  Enjoy

3    the holiday, eat plenty of good turkey, and have a good time.

4         (Jury not present)

5         THE COURT:  Mr. Touger?

6         MR. TOUGER:  Mr. Edelstein will be taking care of the

7    motions, your Honor.

8         MR. EDELSTEIN:  Your Honor, at this time --

9         THE COURT:  Go to the lectern, please.

10        MR. EDELSTEIN:  Ah.

11        Your Honor, at this time, the defendant moves for a

12   judgment of acquittal under Rule 29 on the basis that the

13   government has not presented sufficient evidence of intent to

14   commit a murder for hire to go to the jury.

15        Briefly, your Honor, the government presented evidence

16   of a years-long feud between these two teams, the Czar team and

17   G-Unit, in which many, many shooting incidents occurred.  Both

18   sides were shooting up cars, houses.  They were shooting at

19   people.

20        There has been evidence of well over a hundred bullets

21   fired.  And, according to the government's witnesses, none of

22   these bullets were fired with intent to kill.  There is a

23   custom and practice among these teams that the government

24   proved of committing nonfatal shootings.

25        So, as to any given shooting, unless there's something

1    that sets it apart, there is a built-in reasonable doubt of

2    whether there was any intent to kill.

3            THE COURT:  Let me ask you a question.

4            Is there any evidence that any of the prior shootings

5    was in retaliation for a personal assault on a minor family

6    member of somebody on either side?

7            MR. EDELSTEIN:  Well, Judge, there was evidence of a

8    number of incidents that occurred after the assault, including

9    house shootings and an attempted assault on Chris Lighty or a

10   relative of his, which occurred after the --

11           THE COURT:  So I deduce from your answer, since Chris

12   Lighty was an adult who ran G-Unit and a house is not a minor

13   child of one of the protagonists, that the answer is no?

14           MR. EDELSTEIN:  Your Honor, what --

15           THE COURT:  Is the answer no?

16           MR. EDELSTEIN:  I believe the question was whether any

17   of these actions were taken in retaliation for an assault of a

18   minor child.  Is that correct, Judge?

19           THE COURT:  Yes.

20           MR. EDELSTEIN:  I would submit that the answer is yes,

21   because various incidents were committed by people associated

22   with Czar subsequent in time to the assault on James Rosemond,

23   Jr., and could therefore be taken as being in retaliation for

24   that, even if those actions were directed at adults or at

25   houses.

1    THE COURT:  OK.  I see.  In other words, in your

2    parlance, a house is a minor child?

3    MR. EDELSTEIN:  No, that a shooting of a house that is

4    done after a minor child is assaulted could be retaliation.

5    THE COURT:  Yes, of course.

6    MR. EDELSTEIN:  For the assault on the minor child.

7    THE COURT:  I am having the same problem here I had

8    the other day.  I ask a question and you answer a question that

9    I didn't ask.  You just turned the question around to say what

10   you want to say.  That's fine.  But as a matter of advocacy it

11   doesn't get you anywhere at all, because I'm telling you what's

12   on my mind giving you an opportunity to address it, and you

13   don't want to do it.

14   MR. EDELSTEIN:  Your Honor, if you clarify the

15   question.

16   THE COURT:  Yes, sir.

17   MR. EDELSTEIN:  Because I understood the question to

18   be --

19   THE COURT:  Yes, sir.

20   MR. EDELSTEIN:  OK.

21   THE COURT:  The assertion here is that Fletcher and

22   G-Unit attacked, slapped, roughed up Rosemond's 14-year-old

23   kid.

24   MR. EDELSTEIN:  Yes.

25   THE COURT:  You had said that there was this long

Hbgnros2               Heintz - recross

1    history of nonfatal shootings earlier, and I think your words

2    were unless there's something to set this one apart there is

3    built-in reasonable doubt.  Your words pretty much verbatim,

4    not exactly, but pretty much, right?

5              MR. EDELSTEIN:  Yes, Judge.

6              THE COURT:  I put to you that there is evidence that

7    sets this one apart.  What sets this one apart is that this was

8    a personal assault on Rosemond's 14-year-old son, and I'm

9    asking you if there's any evidence of a personal assault on

10   anybody else's 14-year-old or comparable aged child that was

11   followed by a nonfatal shooting or something of that nature?

12             MR. EDELSTEIN:  OK.  No.  The answer to that is no.

13             THE COURT:  OK.

14             MR. EDELSTEIN:  There were no other children who were

15   assaulted.

16             THE COURT:  Thank you for answering the question.

17             Let's go on from there.

18             MR. EDELSTEIN:  However, what I would point out is

19   that after James Rosemond, Jr., was assaulted, the pattern of

20   nonfatal shootings did continue.  There were nonfatal shootings

21   subsequent to that date.  So I would submit that that doesn't

22   set this shooting of Lowell Fletcher apart.

23             Because the shooting of Lowell Fletcher was not the

24   only shooting that occurred after the June 2007 assault, and

25   all of the other shootings that occurred after the 2007 assault

Hbgnros2                    Heintz - recross

1    were nonfatal and were not intended to be fatal.  So that is

2    not the *ma nishtanah*, Judge.  That's not how this shooting is

3    different from all other shootings.

4           What we have here, and I would also point out, just

5    going through the evidence that the government has presented at

6    the trial and going through, you know, briefly the points that

7    the government has emphasized in their cross, I don't think

8    that any of that suffices to set the shooting apart enough to

9    prove an intent to kill.

10          To start with, the shooting is conducted with a .22,

11   you know, the so-called quiet, a .22 pistol with a silencer.

12   There is evidence from Mohammed Stewart that James Rosemond

13   said he didn't like that .22 because it's too small to do

14   anything unless you shoot a guy in the head.

15          Here the actual shooting was not conducted in the

16   head.  It wasn't conducted at a pointblank range.  Lowell

17   Fletcher was shot from 15 feet away, according to the medical

18   examiner and according to the witness who observed.

19          THE COURT:  Through the heart and it killed him.

20          MR. EDELSTEIN:  Yes.  There were five shots, one of

21   which was fatal, and that one was a lucky shot because it

22   clipped the aorta.  A shot fired with an intent to kill would

23   be a shot, you know, with this pistol.

24          According to Mr. Stewart's testimony, he said, you

25   know, that this defendant didn't like this pistol because this

1   pistol won't kill anyone unless you shoot him from close up,

2   shoot him in the head.

3          THE COURT:  Believe me, I think there's plenty of

4   evidence here and common sense to suggest that although a .22

5   pistol may not be the weapon of choice for killing a person at

6   a distance, it is more than adequate to the task, as proved in

7   this case.

8          I don't see why hitting somebody in the heart is any

9   more of a lucky shot than hitting him in the head.  It all

10  depends on where you aim and whether you are a good shot.

11         MR. EDELSTEIN:  Judge, there was evidence that this

12  defendant had other guns including much heavier .45s,had a

13  machine gun.  What we are looking at is not whether a .22 is

14  capable --

15         THE COURT:  But the evidence of the planning.  To have

16  the victim brought to the scene, obviously at close distance.

17  The plan, according to the evidence which the jury could

18  believe, was to have Derrick Grant step out of the dark recess

19  on Mt. Eden Avenue as the guy walked by.  That was the plan.

20         MR. EDELSTEIN:  OK.  Speaking in the area of planning,

21  Judge, the government has emphasized, well, this is a carefully

22  planned attack, there was a backup team.

23         Now, there are a couple of responses I would have to

24  that.

25         First of all, there was planning on many of the other

shootings as well.  There was evidence that this defendant had

a whole intelligence network going in terms of people feeding

him information on where G-Unit people were, where their houses

were, where they were doing video shoots.  He went out

surveille,d the scenes to find their cars, to find locations

where they were doing a shoot.

There was evidence of a number of other incidents in

which there were multiple people, such as the shooting on 126th

and Madison in which there was this defendant, there was Khalil

Abdullah, and Khalil Abdullah called two other guys, so there

were four.

There was the whole setup with the shooting of Tony

Yayo's mother's house, where we have one guy driving and

another guy shooting from a truck, which shows evidence -- you

know, indication that this was planned in advance and set up in

advance.

So the fact that they are doing planning, getting

information and setting this thing up, does not set this apart

from the other shootings.

The government is going to argue also that Rodney

Johnson was the backup man.  Well, we just saw in the phone

records that there's no evidence in the few days prior to the

shooting or the day of that Rodney Johnson's phones are

communicating with Mr. Rosemond's phone or with Jason Williams

or with Derrick Grant.

1          There's a call to Brian McCleod, but that is

2     afterwards.  That's after it's complete.

3          He's in the vicinity, but there is no testimony from

4     anyone as to what he's doing there or what he's there for.

5          THE COURT:  My recollection of the testimony is that

6     he and another person were sitting in a car somewhere near the

7     corner of Mt. Eden and Jerome, right?

8          MR. EDELSTEIN:  They were, yes.

9          THE COURT:  Late at night.

10         MR. EDELSTEIN:  And there's no evidence that they were

11    armed at that time, I mean although there's evidence that he

12    had a gun later on at his apartment.  There is no evidence of

13    any communication between him and either Mr. Rosemond or any of

14    the other alleged coconspirators that would explain what he's

15    doing there or that he's there to do anything more than

16    observe.  So I would submit that this isn't something that the

17    jury can find sets this apart to make an intent to kill.

18         Judge, there's also evidence concerning words that

19    were used.  "Hit him so fast and so hard."

20         Judge, earlier in that very same conversation that was

21    testified to by Brian McCleod, there's evidence that

22    Mr. Rosemond used the word "hit" to refer to all of the

23    nonfatal Violator shootings that had taken place between these

24    groups over the years.

25         So if a code if "hit" is a code that is understood by

1  the parties in the vernacular, then we, you know, have the key

2  to the code.  We've got the Rosetta Stone in that earlier

3  element of the same conversation where "hit" means shoot

4  without intent to kill.

5           THE COURT:  Did any witness testify that there was an

6  established meaning of the word "hit" and it meant nonfatal

7  shooting?

8           MR. EDELSTEIN:  Well, there was no testimony either

9  way as to the established meaning of the word "hit."  But

10  certainly.

11          THE COURT:  Ergo it is a perfectly rational argument

12  that the jury can accept or not that the word is sufficient to

13  cover both fatal and nonfatal.

14          MR. EDELSTEIN:  Well, without evidence that the word

15  "hit" had ever been used in the past by this defendant or by

16  any of these people for a nonfatal shooting, and the only

17  evidence concerning the word "hit" is that it was used for a

18  nonfatal shooting, then I would submit that, no, the jury could

19  not draw any conclusions that "hit" means kill.

20          And then let's go to Khalil Abdullah --

21          THE COURT:  Maybe it didn't.  Maybe it meant attack.

22  Who knows?

23          MR. EDELSTEIN:  Well, if it meant attack, then this

24  defendant has to be acquitted going.

25          Very briefly, Judge, finally, the fact that the

Hbgnros2                    Heintz - recross

1    defendant paid for it, there is evidence that he paid for other

2    things that he did not authorize, specifically the Violator

3    shootings, where in fact he was upset with Mohammed Stewart for

4    doing it, but nevertheless paid a considerable amount.

5         When we are talking about the amounts that are paid

6    here, there's evidence that he paid Rodney Johnson -- not

7    Rodney Johnson, Brian McCleod a kilogram of cocaine, with a

8    street value in the 30s, but which cost him $21,000, split

9    three ways, and he had previously paid $12,000 to shoot up a

10   house, he paid $50,000 to Brian McCleod for cleaning up the

11   alleged stash house.

12        So, again, this is not an amount of money or the fact

13   of payment, none of that inexorably points to kill.  So,

14   Judge --

15        THE COURT:  Let me ask you another question.

16        There is evidence that would permit the jury to

17   conclude, is there not, that by the time Rosemond pays the

18   money two things are true:  A, he knows Fletcher is dead; and,

19   B, that's what he's paying for at that point.  Whatever he knew

20   before, the jury could conclude that, right?

21        MR. EDELSTEIN:  A jury could conclude that, yes.

22        THE COURT:  OK.  Why isn't that alone enough?

23        MR. EDELSTEIN:  Because the government has to show

24   that the intent existed prior to Lowell Fletcher's death.

25        THE COURT:  I put to you the following hypothetical.

1   Maybe it's hypothetical, maybe it isn't.

2        Rosemond's hands were, vis-a-vis a specific intent to

3   murder, clean at the end of the hit him as hard as whatever,

4   hard-and-fast conversation.  That's not what he meant.  He

5   meant nonfatal shooting.  Let's just assume that.

6        If the jury accepts the testimony of McCleod that

7   McCleod at any rate thought what he had in his mind was kill,

8   misunderstanding, let's just suppose.  He has the conversation

9   with Grant.  By the time he finishes his conversation with

10   Grant, there is clearly an understanding, or at least the jury

11   could find an understanding between Grant and McCleod that they

12   are going to kill Fletcher in the belief that the $30,000 that

13   Rosemond has promised is for the "hit".

14        There is now a conspiracy.  At some point Jason

15   Williams becomes a part of the conspiracy.

16        There's a conspiracy.  As charged in Count One, it is

17   a conspiracy to travel or use a facility of interstate commerce

18   with the intent that a murder be committed in consideration for

19   the receipt of and/or a promise to pay something of value.

20        The jury could find that as among those two or three

21   people, couldn't they?

22        MR. EDELSTEIN:  Correct, Judge.

23        THE COURT:  All right.

24        Now, the deed is done.  Along comes Rosemond.

25        McCleod says, How about the money?

Hbgnros2                    Heintz - recross

1          Rosemond, knowing that Fletcher is dead, pays him the

2     money for what they did, which was to murder.

3          Now, doesn't he at that point, putting aside

4     everything else for the sake of argument, become a member of

5     the conspiracy to commit a murder for hire?

6          MR. EDELSTEIN:  Judge, would I submit not, because at

7     that point the murder has already been committed.

8          Any conspiracy between these other three individuals

9     has achieved its goal.  Lowell Fletcher is dead, you can't join

10    the conspiracy that has --

11         THE COURT:  Well, but the goal, you see, arguably is

12    not just the murder.  Indeed, it doesn't even require the

13    murder.  It is a conspiracy to violate the murder-for-hire

14    statute, which does not require the killing to occur.  It

15    requires doing certain things with the intent that somebody be

16    killed, and those things are, to put it into the terms of the

17    evidence of this case, use a cell phone and an exchange of

18    value for the killing or a promise of value for the killing.

19         MR. EDELSTEIN:  Judge, I would submit that the

20    murder-for-hire statute does not prohibit payment for killings

21    that have already been committed.

22         THE COURT:  Got some cases?

23         Do you have any law for me on that?

24         MR. EDELSTEIN:  Not at the moment, Judge.  I would be

25    happy to elaborate on this at the charge conference.

Hbgnros2                   Heintz - recross

1        THE COURT:  Look, let's just put that to one side for

2   the moment, because it's not indispensable to deciding this

3   motion, but it's something that everybody ought to think about,

4   because I have been thinking about it.

5        I am even not sure that it affects the charge, but

6   it's worth thinking about.

7        Anything else?

8        MR. EDELSTEIN:  No, Judge.  I would just argue that on

9   those grounds and on all other grounds conceivable the Court

10  should enter a judgment of acquittal.

11       THE COURT:  Thank you.

12       Does the government have anything to say?

13       Mr. Enzer?

14       MR. ENZER:  Your Honor, I think the defense argument

15  simply proves why this case should be submitted to the jury for

16  them to decide these issues.  The argument the defense made is

17  really not an argument that we don't have enough to go to the

18  jury.  It's just a presentation.  It illustrates that there are

19  questions of fact the jury can decide.

20       Let me briefly summarize why we think if you accept

21  the evidence, as the Court must give every favorable inference

22  to the government at this point, let me summarize what I think

23  our affirmative story is on why we've proven intent enough for

24  it to go to the jury.

25       Then I will try to address some of the points that the

1    defense has made.

2              First, you have Rosemond's statements of intent, his

3    statement to Khalil Abdullah in late August 2009 or early

4    September 2009 at a barbershop.

5              Rosemond says to Abdullah, My man Slim, my friend Slim

6    is going to line Lowell Fletcher up, because these dudes ain't

7    going to be happy until they go to a funeral.

8              That statement we think demonstrates that the intent

9    here was to kill Fletcher.

10             We have Rosemond's statement to Mohammed Stewart in a

11   discussion about how the feud with G-Unit would end.  I believe

12   the substance of it was, This isn't going to end until they're

13   carrying a coffin.

14             You have Rosemond's statement during his meeting with

15   McCleod when he makes the $30,000 offer:  I have $30,000 for

16   anyone to bring him to me, because I'm going to hit him so fast

17   and so hard he's not going to know what hit him.

18             The jury is entitled we are entitled to argue to the

19   jury and the jury can infer based on the evidence, based on the

20   statement, the actions that follow, the payment, etc., the

21   planning, that what that meant was I want him to be killed.

22             And you have Rosemond's statement after the fact when

23   he meets with McCleod around Thanksgiving of 2009.  He says,

24   this is deja vu all over again, this is what happens when you

25   take a soul.

1    THE COURT:  This is what happens?

2    MR. ENZER:  This is what happens when you take a soul.

3  This is deja vu all over again.  This is what happens when you

4  take a soul.

5    A statement, obviously it's after the murder, but it

6  is a window into what Rosemond's state of mind was, what he

7  thought he was doing.  He thought this entire time what he was

8  doing was taking a soul.

9    You have the planning, the actions that the defendant

10  took.  He has a meeting with McCleod where he learns that

11  McCleod has a line on Fletcher.

12    He has another meeting with McCleod.  This is the

13  meeting at Whole Foods.  He begins the meeting by questioning

14  McCleod about, How reliable is this line?

15    He wants to know is this a reliable guy.  Can I get

16  Fletcher to where I need him to be?  He makes that offer.

17    In that initial discussion, in coded language,

18  Rosemond agrees to McCleod's suggestion to recruit Derrick

19  Grant as the shooter.

20    Then you have a series of events of extensive

21  planning.  Rosemond dispatching McCleod and Jason Williams to

22  check, just to put eyes on Fletcher in Queensboro on September

23  11, 2009.

24    You have Rosemond telling McCleod, Here's money.  Get

25  a special phone a phone to use only to communicate with

1    Fletcher.

2              And, by the way, are you sure you got this?  Because

3    if you don't have this, I got somebody who can take care of

4    this.

5              This was McCleod's testimony.

6              McCleod gets a special phone, the Stacy King phone,

7    the phone he's using to use to lure Fletcher to the ambush and

8    shooting.

9              After that, you have a meeting at Houston's where

10   Rosemond gives McCleod an address and asks him to scout an

11   initial location as a possible spot for the event.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

HBGAAROS3

1            MR. ENZER:  Then Rosemond sends McCleod, Jason

2       Williams and Grant to pick a spot for the murder the day before

3       the murder.  He's kept apprized of what's going on through text

4       messages on the day of the event.  The team, McCleod, Jason

5       Williams and Derrick Grant go there and they carry out the deed

6       and there's a backup team.  How do we know it's a backup team?

7       Khalil Abdullah testified that Rosemond during a subsequent

8       conversation at Mobay Restaurant told Abdullah that he had sent

9       Rodney Johnson to Mount Eden as a backup.  And we know they

10      were there.  We know Rodney Johnson was there with Shawn

11      Williams.  The cell sites show Rodney Johnson was there.

12      McCleod testified that he was there.  And Jason Williams

13      testified that he learned that Rodney Johnson was there after

14      the fact.

15           And we know that Rodney Johnson had a gun while he was

16      there.  McCleod testified that right after the murder he saw

17      Rodney Johnson pass a gun to Shawn Williams after they broke up

18      after events that night.  So there was a lead team and a backup

19      team.  And there was only one way Rodney Johnson ends up there.

20      The way he ends up there, it must have been Rosemond who sent

21      him there.  Rodney Johnson works for Rosemond.  He is a part of

22      Rosemond's drug enterprise.

23           The defense in their argument said there were no

24      communications between Rosemond's phone and the Buckson phone

25      and Rodney Johnson.  But there was testimony from several

witnesses, Rosemond had multiple phones.  He also had

Blackberries with encrypted communication.  The Buckson phone

is not one of the encrypted phones.  We would expect that

Rosemond had other devices to use to talk to Rodney Johnson.

We just didn't capture them during our investigations.

Then afterwards, after the deed is done Rosemond is

informed through coded texts, Jason Williams tells Rosemond in

a coded text something like, It's done.  And what's significant

here is Jason Williams does not say in his text Lowell Fletcher

is dead.  Lowell Fletcher has been murdered.  His testimony

establishes he didn't say that.  Nonetheless, Rosemond

understood he tells Jason, Get rid of that.  In other words,

get rid of the murder weapon.  If he hasn't had a phone -- at

this time Rosemond is in Miami.  He has not had a phone -- he

has not had a voice phone conversation or an in-person meeting

to be told that Fletcher is dead and yet in this and only in

this incident he tells Williams to get rid of the gun.  That's

the only shooting where Rosemond instructs anyone to get rid of

a weapon.  And either that day or the next day, Rosemond sends

a message to Khalil Abdullah, The bitch is out of here.

How would he know that the bitch is out of here, that

Fletcher is dead, unless he understood going into all of this

planning that the goal of it was to murder Fletcher and the

answer is, he must have intended and known that Fletcher was

going to be killed and certainly there's enough evidence for

1    that question to go to the jury.

2            And planning here is dramatically different from the

3    planning of the other violent acts of that the Court heard

4    testimony about.  Yes, there are other shootings and violent

5    acts.  But none of them involve the extensive planning involved

6    in this incident or the number of participants or the size of

7    the payment for it.  All of them pale in comparison to this.

8            In addition, some of those other incidents are good

9    contracts against this one.  For example, Rosemond didn't want

10   Lighty killed.  So he made clear, he specifically said, Make

11   sure you don't kill the man.  That was Stewart's testimony on

12   cross-examination.  He never gave an instruction like that to

13   McCleod or to any of the other participants in this murder who

14   carried out the murder.  He never said, Just shoot him in the

15   leg.  Make sure he is not dead.  Instead, he makes quite clear

16   that he wants something done to the guy and he has his driver

17   bring a .22 caliber with a silencer.

18           And then his actions afterwards there is no indication

19   that Rosemond was angry or upset that the murder had been

20   carried out.  We heard testimony in situations where Rosemond

21   felt the people who worked for him had gone too far.  He made

22   clear that he wasn't happy with them.  For example, I believe

23   defense counsel just pointed out an example where Rosemond had

24   a conversation with Mohammed Stewart after he did a shooting

25   for The Game following the hot 97 incident.  And Stewart was

1    paid.  He wasn't paid by Rosemond.  That was inaccurate.  He

2    was paid by The Game, not Rosemond.

3         But Rosemond talked to Stewart.  He explained to him

4    he shouldn't have done that.  And he made clear, You need to

5    know your value.  You should not be doing things like this

6    unless you're going to get something for it.  There is no

7    indication that Rosemond was angry or upset, that he thought

8    that any of the people involved in this went too far.  Instead,

9    the evidence shows that after the murder he was jubilant and

10   bragged about it.  He says, The bitch is out of here, to Khalil

11   Abdullah.  He gets picked up at LaGuardia Airport on October 1,

12   '09.  Jason Williams drives him.  And the evidence shows he

13   took him to Mobay Restaurant.  Rosemond met briefly there with

14   Khalil Abdullah and Teddie Coleman.  And Rosemond has now been

15   given an in-person update from Jason about what happened and

16   he's bragging about it to Khalil Abdullah and that's how Khalil

17   Abdullah learned the statements that he testified about from

18   the defendant.  That shows, I think, that this is what he

19   wanted.  This is what he intended.

20        And then you have the payment.  He provided a kilogram

21   of cocaine worth 30,000 in the street.  That's the most he's

22   ever paid for any violent act.  It's substantially larger than

23   the payments he provided for less serious acts.  The defense

24   says that's 21,000 in costs to him.  If we want to get into

25   economics, he is losing both the cost of what he paid for the

1    cocaine and the opportunity costs of the profit he would get

2    for selling it.  So I don't understand that argument.

3            But going back to the big picture here, I think the

4    real point is there is more than enough here to let this

5    question go to the jury.  We take seriously the Court's

6    suggestion about whether Rosemond could have joined the

7    conspiracy at the moment he paid.  I don't know the answer to

8    that.  I recall the case of Frampton, Second Circuit.  I'm

9    going to have to look at it after the Court's remarks.  I'm not

10   sure, your Honor, that he can join the conspiracy that late.  I

11   don't know one way or the other.  We're going to have to look

12   at that question.  We're not relying on that to put this case

13   to the jury.  We're not relying on that to say that --

14           THE COURT:  OK.  Look, if the government's not relying

15   on it I'm going not going to put anybody to the work of doing

16   the research.

17           MR. ENZER:  We're going look at it because if that

18   theory works I think it's an argument we'll want to make in

19   closing but for purposes of the decision --

20           THE COURT:  So you are not disavowing it.

21           MR. ENZER:  We are not disavowing it, judge.  I cannot

22   tell you here as I stand here that that works under the law.

23   I'm not sure.  Candidly, my thought going into this is that the

24   agreement has to be -- However, I am going to look at it.

25           THE COURT:  Well, the reason I asked of this because,

1  the reason it occurred to me to be more precise is that years

2  ago I had a conspiracy case.  I believe it was a conspiracy to

3  commit mail fraud --

4           Is that right, Rachel?

5           -- called United States Benussi, B-E-N-U-S-S-I, and

6  the defendant was seeking judgment of acquittal on the theory

7  that the statute of limitations had expired.  And what had

8  happened was some sort of the securities something that

9  contemplated the receipt by the defendant or a co-conspirator

10 of some warrants for security and the receipt of the warrants

11 occurred more than five years before the indictment came down.

12 But some of the warrants were then sold after the indictment,

13 less than five years before the indictment was sold.  And the

14 holding in the case ultimately was that as long as deriving the

15 economic benefit of the conspiracy was within the general scope

16 of the conspiracy then what mattered is the last act that

17 derived economic benefit which was the sale of the warrants

18 which was less than five years before.

19          So that then put me in mind of the possibility here

20 that there was a conspiracy to engage in murder-for-hire that

21 did not at the beginning involve Rosemond or at least the jury

22 couldn't find beyond a reasonable doubt that it had involved

23 him at the beginning but that there came a point where he paid

24 for it.  And by paying for it furthered the accomplishment of

25 the goal which was a murder-for-hire, not necessarily a murder

HBGAAROS3

1    but an agreement to do a murder in exchange for something of

2    value.  That's the thought.

3            MR. ENZER:  Understood, judge.  And I think we are

4    going to look at it seriously but for purposes of this

5    decision, we're not relying on that.

6            THE COURT:  OK.  But just so Mr. Touger isn't misled,

7    I understand you to be reserving the possibility of arguing

8    that.  And if you are going to do that, he is entitled to

9    advance word.  And I think it would serve both your interests

10   unless you disavow it between now and the time of -- to brief

11   the issue so that I can make a most informed judgment about it

12   because I'm sure that Mr. Touger is going to object and so I'm

13   going to have to rule on that.

14           MR. ENZER:  How about we brief it in advance of the

15   charge conference on Monday?

16           THE COURT:  Yes.  I think that's appropriate and long

17   enough in advance for me to look at it.

18           MR. ENZER:  Sure.

19           THE COURT:  So Saturday afternoon, OK?  Exchange

20   briefs.

21           MR. ENZER:  Sounds good, your Honor.

22           THE COURT:  Nobody's obliged to submit a brief but if

23   you are going to do it, I want it by Saturday afternoon.

24           MR. ENZER:  You got it, judge.

25           MR. TOUGER:  I tend to try to keep Shabbat.  Saturday

1   afternoon is a difficult time for me.  So could we have Sunday

2   morning.

3                THE COURT:  Sure.  So we'll make it 10:30 on Sunday.

4                MR. TOUGER:  That's fine, your Honor.

5                MR. ENZER:  That's fine, judge.

6                THE COURT:  You'll file it on ECF AND then I can see

7   it.

8                MR. ENZER:  I don't think the Court needs me to

9   respond to the arguments defense counsel has made but I can if

10  you want me to.

11               THE COURT:  No.  I think I've heard plenty.  The

12  motion is denied.  There's just an abundance of evidence which

13  if credited by the jury would establish every element on each

14  of the four counts of the indictment.  It's just, I mean there

15  are obviously credibility issues all over this case but the

16  evidence if accepted by the jury is more than enough.

17               MR. TOUGER:  Your Honor, just one question to clarify

18  that case, the Benussi.  Am I correct that the fact that the

19  Court was saying that Benussi joined conspiracy before the

20  statute of limitations expired?

21               THE COURT:  I don't want to freestyle.  My

22  recollection is, yes, but don't rely on that.  It's a long time

23  ago.

24               MR. TOUGER:  I was just asking if that was --

25               THE COURT:  The key point that I have in mind is that

1    in a sense the payment was viewed as in furtherance of the

2    conspiracy and late enough to make the indictment timely.

3    That's the key.

4           MR. TOUGER:  The key point I'm trying to make, your

5    Honor, is that that conspiracy, the individual joined the

6    conspiracy before the statute of limitations.

7           THE COURT:  He may well have.

8           MR. TOUGER:  So therefore --

9           THE COURT:  And this question is slightly different.

10    This question more than slightly but not wildly.  This question

11    is suppose, as indeed Mr. Edelstein agreed, there's sample

12    evidence that there was a conspiracy to commit murder-for-hire

13    that did not yet involve Mr. Rosemond.  Did the payment with

14    knowledge of the debt and with the payment being specifically

15    for the shooting that resulted in death make him a member of

16    the conspiracy or the jury could so find anyway?  That's the

17    question.

18           MR. TOUGER:  I don't want to argue the facts at this

19    point, your Honor, but there's testimony from Jason Williams

20    that he didn't know there was going to be a shooting or a

21    murder.

22           THE COURT:  Of course you're arguing the facts.

23           MR. TOUGER:  I'm just saying the fact that you said

24    Jason Williams joined the conspiracy is disputable.  And also

25    that there's actually a conspiracy at all is disputable because

HBGAAROS3

1    all three people, McCleod --

2                THE COURT:  So you are taking back the concession your

3    colleague made or trying.

4                Look, Jason Williams' testimony is both here and

5    there.  He testified as I remember and used the word "murder".

6    I don't remember what you're referring to you.  May be right.

7    You may be wrong.  It's the facts.  The bottom line here is

8    that I, at least, think that there's certainly evidence

9    sufficient to conclude that at least those other guys were part

10   of the conspiracy to commit murder-for-hire and that it dates

11   back to, I think the conversation was at Whole Foods and

12   immediately thereafter.

13               OK.  I thank you.

14               And we'll have the charge conference at two on Monday.

15   You can pick up the draft charge from my chambers 11 o'clock

16   Monday.

17               (Adjourned to Monday, November 20, 2017 at two p.m.)

18

19

20

21

22

23

24

25

1    INDEX OF EXAMINATION

2    Examination of:                          Page

3    JOHN HEINTZ

4    Direct By Mr. Johnson-Skinner . . . . . . . .1205

5    Cross By Mr. Touger . . . . . . . . . . . .1255

6    Redirect By Mr. Johnson-Skinner . . . . . .1263

7    Redirect By Mr. Johnson-Skinner . . . . . .1265

8    Recross By Mr. Touger . . . . . . . . . . .1269

9    GOVERNMENT EXHIBITS

10   Exhibit No.                            Received

11    510  . . . . . . . . . . . . . . . . . . .1208

12    1370, 520 and 521  . . . . . . . . . . . .1212

13    1373  . . . . . . . . . . . . . . . . . . .1217

14    1355  . . . . . . . . . . . . . . . . . . .1273

15    54 and 1365  . . . . . . . . . . . . . . .1275

16

17

18

19

20

21

22

23

24

25