Hbsnros1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                  v.                        10 Cr. 431 (LAK)

5    JAMES J. ROSEMOND,

6                  Defendant.

7    ------------------------------x

8                                        New York, New York
                                         November 28, 2017
9                                        9:30 a.m.

10

     Before:
11
                        HON. LEWIS A. KAPLAN,
12
                                        District Judge
13

14                          APPEARANCES

15   JOON H. KIM
          Acting United States Attorney for the
16        Southern District of New York
     BY:  SAMSON ENZER
17        DREW JOHNSON-SKINNER
          ELIZABETH HANFT
18        Assistant United States Attorneys

19   DAVID TOUGER
     JONATHAN EDELSTEIN
20        Attorneys for Defendant

21   ALSO PRESENT:

22   NYPD Detective Steven Smith
     Nicholas Pavlis, Paralegal (USAO)
23

24

25

Hbsnros1

1             (Trial resumed; jury not present)

2             THE COURT:  Good morning, everybody.

3             I hope everyone is filled with turkey and otherwise in

4      good form.  There was an open issue or two regarding the charge

5      on which I have now made up my mind.

6             Mr. Edelstein, I am adopting in substance your request

7      for an instruction that the conspiracy in Count One could not

8      be joined after the death of the intended victim.

9             I will read it to you.

10            "In the case of a conspiracy to commit murder for hire

11     that results in death, however, the latest time at which a

12     person can join the conspiracy is the time of the victim's

13     death."

14            Satisfactory to both sides?

15            MR. JOHNSON-SKINNER:  No objection, your Honor.

16            MR. EDELSTEIN:  Yes, your Honor.

17            THE COURT:  OK.  With respect to your

18     more-probable-than-not request -- do you remember what I am

19     referring to?

20            MR. EDELSTEIN:  I do, your Honor.

21            THE COURT:  I am not giving it.

22            The Court of Appeals has repeatedly cautioned district

23     judges not to ad lib on the definition of reasonable doubt.

24     Among other things, in a case called *United States v. Ivic*, 700

25     F.2d 51, the Court of Appeals had this to say, "Although

Hbsnros1

creativity by district judges in enlightening juries is

generally to be encouraged, a century's experience has

confirmed the wisdom of the Supreme Court's observation that

attempts to explain the term reasonable doubt do not usually

result in making it any clearer to the minds of the jury.

Chief Judge Coffin of the First Circuit has pointedly observed

that appellate courts have repeatedly cautioned that attempts

to explain reasonable doubt seldom clarify the concept and may

flirt with an impermissible reduction of the prosecution's

burden of proof and has wisely warned against personal

variations and needless departures from standard formulations.

At worst such variations may be prejudicial to a defendant.  At

best, they add needlessly to the work of appellate courts,

while being of no real benefit to the jury."

I would note also that the Second Circuit does not

require that any definition of reasonable doubt be given at

all.

So what you are getting is in substance Sand

Instruction 4-2, which has been repeatedly upheld, and that's

that.

OK.  Now, I just want to bring to the attention of the

lawyers that, given where we are, you ought to be aware of some

matters with respect to the jury.

You may remember that long ago Juror No. 10 sent us a

note advising us that the juror needs to be at something

Hbsnros1

1    starting at 11 o'clock on November 30 and can't get out of it.

2             Now, with respect to that, one possibility is to find

3    out how much of November 30 one would lose if she remained on

4    the jury.

5             The second and comparable problem is that alternate

6    No. 4 gave us a note, which was Court Exhibit G, saying that

7    she has travel plans for November 30 through December 3.

8             Now, what I do not want to happen here if it can

9    possibly be avoided is what happened in the recent Menendez

10   trial, which is to say we wind up with a deliberating jury on

11   November 30 and either have to break until the following week,

12   yet again which is a conceivable outcome here, or seat an

13   alternate in the middle and restart deliberations.  I don't

14   think that is in anybody's interest.

15            Now, give me your latest view on how long the

16   summation are going to be.

17            MR. JOHNSON-SKINNER:  The government's closing will be

18   two hours.  The rebuttal will be 45 minutes.

19            THE COURT:  Mr. Touger.

20            MR. TOUGER:  Hour and a half.

21            THE COURT:  All right.

22            If you keep to those times and if we limit the lunch

23   break to an hour and take no more than 30 minutes of break, we

24   are going to be here for eight hours today, at which point the

25   jury could get the case around 6 o'clock tonight.  My

Hbsnros1

1    inclination, given the situation, is to seriously consider

2    holding them into the evening so that they can begin

3    deliberating.

4          Any thoughts, comments on that situation I will

5    entertain now, because I think we're still down a juror or two?

6          MR. TOUGER:  I would think that we should just get rid

7    of Juror No. 10 and put an alternate in since I believe we have

8    two alternates even taking out the one alternate who has to

9    travel.  Then we have a full day on November 30 no matter what.

10   I would hate to have the jury thinking we have to come to a

11   verdict by November 30 at 11 o'clock or otherwise --

12         THE COURT:  I will not put a deadline on them.  That

13   is clear.

14         MR. TOUGER:  If Juror No. 10 hasn't come to a verdict,

15   then we would have having that situation at the Menendez trial,

16   where we are putting in an alternate after a day of

17   deliberations.  It seems to me we should just start out with an

18   alternate and get rid of Juror No. 10?

19         THE COURT:  What is the government's view?

20         MR. JOHNSON-SKINNER:  Judge, we don't think that juror

21   needs to be eliminated right now.  We think the Court's idea of

22   asking the jury what is going on on November 30 at 11 is a good

23   one.  That would might us a more information about what the

24   limitation is.

25         THE COURT:  Rachel, would you go back and tell Andy if

Hbsnros1

1    Juror No. 10 is here please send Juror No. 10 in and I will see

2    Juror No. 10 and counsel at the sidebar.

3              Thank you, Officer.

4              OK.  Let's go to the sidebar.

5              (Juror No. 10 present)

6              (At sidebar)

7              THE COURT:  This is about Thursday if we get that far.

8              JUROR NO. 10:  Yes.

9              THE COURT:  Just remind me, you are Ms. Blacklaw?

10             JUROR NO. 10:  I am Elizabeth Handler.

11             THE COURT:  I'm sorry I was thinking about a rule book

12   by Black Law.

13             What is the situation for Thursday?

14             JUROR NO. 10:  Thursday I have a school fundraiser

15   that I am in charge of.

16             THE COURT:  A school fundraiser?

17             JUROR NO. 10:  Correct.  I can get people to do

18   portions of it, but it starts at 5:30.

19             THE COURT:  At 5:30?

20             JUROR NO. 10:  But I am supposed to set up.

21             THE COURT:  Can somebody else set up, if we are

22   still --

23             JUROR NO. 10:  We can do that.

24             THE COURT:  If we are still in session obviously.

25             JUROR NO. 10:  Correct.

Hbsnros1

1              THE COURT:  On Thursday your problem starts at -- how

2      long does it take you to get to the school?

3              JUROR NO. 10:  About 4.

4              THE COURT:  I understand.  OK.

5              We will let you know where we are.

6              JUROR NO. 10:  OK.

7              THE COURT:  OK.

8              MR. TOUGER:  I couldn't hear.  She doesn't need to

9      leave until 4 o'clock on Thursday.

10             THE COURT:  Doesn't need to leave until 4 o'clock on

11     Thursday.  Thank you.  Go on back to the jury room.

12             (Continued on next page)

Hbsnros1

1              (In open court)

2              (Juror No. 10 not present)

3              THE COURT:  OK.

4              Now, what are the views of counsel in light of the

5      fact that we know that Juror No. --

6              MR. TOUGER:  That makes that easier, your Honor.

7              THE COURT:  I know it makes it easier.

8              What would you like me to do?

9              MR. TOUGER:  We might as well keep her as long as we

10     break at 4 o'clock on Thursday.

11             THE COURT:  OK.

12             Agreed?

13             MR. JOHNSON-SKINNER:  Yes, Judge.

14             THE COURT:  OK.  All right.  That takes care of that.

15             Now, given the tight schedule today, we are going to

16     provide the jurors with lunch.  We are not going to release

17     them over the lunch hour because they have a way of not getting

18     back when they're supposed to be back, at least not all of

19     them, and we'll try to adhere to the tight schedule we have.

20             MR. TOUGER:  I understand the Court's schedule.  The

21     Court wants to sum, charge, and have the jury deliberate today?

22             THE COURT:  Yes.

23             MR. TOUGER:  OK.  I mean, since we don't have the push

24     on Thursday, I don't really see the necessity of keeping them

25     for such a long time period.

Hbsnros1

| | |
|---|---|
| 1 | THE COURT:  I have learned that life is uncertain. |
| 2 | MR. TOUGER:  No doubt. |
| 3 | THE COURT:  No doubt.  Absolutely.  I know just what |

you are talking about.

MR. TOUGER:  There is no doubt about that, your Honor.

THE COURT:  I want the whole case fresh in their mind
when they start, and they will have it notwithstanding the
break, thanks to your summations and they will have the law and
they will at least get started and see where they are.

I am going to tell them I am going to hold them at
least until 7, but not later than 8, and we will just resume
tomorrow if there is no verdict.

OK.  Do we have the whole jury?

THE LAW CLERK:  All the jurors are here.  They are
just filling out menus.

THE COURT:  They are filling out lunch menus.

(Jury present)

THE COURT:  Good morning everyone.

JURORS:  Good morning.

THE COURT:  I hope you all had a wonderful
Thanksgiving and had a lot of great turkey and apple pie or
whatever it is you like.

OK.

Let me talk to you a little bit about the schedule
from this point on.  We are going to hear closing arguments

Hbsnros1

today.  It is my intention as of now that, if we keep to the

schedule that we are on, I will instruct you today, and you

will get the case late in the day.

          I am going to ask you to stay at least until 7 if you

have not reached a verdict, and possibly as late as 8.

          Andy, am I right that if they stay until eight they

get transportation home?

          (Pause)

          THE COURT:  If I were to keep you to 8, we will order

cars to take you home.

          We will get you dinner if that happens.  There will be

a phone installed in the jury room so that you will have access

to a phone over the lunch break to call whoever you have to

call in light of that schedule.

          I did warn everybody at the beginning of the trial

that there was a possibility that late in the trial we would

sit late, and here we are.

          Now, that is not to suggest a verdict has to be

reached at any particular time.  I am just bearing in mind the

fact that the case has taken longer for a variety of reasons in

calendar days than we expected at the beginning, and it is

getting into a difficult season.  So I'm trying to make sure

that you have a full opportunity to deliberate.

          Tomorrow will be a full day if you have not reached a

verdict today.  In all likelihood, though not with certainty,

Hbsnros1                    Summation - Mr. Johnson-Skinner

1    we may break a little early on Thursday if there is no result

2    by the late afternoon, but that is up in the air, and we'll go

3    from there.

4           Please, please, please take seriously my statement

5    that in discussing the schedule that goes out a couple of days

6    all I am trying to do is to provide against contingencies.  I

7    am not suggesting anything about how long you will take, how

8    long you should take, or how short a time you should take much

9    that is totally up to you.  Not my business.  I am just

10    planning the schedule.

11           OK.  With that, we are now going to hear closing

12    argument, and I will note that the defendant has been present

13    throughout this morning.

14           Closing argument.

15           Mr. Skinner.

16           MR. JOHNSON-SKINNER:  "Those dudes ain't gonna be

17    happy until they're carrying a coffin."

18           That's what James Rosemond said to Mohammed Stewart

19    about how his feud with G-Unit would end.

20           "Those dudes ain't gonna be happy until they're going

21    to a funeral."

22           That's what James Rosemond said to Khalil Abdullah

23    during a conversation about how Brian McCleod had a line on

24    Lowell Fletcher, who had assaulted Rosemond's son.

25           "That bitch is out of here."

1          That's what James Rosemond said to Abdullah after he

2     knew his plan had worked and Fletcher was dead.

3          "I can finally sleep."

4          That's what Rosemond said to Stewart when he knew he

5     had his revenge and his feud with G-Unit was over.

6          That man, James Rosemond, planned, ordered, and paid

7     for the murder of Lowell Fletcher.  Because there was a

8     funeral, because Fletcher was in the coffin, he had his

9     revenge, his feud was over, and he could finally sleep.

10          The feud between Rosemond and G-Unit, it started as a

11     music industry dispute, but in March 2007, G-Unit members,

12     including Lowell Fletcher, assaulted Rosemond's 14-year-old

13     son.

14          For Rosemond, they had gone too far.  He became

15     focused on a revenge-driven and sleep-depriving vendetta.

16     Instead of shootings at office buildings and cars, he targeted

17     real people and their families, just like his family had been

18     targeted.

19          Fletcher was arrested shortly after the assault on

20     Rosemond's son and served about two years in jail, but Rosemond

21     never forgot about what he did.  So when Brian McCleod, Slim,

22     came home from prison and told Rosemond he had a line on

23     Fletcher, Rosemond set in motion his plan to get his revenge

24     and to kill Fletcher, a plan that violently and permanently

25     ended his feud with G-Unit on September 27, 2009.

1    When Fletcher left his sister's house that day, he

2  thought he was going out for a night after coming home from

3  prison.  He had no idea that when he got off the train in the

4  Bronx a team of killers was waiting for him and that one of

5  them had a .22-caliber gun with a silencer.  Fletcher had no

6  idea that he would be shot five times in the back and in the

7  arm.

8    He had no idea that he would die after lying shot half

9  off the curb on that street in the Bronx.  He never met the

10  good Samaritan who stopped her car full of kids and tried to

11  save his life, and he didn't know that his sister was going to

12  get one of the worst phone calls of her life and leave her job

13  in tears.

14    Fletcher also had no idea that James Rosemond had been

15  waiting two years to get his revenge; that Rosemond had sent

16  his team of killers to murder him.  He didn't know that

17  Rosemond sent his old friend from prison as the lure man, his

18  personal chauffeur as a getaway driver, one of his gun guys as

19  the trigger man, and one of his drug dealers as the backup

20  shooter that night.

21    He had no idea that Rosemond had put a $30,000 bounty

22  on his head.

23    But you know who is responsible for that murder.  You

24  know why Fletcher died.  You know that James Rosemond is guilty

25  of hiring a crew of his own trusted men to kill Fletcher, that

Hbsnros1                    Summation - Mr. Johnson-Skinner

1    he sent his gun with a silencer to the scene, that he paid

2    thousands of dollars for the murder after it was done.

3            Three weeks ago we told you that we would prove to you

4    that Rosemond ordered, planned, and paid for the murder of

5    Lowell Fletcher as part of his violent feud with G-Unit, and

6    that is exactly what the evidence has shown.

7            Before I go any further, I want to give you a brief

8    roadmap of what I will talk about today.  I am going to talk

9    about three things:

10           First, I am going to go over what is really in dispute

11   in this case.

12           Second, I am going to talk about the evidence that you

13   have seen and heard, evidence including the feud before the

14   slap, the violence after the slap on his son, and the murder of

15   Fletcher and how that evidence shows the defendant intended

16   that murder.

17           And, third, I will remind you of the charges and go

18   over how the government has proven the elements of the charged

19   crimes, why the defendant is guilty.

20           So now that we've reached the end of case, what's in

21   serious dispute here?

22           Based on everything defense counsel conceded in his

23   opening, the answer is not much.  Now, defense counsel has no

24   burden.  It's the government's burden, and we embrace it.  But

25   let's focus on what's really in dispute.

Hbsnros1                          Summation - Mr. Johnson-Skinner

1           Defense counsel conceded in his opening that there was

2   a violent feud between G-Unit and Rosemond.

3           He conceded that Fletcher assaulted Rosemond's son.

4           He conceded that Rosemond was deeply upset by that

5   assault and was seeking revenge for it.

6           He conceded that Rosemond's associates were offered

7   $30,000 to bring Fletcher to Rosemond.

8           And he conceded that Fletcher died.

9           There also can be no serious dispute that when

10  Fletcher was killed, when he was shot to death by the

11  .22-caliber gun, four of Rosemond's closest associates were at

12  the murder scene:  Brian McCleod, Slim; Jason Williams, his

13  driver; Derrick Grant, D; and Rodney Johnson, Toree.

14          There can't be any serious dispute that Fletcher was

15  shot and killed by Grant, and that McCleod lured Fletcher

16  there, and that Jason Williams was the getaway driver that day

17  and that Johnson was waiting in a car nearby.

18          There can't be any real dispute that all of those men

19  agreed and conspired with each other to shoot and kill Fletcher

20  that night.

21          I will discuss the evidence in more detail later, but

22  McCleod and Jason Williams admitted to that before you on the

23  witness stand.

24          You heard how Grant let off seven shots with a gun

25  with a silencer and that five of them hit Fletcher.  There can

Hbsnros1                         Summation - Mr. Johnson-Skinner

1  be no real dispute that the four Rosemond associates at the

2  murder scene had no motive of their own to kill Fletcher except

3  for their association with Rosemond, who had an obvious motive

4  to get revenge on Fletcher for what Fletcher did to his son.

5          There can be no serious dispute that Rosemond

6  participated in numerous meetings and conversations with

7  McCleod in advance of Fletcher's murder.  McCleod testified

8  about that.  His testimony was confirmed and was corroborated

9  by the testimony of Jason Williams, Khalil Abdullah, from the

10  phone records you saw, and from the cell site evidence you saw.

11  That showed Rosemond at the in-person meetings and in those

12  phone conversations with McCleod in the days and weeks before

13  Fletcher's murder.

14          So what's really in dispute here?

15          Defense counsel said in his opening the one major gap

16  in the government's case is that there was "no evidence" to

17  prove that Rosemond intended Fletcher to be killed instead of

18  shot or injured.

19          He said the question would be under what circumstances

20  did he die and who intended Fletcher's death?

21          Well, now you have heard all the evidence.  You know

22  there is no gap in the government's case.  You know who

23  intended Fletcher's death.  James Rosemond.

24          You know that he led the plot to kill Fletcher, that

25  he ordered it, planned it and paid for it.

Hbsnros1                    Summation - Mr. Johnson-Skinner

1          And you know he wanted a funeral as a result of his

2   actions.  He wanted Fletcher to die.  That's why he's guilty.

3          Now, before we go through all that evidence, since we

4   had some time apart, I want to remind you about the cooperating

5   witnesses in this case:  Mohammed Stewart, Khalil Abdullah,

6   Jason Williams and Brian McCleod.

7          First, Mohammed Stewart, Tef.

8          Stewart knew Rosemond since he was about 20 years old,

9   and he was living with his mother in the same building as

10  Rosemond.  Rosemond was about 15 years older than Stewart.

11  Stewart was one of Rosemond's enforcers, his Swiss knife as

12  Khalil Abdullah put it.

13         He told you about working in Rosemond's drug business,

14  and he told you about doing multiple shootings for and with

15  Rosemond as part of the G-Unit feud.  Stewart testified about a

16  conversation where Rosemond told him, "Those dudes ain't gonna

17  be happy until they're carrying a coffin."

18         And then Stewart told you about how Rosemond called

19  him back to New York after Stewart had moved to Atlanta, how

20  Stewart saw Fletcher's obituary, and how Rosemond told him, "I

21  can finally sleep."

22         Next, Khalil Abdullah.

23         Abdullah was the defendant's number two man in his

24  drug business.  He also took part in some of the violence you

25  heard about.  He told you about Rosemond telling him that

1    McCleod was in touch with Fletcher, and he could line him up

2    after he got home from prison, and that McCleod was doing that

3    "because those dudes won't be happy until they go to a

4    funeral."  Abdullah testified about the message he got from

5    Rosemond after Fletcher's murder that "that bitch is out of

6    here."He also told you about Rosemond recounting the murder to

7    him in detail a few days after the murder at that meeting in

8    Harlem outside the restaurant.

9                Next, Jason Williams.

10               He started as Rosemond intern at the music business in

11   about 2001.  Williams was about 19 years old then.  Like

12   Stewart he was about 15 years younger than Rosemond.  Williams

13   was eventually promoted to Rosemond's personal driver.  He ran

14   errands for Rosemond, including in the drug business, and he

15   drove Rosemond and others to shootings as part of the feud with

16   G-Unit.

17               Rosemond handpicked Williams to be part of the murder

18   crew.  He sent Williams to the scene of the murder with

19   Rosemond's .22-caliber gun with a silencer, and he had Williams

20   get rid of the gun after the murder was done.

21               Last, this is Brian McCleod, Slim.

22               McCleod was Rosemond's friend whom he met in prison in

23   about 1997.  McCleod worked at Czar, Rosemond's music company

24   in the early 2000s keeping an eye on things for Rosemond.  He

25   also helped with the drug business, and in 2004 McCleod was

Hbsnros1                    Summation - Mr. Johnson-Skinner

1    arrested after Rosemond asked him to go clean out one of

2    Rosemond's drug stash houses.  McCleod spent five years in

3    prison for Rosemond before getting out in 2009.

4            By the time of Fletcher's murder, Slim knew Rosemond

5    for about 12 years.  Doing that time in jail is where McCleod

6    first located Fletcher, and because he had been loyal to

7    Rosemond, he never cooperated with the police against him,

8    Rosemond felt he could trust McCleod to play a key role in his

9    plot to kill Fletcher.  McCleod was the lure man and he

10   coordinated the murder directly with Rosemond.

11           Now, I want to talk to you about what those witnesses

12   told you what all the other evidence in this case showed about

13   how Rosemond intended Fletcher's murder.

14           You can't understand why Fletcher was murdered without

15   understanding the background that came before the murder.

16   Context matters.  The context for Fletcher's murder was the

17   ongoing violent feud between Rosemond and G-Unit that developed

18   into a conspiracy to kill a member of G-Unit.

19           Let me take a moment to remind you about the people

20   you heard about in this trial on each of the side feud.

21           On one side was Rosemond; his enforcer, Mohammed

22   Stewart; his personal driver, Jason Williams; his drug business

23   partner, Khalil Abdullah.

24           You also heard about other Rosemond associates who

25   worked or hung out at his office, people like Brian McCleod,

Hbsnros1                    Summation – Mr. Johnson-Skinner

1    Teddy Coleman, and Derrick Grant.

2                You heard about members of his drug crew, like Derrick

3    English, Little D; Jonathan Brown; Rodney Johnson, Toree; and

4    Brian James, B-Love.

5                You heard about one of the artists that Rosemond

6    managed in his music business, The Game.

7                On the other side was G-Unit.  G-Unit was a music crew

8    made of 50 Cent, Tony Yayo, and other rappers.  The manager for

9    G-Unit -- like Rosemond was the manager for The Game -- was

10   Chris Lighty.  He had his own music management company called

11   Violator Records.

12               G-Unit's muscle, like Rosemond had Stewart, was a man

13   named Baja, a road manager for G-Unit.  Fletcher was also

14   another road manager for G-Unit.

15               During this trial you heard about the many shootings

16   and acts of violence that were part of this feud, most of which

17   were ordered by and paid for by the defendant.

18               Now there's too many of them.  I'm not going to go

19   through all of them.  I'm just going to start with the

20   incidents before Rosemond's son was slapped.  These incidents

21   showed you that, even before his family was attacked, Rosemond

22   was willing to use violence as part of this feud.

23               So let's start with the first one.

24               The first shooting you heard about was done by Derrick

25   Grant at the front door of Violator Records.  There's Violator

1    Records.

2         McCleod testified that Grant told him that he shot at

3    Violator, and Rosemond was going to pay Grant for that

4    shooting.  And you know the shooting happened because you have

5    a stipulation that in January 2003, an NYPD officer responded

6    to Violator's offices and saw shell casings from a bullet,

7    bullet holes, and broken glass.  It's stipulation 1380.  You

8    can ask for any of these stipulations in the jury room.

9         So the same shooter, Derrick Grant, who ended the feud

10   with G-Unit by killing Lowell Fletcher, he did one of the first

11   shootings.  Then McCleod told you about the time Rosemond told

12   him that he himself shot at Chris Lighty's car because Lighty

13   wasn't returning his calls.

14        Here's a stipulation about how an NYPD officer saw

15   bullet holes in a truck near Violator's offices after that

16   incident in February 2003.  So you know McCleod was telling the

17   truth about that.

18        Mohammed Stewart told you about the next incident.

19   That is at Hot 97 radio station.  There is a picture of it.

20        He told you he went to Hot 97 to back up The Game, who

21   was there to confront 50 Cent.  Stewart saw a shooting outside

22   the door, aimed at The Game's people outside.

23        Stewart talked to The Game afterwards, who was upset

24   and said he wanted to go some happen.  So, Stewart called his

25   friend, his friend came and retaliated by shooting at

Hbsnros1                    Summation - Mr. Johnson-Skinner

1  Violator's offices.

2       You know that happened, too.  You have these two

3  stipulations first about how an NYPD detective found a person

4  shot outside of Hot 97 that day, and then a second one about

5  how another detective found shattered glass and bullet holes at

6  Violator Records.

7       Now, Stewart told you straight up Rosemond didn't

8  order him to do that shooting.  But remember what Stewart said

9  about talking to Rosemond about it, that Rosemond lectured him

10 afterwards.  Not because you shouldn't be shooting at office

11 buildings, but because he did it for free.  Let The Game's guys

12 do that.  Rosemond told him to know his value and told him he

13 would get him money from The Game for that, and Rosemond

14 eventually got Stewart $2,000 Stewart told you.

15      Now, compare that to the murder of Fletcher.

16      Did you hear any evidence about Rosemond lecturing

17 anyone after the murder for doing something out of turn?  No,

18 because in that case, they did what Rosemond wanted.

19      Next, the Apollo Theater shooting.

20      Stewart and Abdullah both told you about this.  They

21 told you that Tony Yayo and members of G-Unit approached

22 Rosemond at the theater and asked about The Game.  Stewart told

23 you there was an altercation, and he and Rosemond left the

24 theater.

25      He told you he saw Rosemond talking to Abdullah

1    outside the theater, and Stewart told you later that Rosemond
2    came back and said they shot at Yayo's Bentley.
3            Abdullah told you that Rosemond made a call to inside
4    the Apollo to find out where was Yayo and learned he was in the
5    Bentley.  Abdullah told you that he told Rosemond he would take
6    care of it right now.  And Abdullah called his friend to bring
7    some guns and shoot up Yayo's car.
8            Abdullah and Rosemond were waiting together in a
9    nearby car when that shooting happened.
10            You know Abdullah and Stewart were telling you the
11    truth about that because you have a stipulation about a person
12    being shot near the Apollo that night.
13            Now, I want to fast forward to March 20, 2007, the day
14    Rosemond's rivalry with G-Unit changed from shootings at
15    buildings and cars to something more personal and serious.
16            There's no dispute that Jabulani Rosemond, the
17    defendant's son, was assaulted that day by members of G-Unit
18    and that Jabulani identified Yayo and Fletcher as the people
19    who attacked him.
20            You have this stipulation about an NYPD's detective's
21    investigation of that assault and that Yayo and Fletcher were
22    arrested afterwards.  You heard from Rafael Maldonado, that
23    parking lot attendant across the street, who gave you an
24    eyewitness account of the slap of Rosemond's son.
25            Abdullah testified that Rosemond told him that Yayo

Hbsnros1                    Summation - Mr. Johnson-Skinner

1    and others had grabbed his son, acted like they had a gun, and

2    smacked him.

3           Stewart told you what happened that day, too, that he

4    was called down to Rosemond's office, and Rosemond and Jabulani

5    were there.  Jabulani was crying and Rosemond was angry.

6           Stewart told you that he went outside with Rosemond

7    down to 25th Street, remember where Violator's offices were,

8    across the street from Czar's offices, Rosemond's company.

9    Stewart saw Lighty's brother, and he persuaded Rosemond to let

10   him attack Lighty's brother.

11          Now, Stewart told you at first Rosemond didn't agree

12   that a family member of G-Unit should be attacked.  But Stewart

13   pointed out that Rosemond's own family had been attacked.  So

14   Rosemond nodded his head, and he passed a razor blade to

15   Stewart, and his enforcer took care of the rest.

16          You know, in the defense opening defense counsel

17   promised you that you would hear about a lot of incidents where

18   Rosemond was attacked and he just walked away, turned the other

19   cheek he said.

20          Now, again, defense has no burden.  The burden of

21   proof always rests with us.  But when the defense makes

22   arguments in opening and cross-examination, you can and should

23   scrutinize those arguments.

24          The defense promised in the opening that the evidence

25   would show that Rosemond instructed Stewart not to attack

Hbsnros1                    Summation - Mr. Johnson-Skinner

1   Lighty's brother.  Now you have heard the evidence, and you

2   know that's just wrong.

3           Stewart testified that Rosemond initially didn't want

4   to attack Lighty's brother, but then Stewart said the gloves

5   should come off, and Rosemond agreed, and he nodded his head

6   and passed the razor.  That is at transcript 186 to 187.

7           And Abdullah's testimony backs Stewart up.  Abdullah

8   said that Rosemond told him he sent, sent Tef down the block,

9   and Tef cut somebody in the face.

10          That's at 506.

11          Rosemond didn't turn the other cheek in that incident,

12  and he didn't turn the other cheek after the Apollo incident

13  either.

14          You heard that Rosemond initially said after the

15  Apollo incident, "I want to handle it later," and Abdullah

16  said, "I'll handle it now."

17          "Handle it later" is what Rosemond said.  That's what

18  you heard about Rosemond doing in this case.  Handling it

19  later.  That's not turning the other cheek.  That's being smart

20  and waiting for the best time to strike.

21          That's revenge as a dish best served cold, like how

22  Rosemond waited for two years for Fletcher to get out of jail

23  after serving time for assaulting his son, and then hit him so

24  hard and so fast he didn't see it coming, because Rosemond

25  couldn't turn the other cheek after the assault on his son.  An

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Hbsnros1                    Summation - Mr. Johnson-Skinner

1    attack on his son was not something he was going to stand for.

2         From that moment forward, Rosemond's feud with G-Unit

3    was no longer about cars and office buildings.  It was about

4    attacking G-Unit members and their families and putting someone

5    in a coffin.

6         Stewart told you on the stand about how Rosemond's

7    attitude changed after the assault on his son.  Stewart

8    testified that Rosemond was always upset.  He spoke to Stewart

9    almost every day about strategy for getting back at G-Unit.

10   Stewart told you that Rosemond told him about all the nights of

11   sleep that Rosemond had lost.

12        And Brian McCleod told you the same thing, using

13   almost the same language, that Rosemond said he couldn't sleep

14   since the assault on his son.

15        There's the transcript cites for both of those.

16        So let's talk about Rosemond's response to that

17   assault, the conspiracy to murder members of the G-Unit that

18   resulted in Fletcher's death.

19        You heard about a shooting Rosemond did personally

20   just one month after the slap on his son in April 2007.  This

21   is Tony Yayo's mother's house.  All four cooperating witnesses

22   told you about this shooting, and they corroborated each other.

23        Abdullah told you he went to a banquet with Rosemond

24   where Rosemond told him he had a line on Yayo's mother's house

25   and was going to go clap it up.

Hbsnros1                        Summation – Mr. Johnson-Skinner

1          Abdullah told you that Rosemond left the banquet with

2    Jason Williams.  Abdullah told you that later that night

3    Rosemond came back to the banquet and told him the shooting

4    went well.  He fired 30 bullets at the house with what Abdullah

5    called Rosemond's Mac with a silencer.

6          Jason Williams told you about that shooting too.  He

7    told you he drove Rosemond to Yayo's mother's house, that

8    Rosemond reached out the window of the car and did a drive-by

9    shooting of the house with the same Mac machine gun with a

10   silencer.

11         You remember Williams' testimony about the noise the

12   gun made.  He said it sounded like a roulette wheel when

13   Rosemond was firing it.

14         Stewart told you about that shooting, too.

15         Rosemond told Stewart that he went to the house, to

16   Yayo's mother's house, where he waited.  He waited, he said,

17   for Yayo's sister to walk in with her baby.  Rosemond told

18   Stewart he saw that bitch go in and he shot up the house with a

19   .45-caliber gun.  That is at transcript 215 to 216.

20         That gun is the same gun that Abdullah and Williams

21   described as the Mac machine gun.  You saw how they all told

22   you it was about the same size, about a foot and a half long.

23         Finally, McCleod told you that when he met with

24   Rosemond in Central Park later on, after McCleod got out of

25   jail, Rosemond told him he put shoots into Yayo's mother's

1    house.

2              How else do you know about the shooting?

3              Well, Valerie Bernard, that's Tony Yayo's sister, she

4    took that stand.  And even though she was so scared she didn't

5    want to say the name of her child, she told you about how she

6    was in the house with her two-year-old daughter and that she

7    usually eats dinner in the kitchen.  But that night she decided

8    to go upstairs.  And while she was up there, she heard rapid

9    gunshots into the house.

10             She threw her daughter to the floor, she covered her

11   up, and she called 911.  When she finally got up, she saw

12   bullet holes through the front door of her house into her

13   kitchen where she usually would have been with her daughter.

14             Last, you have Sergeant Burt Antoine, who told you he

15   responded to that house, and he recovered shell casings, which

16   Detective Fox told you were .45-caliber shell casings, the same

17   caliber as that gun, and he told you that Yayo's mother sister

18   and daughter were actually in the house when Sergeant Antoine

19   arrived.

20             So, was Stewart right about Rosemond telling him that

21   he waited for the sister and the baby to go into the house?

22   Stewart wasn't there, remember.  He heard this from Rosemond.

23             How else would Stewart know that Ms. Bernard and her

24   daughter were actually in the house unless Rosemond really told

25   him that?

Hbsnros1                    Summation - Mr. Johnson-Skinner

1           That's one way you knew Stewart was telling you the

2    truth about that.

3           Rosemond's next main target was Baja, the enforcer for

4    G-Unit.  Stewart told you that Rosemond offered him money to

5    shoot at Baja's house and Baja's sisters house shortly after

6    the slap on the son.

7           So Stewart got his friend Life to shoot at Baja's

8    house in Staten Island.  And Rosemond paid Stewart $12,000 for

9    that.

10          Now let's pause on that price Rosemond paid, $12,000

11   for Stewart getting one other person to shoot at a house.

12          We'll come to it later.  But you know that Rosemond

13   offered at least $30,000 for the murder of Fletcher.  That's

14   almost three times the amount of money he paid for a shooting

15   at a house.

16          That's important.  The amount of money alone is

17   evidence of Rosemond's intent.  He didn't intend a nonfatal

18   shooting or a shooting at a house.  He intended something more

19   serious and more expensive, a murder.

20          Stewart told you that he sent his friend Life to shoot

21   at Baja's sister's house also, and he had him use Rosemond's

22   .22-caliber gun with a silencer.

23          Stewart heard from Rosemond that the shooting didn't

24   actually happen, even though Life said it did.  So Rosemond

25   wasn't going to pay him for that.

Hbsnros1                    Summation - Mr. Johnson-Skinner

1          That is because Rosemond was a businessman.  He only

2     pays you when you do what he wants, like he paid the members of

3     the murder crew who carried out the murder of Lowell Fletcher

4     that he wanted done.

5          Jason Williams told you about that shooting at Baja's

6     sister's house, too, that he drove Stewart's friend there.

7     Williams didn't know his name, but that's the friend Life.

8          Williams said the friend got out of the car with a gun

9     with a silencer, just like Stewart told you.  And when the guy

10    came back to the car he said he actually did shoot a bystander

11    in the foot.  That's more corroboration for what Stewart said.

12         You heard about the car Jason Williams drove that day,

13    his Nissan.  You heard that after the assault on Rosemond's son

14    that's when Rosemond asked Jason Williams to get a stash box or

15    a hidden compartment installed in that car, the same stash box

16    that would hold the .22-caliber gun on the night of the murder.

17         Stewart told you about another attempted shooting at

18    Baja's house that Rosemond personally participated in.  Stewart

19    testified that he met Rosemond one night at Baja's house.

20    Stewart said Rosemond gave him the same big .45-caliber gun.

21    Stewart ran around the back of the house, but he saw a girl in

22    the window, so he didn't shoot.

23         When Stewart came back to Rosemond, Rosemond was

24    disappointed and angry saying, "Don't be wasting my time."  In

25    other words, don't be wasting my time by not shooting, even if

Hbsnros1                    Summation - Mr. Johnson-Skinner

1    a young girl is in the house.

2          That is powerful evidence that the G-Unit feud had

3    changed after the assault on Rosemond's son.  Rosemond wasn't

4    interested in excuses.  He wanted results.  It is also

5    important evidence again about what Rosemond does when you

6    don't do what he wants.

7          He has no problem telling his men when he's not happy.

8    You will hear there is no evidence of him being upset or

9    telling anyone he's not happy about his crew killing Lowell

10   Fletcher.

11         Stewart also told you about his conversations with

12   Rosemond about killing Baja, about how Rosemond wanted to see

13   how much it would cost to put a hit on Baja.

14         Rosemond told Stewart to see if he can get guys

15   Stewart knew in Brooklyn to kill Baja for $20,000.  Stewart

16   spoke with the guys in Brooklyn, and then he reported back to

17   Rosemond that they're willing to kill Baja but they'd asked for

18   $75,000.

19         Stewart testified that Rosemond told him, nah, that

20   was too much money.  Notice Rosemond didn't say to Stewart:

21   No, I am not having any of those G-Unit guys killed.  You got

22   me wrong.

23         He told him it was too expensive.

24         That conversation is important evidence about

25   Rosemond's state of mind and his joining a conspiracy to have

Hbsnros1                        Summation - Mr. Johnson-Skinner

1    members of G-Unit killed.

2              Here he is talking to Stewart about how much money it

3    would take to kill Baja.  You can ask for that testimony in the

4    jury room.  It's pages 219 to 221.

5              And, again, look at the amount of money.  The amount

6    of money Rosemond offers for Fletcher's murder remember is at

7    least $30,000.  That's $5,000 more than the $25,000 here he

8    wanted to pay to have Baja killed.

9              So the fact that the money is about the same, that's

10   another way you know that Rosemond intended Fletcher to be

11   killed.

12             You also heard about the time Rosemond was staking out

13   a 50 Cent video shoot in New Jersey, and he Stewart and

14   Williams followed a car with Chris Lighty in it.

15             Stewart told you that Rosemond tried to get the

16   .45-caliber gun out of the car when they were stopped at a toll

17   booth next to Lighty's car.  Stewart told you the gun went off

18   as Rosemond was trying to get it.  And Williams told you too

19   that when Rosemond reached for the gun it jammed, and it went

20   off in the car.

21             You know Stewart and Williams were telling you the

22   truth because they both told you the same things about that

23   incident.

24             You heard from Stewart and Abdullah about Rosemond

25   plotting to have Lighty shot on other occasions.

1       Now, the cooperating witnesses they told you straight

2   up that Rosemond didn't want Lighty killed.

3       You heard about the instruction he gave Abdullah:

4   "Give him a leg shot."

5       And both Abdullah and Stewart told you that Rosemond

6   said almost the same words, "Don't kill the man," when he was

7   giving instructions of violence against Lighty.

8       Two things about that.

9       First, does that mean that Rosemond didn't want a

10  member of G-Unit dead?

11      No.  It tells you that Lighty was not the same to

12  Rosemond as Baja and Fletcher and Yayo.  Lighty wasn't

13  identified as part of the group of people that assaulted his

14  son, like Fletcher and Yayo were.

15      And Abdullah told you Lighty was a, quote, square.

16  His father was in law enforcement.  He wasn't a street guy like

17  Baja.  He owned his own music company.

18      For Rosemond, killing Lighty would not be the same as

19  killing a street guy, someone who Rosemond saw as a gang banger

20  in the Bronx, like Fletcher.

21      Second, it tells you that Rosemond had no problem

22  making crystal clear to his men when he wanted someone shot but

23  not killed.  "Don't kill the man."

24      Ask yourselves, since Rosemond had a whole murder team

25  in place to kill Fletcher, since he asked them to scout

Hbsnros1                    Summation - Mr. Johnson-Skinner

1    locations with no cameras, since he sent his gun with a

2    silencer to the scene, since he asked McCleod to get an

3    untraceable Stacy King phone to only use with Fletcher, since

4    he offered McCleod at least $30,000, if Rosemond didn't intend

5    his crew to kill Fletcher, that he just wanted him injured,

6    don't you think he would have said something clear like, "Don't

7    kill the man."

8            All of these incidents that occurred after the assault

9    on Rosemond's son, where Rosemond and his crew are shooting at

10   G-Unit members and their families, this is how you know that

11   the feud changed, that Rosemond wanted revenge for the assaults

12   on his son and that he wanted a G-Unit member dead.

13           On September 27, 2009, he achieved that goal.  So now

14   I want to turn to the events that led to Fletcher's murder.

15           McCleod told you he was released from prison on August

16   10, 2009 after serving five years from jail for cleaning out

17   Rosemond's drug stash house.

18           You heard evidence that over the years that McCleod

19   was in jail Rosemond had put money into McCleod's prison

20   account.  McCleod told you he had received the money, and Jason

21   Williams told you he put the money into the account for

22   Rosemond.  And you saw the stipulation that showed you that

23   Williams and Rosemond and Czar Enterprises, Rosemond's

24   business, put money into McCleod's account.

25           Rosemond was loyal to McCleod, just like McCleod had

1    been loyal to Rosemond by not cooperating against him after he
2    was arrested at that drug stash house.

3         McCleod told you that two days after he came home on
4    August 12, he went to Rosemond's office at 25th Street.
5    Rosemond wasn't there, but McCleod spoke to him on the phone.

6         Rosemond told him he didn't want to meet at the studio
7    because it was under a lot of surveillance.  Rosemond told
8    McCleod there was something for him at the office, and he
9    should use it to get a phone and then call Rosemond immediately
10   with the number.  And McCleod picked up an envelope with about
11   $5,000 from Rosemond's secretary.

12        The next day, it is August 13 now, using some of that
13   money, McCleod told you he went to a Metro PCS store, where he
14   purchased a cell phone using the name Iraqius Thibedeaux, named
15   after an old army buddy of his.  You know that's true because
16   here's the subscriber information for that phone McCleod
17   purchased on 8/13/2009.

18        Now McCleod told you he didn't spell out the name for
19   the store clerk, so you know why it ended up as the Thibedeaux
20   Ingam phone.

21        Here's the main cell site area for that phone, where
22   he most often went to sleep at night and woke up in the
23   morning, right near where McCleod told you he was living at the
24   time in Brooklyn.

25        So that's McCleod's first phone when he was out of

Hbsnros1                    Summation - Mr. Johnson-Skinner

1    jail, or the Ingam phone or the McCleod phone 1 in our charts.

2         About a week later McCleod told you he had his first

3    face-to-face meeting with Rosemond.

4         McCleod thought this meeting was on August 17, but if

5    you look at the phone records you will see that Rosemond and

6    McCleod they actually first had their phone calls on the Ingam

7    phone on August 19. So was it the 19th instead of 17th?

8    Probable. But, either way, you know the meeting happened from

9    the phone records.

10        Now, by now you know that the phone Rosemond used to

11   talk to McCleod, listed here as the Buckson phones, that's

12   Rosemond's phone. The phone was bought and paid for by

13   Dr. Theresa Buckson, who testified that she gave Rosemond an

14   AT&T iPhone as a present. Stewart told you that Rosemond had

15   multiple phones, including a BlackBerry and an iPhone, and you

16   heard Deputy Heintz testify that the main or the most common

17   cell area where that phone went to sleep and woke up, it was

18   right here on the West Side of Manhattan, near West End and

19   60th Street. Dr. Buckson and Jason Williams both told you that

20   that's where Rosemond lived at the time in 2009.

21        Defense counsel even brought out from Deputy Heintz

22   that Rosemond lived at 63rd and West End Avenue, and therefore

23   it wasn't unusual for his phone to be concentrated there.

24        Deputy Heintz also told you that that phone, it only

25   hit once or twice in the Maryland or Washington, D.C. area,

1    which is where Dr. Buckson told you she lived at the time.

2                  Look at the people that the Buckson phone communicated

3    with.

4                  Deputy Heintz told you it contacted Mohammed Stewart,

5    Brian McCleod, people who told you they didn't recognize

6    Dr. Buckson's picture, but who you know committed crimes with

7    Rosemond.  That's because that Buckson phone, it was one of

8    Rosemond's multiple phones at the time.

9                  Now, back to that first meeting between McCleod and

10   Rosemond in Central Park.

11                 McCleod told you that he met Rosemond -- if we go to

12   the next slide -- here in Central Park.

13                 McCleod told you he saw Jason Williams in a car

14   nearby.  And you heard testimony about Rosemond having other

15   meetings near Central Park.  Stewart told you that he met

16   Rosemond near Central Park, and that makes sense, given what

17   you know about where Rosemond lived, that he wanted to meet in

18   Central Park.

19                 During this meeting McCleod told you that Rosemond

20   warned him there was a totally different climate now than when

21   McCleod had first gone to jail.

22                 Rosemond said every law enforcement agency was looking

23   at it.  And Rosemond told McCleod about the G-Unit feud and

24   that he was going to war with these clowns.

25                 Rosemond told McCleod that he had shot at cars at the

Hbsnros1                    Summation – Mr. Johnson-Skinner

1    Apollo and that he had 70 shots sent into Yayo's mom's house.

2              That is when McCleod told the defendant for the first

3    time about his line on Lowell Fletcher.  McCleod explained to

4    you why he had a way to contact Fletcher.  Fletcher had been in

5    the same jail as him at Mohawk, and he was bragging about

6    attacking Rosemond's son in jail.

7              McCleod had a friend still in the jail, Kevin Chung,

8    who could reach out to Fletcher, who was a Blood gang member

9    like Fletcher, and who had the same lawyer as Fletcher, and

10   McCleod knew that Fletcher was coming home soon, so he might be

11   able to reach out to him.

12             McCleod told you Rosemond was very interested in this

13   information, and McCleod testified what Rosemond did next.  He

14   got quiet, and he told McCleod that he hadn't been able to

15   sleep since "they touched my boy."

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

HBSAAROS2                    Summation – Johnson-Skinner

1          MR. JOHNSON-SKINNER:  This is in August 2009, ladies

2    and gentlemen.  The slap on his son was in March 2007.  This is

3    more than two years later.  Rosemond was still focused on that

4    assault, still lost sleep over it.  That tells you how

5    important the event was to him.  It also tells you he was still

6    frustrated.  None of his other nonfatal shootings were not this

7    satisfying.  That's more evidence that this was different.  He

8    intended here to murder Fletcher.  McCleod also testified that

9    Rosemond said he wished he had known McCleod had a line on

10   Fletcher because Rosemond had $10,000 for someone to mark or

11   scar Fletcher in prison.  At the end of this meeting Rosemond

12   gave McCleod more money, another $5,000.  Rosemond told McCleod

13   the money was more payment for staying loyal to Rosemond over

14   all these years.

15          You heard about McCleod's lying of Fletcher from other

16   witnesses too.  Abdullah told you about another conversation he

17   had with Rosemond outside a barbershop sometime shortly after

18   McCleod had come home.  In that conversation Rosemond told

19   Abudllah that McCleod had been in jail with Fletcher and that

20   he was going to stay in touch with him to possibly line him up

21   when he got home.  He said because these dudes ain't gonna be

22   happy until they go to a funeral.  That's at page 526.  Ask for

23   this testimony in the jury room.

24          Ladies and gentlemen, pay attention to this

25   conversation between Rosemond and Abdullah, shows Rosemond

HBSAAROS2                    Summation - Johnson-Skinner

1    Rosemond's state of mind.  Look at the context.  Since the

2    assault on his son Rosemond had been doing shootings and paying

3    others to do shooting.  There had been retaliation back.

4    Stewart told you about Baja trying to put money on Stewart's

5    head.  Stewart told you about those guys in the white van

6    shooting at him and about Rosemond being ambushed by 50 Cent's

7    entourage.

8            And you know from McCleod that Rosemond was losing

9    sleep still over his son being assaulted.  So in that context

10   Rosemond explained to Abdullah exactly why McCleod was going to

11   line up Fletcher.  He said because these dudes -- that's

12   G-Unit -- wasn't gonna be happy.  In other words, they weren't

13   going to stop.  The feud was not going to end until G-Unit went

14   to a funeral, until one of their own died.  That's why McCleod

15   is working on lining up Fletcher.

16           So this conversation is another way you know what

17   Rosemond wanted.  He wanted to send G-Unit members to Lowell

18   Fletcher's funeral.  By the way, he is telling the truth about

19   this barbershop meeting.  How do you know?  Abdullah testified

20   that during this meeting with Rosemond, Rosemond told Abdullah

21   that McCleod had received only $1000 in coming home money from

22   their associate, Rodney Johnson.  And McCleod also took the

23   stand and testified that after he got out of jail he actually

24   got $1000 from Johnson to help him get back on his feet in

25   August 2009.

HBSAAROS2                    Summation – Johnson–Skinner

1           Now, you have to ask yourself, how did Abdullah, who
2      told you he'd never spoken to McCleod in his life know that
3      McCleod was given $1000 by Johnson?  He knew that because
4      Rosemond told him.  That conversation really happened at the
5      barbershop.  That's how you know he was telling the truth about
6      that.
7           About a week after that first meeting between McCleod
8      and Rosemond in Central Park, Rosemond summoned McCleod for a
9      second meeting.  This one took place inside the Whole Foods at
10     Columbus Circle again near Rosemond's home on the west side.
11     Makes sense.  McCleod told you that Rosemond wanted to meet
12     there because there was no phone reception downstairs and
13     Rosemond noticed going down the escalator he had no cellphone
14     signal on his phone.  Rosemond was being careful because he
15     knows the seriousness of what he is about to talk about with
16     McCleod.  He is about to plan a murder.  This meeting is very
17     important.  It's here by that "Sweet and Spice" sign that
18     Rosemond starts to work out the details of his plot to kill
19     Lowell Fletcher.
20          Here is what McCleod told you was said.  Rosemond
21     first said he had $30,000 for anyone who could bring Fletcher
22     to him because he's gonna hit him so hard and so fast he's not
23     gonna see it coming.  McCleod responded, Are you thinking about
24     doing this yourself?  You're gonna do this yourself?  And
25     Rosemond said, Yeah.  What were you thinking?  And McCleod then

said, I spoke to "D" the other day.  And Rosemond said, OK.  I

haven't seen "D" in quite some time.  OK, yeah.  Speak to "D".

Let me know how that goes.

          Now let me go back and break this down because it's

important.  The first thing Rosemond said to him was that he

had $30,000 for anybody who can bring Fletcher to him.

$30,000.  Again, think about that.  Why is he willing to pay

$30,000 for someone to bring Fletcher to him?  So Rosemond

could have a discussion with Fletcher?  Would he pay $30,000 so

Fletcher could be murdered, so Rosemond could beat him up?  Why

got just wait until he gets out of jail and find him on the

street like G-Unit found Rosemond's son on the street.

          Remember the amounts of money in the past, not just

luring someone but for organizing and carrying out an act of

violence.  He paid five thousand dollars for -- He paid $12,000

to Stewart for someone else to shoot at Baja's house.  And he

also just told McCleod that he had $10,000 to injure Fletcher,

cut him with a knife in jail.  $30,000 is triple $10,000.

That's the amount of money he had to injure Fletcher.  And not

for actually doing the shooting or doing the cutting or for

just luring him somewhere.  The reason Rosemond had $30,000 for

that is because Rosemond was going to do more than just injure

Fletcher or shoot him in the leg.  He was going to shoot and

kill him.  And the person luring Fletcher to Rosemond for a

murder would take on a lot of risk.  They'd be part of a murder

1  conspiracy.  Going to have to get paid a lot of money for that.

2  So just the $30,000 alone told you that Rosemond intended this

3  to be a murder.  But that is not all Rosemond said.  He then

4  said he wanted Fletcher brought to him because he's gonna to

5  hit him so hard and so fast he's not gonna to see it coming.

6  You know Rosemond didn't mean to him with his fist.  He's not

7  going to pay $30,000 to lure hum so he could slap him like his

8  son was slapped.  He didn't arrange for -- for Fletcher to be

9  released from jail so he could beat him up.  He wand him

10  brought so he could kill him.  McCleod told you he had no

11  misunderstanding about this and that's why he proposed Derrick

12  Grant as the shooter.  On cross-examination McCleod said he

13  understood Rosemond to be talking about killing Lowell Fletcher

14  himself.  That's 1133.

15        That's why McCleod said to Rosemond next, You're

16  thinking of doing this yourself?  Do you think McCleod would

17  have been concerned if he thought Rosemond was going to beat

18  Fletcher up or do a driveby shooting like he did at Yayo's

19  mother's house?  No.  Mohammed McCleod was concerned because he

20  didn't think it was a good idea for Rosemond, the head of a

21  music management company and the head of a huge drug

22  trafficking organization someone already under a lot

23  surveillance to kill someone himself?  So that's why when

24  Rosemond responded to McCleod, Yeah.  What were you thinking,

25  McCleod said, well, I spoke to "D" the other day.  "D" is

HBSAAROS2                   Summation - Johnson-Skinner

Derrick Grant.  And Rosemond responded, OK.  I haven't seen "D"
in over three years.  Yeah.  Speak to "D".  Let me know how
that goes.

          Now, to a shopper at Whole Foods passing by this might
be a harmless conversation about a friend named "D".  But you
know having heard all the evidence and knowing the history of
the G-Unit feud and the full context of his conversation, this
was far from harmless.  It was deadly.  Of course sitting in
the public Whole Foods, Rosemond wasn't going to say, I'm
planning on killing Fletcher myself.  And McCleod wasn't going
to say, It's a good idea to kill Fletcher.

          What about Derrick Grant, the triggerman?  They left
what didn't need to be said unsaid.  They knew each other from
their time in jail together and their time in the drug business
together.  They shared a history that was about 12 years long
at that point and they knew the context.  McCleod knew that
Rosemond also had known Grant from prison and that Grant had
done that first shooting at Violator Records.  Remember it was
McCleod that told you about that.  So McCleod knew they could
both trust Grant.  Based on all this history, McCleod
understood why Rosemond was offering $30,000 and what Rosemond
was proposing to do.  And based on all the evidence, you know
that Rosemond knew what McCleod was saying too even though
McCleod didn't spell it out in a written contract.  He told
Rosemond, let's see if Derrick Grant will be the shooter

HBSAAROS2                     Summation – Johnson-Skinner

1    instead.  Rosemond agreed and told McCleod to reach out to

2    Grant and then report back to him on what Grant said.  By the

3    way, it's no surprise that Rosemond quickly realized it'd be

4    better for Grant to be the shooter here.

5          Remember what you heard about how Rosemond's a

6    well-known head in the music management company.  And remember

7    what Rosemond told McCleod about how he is under surveillance,

8    all the agencies are looking at him.  The climate's never been

9    like this.  It's better for Rosemond to act like a businessman.

10   Delegate this to someone who is under less scrutiny like Grant

11   and McCleod.  That is why he said, Yeah.  Speak to "D".  Let me

12   know how that goes.

13         And by the way McCleod's testimony about this meeting

14   at Whole Foods it's corroborated by the phone records.  McCleod

15   told you he was contacted by phone to meet up that day.  On

16   August 24, 2009 McCleod gets a call and he has back and forth

17   calls with Jason Williams.  McCleod told you that shortly after

18   that second meeting with Rosemond, McCleod went to visit Grant

19   at his house on 174th Street in the Bronx.  Here is a photo of

20   Grant's house.

21         McCleod testified that he told Grant about his line on

22   Fletcher.  And that Rosemond wanted to do it himself.  Again,

23   McCleod didn't have to spell it out for Grant.  Grant knew the

24   context too.  Grant responded, For real?  And they both just

25   looked at each other.  Again, no surprise that Grant who did a

shooting for Grant in the past didn't think that Rosemond

should be shooting himself.  McCleod told Grant, Yeah.  I

mentioned you.  And Grant told McCleod that he was in.  Let him

know that's a go.  Yeah, I'm with that.

McCleod said that he and Grant also discussed the fact

that Rosemond had $30,000 for someone to bring Fletcher to him

so Rosemond could be the shooter.  And now that Rosemond wanted

Grant involved and McCleod would bring Fletcher to Grant

instead of to Rosemond, they could expect at least twice that

amount of money.  That makes sense.  McCleod and Grant knew

they'd be getting paid for this murder, at least $30,000.  But

they also thought maybe we'll get something more because of the

extra work they're doing.

Let me be clear about this.  McCleod and Grant didn't

talk about extra money because the goal of their contract from

Rosemond changed as defense counsel suggested in his opening.

The goal is the same all along, murdering Fletcher for which

Rosemond had at least $30,000.  The only thing that changed is

that McCleod and Grant had more work to do themselves now.

McCleod testified that he then confirmed for Rosemond that

Grant was in and Rosemond said, OK.

Now, I want to go forward to September 10, 2009.

McCleod spoke to his contact in jail that day who told him

Fletcher was being released the next day from Queensborough

Correctional.  McCleod testified he told Rosemond this.

1    Rosemond told McCleod, OK, get with Jason and get with "D" and

2    let them know.  In other words, get with one of the closest

3    people to me, my driver Jason Williams and Derrick Grant who

4    we've already picked to do this.  McCleod's testimony was

5    corroborated by phone records in that phone chart, Government

6    Exhibit 502.  You can see that from 7:11 p.m. on September 10,

7    2009 until 9:46 p.m. that same day there are six texts between

8    Rosemond and the McCleod phone one.  That's the Ingam phone you

9    see.  There are three calls and text between McCleod and Jason

10   Williams on that same day about that same time period.  So

11   those are all the calls McCleod told you about planning with

12   Rosemond and Williams what to do on the day Fletcher got

13   released.

14          By the way, was there any surprise Rosemond wanted to

15   involve Jason Williams in that plot?  You heard about how

16   Jason -- he was driving the car when Rosemond tried to get the

17   gun to shoot a Lighty in New Jersey.  Williams is one of

18   Rosemond's most trusted men and he was already a part of this.

19   Rosemond involved him in the murder that would end the feud.

20   Rosemond, not McCleod involving a third person, Williams, after

21   Grant and McCleod are already part of the scheme.  There is

22   more evidence that this is a plot to kill and this is

23   Rosemond's plot.  He is in charge.

24          The next day, September 11, 2009.

25          McCleod told you that Jason Williams picked him up at

HBSAAROS2                   Summation - Johnson-Skinner

1    a halfway house in Brooklyn where he was living.  He told you
2    he and Williams drove to Queensborough to lay eyes on Fletcher.
3    McCleod found out from a guard that Fletcher had just left.
4    McCleod thought for a second and decided to call Robert
5    Macedonio.  He was also the lawyer for Kevin Chung the last
6    contact from jail.  So McCleod called the lawyer's office.  And
7    you can see that call here in the phone records.  On
8    September 11, McCleod called the Macedonio office landline.
9    The person in the office said, actually, they're together right
10   now.  I'll put you in touch.  McCleod told the lawyer then
11   passed the phone to Fletcher.  That's when McCleod talked to
12   Fletcher on the phone.

13        McCleod told you about this conversation.  He
14   introduced himself.  He said he had a common friend.  The guy
15   in jail that told him to lookout for Fletcher.  McCleod gave
16   Fletcher that phone number and told Fletcher they should get
17   together and he suggested maybe I'll have some money for you
18   when you get out.  Those are all things that someone getting
19   out of jail needs and wants.  What Fletcher didn't knew is that
20   he would be dead 16 days later, 16 days after getting out of
21   jail for assaulting Rosemond's son.

22        Williams told but this trip to Queensborough too.  He
23   testified that he drove to Queensborough with McCleod because
24   Rosemond asked him to get with McCleod that day.  He waited
25   outside the jail while McCleod went in.  In addition to the

HBSAAROS2                    Summation – Johnson–Skinner

testimony from both of those witnesses and the phone call
records, how else do you know that McCleod is telling the truth
about September 11?  You saw these cell site maps.

This map is McCleod's phone one.  It shows you that
morning from nine to ten a.m. he was in the area of this
halfway house in Brooklyn and then he started going west.  The
next slide shows you during the same period Jason Williams was
there because he is picking up McCleod at his house.  The next
map shows you McCleod near Queensborough.  And the next map
shows you Jason Williams there too because he's waiting
outside.

Now, McCleod testified about a week or a little more
later he got a text from Rosemond to meet him at the same place
as their last meeting.  This would be their third meeting
before the murder.  McCleod told you'd Williams was also
present for this.  McCleod told you this time they stayed out
outside.  You don't have to rely on McCleod alone to know these
meetings happened because you saw these phone call records
which shows that the defendant and McCleod had numerous phone
calls back and forth.  There are two texts from Rosemond at the
beginning from the McCleod phone asking McCleod to meet and
Williams and McCleod also shared text and calls that day.

How else do you know this meeting happened?  Location
data about it.  The cell site maps place first make at Columbus
Circle, then Rosemond's phone at Columbus Circle, then

Williams' phone, same place between ten a.m. and 12:30 on the
24th just like McCleod told you.  No question McCleod met with
Rosemond that day, three days before the murder.  McCleod told
you what he and Rosemond talked about at that meeting.
Rosemond asked McCleod if McCleod was using his regular phone,
the same phone.  When McCleod told him yes Rosemond said, no,
get another phone and make sure you talk to Fletcher and no one
else on that phone.

     He told Jason Williams to give McCleod a few hundred
dollars to buy a new phone and Rosemond pointed to a Radio
Shack where McCleod could get it.  Ask yourselves, why did
Rosemond want McCleod talking to Fletcher on a phone that had
never been used for anything else and that couldn't be traced
back to McCleod and Rosemond?  Did you hear about Rosemond
making sure there is an untraceable phone in any of the other
shootings in this case?  No.  Like I said before, Rosemond was
careful.  He took extra precautions because this was a
murder-for-hire conspiracy.  He intended this murder and he
didn't want McCleod and himself to be caught.  He didn't want
to be sitting here in this courtroom today.

     Another thing you should remember, at this meeting
McCleod told you that Rosemond also asked are you sure you guys
can handle this?  Are you sure you got it?  That's at 986.
Because if you can't handle it, I have somebody.  Two important
things about that.

HBSAAROS2                     Summation - Johnson-Skinner

1          First, Rosemond's making clear to McCleod he wants a

2     result this time.  This is not going to be an attempted

3     shooting where Rosemond has time wasted?  Are you sure you can

4     handle this?  This is not something you need to ask when you

5     are planning to injure someone.  You never heard him saying

6     that in any of the previous shootings.  That's another way he

7     intended this to be a murder.

8          Second, it shows you that Rosemond had other people he

9     could involve in this besides Williams, McCleod, Grant.  It

10    shows you this wasn't McCleod's operation.  It wasn't William's

11    operation.  It wasn't Grant's operation.  It was Rosemond's.

12    And if he wanted more people involved so he could be sure it

13    got done this time, he'd do it.

14         McCleod told you that he did what Rosemond asked.  He

15    bought a new prepaid phone at a Radio Shack under the name of

16    Stacy King.  You know he is telling you the truth about that

17    because you saw that exhibit.  The subscriber info for the

18    Stacy King phone that shows you that phone was activated the

19    same day.  Look at the address 304 West 58 Street, New York,

20    New York as a user address right there at Columbus Circle.

21         The next day September 25.

22         McCleod told you after he bought the Stacy King phone

23    that night he contacted Fletcher in order to give him the new

24    phone number.  Here are those records.  He contacted Fletcher,

25    actually, on 25th early in the morning at 2:59 a.m.  Fletcher

HBSAAROS2                    Summation - Johnson-Skinner

1    called him back at 7:39.  In fact, just like McCleod told you

2    except for this one call you see here, over the next two days

3    this phone only called Fletcher's phone just like Rosemond

4    wanted.

5            McCleod also told you he received a text message from

6    Rosemond that day, September 25, and he and Rosemond agreed to

7    meet at Houston's Restaurant and it would be their fourth and

8    last meeting before the murder.  Here the text messages between

9    McCleod and Rosemond that day and throughout the day, look at

10   all those texts between McCleod and Rosemond's Buckson phone.

11   That is two days before the murder.  That's another way you

12   know that Rosemond was intimately involved in this murder.

13           McCleod told you he met with Rosemond at Houston's and

14   they had to wait for a table.  While they were waiting Rosemond

15   and McCleod went upstairs to Barnes and Noble.  Rosemond took

16   out a Blackberry.  He showed McCleod an address at 161 Street

17   and said this is where Fletcher lives according to a spy he

18   had.  Rosemond asked him, See if something can be done up

19   there.  Take a look at that area and let me know.  Page 994.

20           You know that 161 Street is where Leta Bethel,

21   Fletcher's sister told you she lived and where Fletcher was

22   when he got out of jail.  Here is a picture of that apartment

23   building.  So did McCleod make up that testimony about Rosemond

24   telling him to go to 161?  No.  How would McCleod know that

25   Fletcher's sister actually lived at 161 Street?  Rosemond told

HBSAAROS2                    Summation – Johnson–Skinner

1    him at this meeting.  Was McCleod telling you the truth about

2    Rosemond having a G-Unit spy.  You know he was because it was

3    corroborated by Abdullah.  Abdullah also told you that Rosemond

4    had a G-Unit spy down on his luck and Rosemond was paying him

5    for information.

6            Again, stop and ask yourselves, why is Rosemond

7    sending McCleod to see if 161 Street is a place where something

8    can be done?  Where what can be done?  You need to scout

9    locations not when you are planning a shooting of someone's

10   house or a car like Rosemond had done in public before without

11   regard to who is nearby, but when you are planning a murder and

12   you want to get away with it without getting caught.  So the

13   fact that Rosemond had people scouting locations was another

14   way you know he intended this murder.  McCleod told you that

15   after that dinner at Houston's, at Rosemond's request he hung

16   back to listen to conversations between Rosemond and that spy.

17           The spy told Rosemond that Fletcher was nervous about

18   someone setting him up.  But as McCleod listened to that

19   conversation he realized Fletcher wasn't nervous about McCleod.

20   It was somebody else.  Why is that important?  Because it shows

21   again the lengths that Rosemond is going to go to make sure

22   that this murder is successful.  You don't care if your target

23   is tipped off if you are planning to shoot at his house or

24   shoot at his car.  Rosemond wanted a result this time.  That's

25   more evidence that he wanted this to be a murder.

1    So now take a step back after this fourth planning

2    meeting, two days before the murder.  Look at Rosemond's

3    response after getting the information from McCleod that he had

4    a line on Fletcher.  Rosemond didn't react impulsively.  He

5    didn't tell security, hey, go get your guy, Life, in Brooklyn

6    and go shoot at his house.  He didn't go to Jason Williams to

7    do a driveby shooting.  No.  He took his time this time.  He

8    had meetings.  He planned the murder.  He got all of his team

9    in place.  He made sure everything was to his advantage.

10   Comparing the level of planning here to the other prior

11   nonfatal shootings shows you Rosemond's intent again.

12       By the way, how do you know McCleod is telling you the

13   truth about this meeting?  Look again at the cell site maps.

14   They place McCleod's phone at Houston's seven to 8 p.m.

15   September 25, 2009.  Then Rosemond's phone, same place.  And

16   then Williams phone same place.

17       Now at that Houston's meeting McCleod and Rosemond

18   agreed that 161 was a good location McCleod texted Rosemond,

19   it's a good date.  I like her.  McCleod testified that after he

20   scouted out Leta Bethel's house, he didn't like the location.

21   So he texted Rosemond, I don't like the girl.  No chemistry.

22   You'll see these texts here at 11:11 p.m. same night

23   September 25, 2009.  McCleod told you he went up there right

24   after this meeting.  McCleod told you that Rosemond then told

25   him, OK, get with Jason Williams and Derrick Grant the next

1    day.  And there's Rosemond's response in these texts.  You know

2    the reason that Rosemond wanted him to get with Williams and

3    Grant is to scout more locations.

4         Now, these texts about the girl, McCleod is reporting

5    to Rosemond about whether 161 Street is a good location because

6    Rosemond is McCleod's boss in this murder-for-hire conspiracy.

7    If McCleod was doing this by himself would McCleod need to

8    report to the Rosemond about whether he liked or didn't like

9    the location?  Of course not.

10        Why is it in code about a girl?  Use your common

11   sense.  When you're planning a murder-for-hire and discussing

12   the best location to do a murder, you speak in code.  You don't

13   want to write out, this isn't a good location for the murder.

14   Again, if Rosemond was careful and he made sure that the

15   members of his murder crew were careful too.

16        McCleod testified that later that night he reached out

17   to Williams or Grant to help him to meet up at Grant's house

18   the next day.  You see those calls at ten p.m. that night and

19   11:35 that night.  McCleod told you the next day he want

20   looking for the perfect place like Rosemond wanted him to do.

21   You see these calls between McCleod, Williams and Grant

22   throughout the day the day before the murder.  Williams told

23   you the same thing about this day too, that he drove around

24   with McCleod and Grant look for a place.  Williams told you he

25   did that because Rosemond asked him to find a spot to lure

HBSAAROS2                    Summation - Johnson-Skinner

Fletcher to.

And Rosemond told him to final a spot with no cameras.
No cameras.  Stop and think about that for a minute.  Rosemond
knows he is sending his people to lure Fletcher to a certain
location with no cameras.  Did you hear him worried about
cameras outside the Apollo Theater or at the toll booth in New
Jersey or Baja's or his sister's house?  No.  This was
different.  Rosemond knew it.  It's know another way you knew
he intended murder.

You knew know from McCleod after looking at a spot he
realized he had a perfect place all along, somewhere near where
he lived before.  He chose a spot at Jerome Avenue and -- it
was dark.  McCleod thought a camera by the building could be
avoided.  It was near a subway and it was also near the Cross
Bronx Expressway so Williams to could drive away in the getaway
car.

Location, McCleod pointed out that there was no
sidewalk at that time on 2009 on the other side of the street.
So a person walking up the sidewalk would have to walk right by
that dark recess area.  McCleod told you why he and Grant
planned he would be the recess so Lowell Fletcher would have to
walk right passed him.

You know that McCleod and Williams were telling the
truth because you saw these cell maps again that placed their
phones near Mount Eden Avenue on that same day, the first one

HBSAAROS2                        Summation - Johnson-Skinner

was McCleod.  This one is Williams.  You also have the

stipulation that McCleod actually got a ticket for not wearing

a seatbelt that night at the same place.  McCleod and Williams

both told you about McCleod getting that ticket too.  More

corroboration.  Williams told you that after picking the shot

spot he sent Rosemond and encrypted e-mail, We all good.  We

found a spot.  And Rosemond said, OK.

          Just like McCleod sent Rosemond updates about the

murder, Williams did too.  Rosemond was the leader of this

murder plot because it wasn't McCleod or Williams who wanted

revenge on Fletcher.  It was Rosemond.  So he was the boss.

After picking the shot Williams, McCleod and Grant then went to

Harlem and met up with Rodney Johnson.  McCleod told you it was

then that he realized Toree was involved in this too.  At that

meeting Johnson told the others that he had Brian James, that's

B-Love scouting out 161 Street.  And Williams and Grant told

Johnson, It's OK.  We've already picked out a place.

          Remember what you know happened just two days before

the Rosemond asked McCleod outside the Whole Foods, Are you

sure you can handle this?  Because I've got someone else.  Here

is that someone else.  McCleod told you he'd never even spoken

to Toree about Fletcher or about how he lived at 161 Street

that day.  McCleod told you he thought to himself, Why is Toree

saying this?  You know who else had the information that

Fletcher lived at 161 Street.  Rosemond.  So this shows you

HBSAAROS2                    Summation - Johnson-Skinner

that Rosemond was involving in other people without McCleod
even knowing in this murder plot.  And again, that makes sense.
Rosemond is not just a part of this.  He was the orchestrator.
This was important to him.  It wasn't just a shooting at a
building or at a car.  He was doing his homework this time
because it was a murder.

          McCleod told you on the night of September 26 he
called Fletcher using the phone Rosemond told him to get and
use only for Fletcher.  He told you about that call in his
testimony.  It's corroborated by the phone records.  Here is
the call at 10:17 p.m.  And then Fletcher called McCleod back
at 3:43 a.m. and McCleod returned the call at 3:45 a.m. on the
27th, the day Fletcher would die.

          McCleod told you about that conversation, that he told
Fletcher they should get together tomorrow, meaning
September 27 that day.  McCleod told Fletcher he would give him
$25,000 and they would get some drinks and see some girls.
McCleod told you Fletcher was excited about that.  McCleod
testify after that conversation.  McCleod texted Jason and said
they were on for tomorrow.  Again, his testimony is backed up
by the phone record.  There's a text to Jason Williams
immediately after those calls to Fletcher.  See that text at
3:51 a.m. and then he calls later in the day to Grant at
1:01p.m.  The next day was September 27, 2009.  McCleod
testified Williams picked him up that night and drove him the

1    Bronx.  Williams told you why he did that.  Because Rosemond

2    asked him to.  Williams testified that Rosemond told him today

3    was basically the day, the day Rosemond's been waiting for all

4    these years.  Williams testified the same e-mail conversation,

5    the encrypted e-mail conversation is when Rosemond told

6    Williams, Bring the quiet.  Bring the quiet.  In other words,

7    bring my silencer .22 caliber gun.  Rosemond telling Williams

8    to bring the gun with the silencer out of all the guns Williams

9    was holding for Rosemond is more evidence that Rosemond

10   intended this to be a murder.  He was being as careful as

11   possible.  It's the same reason he wanted to get a .22, a

12   smaller gun -- street shooting.  This is not a driveby at Tony

13   Yayo's mother's house.  You can't fight a one and a half foot

14   gun in a bag of chips.  Let's be clear.  Rosemond knew it too.

15   You heard what Rosemond told Stewart about that gun, that it

16   did damage by bouncing around the body and cutting arteries.

17   That's at page 203.  So Rosemond sending his .22 silencer,

18   that's more evidence that he intended to murder.

19            McCleod told you he communicated with Williams that

20   day.  And if you look at the phone chart you'll see again the

21   text and several calls between McCleod and Williams that day.

22   McCleod told you he also called Fletcher again and told him to

23   meet up in the Bronx that night.

24            This is a call on September 27.  McCleod testified

25   that at some point we waiting for Williams to pick him up he

HBSAAROS2                    Summation - Johnson-Skinner

also texted Rosemond and said, I got a hot date.  That's

basically the same code he had already discussed with Rosemond

about the girl and murder location.  He is telling Rosemond he

is going through the plot.  He's got the date.  What did

Rosemond say in response?  Have fun.

Now defense tried to suggest in cross-examination that

McCleod and Rosemond didn't sit down and discuss, I got a hot

date and McCleod must have been confused.  Ask yourself what

does "have fun" mean.  If it doesn't mean go ahead with our

plan, does it mean, "stop, don't kill the man"?  Does that mean

we have four planning meetings?  I've offered you at least

$30,000.  I've sent you to scout murder locations with no

cameras.  I sent my .22 caliber gun with a silencer to a scene.

I have a backup team in place that you don't even know about

yet but make sure to give him a leg shot?  No.  McCleod and

Rosemond both knew a message was Rosemond giving him the green

light to go ahead and kill Fletcher.  You know McCleod is

telling the truth because you saw his phone records between

Rosemond and McCleod that day right after the call to Fletcher

at 3:20 p.m. look at what McCleod does.  He texts Rosemond at

3:28 p.m. and there's four messages about two hours before the

murder.  Rosemond is in direct contact with McCleod.  It's more

evidence of his involvement in this murder.

At the murder scene McCleod told you about the

additional people Johnson and a man he later learned was Shawn

HBSAAROS2                    Summation – Johnson-Skinner

Williams sitting in Johnson's truck by that McDonald at Mount
Eden and Jerome.  McCleod told you he was very surprised
because someone was about to be killed because here is two
people involved in a plan McCleod didn't know about.  He didn't
know he was going to show up that day.  McCleod told you the
only people he discussed the murder with were Williams, Grant
and Rosemond.

        And you know how Johnson got there and what his job
was.  Abdullah testified that Rosemond later told Abdullah that
Johnson was there as the backup shooter.  Johnson was there
because Rosemond had sent him.  Now, let me stop there.
Rosemond sent a backup shooter.  Did you hear testimony about a
backup shooter at any of the other incidents?  No.  You only
need a backup shooter when you want to make sure your target
doesn't get away.  You only need a backup shooter when you are
desperate for your plan to work, when you want a target to die,
when you waited years and plotted this murder and you don't
want to mess it up.

        Also, look at what it tells you about all the people
now involved in this.  In addition to Rosemond, there's
McCleod, Grant, James, Johnson B-Love who scouted the location
and Johnson's extra guy in the car, Shawn Williams.  Remember
what Abdullah said on the stand, oh, man, Jason, Toree, the
shooter, Slim, Slim's man, five people there for that one dude.
What does that tell you?  Rosemond assembled a hit team.  In

1    all the other violent incidents no witness testified there were

2    this many people involved in an assault or another shooting.

3    The sheer number of people involved also shows you Rosemond

4    intended this to be a murder.

5            Now -- told you after he arrived at the scene, he

6    parked his car.  McCleod told you was it was in the same place

7    on the right side of the next photograph on Mount Eden Avenue.

8    McCleod, Williams and Grant all met in the car.  Williams

9    remembered driving there with Grant.  McCleod told you Grant

10   was wearing a dark hooded sweatshirt and all black gloves and

11   clothes.  You saw that in the video surveillance.  McCleod and

12   Williams both told you that Grant went to get a bag of chips to

13   put the gun in.  McCleod told you he walked with Grant to get

14   that bag of chips.  They came back to the car.  Williams then

15   went to park his car around the corner up on Macombs.  McCleod

16   went to find Fletcher and Grant took his spot on that recess to

17   kill him.

18           Now, on this phone chart you see there Fletcher called

19   mac McCleod.  McCleod told you about that call and said he was

20   off the 4 train in the Bronx.  You know that is when Fletcher

21   arrives because you seen the cell site evidence that shows you

22   Fletcher's phone in the area of the murder at the time of this

23   call.  McCleod said he walked upward Macombs and told Fletcher

24   to go there too.  McCleod told you he hung up the phone so he

25   could call Grant and tell him he is coming.  Here are the calls

right here.  After that call to Fletcher, McCleod calls Grant

at 8:47.  McCleod then told you about the back and forth with

Fletcher calling him and sending Fletcher up and down that hill

and calling Grant to tell him he's coming and did you get him

yet.  McCleod didn't know how Fletcher was making it past Grant

alive.  You see these phone calls at 8:48 from Fletcher and

also at 8:53 from Fletcher.  And then you see McCleod calling

Grant.

Now, Fletcher didn't call again after that 8:55 call

from McCleod to Grant.  You know that's because Grant fired at

least seven shots.  He hit Fletcher's back and arm as he tried

to run away.  Brook told you that Grant shot Fletcher from

about 15 feet away from about the front of that table to the

witness stand.  Not very far.  You know that seven .22 caliber

shell casings were found in this photo near the McDonalds.

And let's just briefly play a clip of video

surveillance that shows Grant and Fletcher.  There's Fletcher

at the top screen in the red jacket just like McCleod told you

and there's Grant in all black just like McCleod told you.  And

you can see something shiny, the bag of chips in Grant's hand

as he walks away.  Looks like he put something in it.

Then Williams told you that Grant had run up the hill

and got in his car waiting at the top of hill.  Grant gave

Williams Rosemond's .22 caliber gun.  And Williams put it back

in the stash box in the car.  There's that testimony.  Williams

told you what Grant said that Fletcher realized what was
happening and tried to run away but it was too late.  He shot
him once.  He thought his job was done.  He ran back to the
car.

            McCleod told you about what Grant told him too, that
grant said he almost got away.  The last time I just couldn't
get let him get away.  I had to chase him down and luckily I
had the quiet on it because I let off a lot of shots.  That's
what Grant said.  So there's no question what Grant was doing
that night.  Grant pulled the trigger at least seven separate
times and fired at least seven shots to match those seven shell
casings.

            Now McCleod told you after the shooting he Shaw
Fletcher's body.  You know Fletcher made it from the area by
the McDonald to Macombs and Goble.  His body pumping with
adrenaline running for his life, that's why Fletcher made it.
McCleod said he saw Fletcher with one foot in the street and
the rest of his body on the curb.  McCleod told you he saw the
body as unresponsive and he told himself he's dead.  He's very
dead.  After seeing the body McCleod testified he tried to call
Williams and Grant and Johnson and here are those calls.

            There's two calls to Williams, two calls to Grant and
then Johnson calls McCleod.  It's more corroboration of
McCleod's testimony.  Johnson told McCleod to come to his house
in Harlem.  Johnson jumped in a cab and went to his house.

HBSAAROS2                    Summation - Johnson-Skinner

There was a post murder meeting.  He met Williams, Johnson, Grant, Johnson's man in the car, Shawn Williams.

Williams corroborated this.  He told you about this meeting too.  He told you he drove with Grant to Harlem after the shooing where he met up with McCleod and Johnson.  McCleod testified he told the people at the meeting.  He saw Fletcher's body and he's finished.  McCleod told you he explained he saw him laid out on the gurney with no movement.  He told you that when he said that none of Rosemond's associates were angry or shocked or surprised.  That makes sense because they all understood that's what they were supposed to do.  Here is what Jason told you about why he wasn't surprised.  That's what we went there to do.  Page 770.

Here is what Brian McCleod told you about why he wasn't surprised.  That was the expected outcome.  Page 1077.

At the meeting Johnson pointed at the Stacy King phone.  He took it from McCleod and he gave pieces of it to each person to break it up.  Now McCleod told you he didn't ask Johnson to do that.  No one else gave up their phones.  Johnson somehow knew that that Stacy King phone had to be destroyed.  He knew for the same reason -- Rosemond told him to do it.  Rosemond knew this was a murder.  It was different from his other shootings where you never heard about any phones being destroyed afterwards.

And by the way, you know John was the backup shooter.

HBSAAROS2                Summation - Johnson-Skinner

You know he had a gun with mim that night because McCleod told

you that after the meeting he saw Johnson pass the gun to Shawn

Williams in Johnson's building after the meeting.  That's the

gun Johnson brought to the scene because Rosemond, he didn't

send him as a backup to the assault.  He was the backup shooter

in a murder.

        The cell site evidence backs him up.  Here are the

slides, time of the murder.  First, this is Jason Williams'

phone.  Then here is Derrick Grant's phone hitting a cell tower

in the same area on all those calls with McCleod about what's

going on?  Where is he?  And then here is Johnson's two phones.

His first one was the Leslie Pretty phone and Mike -- phone,

same area.  Then here is McCleod Stacy King phone, the phone he

used to talk to Fletcher.  At 8:02 and 8:48 and then at 8:53

that was that last call from Fletcher that he night when he

then called Grant at 8:53, he's up there right where you expect

him to be.

        Finally, here is McCleod's regular phone hitting all

these cell towers and all these towers closest to the murder.

He'd only hit these other two towers to the right at 9:18 p.m.

That makes sense.  That's about when he was leaving.  That's

who he is talking to on those calls.  Johnson told him to come

to his place.  It's a little bit farther away.  And here is the

cellphone maps for later that night at the meeting at Johnson's

house 9:20 to 10:30.  Here's McCleod's phone right there.

1          Next is Jason Williams right there.  Johnson's phone,

2     same place.  Because they're all at that meeting just like the

3     witnesses both told you.  Jason Williams said he communicated

4     with Rosemond by encrypted Blackberry that night after the

5     murder.  He told him everything was all right.  Page 771.

6          He said just enough so Rosemond would understand that

7     his plan had worked.  That is how Rosemond wanted his crew to

8     operate.  Williams told you what Rosemond said that same night.

9     Make sure you get rid of that.  Again Williams knew what he

10    meant.  Make sure you get rid of my gun that was used as a

11    murder weapon.

12         So after the meeting Williams went to the East River

13    and he threw the gun in the water.  Detective Fox told you that

14    he has that computerized system that alerts him if any of the

15    shell casings from this case ever match a gun that was found.

16    There's never been any hits.  You know why because the gun is

17    in the East River just like Williams told you.  Again, Rosemond

18    and I'm sure members of his crew were careful.  He had the

19    murder weapon thrown away.  His careful covert tactics that's

20    more evidence of Rosemond's intent to murder.

21         What did Abdullah tell you happened to him that day,

22    September 27?  He said he received a text on his Blackberry

23    from Rosemond.  Abdullah testified he didn't know what this was

24    about at the time but he understood it to mean get Johnson to

25    call Williams, the driver, ASAP.  Abdullah remembered the

HBSAAROS2                    Summation - Johnson-Skinner

message because he was watching football.  Abdullah also

remembered that Rosemond was in Miami at the time.  You now

know from Deputy Heintz Rosemond was in Miami at the time of

the murder.  Abdullah told you he followed Rosemond's

instructions.  He passed along Rosemond's request that Johnson

contact Williams.  You know why Rosemond wanted Johnson to get

in touch with Williams.  This was the night of the murder and

Rosemond needed Johnson, the backup guy, to know where to go to

contact Williams to make it to the murder scene.

         Abdullah told you the next day, September 28, he

received a message from Rosemond that said, yo, that bitch is

out of here.  Abdullah testified he didn't really understand

the significance of this until he got back to New York and had

a face-to-face meeting with Rosemond at that restaurant in

Harlem.  But you understand the significance.  That's Rosemond

in his own words celebrating the death of Fletcher with his

drug dealing partner.  Remember, someone who knew about the

G-Unit feud and who knew about the slap and who even knew that

Brian McCleod --

         But Rosemond made a I was take here.  For all his

efforts to be careful he made a mistake.  His desire to

celebrate Fletcher's death, it got the better of him.  Because

while there's a map of Rosemond's intent, this message alone is

enough for you to find that he intended to murder.  Let me

explain why.  This is very important.  What do you know

HBSAAROS2                    Summation – Johnson-Skinner

Rosemond knows at this point on Monday September 28, 2009?

Rosemond is in Miami.  He left New York City sometime after

that 5:48p.m. call on September 27.  Deputy Heintz told you the

record show that the next calls in Miami.  Williams said he

only sent Rosemond a message by encrypted Blackberry that

everything's all right or everything's good.  He didn't tell

Rosemond Fletcher died or he's lying on the curb unresponsive.

Just old him, Everything's all right.  It wasn't until a

through few days later on the ride back from picking up

Rosemond at LaGuardia Airport that Williams told Rosemond in

detail what happened.  Makes sense Rosemond only wants to talk

about that kind of stuff in a face-to-face meeting.

          McCleod told you he didn't contact Rosemond the night

of the murder either.  They phone records showed McCleod

contacted Rosemond September 29, the next day after this

message from Rosemond to Abdullah, That bitch is out of here.

So the only evidence about what Rosemond knows at this point on

the day of the, after the murder is that Everything is good.

Everything is all right.

          What does Rosemond do?  He tells Abdullah, That bitch

is out of here.  The only reason he would have said that is if

he planned this from a murder from the beginning.  He learned

that his plan worked.  All he was told was, Everything's good.

Everything was all right.  And what did he say?  The bitch is

out of here.  Make no mistake "the bitch is out of here", that

means Fletcher's dead.  It's not something Rosemond would have

said if he knew that his crew had been successful in giving

Fletcher a leg shot or injuring Fletcher.  "Out of here" means

what it says.  He's dead.  Gone.

So when Williams told him, Everything's good, all

Rosemond knew is that his crew did the job he ordered planned

and paid for.  They murdered Fletcher like he wanted.  That's

why Rosemond told Abdullah, The bitch is out of here.

Rosemond wrote back, Get rid of that murder weapon.

Again, you didn't hear Rosemond telling anybody to get rid of a

gun in any other shootings.  Williams told you Rosemond never

asked him to get rid of the gun.  The one and only time he

asked him to get rid of a gun was when Rosemond told Williams

to get rid of that .22 caliber gun.  So on the night of the

murder just after Fletcher was killed and just after learning

everything's good, Rosemond had the presence of mind to tell

Williams, Get rid of that.  That tells you that what Rosemond

wanted, what he planned was a murder from the very start.

Next day September 29.  Now what did McCleod do after

the murder?  He testified that a few days later he texted

Rosemond.  Here is those text September 29, 30, October 1.  He

told you that he did that because Grant ask about the money.

Remember, this is a business transaction, a murder-for-hire.

McCleod and Grant need to get paid.  And what did Rosemond say

when McCleod asked him for money?  Did he say, no way, I'm not

1  paying you for that.  You went too far.  Instead Rosemond was

2  only annoyed that McCleod was texting him.  He said, Y'all got

3  to be patient.  Relax.  Stay off my phone.  Rosemond's response

4  here that's more evidence he intended this murder.

5          Again, Rosemond's being careful.  He doesn't want the

6  man who lured Fletcher to his death as part of his scheme

7  calling and texting him two days later about the murder.

8  Rosemond knows it's dangerous to communicate on phones about

9  criminal activities.  That's why he gave McCleod, use the Stacy

10 King phone.  That's why he used encrypted Blackberries and

11 multiple phones.  That's why he met.  Rosemond knew he's guilty

12 and he knew McCleod's text and calls to his phone could get him

13 caught for what he did.  So he tells McCleod stay off the

14 phone.

15         The next day October 1, Williams told you a few days

16 after the murder he picked up Rosemond at LaGuardia Airport

17 when he was coming back from Miami.  Now Williams didn't know

18 the date.  He told you that in that car drive back he told

19 Rosemond all the details about the murder.  He testified

20 Rosemond was not shocked or angry when he told him.  His

21 response was just regular.  Why would he be shocked and angry?

22 Rosemond knew Fletcher was dead.  He knew his crew had been

23 successful already from that text from Williams and that's what

24 he wanted all along.

25         So Williams told you he picked up Rosemond at the

HBSAAROS2                    Summation - Johnson-Skinner

airport and Abdullah told you he met with Rosemond in Harlem.
Abdullah told you he wanted to buy a Cartier watch.  So he and
Rosemond met outside the Mobay Restaurant in Harlem.  There
Abdullah told you Jason Williams was in the car.  Makes sense
because Jason was in the car, just picked him up from the
airport to drive him back.  Abdullah testified, told you
Rosemond had just come home.  He is staying at his sister's
house in the Bronx.  The Rosemond told him -- was not taking
care of one of their own and that McCleod had offered to give
Fletcher some money.  Rosemond told Abdullah that Rosemond gave
Williams his .22 with the silencer to give to McCleod for when
McCleod met Fletcher.  Rosemond also told Abdullah that
Fletcher met with McCleod, came from out of no where and
started clapping him up and Fletcher ran.

        Rosemond also explained to Abdullah the Blackberry
messages he had just sent.  He said he asked him to have the
drive on the day of the murder because he had Johnson there as
a backup shooter and he texted, Yo, the bitch is out of here,
because Fletcher was dead.

        You know Rosemond told Abdullah about these details
matching up with what happened.  That's more corroboration for
what the cooperating witness told you.  You know that Rosemond
spent more than two years trying to get his revenge.  When he
knew Fletcher was coming home he exploited a weak link in
G-Unit by finding a man who had just come home from jail had no

HBSAAROS2                    Summation - Johnson-Skinner

money and wasn't taking being taken care of by his crew.  He
sent his handpicked team and then he sent his backup team.  He
sent his .22 caliber gun with the silencer.  That's why
Fletcher was out of here.

        Abdullah also told you he asked Rosemond outside of
Mobay, Are you worried this going to come back to you?  Did he
say, No, I'm not worried, I had nothing to do with this, they
went too far, I didn't order this murder?  No.  This is what he
said.  He said Fletcher is a known gang banker.  It could be a
gang related killing.  Rosemond was banking on the fact that no
one would care that Fletcher, a gang member, got killed on a
dark Bronx street, that they would just chuck it up to another
gang related killing.  He was wrong.

        How do you know -- conversation with Williams in the
car from the airport and this meeting with Abdullah outside
Mobay actually took place?  Cell site evidence about it.
Remember when Abdullah was on the stand and defense asked
Abdullah, Are there any phone records that corroborate that
Mobay meeting?  Here is a map showing Jason Williams phone on a
highway leading from LaGuardia Airport, what Williams told you
he picked Rosemond up coming back from Miami 9:38 p.m. on
October 1, 2009.

        If you look at the same slide you'll see that at
10:46 p.m. it hit that tower across the river.  Could be the
west side of Manhattan right there is 125 Street.  The next

HBSAAROS2                    Summation – Johnson–Skinner

1  slide shows that at 10:59 and 11:15p.m. there's the Williams
2  phone west end and about 65 Street hitting a tower there.
3  That's the same cellphone tower where Rosemond lives.  So these
4  slides that show you Williams picking up Rosemond at the
5  airport driving him to the west side across Manhattan 125
6  Street and then going to Rosemond's apartment on west end and
7  65.

8            Now, did they go straight to Rosemond's home?  No.
9  The trip took too long for that, almost and hour and a half.
10  They stopped at Mobay where Rosemond got the cash from Abdul
11  and had that conversion about the murder.  Here is Abdullah's
12  phone near Mobay when he was meeting with Rosemond there.

13            (Continued on next page)

Hbsnros3                     Summation – Mr. Johnson-Skinner

1

2          So that is how you know Williams and Abdullah are

3   telling you the truth about that meeting.

4          The next day was October 2, 2009.  McCleod told you he

5   texted with Rosemond to set up an in-person meeting with

6   Rosemond at Columbus Circle about payment.  And you know

7   McCleod was telling you the truth because you saw these cell

8   maps showing you that McCleod's phone, Rosemond's phone, and

9   Williams phone were all at Columbus Circle on October 2,

10  between 10 a.m. and 12 p.m.

11         Here are the texts between the Ingam phone, that's the

12  McCleod phone 1, and the Buckson phone, used by Rosemond, that

13  morning on October 2 to set up that meeting.

14         McCleod told you that at that meeting Rosemond told

15  him the delay in payment wasn't his fault.

16         He said:  That wasn't on me.  As soon as that happened

17  I told Khalil and T to give you to y'all.

18         So, stop right there.  Rosemond is saying as soon as

19  the murder happened, he didn't hesitate.  He knew payment was

20  due immediately, and he told Abdullah and Toree -- that's

21  Johnson -- to give the cocaine he owed to McCleod and Grant.

22         McCleod testified that Rosemond told him to go see

23  Toree.  He had one kilogram for him.  Again, Rosemond expressed

24  no anger at McCleod about the fact that Fletcher was dead.

25  None.  It is on your screens, page 1085 to 1086.

HBSAAROS2                    Summation - Johnson-Skinner

1          By the way, if this is a situation where Rosemond had

2     only wanted a leg shot, and McCleod and the rest of the crew

3     had gotten carried away do you think Rosemond would have

4     apologized to McCleod for the delay in payment.  Of course not.

5     He would refuse to pay, he would pay less, or he would scold

6     him, like he had done before.

7          Rosemond apologized.  He made sure that McCleod was

8     given the payment that he was promised because Rosemond wanted

9     McCleod and the rest of the crew to do that murder, and they

10    had successfully completed the job.

11         Now, you heard what happened after this meeting

12    between McCleod and Rosemond.  McCleod told you before actually

13    going to pick up the cocaine from Johnson, he had to see his

14    parole officer in the Bronx.  Here's the cell site map that

15    shows the same thing.  There is his phone and here is the

16    parole officer's address in the Bronx that day.  And then

17    there is a stipulation about the parole officer's testimony

18    that McCleod actually came to visit him that day.

19         McCleod told you that after the parole officer he then

20    went to visit Johnson in front of his building in Harlem, that

21    Johnson had Lover with him.  That's Brian James, B-Love.  And

22    Lover gave McCleod a kilogram of cocaine hidden in an Apple

23    computer box.

24         You know McCleod was telling you the truth about that

25    too, because you saw more cell site maps which show McCleod's

1    phone and then Johnson's phone both at that residence on

2    October 2 at 2 p.m.

3            And then McCleod told you he went to Grant's house in

4    the Bronx to give him his share of the payment.  McCleod told

5    you at Grant's place he opened the box, had the cocaine in it.

6            And how was it packaged?

7            He said, like all the cocaine from Rosemond's

8    organization was packaged, with mustard or a condiment placed

9    inside to hide the smell.  That is what Abdullah and Williams

10   told you about how their cocaine was packaged.  That is more

11   corroboration.

12           McCleod told you he split up some of the cocaine to

13   share the profits with Grant.  And Abdullah told you about the

14   same payment, corroborating McLeod again.  He told you that,

15   soon after the murder took place, Rosemond contacted him by

16   encrypted BlackBerry, a different message.  Rosemond asked him

17   to tell Johnson to give McCleod a kilogram of cocaine.

18           And Abdullah told you that Johnson later confirmed to

19   him he did in fact give McCleod that kilogram worth $30,000.

20           There's one last thing about this payment.  Abdullah

21   told you about a later conversation he had with Rosemond, about

22   how they were discussing the drug count for the business, and

23   how the numbers were a little off.

24           Abdullah told you he said to Rosemond, It's short

25   because you told me to tell Johnson to give McCleod one of

HBSAAROS2                    Summation - Johnson-Skinner

1    those things, a kilogram of cocaine.

2         Rosemond said, Oh, yeah.  That was for the Bronx shit.

3    I've got to give him two keys for that.

4         So Rosemond was planning on paying McCleod two

5    kilograms for the murder, but acknowledged he had already told

6    Abdullah to tell Toree he gave McLeod one.  Rosemond paying the

7    $30,000 he owed for this murder and planning to pay more, it's

8    more evidence that he intended the murder.

9         So the payment of one kilogram about $30,000, that

10    happened October 2.

11         What else do you know happened that day?

12         That's the last day the Buckson phone number was ever

13    active.  That is the phone Rosemond used in planning this

14    murder.  That is the end activity date 10/2/09 on the phone

15    records for that phone.

16         Deputy Heintz told you that the records reflect a

17    customer called to cancel the phone service.  Now, we don't

18    know whether it was Rosemond himself or Dr. Buckson.  We do

19    know that four days after the murder and one day after Rosemond

20    returned from Miami and the same day he met with McCleod to set

21    up the payment for that murder, the phone Rosemond used to plan

22    the murder was deactivated, the same phone Rosemond told

23    McCleod stay off of.

24         That is more evidence that Rosemond knew he was

25    guilty, didn't want to be associated with McCleod, and was

1    covering his tracks.

2            By the way, in addition to the payment to McCleod, you

3    also know Rosemond paid Williams $8,000 for Williams' role in

4    the murder.

5            Why is that $8,000 important?

6            Before the murder Rosemond never made a promise to

7    Williams to pay him this money.  He promised to pay the $30,000

8    to McCleod and Grant, but not to Williams.

9            If the murder wasn't what Rosemond wanted, would he

10   have paid Williams a bonus?

11           Of course not.  Rosemond paid that bonus because he

12   was pleased with what Williams had done.

13           By the way, ask yourself, did Rosemond ever pay

14   Williams for any other nonfatal acts of violence that G-Unit

15   and Williams were involved in?  You never heard about any of

16   that.  It shows you how important this murder was to Rosemond.

17   He paid a bonus to Williams for the first time for his role

18   because this was different from the other shootings.

19           So that was the payment.

20           You then have a meeting in November of 2009.  McCleod

21   met with Rosemond, and McCleod told you Rosemond was

22   complaining to him about how he was in debt.  How he was down

23   about a million dollars.

24           This is what Rosemond said:  "It's like deja vu.  This

25   is what happens when you take a soul."

1    Let me say that again, "This is what happens when you

2    take a soul."

3    Rosemond said that to McCleod, ladies and gentlemen,

4    the man who told him he had a line on Fletcher and who lured

5    Fletcher to his death for Rosemond two months before.

6    Let's be clear.  That is an admission to the murder

7    from Rosemond's own mouth.

8    Rosemond did say not this is what happens when someone

9    goes to far and you wanted a leg shot and someone got killed.

10   No, talking about himself, he says, "This is what happens when

11   you take a soul."

12   What is the last thing you have Rosemond saying about

13   this murder?  Abdullah told you he had a conversation with

14   Rosemond after Johnson had been arrested in April 2010.

15   Abdullah was worried about Brian James, B-Love,

16   cooperating and telling the police about Rosemond's role in the

17   murder.  B-Love is the one who Johnson said he had checking out

18   Fletcher's house on 161st and who gave McCleod the box

19   containing the kilogram of cocaine.

20   Abdullah thought, although he was wrong, that B-Love

21   was also the one in the car with Johnson at the scene.

22   Actually, that was Sean Williams.  At the meeting Abdullah

23   asked Rosemond, What if B-Love talks to the police about the

24   murder?  And Rosemond said:  Don't worry about it.  The only

25   person that can hurt me in this thing is Slim.  And I had told

1    Slim to lay low, just in case.

2            You know why Rosemond thought McCleod was the only one

3    who could hurt him, because he was the one who Rosemond knew

4    had the most information about the murder.  He was the lure

5    man.  He was one who agreed with Rosemond to involve Grant as

6    the shooter.  He was the one who Rosemond told to get an

7    untraceable phone.  He was the one Rosemond told to scout

8    locations, the one who Rosemond told to have fun right before

9    the murder, and the one Rosemond paid for the murder after.

10            That's why McCleod could hurt him, because Rosemond

11   knew McCleod had the knowledge of the facts showing that

12   Rosemond ordered, planned, and paid for this murder.

13            I'm sure you noticed, by the way, the difference in

14   the level of detail that McCleod and Williams testified about

15   this.  That makes sense.  That is what Rosemond wanted to

16   happen.  Williams' role was to be the driver and bring the gun.

17            From Rosemond's point of view, the less information

18   Williams had the better.  Rosemond wanted McCleod to be the

19   only one that could hurt him.

20            Look at the roles Rosemond put people in, in this

21   murder.  The members of the crew, they played the same roles

22   in this murder as they played for Rosemond in the rest of his

23   life.

24            Williams was Rosemond's driver.  He was the getaway

25   driver in the murder.

HBSAAROS2                    Summation - Johnson-Skinner

1    Grant was a shooter for Rosemond in the past.  He was
2  the shooter in this murder.
3    Abdullah was Rosemond's drug partner.  Rosemond had
4  him handle getting the drugs to McCleod as payment.
5    And McCleod, he was the guy who was loyal to Rosemond,
6  who took the heat for him on that prior drug stash house
7  arrest, and who Rosemond thought wouldn't tell on him about
8  this murder.  That is another way you know this was Rosemond's
9  murder plot.
10    Three weeks ago Mohammed Stewart told you about two
11  conversations he had with Rosemond about the beginning and the
12  end of this feud.
13    Stewart testified that after Rosemond's son was
14  assaulted the defendant's attitude changed.  He was always
15  upset talking every day about strategy to get back.  Stewart
16  told you Rosemond said his dispute with G-Unit wasn't going to
17  be over until they are carrying a coffin.
18    Rosemond kept that promise, ladies and gentlemen.
19    You heard Stewart tell you about what Rosemond said at
20  the end of the feud too.  He told you about when he met with
21  Rosemond after the murder on the Lower East Side.  Rosemond had
22  him called up from Atlanta for an in-person meeting.  Stewart
23  told you he saw Williams first, and he was handed Lowell
24  Fletcher's obituary, this obituary.  And Williams told you
25  about this meeting, too, corroborating Stewart.

1          By the way, Stewart told you he hasn't spoken to

2     Williams in years, in fact, not since this meeting.

3          Stewart didn't remember showing the obituary to

4     Rosemond, but Williams remembered that Stewart still had it in

5     his hand when Rosemond came outside.  Stewart told you that

6     Rosemond came outside bouncing, with a pep in his step as he

7     said later.

8          Stewart asked Rosemond, "We can all sleep now?"

9          Rosemond said, "I can get some sleep.  You don't know

10    how many sleepless night I had with this."

11         Stewart told you he responded, "I don't know.  I

12    was -- I had been dealing with the beef with you."  That's the

13    G-Unit beef that you know Stewart had been dealing with, with

14    Rosemond, and Stewart told you Rosemond looked and nodded.  He

15    knew what Stewart meant.

16         You knew, too, ladies and gentlemen.  You know why

17    Rosemond could sleep again, because he had his revenge, because

18    Fletcher was in a coffin, and because James Rosemond had put

19    him there.

20         So that is how and why Fletcher was murdered.

21         I said at the beginning only one thing is really in

22    dispute here, whether Rosemond intended and was part of a

23    conspiracy to murder Fletcher instead of injure him.

24         Ladies and gentlemen, having heard all the evidence,

25    you know that Rosemond entered into a conspiracy to kill

1   Fletcher and that he did intend that Fletcher would die.

2          Now, you know a conspiracy to murder Lowell Fletcher

3   existed.  Jason Williams told you he was a member of that

4   conspiracy, and that the goal was to murder Fletcher.

5          Here's his testimony about it.  It's page 775.

6          Brian McCleod told you that he wasn't surprised when

7   he saw Fletcher dead because that was the outcome he expected.

8   You know Derrick Grant was a member of this conspiracy, too.

9   He fired seven shots at Fletcher's back and had to chase him

10  down to make sure he didn't get away.

11         You know Rodney Johnson was a member too.  You heard

12  the evidence that Rosemond sent him there as a backup shooter

13  and that he had a gun with him.  So the only question is was

14  Rosemond a member of that conspiracy.  You know that he was

15  based on everything that he said and did.

16         Now, defense counsel tried to make a big deal about

17  how Rosemond never said the words "kill" or "murder."  The

18  problem is your common sense tells you that's not the only way

19  you can get into a murder-for-hire conspiracy.  You have to

20  listen to Judge Kaplan on the law, but I expect he will

21  instruct you that, to prove a conspiracy, the government

22  doesn't have to show that two or more people sat around a table

23  and entered into a solemn pact orally or in writing.  We have

24  to prove a mutual understanding, either spoken or unspoken,

25  between two or more people to accomplish the unlawful purpose

1    charged in the indictment.

2            And you know that murder-for-hire conspiracy wasn't

3    spelled out in a written or oral pact.  It was an illegal

4    agreement, a mutual understanding between men who had committed

5    crimes together in the past and who knew the context of the

6    G-Unit feud.  And it was planned in secret, so it's no surprise

7    that in this secret criminal murder-for-hire conspiracy, the

8    members of the conspiracy didn't spell everything out in

9    explicit detail.  They didn't say "murder" and "kill".

10           Use your common sense.  That is not how Rosemond did

11   things.  Like Jason Williams told you, when it came to talking

12   about crimes, Rosemond pretty much left what doesn't need to be

13   said unsaid.

14           Rosemond -- your common sense tells you that that's

15   what people planning a murder conspiracy do.  Rosemond was too

16   savvy to say what didn't need to be said.  He was too careful

17   about what could get him in trouble.

18           When you look at what he did say and all the evidence

19   about the actions he took before and after the murder, you know

20   he was a member of that conspiracy to murder Fletcher.

21           Now, how do you know that Rosemond intended that

22   Fletcher be killed instead of just shot or injured?  Well, look

23   at all the evidence of Rosemond's actions and statements before

24   and after the murder that we just talked about and use your

25   common sense.

HBSAAROS2                    Summation – Johnson-Skinner

1           That is the one thing the defense doesn't want you to

2     do, because when you take a step back and you look at all the

3     evidence together using your common sense, the evidence is

4     devastating.

5           Defense counsel in his opening statement asked you to

6     look at each piece of evidence or each witness.  Look at them,

7     ask if they help you decide intent and then set them aside.

8           For example, he suggested Dr. Smiddy, the medical

9     examiner, wouldn't help you decide whether Rosemond intended

10    this murder.  When you think about it, when you look at

11    Dr. Smiddy's testimony, that Fletcher was shot five times in

12    the back and the arm with bullets that she took out of the body

13    and that Detective Fox told you were .22-caliber bullets, when

14    you look at that in the context of all of the evidence in this,

15    like the evidence that Rosemond sent this .22-caliber gun with

16    the silencer to the scene and that Grant used that gun to kill

17    Fletcher, when you use your common sense, you realize that

18    Smiddy's testimony about the bullets shot into Fletcher, it

19    does help you determine Rosemond's intent, to know that he

20    intended that Fletcher be shot and killed that night.

21          I also want to take a minute to discuss the idea that

22    Rosemond could have wanted Fletcher to be shot and not killed.

23    This is not the movies.  This not a TV show.  Derrick Grant was

24    not a trained sniper with a laser sight shooting at Fletcher's

25    foot.  This is one man shooting at another man on a street in

HBSAAROS2                    Summation - Johnson-Skinner

1  the Bronx from about 15 feet away at night.

2          Let's be clear.  When you send someone to do a

3  shooting with a silenced handgun on a street corner with

4  bullets that can rip through muscles and lungs and the heart,

5  that is evidence you intended to murder.

6          If you look at all the evidence and you consider it in

7  the context of everything you have seen and heard, you will see

8  this wasn't a plot to beat Fletcher up.  It wasn't a plot to

9  shoot him in the leg.

10         If you look at how this murder was plotted in more

11  detail, with more participants than Rosemond's prior nonfatal

12  shootings.  If you look at Rosemond's planning, the four

13  planning meetings and his meeting with the G-Unit spy -- and

14  here's a list of his meetings -- and the one meeting afterward

15  to discuss the payment.

16         If you look at how Rosemond had people scout murder

17  locations, if you look at all the covert careful tactics he

18  used, like the untraceable phone, meeting underground at Whole

19  Foods, the silencer on the gun, getting rid of gun and rid of

20  the phone afterwards, if you look at the facts that Rosemond

21  sent his own gun to the scene, that he sent a backup shooter,

22  if you look at the amount of money he promised and actually

23  paid, more than $30,000, and if you look at his own words,

24  words like, Those dudes aren't gonna be happy until they're

25  carrying a good coffin or going to a funeral I'm going to hit

HBSAAROS2                  Summation – Johnson–Skinner

him so hard and so fast he's not going to see it coming how he
said the bitch is out of here when all he knew was that
everything was good, how he said I can finally sleep when this
was done, and how he said this is what happens when you take a
soul, if you look at all of those things, you will know that he
intended this to be a murder.

You will know there is no gap in the government's
evidence like defense counsel claims.  You will know this is
not special sauce with no beef like the hamburger commercial
defense counsel referenced.  This is not a TV commercial.  This
is evidence in a murder case.  A real person, Lowell Fletcher,
died.

All the evidence we have been talking about today and
your common sense tell you that Rosemond intended that Fletcher
would die when he ordered, planned, and paid for this murder.

Now, I'm almost done.

Before I reach my last point, let me address something
I expect you will hear from defense counsel, that the
cooperating witnesses, they're all liars and you can't believe
any of their devastating testimony about Rosemond.  Let me be
clear.  All four of these men committed serious crimes with and
for the defendant.  With the exception of Williams, all of them
committed serious crimes on their own that had nothing to do
with the defendant.

That is why the government prosecuted, arrested, and

HBSAAROS2                    Summation - Johnson-Skinner

1    convicted them for their crimes.  It is also why in our opening

2    statement we asked you to carefully scrutinize their testimony.

3    It is because of their criminal relationship with Rosemond that

4    they have important testimony to offer, testimony about

5    Rosemond's planning Fletcher's murder.

6            To learn about a complex murder-for-hire scheme that

7    involved multiple people, you actually have to get the

8    information from the inside sources, from the people who are

9    actually part of the conspiracy.

10           So one of the things you have to decide is, are these

11   inside sources telling you the truth, or are they just weaving

12   a fantastic story to try to trick each and every one of you?

13           How do you tell?

14           First, ask yourself what did they testify about?

15           Did they testify just about Rosemond, or did they also

16   testify about other people and even themselves?

17           when they talked about themselves, were they candid or

18   did they hold back?

19           Stewart told you about numerous shootings he's

20   committed, and many over crimes he's done.

21           Abdullah admitted he sold huge quantities of drugs and

22   was involved in other shootings.

23           Williams admitted not only to this murder but to two

24   other serious crimes.

25           And McCleod told you he sold drugs for a long part of

HBSAAROS2                    Summation – Johnson-Skinner

1    his life separate from the defendant.

2            Ask yourself, is anyone going to get on the stand and

3    make up all these terrible things about themselves?

4            Of course not.

5            Also ask yourselves, if the cooperators were honest

6    about not only themselves, what about other people they

7    committed crimes with beside Rosemond.

8            They didn't just talk about Rosemond.  They named

9    names.  They told you about all the other people involved in

10    the defendant's crime, people like the other cooperating

11    witnesses, people like Derrick Grant, Rodney Johnson, Brian

12    James, Derrick English.

13            Did they tell the truth about these people, but only

14    lie about Rosemond?

15            No.

16            Also ask yourselves, what are the cooperating

17    witnesses' incentives?

18            Are they better off lying or telling the truth?

19            Stewart told you he's still waiting to be sentenced,

20    and he faces an automatic mandatory minimum 20 years.  If he

21    lies, his cooperation agreement is ripped up.  If he tells the

22    truth and gets that letter from the government, there's a

23    chance he gets less than 20 years.

24            Jason Williams, already serving a sentence of more

25    than 24 years.  His only chance for less time is if he tells

1    the truth and gets a similar letter if the government.  If he

2    lies, he will serve all of that time, and he risks additional

3    time for perjury.

4         You saw Jason Williams' demeanor on the witness stand

5    and how uncomfortable he was testifying against Rosemond.  He

6    told you it was hard to talk about Rosemond because he was like

7    family to me.

8         Williams isn't out to get Rosemond, ladies and

9    gentlemen.  You know he's telling the truth for one reason,

10   because it's in his own best interest to do so.

11        What about McCleod and Abdullah?  They have already

12   been sentenced and served their time, and they are on

13   supervised release, a form of parole.

14        Defense counsel tried to suggest that these witnesses

15   would all do anything to get out of jail.  These guys are

16   already out.  It doesn't make any sense.  At this point, having

17   served their sentences, what incentive do they have to come

18   here, take an oath, and commit perjury against Rosemond?  None.

19        If they tell the truth, their supervised release may

20   be reduced.  That is not much of a carrot for getting on the

21   witness stand and talking about their criminal past in a public

22   trial.  But if they lie, they face a harsh stick:  They could

23   risk going back to jail, and everything they did to cooperate

24   before could be for nothing.  Under the circumstances, what's

25   best for McCleod and Abdullah is to tell the truth.

HBSAAROS2                    Summation – Johnson–Skinner

1          You get to scrutinize the cooperators' testimony, and
2    you should.  But when you do, you are going to start asking
3    yourselves, how is it that what each of them says matches up
4    with what other people say in important details?
5          How is it that both Abdullah and Stewart told you that
6    Rosemond used basically the same words to describe how the
7    G-Unit feud would end, with a coffin or with a funeral.
8          How is it what Abdullah said Rosemond told him about
9    the details of the night of murder at that Harlem meeting at
10   the restaurant matches exactly what you know happened in the
11   murder?
12         On the details of events that matter, the ones you
13   would expect someone to remember if they actually occurred,
14   these witnesses all told you consistent accounts.  That's a way
15   you can tell they are telling the truth.
16         Finally, ask yourselves, if the cooperating witnesses
17   were lying, how is it that what they told you is supported not
18   only by the other witnesses, but by the other independent
19   evidence in this case, like the cell site evidence showing
20   Rosemond's phone at meeting locations where and when the
21   witnesses told you he was, and the phone records showing texts
22   and calls between Rosemond and McCleod just like McCleod told
23   you?
24         The answer is simple, because what the witnesses told
25   you is what happened.

Now, I want to talk to you for a few minutes about my last topic, the charges and how we have met our burden on the elements.

Listen to Judge Kaplan on the law and the charges, but I expect he'll tell you the defendant has been charged in four counts.

Count One charges Rosemond with conspiring or agreeing with others to have members of G–Unit murdered in exchange for payment from March 20, 2007, the date Rosemond's son was assaulted, up to September 27, 2009, the date Fletcher was murdered.

Count Two charges Rosemond with the murder for hire of Fletcher and the aiding and abetting of that murder for hire. This is the substantive murder for hire, as distinguished from the conspiracy to murder members of G–Unit that resulted in Fletcher's death as charged in Count One.

Count Three charges that, during the murder–for–hire conspiracy charged in Count One, Rosemond used, carried, and possessed firearms in connection with that conspiracy, and aided and abetted others who did the same.

Finally, Count Four charges that Rosemond used a firearm in connection with the murder for hire of Lowell Fletcher or aided and abetted others who used the gun in murdering him.

For the murder–for–hire counts, I expect the judge

HBSAAROS2                    Summation – Johnson–Skinner

will tell you that that there are three elements of the

substantive offense:

First, the defendant used or caused someone else to

use a facility of interstate or foreign commerce;

That he did so with the intent that Lowell Fletcher be

murdered in violation of the laws of any state or the United

States; and,

Third, that the defendant intended that the murder of

Lowell Fletcher be carried out in exchange for something of

pecuniary value or a promise or agreement to pay something of

pecuniary value.

With respect to the first element, you know that

Rosemond and other members of this conspiracy used facilities

of interstate or foreign commerce -- cell phones.  That is part

of this plot to murder Fletcher.

You remember this long stipulation I read about the

phone records.  It's Government Exhibit 1305.  Again, you can

look at all the stipulations in the jury room.

This tells you that each of those cell phone carriers

operate a telephone network that's capable of placing calls

between states and internationally.  You heard about literally

dozen of calls in this case and texts made by members of the

conspiracy.

You know Rosemond used the Buckson phone to

communicate with McCleod about the murder and to set up their

planning meetings.  You know Rosemond had McCleod buy the Stacy King phone to use to communicate with Fletcher.  Those examples are more than enough for that element.

Skipping ahead to the third element, that the defendant intended that the murder be carried out in exchange for something of pecuniary value, as to that element you have first what happened before the murder, that Rosemond and McCleod discussed how Rosemond had at least $30,000 for McCleod's role in the murder.

You heard that from both McCleod and Abdullah.  That Rosemond in fact gave McCleod a kilogram of cocaine worth about $30,000 in payment for the murder.

You heard Abdullah's testimony that Rosemond told Abdullah to have Johnson give those drugs to McCleod.

And you saw the cell cite evidence and the stipulation showing you that what McCleod said about picking up the drugs was true.

That is the first and the third element of substantive murder for hire.

The second element is that the defendant used or caused someone else to use the phones with the intent that Fletcher be murdered.

We just talked about all the ways that you know that Rosemond intended that Fletcher would be murdered, so that element is met too.

HBSAAROS2                    Summation – Johnson–Skinner

1          With respect to Count One, the conspiracy count, I

2     expect the judge will tell you you have to find a conspiracy to

3     commit murder for hire existed and that Rosemond knowingly and

4     willfully and voluntarily joined that conspiracy.

5          Again, we just talked about all the ways you know that

6     Rosemond did join a conspiracy to commit murder for hire.

7          I also expect the judge will ask you on Counts One and

8     Two, if you find that Fletcher died as a result of those

9     crimes.  Of course, you know he did.

10          Dr. Smiddy testified the cause of Fletcher's death was

11     his gunshot wounds, and specifically this wound A, the shot

12     through his lungs, heart and his aorta.

13          Now I want to spend a few moments on the last two

14     counts, Counts Three and Four, the gun counts.

15          You have heard testimony about a lot of guns.  You

16     only have to focus on one, the .22-caliber with the silencer.

17     There can be no serious dispute that that gun was used to

18     murder Fletcher.  There were seven. .22-caliber shell casings

19     found at the scene.

20          You heard from Detective Fox that those shell casings,

21     they all matched each other.  That meant they were all fired

22     from the same gun.  You heard there were .22-caliber bullet

23     fragments found in Fletcher's body.

24          Detective Fox told you that actually three of those

25     bullets matched each other.  The other two were so deformed

HBSAAROS2                    Summation – Johnson-Skinner

```
 1    from being shot through his body, they couldn't be examined.
 2             You know that that gun was Rosemond's gun.  Williams
 3    told you he was holding that gun for Rosemond, that Rosemond
 4    told him to take it to the murder scene and get rid of it
 5    later.
 6             Rosemond himself told Abdullah that that .22-caliber
 7    gun with the silencer, his gun, was used to murder Fletcher,
 8    and Mohammed Stewart told you about that gun too.  If you
 9    remember, he was holding it for Rosemond when Life used it to
10    go shoot at Baja's sister' house.  And Stewart said he actually
11    gave it back to Jason Williams.
12             Again, listen to Judge Kaplan on the law, but I expect
13    he will tell you that it is not required that the defendant
14    personally commit all the elements of the substantive
15    murder-for-hire count or personally hold or use a firearm in
16    connection with Counts Three and Four in order to be guilty of
17    those crimes if he aided and abetted others who did the same
18    thing who committed those crimes.
19             Keep those instructions in mind when you consider the
20    fact that Rosemond sent Williams to the murder scene with his
21    .22-caliber gun knowing and intending that his murder crew were
22    going to kill Lowell Fletcher with it.
23             Keep those instructions in mind when you consider all
24    the things Rosemond did to bring about this murder, even though
25    he wasn't the trigger man himself.
```

1    At the start of this trial the first witness Leta

2    Bethel, she told you that on the day of her brother's death,

3    she ordered him a couch so he would have a place to sleep in

4    her small one-bedroom apartment.

5    We can go to that slide.

6    She told you, "I purchased the couch, but by the time

7    they delivered it, you know or whatever --"

8    She trailed off, but she was crying about how her

9    brother had died.

10    You know what happened before they delivered it.

11    Lowell Fletcher never got to sleep on that couch.  But James

12    Rosemond, he could sleep again, because Lowell Fletcher was

13    dead.  He had his revenge, and the feud was over.

14    Rosemond paid for Fletcher to die because only one

15    thing could satisfy him after Fletcher and the other G-Unit

16    members assaulted his son.

17    He unleashed an onslaught of violence and shootings,

18    but it wasn't enough.  He wanted someone in a coffin before he

19    could rest, so he ordered, planned, and paid for Fletcher

20    murder.

21    You might ask yourself, why did Rosemond, the CEO of a

22    music management company, the head of a profitable drug

23    business, why did he think that he could get away with all

24    these shootings and with carrying out this plot to kill

25    Fletcher?  Even though his desire for revenge was so strong he

1  couldn't sleep, why did he actually go through with killing

2  Fletcher?

3        Why was Rosemond so brazen?

4        Because Rosemond thought he wouldn't get caught for

5  this crime.  He didn't think his enforcer, Mohammed Stewart;

6  his number two man in the drug business, Khalil Abdullah; his

7  personal driver, Jason Williams; his old friend from jail who

8  had been loyal to him before, Brian McCleod; he didn't think

9  that they would come here take that witness stand and tell you

10  what he did.  He didn't think he would be caught with all his

11  covert tactics like not saying too much, getting rid of the gun

12  with the silencer, deactivating his phone after the murder was

13  done.  He also didn't think anyone would ask too many questions

14  about a gang banger being killed in the Bronx.  He was wrong.

15        Those witnesses, they did come here and they told you

16  about how Rosemond is responsible for Fletcher's murder.  And

17  now, at this trial, Rosemond is facing justice for his crimes.

18        You heard about how not much is actually in dispute in

19  this case.  You know that on the issue that is in dispute the

20  evidence that Rosemond intended to murder, it's overwhelming.

21  You heard how the testimony of all the witnesses matches and

22  supports each other.

23        You know the witnesses' testimony is supported not

24  just by each other, but by the other evidence in the case, like

25  the cell site records and the phone records.

HBSAAROS2                    Summation - Johnson-Skinner

1           At the start of this trial, we asked you to use your

2   common sense as you listened to the evidence.  Now I am going

3   to ask you to keep using your common sense as you go back to

4   the jury room to deliberate.  When you consider the testimony

5   of all the witnesses and all the evidence that you have seen

6   and heard, the only just and fair view, the only view that's

7   consistent with the evidence is that the defendant, James

8   Rosemond, is guilty.

9           THE COURT:  Thank you, Mr. Skinner.

10          We will take a ten-minute break.

11          (Jury not present)

12          (Recess)

13          MR. TOUGER:  Your Honor, I expect you want me to stop

14  around 1?

15          THE COURT:  No, I expect you to finish.

16          MR. TOUGER:  You want me to finish the whole thing?

17          THE COURT:  If you don't mind breaking, stop around

18  1:15.

19          But I will leave that to you.  If you want to go

20  straight through, your call.

21          If you want to interrupt, interrupt about 1:15.

22          MR. TOUGER:  OK.

23          THE COURT:  Just let me know ahead of time.

24          Are you going to do that or not?

25          MR. TOUGER:  The only problem is if I go straight it

HBSAAROS2                    Summation - Johnson-Skinner

1  will probably take us to 2 o'clock.  I think that is a long --

2           THE COURT:  Your hour of last week became an hour and

3  a half this morning.  Now it's getting into an hour and

4  three-quarters.

5           MR. TOUGER:  It's going to be an hour and a half.

6           THE COURT:  Do you want to break it or not?

7           MR. TOUGER:  I think so.  If I go through, I go

8  through.

9           THE COURT:  I would like to know.

10          MR. TOUGER:  You would like to know?

11          THE COURT:  You can have it either way.  Just tell me.

12          MR. TOUGER:  I'll go through.

13          THE DEPUTY CLERK:  Shall I get the jury, your Honor?

14          THE COURT:  Yes.

15          MR. TOUGER:  We'll go straight through, your Honor.

16          THE COURT:  You need to have that in a case where I

17 can see it.

18          MR. TOUGER:  That's my problem.  I'm trying to find a

19 place where everybody can see it.

20          Can you see it now, your Honor?

21          THE COURT:  Yes.

22          (Jury present)

23          THE COURT:  OK.  Members of the jury are present and

24 the defendant is present.

25          What we are going to do, ladies and gentlemen, is

Hbsnros3                    Summation – Mr. Touger

1    Mr. Touger is going to make his closing argument.  We will then

2    break for lunch.  You will hear the rebuttal argument from the

3    government after lunch, and then I will charge you and we will

4    stay tonight.

5              Mr. Touger.

6              MR. TOUGER:  Thank you, your Honor.

7              First of all, ladies and gentlemen, let me thank you

8    for sitting here as jurors in this case.  This case has gone on

9    a little bit longer than we expected, but that is kind of

10   typical.  I want to thank you all for your prompt attendance

11   here, and what I know was your attention to every bit of

12   evidence that came in because I was watching you during the

13   trial and none of you fell asleep, which I give you a pat on

14   the back for.

15             The government brought up in their closing argument

16   today my analogy to where's the beef.  So let me go back to

17   that for a second.

18             I don't mean in any way to take away from the

19   seriousness of this case.  This is obviously a very serious

20   case for Lowell Fletcher's family, for the government and

21   obviously for Mr. Rosemond, who faces the charges here.

22             I want you to imagine -- I am going to explain the

23   commercial a little bit, because, as I understand it from

24   people, that people younger than me don't know what that

25   commercial is even about.  I am going to explain it in a

1    different way.

2              I want you to think of it you are going to a

3    restaurant and you have been told they have the best bacon

4    cheeseburger in New York City.

5              You go into that restaurant and you order that --

6    sorry for those vegetarians in the crowd -- and it comes to

7    you.

8              There is a beautiful bun, there's a crisp piece of

9    lettuce, there's a nice juicy piece of tomato, there's

10   perfectly aged cheddar cheese.  Everything looks just right,

11   except when you really investigate and you go to put some

12   ketchup on it, you notice there's no burger.

13             And that's what we have here, ladies and gentlemen.

14   The government's evidence can be a metaphor for that hamburger.

15             Let's look at it again.

16             The roll, this beautiful roll could be all these prior

17   shootings you heard about and all the cell phone records that

18   back up where everybody was.

19             The tomato, that could be the fact that Jimmy

20   Rosemond's son was assaulted.

21             The lettuce could be that Jimmy participated in these

22   conversations with Mr. McCleod.

23             The cheddar cheese could be that Jimmy spoke with

24   Brian McCleod many times and ordered Jason to bring the .22.

25             And the bacon could be all of Jimmy's statements after

Hbsnros3                     Summation - Mr. Touger

1    the incident occurred.

2           But what they are missing, even with all this

3    wonderful evidence, and it's very good evidence, but it doesn't

4    prove one thing, they are missing the burger, the intent of

5    Jimmy to kill.  That's what's missing in this case.

6           It doesn't matter how many meetings they verified

7    occurred.  It doesn't matter all the other evidence that is

8    beyond established.  They have failed to prove the main element

9    in this case, that Jimmy intended that any member of G-Unit

10   die, let alone Lowell Fletcher.  That evidence is missing from

11   Jason Williams' testimony and Brian McCleod's testimony.

12          Nowhere in their testimony did either of them say the

13   key words, "Jimmy ordered me to kill Lowell Fletcher."  And I

14   don't mean just using the word "kill."  They testified that

15   there's nowhere that he even used any words that mean kill,

16   murder.  Nowhere.

17          Go through the record.  There's a lot of smoke thrown

18   up by the government and all the testimony about drug dealing

19   and other shootings, all to cover up the big void in their case

20   that no one ever says Jimmy wanted Lowell Fletcher dead or

21   anybody else from G-Unit dead.

22          This is the essence of the case.  Did Jimmy -- and

23   Jimmy's the only important one.  It doesn't matter what Brian

24   McCleod's intent was.  It doesn't matter what Jason Williams'

25   intent was.  It doesn't matter what Derrick Grant's intent was.

1    They are not on trial.

2            The only person who matters, the only intent that

3    matters to you is what was Jimmy's intent?

4            Did Jimmy join a conspiracy with the intent to have

5    somebody killed?

6            Now let's go back to the government's opening

7    statement to see what they said they will prove and how they

8    would do it.

9            The first thing they said was, as you will see and

10   hear during this trial, for more than two years Rosemond and

11   his team tried over and over again to have a member of G-Unit

12   shot and killed.

13           There is no proof the government can point to

14   throughout this whole trial that supports this statement.

15           Stewart, and as he told you he was, and as the

16   government just said, he was Jimmy's right-hand man with all

17   this.  He was the Swiss army knife I believe he referred to

18   himself.  He was Jimmy's go-to guy.  He was the main man in the

19   feud.

20           And what did he say?

21           He never wanted to kill anyone; never asked anyone to

22   kill anyone.

23           So how, if the main man in this alleged feud for these

24   two years wasn't supposed to kill anyone and never tried to

25   kill anyone, was Jimmy's intent to kill?

Hbsnros3                    Summation – Mr. Touger

1              Abdullah, same testimony, same intent.  Never intended

2    to kill anyone, never tried to kill anyone, never ordered

3    anybody else to kill anyone, never wanted anyone to die.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. TOUGER:  All shootings they both made it quite

2     clear to you that they never shot with the intent to kill.

3          Jason Williams never was asked to kill anyone.  He

4     never shot at anyone and never saw Jimmy kill anyone.  McCleod

5     wasn't in jail for the entirety of the feud, so he has no

6     testimony on this issue.  So none of the four witnesses the

7     government brought before you and have told you they are

8     telling the truth, remember the government stands behind each

9     and every one of these people, they are telling the truth, can

10    support their first argument that for two years Jimmy tried to

11    kill a G-Unit member because all of the people involved this

12    those shootings told you that wasn't true.

13         Stewart testified at page 190, We were going to bring

14    the beat to G-Unit when ever we saw them.  But he told you that

15    doesn't mean kill.  He made that very clear.  Hurt them maybe,

16    but not kill them.

17         Then the government continued:

18         first you'll hear from law enforcement officers such

19    as the officers who responded to the murder scene, as well as

20    officers who responded to other violent acts that Rosemond and

21    his associates committed against members of G-Unit.

22         I would suggest to you that none of the police

23    officers who testified here or whose testimony was placed

24    before you by stipulation helped you answer the question, Did

25    Jimmy intend to have anyone killed?  Their basic testimony was

1  they arrived at a location where there had been a shooting.

2  They gathered ballistics and they left.  One or two of them

3  interviewed a few witnesses.  But that was what their sole

4  involvement in the case was.  The only thing they proved is

5  that no one ever got killed at any one of these shootings and

6  in all the shootings only one person got hurt by a Czar alleged

7  shooting.  Which is a misstatement from what the government

8  said to you in their opening when he said it all changed on the

9  day that Mr. Rosemond's son was attacked.  I would suggest if

10 you ask the man who got shot at the Apollo that night by

11 Abdullah was a person -- did he get wounded, he got wounded he

12 got shot.

13         Second panel.

14         You will hear from a few expert witnesses.  For

15 example, you will hear from a medical examiner who will testify

16 to you how Fletcher died from gunshot wounds.

17         Again, I suggest to you that neither of the two

18 experts, Dr. Smiddy or Deputy Heintz who testified in case gave

19 you any assistance in deciding the only question that is in

20 dispute.  Dr. Smiddy certainly does not help the prosecution's

21 case even taking back -- yes, Lowell Fletcher did die due to

22 the shooting but that is -- and this is the first important

23 thing for you to remember -- is not important in this case.

24 That's not the question you have to decide.  It is obvious that

25 Lowell Fletcher died.  The proof that is irrelevant is that if

1    Jimmy had decided to kill Lowell Fletcher and Lowell Fletcher

2    lived he'd still be guilty of Count One.  The fact that Lowell

3    Fletcher died or didn't die is not important.  It's sad.  We

4    have sympathy for his family but you can't use those emotions.

5    As far as evidence in this case, it means nothing.

6         Dr. Smiddy's testimony, if anything, proves that Jimmy

7    never intended for Lowell Fletcher to die that night.  She

8    confirms that Lowell Fletcher was shot at a distance.  There

9    was no stippling or any of that other evidence that proves a

10   close-up shot.  We know from the civilian witness that he puts

11   that distance, Mr. Brooks, at 15 or more feet.  And then a .22

12   caliber weapon was used.  And as I will show you later on, both

13   those facts prove that this was not an intended homicide.

14        Marshal Heintz's testimony certainly does not help you

15   answer the question.  All he did was confirm that certain

16   meetings and communications took place during this case.  Well,

17   did you ever see me argue -- no, because I don't.  All those

18   meetings, they took place.  It's obvious they took place just

19   as the prosecutor just told you.  We do not dispute one fact of

20   his testimony.  But what is important is not that the meetings

21   took place.  What is important is what was discussed at those

22   meetings and for that you have no proof from Marshal Heintz or

23   anybody else except the cooperators and we'll get to that

24   later.

25        Third, you'll hear from everyday citizens who happen

to witness events relating to the murder.  For example, you
will hear from an eyewitness who saw the shooting take place on
his way back from picking up dinner.  And you will also hear
from Fletcher's sister who he was living with at the time and
who spent the day with Fletcher the day he was murdered.
Again, these witnesses certainly do not prove that Jimmy
intended Lowell Fletcher to die that night.  They are just
further proof of the extent the prosecution will go to coverup
the gaping hole in their proof.  They will try anything to
inflame your passion against Jimmy and hope you will just
convict him because you don't like him.

         While the testimony of Ms.–Marte is very dramatic and
she certainly deserves an accommodation for what she did, it
does nothing to help you answer the question, What was the
intent of Jimmy on that night?  Again, we'd all have sympathy
for Lowell Fletcher's sister and all his family but her
evidence, her testimony does not help the government prove to
you that Jimmy intended Lowell Fletcher to die.

         And Valerie Bernard, Yayo's sister, why was she called
to testify at all if not to rachet of your disdain for the
world that Jimmy lived in.  The defense stipulated to the fact
that her house was shot at.  So why was it necessary to call
her to say her house was shot at?  It was only to get you to
dislike him more, so she could testify about her daughter.

         And what's interesting about that is did Jimmy shoot

them as they were going in the house?  No.  The testimony is
that they waited till they got in the house and the house was
their protection.  If he wanted them dead, they would have been
shot as they went in the house.

Not one civilian witness provided you with any proof
that Jimmy intended Lowell Fletcher to be kill as opposed to
being shot at.

Panel Four.

I mentioned you would also see physical evidence that
evidence to support what you will hear from the witnesses.  For
example, you will hear about cellphone evidence tying Rosemond
to the planning and executing of the murder.  Well, the
cellphone evidence as we've already mentioned does nothing of
the sort.  All it proves is that there were meetings and
conversations.  It proves nothing about the content of those
meetings.  There is absolutely no physical evidence in this
case that proves Jimmy intended Lowell Fletcher to be killed as
opposed to being shot at.  There are no tapes of any
conversations.  There are no videotapes of any consequence.
There are no photographs of any consequence.  The only thing
the videotape of actual shooting demonstrates is how poorly
this allegedly well-planned incident was done.  For all their
planning that McCleod allegedly did he can't even get Fletcher
to go to the right spot.  The actual shooting takes place no
where near the allegedly intended site.

1           Panel Five.

2           The prosecution's supposedly most powerful witnesses.

3    Finally, you're going to hear from people who have inside

4    knowledge of Rosemond's crimes.  That is because those people

5    committed crimes with Rosemond.  I suggest to you that not one

6    of these four people provided you with evidence that Jimmy

7    intended Lowell Fletcher to die that night.  Remember most

8    importantly, it is not the intent of Brian McCleod or Derrick

9    Grant that matters.  It is only the intent of Jimmy.  Did Jimmy

10   intend for Lowell Fletcher to be killed?  Well, let's look at

11   each one of those cooperators for a short moment right now.

12          Mohammed Stewart the first one, told you he has no

13   firsthand knowledge of the incident.  He knows nothing about

14   the shooting of Lowell Fletcher till after it occurs.  He does

15   however shoot a lot of people sometimes even at close range.

16   Remember his description of the Ocal shooting?  He took his .45

17   caliber gun, put it to the man's stomach and emptied it into

18   his stomach but never intended to kill him that night and

19   didn't want him to die.  They are telling you Mohammed

20   Stewart's telling the truth.  So you can't question that

21   testimony.  He shoots people.  He orders people shot but never

22   intends for that person to die.  As a matter of fact, he's told

23   you quite honestly he's never killed anyone.  So I ask you how

24   does he help the government's case?

25          Khalil Abdullah, again, he told you he has no

1    firsthand knowledge of the incident.  Finds out everything

2    after it has occurred.  He also shoots a lot of people and has

3    ordered others to shoot at people even using terms such as

4    "clap him up".  For him the terms that they say means in their

5    minds kill but he's told you when he's used those words it

6    doesn't mean to kill.  Their own witness is defeating their

7    argument.  So I ask you how does he help the prosecution's

8    case.

9            If anything, Abdullah and Stewart are the defense's

10   best witnesses because both say they shoot at people or order

11   others to shoot at people, use words such as "clap him up" and

12   most importantly, have never ever after saying clap him up or

13   hit him but don't kill.  Abdullah made that quite clear, he's

14   never added that little sentence fragment at the end "don't

15   kill him".  That is exactly the situation we have here.

16           Furthermore, the government's argument that this is

17   personal to Jimmy and that is why it's homicide.  Well,

18   Mohammed Stewart told you pointblank the war between him and

19   Baja became personal.  Baja shot at him multiple times.  Blew

20   up his barbershop but he never wanted to kill Baja, never

21   intended to kill Baja.  If he died he wouldn't have been

22   unhappy but never wanted to kill him.

23           Then you have Jason Williams talk about him much more

24   later on the but at page 841 and 842.

25   Q.  You had no idea whether they were going to kill Lowell

1  Fletcher that night or shoot him because you had been involved

2  in none of the planning?

3  A.  Right.

4        So Jason Williams a telling you that he had no idea

5  what the goal of Brian McCleod and Derrick Grant was that

6  night, let alone Jimmy.  The one person who testified in this

7  case who as the prosecution just told you this morning was

8  closest to Jimmy, had the best relationship with Jimmy, spoke

9  to Jimmy everyday either in person or by telephone, he tells

10  you pointblank he had no idea.  What better evidence can you

11  have that the government's failed to prove to you that Jimmy

12  intended to kill Lowell Fletcher that night?  The star witness

13  who they stand behind 100 percent who hopes to get out of jail

14  by New Year's comes in here, testifies in front of you and says

15  he has no idea.

16        Let's go to Brian McCleod.

17        For now I just want to concentrate on one point in his

18  testimony and that is a lead up to and the proffer session of

19  January 2014.  To set the scene Brian McCleod is about to go to

20  his first proffer session.  Let's see what McCleod says at page

21  1120 of the record.

22  A.  I plan to tell the truth and change one part.

23  Q.  What is the one part you plan to change?

24  A.  Who I gave my portion of the cocaine to.

25  Q.  OK.  Besides that, you plan to tell the entire truth about

1    your activities?

2    A.   Yes.

3              He says:

4              I'm going to tell the truth about everything but who I

5    gave the drugs to.

6    Q.   Nothing else would be a non truth?

7    A.   Exactly.

8              Continuing on to page 1121.

9    Q.   And you specifically told them that this was going to be a

10    shooting, "them" being the prosecution, a shooting not a

11    homicide, right?

12    A.   I told them I felt I was participating in what would be a

13    shooting and not a killing, yes.

14    Q.   Then you had many more meetings with the government after

15    that, right?

16    A.   Yes, sir.

17    Q.   And you even count how many proffer sessions you attended

18    prior to your testimony at a prior proceeding in February 2014?

19    A.   I would say somewhere between 10 and 15.

20    Q.   And you spoke with them for a long time at some of those

21    proffer sessions, right?

22    A.   Yes, sir.

23    Q.   And each one of those proffer sessions you signed the

24    proffer agreement saying you are going to tell the truth?

25              Into page 122.

A.  I believe so, yes, sir.

Q.  And by then after the first when did you realize that you had to tell them the whole truth even about Blast, the man he gave the drugs to?

A.  I realized that when I left the first session.

Q.  So Mr. McCleod has told you that after he left the first session even during that session he was telling the truth except about Blast but when he left the first session he was going to tell the whole truth about everything?

Now let's jump to January 2014.  McCleod has been cooperating for a long time.  He's been to over ten proffer sessions, 10 to 15 he says and he's questioned for hours upon hours, knows full well that he has to tell the truth and not protect anybody and not leave any facts out.  He's being prepared to testify at a prior proceeding in the case and the government asked him the important questions just like they did at his very first proffer session.  What was your intention that night to kill Lowell Fletcher or to just shoot him?  And on that day, just as he did on the first day, he said, our intention was not to kill him but to shoot him.

And what happens after that?  Page 1123 of the record.

Q.  And would I also be correct in saying that at that point a problem erupted at the meeting.  A problem erupted at the meeting?

A.  Yes, sir.

1  Q.  So the government stops the meeting and says you'd better

2  go talk to your lawyer.

3          Over ten proffer sessions, hours upon hours of

4  questioning –– and this has never happened before.  The

5  government doesn't like the answer because if that is his

6  answer they have no case against Jimmy.

7          So what happens?  The proffer session is halted.

8  Mr. McCleod goes to talk to his lawyers.  He comes out of that

9  meeting and lo and behold, the answer changed.  Why do you

10  think that is?  Isn't it most likely that his lawyers said if

11  you want this cooperation agreement that you have to say it was

12  a murder from the beginning.  And Brian McCleod looks into the

13  future and he see life behind bars or he sees getting out of

14  jail and being a free man.  And he changes his answer and

15  magically the shooting becomes a murder for one reason and one

16  reason only.  Brian McCleod wanted to go home.

17          Page 1126 leading into 1127 of the record.

18  Q.  At the last proffer session was different from the answer

19  you gave at that point?

20  A.  Yes.

21  Q.  And you went on and testified at that prior proceeding in

22  February of 2014, right?

23  A.  Yes.

24  Q.  And after that you got your 5K1 letter?

25  A.  Yes.

HBSAAROS4                    Summation – Touger

Q.  And after that you got sentenced not to life in jail, not
to 20 years but to six years?

A.  Well, I think you're leaving out another proceeding in
November.

Q.  Right?

A.  But yes.

Q.  Ultimately you, got sentenced to six years after you got
the 5K1 letter?

A.  Yes.

"Q.  And now you've walked out of jail?

A.  I left jail, yes.

         That is why we are here, ladies and gentlemen.  If
Brian McCleod doesn't change his answer back in January of 2014
so he could walk out of jail a free man you all, me, and
Mr. Rosemond would not be sitting here today.

         At page 1129 McCleod told you they talked about Lowell
Fletcher at every proffer session.  So for years and dozens of
meetings it was just a plain shooting, not a homicide.  But
when it came time for Brian McCleod to testify in a prior
proceeding the government couldn't have that answer any more.
So they told him go talk to your lawyer and it changed.  Well
which is the true statement?  The statement he told so many
times he can't count knowing he had to tell the truth or the
statement he told once because he wanted to get out of jail?
The government and his lawyers laid it out for Brian McCleod

HBSAAROS4                    Summation - Touger

1    and he saw the writing on the wall and he changed his answer.

2               And now based on that answer these five people sitting

3    at that table want you to convict Jimmy for conspiring to

4    murder and actually murdering Lowell Fletcher.  That is the

5    foundation of their proof beyond a reasonable doubt.  This one

6    answer which for years went one way and then magically changed.

7               Now let's look at other factors the government says

8    proves that this was a homicide.  During their initial

9    summation they made a big deal about the fact that Jimmy agrees

10   to pay $30,000 to McCleod and his men.  The government has

11   argued to you that this is more than Jimmy has ever paid for

12   anything and thus, this proves it was more than just a

13   shooting.  But I look at the evidence completely disproves this

14   theory.  McCleod himself tells you not to believe that argument

15   quite clearly when he testified at page 1095 even if Lowell

16   Fletcher had just gotten shot in the kneecap, even if it was

17   just a leg shot, I deserve more than $30,000.

18              So right there the government's argument goes down

19   to -- no murder necessary.  Just a knee shot.  And Brian

20   McCleod tells you I get more than $30,000.  But there's so much

21   more.  Brian McCleod told us at page 907 that back in 2003

22   Jimmy pays Derrick Grant acting alone a half a kilo to do

23   nothing more than shoot up the window of Violator Records.

24   $15,000 in 2003 before his son was assaulted, $15,000 to shoot

25   up a window.  Jimmy is now paying him a third of a kilo for

1    this thing.  So how is it more?  Half a kilo to shoot up a

2    window, a third of a kilo to do what a murder?  You've got to

3    be kidding me.

4         Mohammed Stewart testified at page 199 that Jimmy paid

5    him $12,000 to shoot up a house.  Again, no murder involved.

6    No murder intended.  So how does the fact that Jimmy's willing

7    to pay each McCleod, his inside man and Derrick Grant $10,000

8    for the murder when Jimmy was paying more for just -- had

9    nothing to do with the murder.

10        Plus, we know from the evidence that a murder costs a

11    lot more than $30,000.  Remember Mohammed Stewart's testimony

12    that to kill Baja was going to cost $75,000.  I do my math

13    that's two and a half times $30,000.  So how was $30,000 --

14    remember McCleod's testimony it really doesn't matter what

15    you're doing because the kneecap was worth more than $30,000.

16    It matters how much you're involved in the activity.

17        And don't let the government fool you by saying the

18    price went up after the incident occurred because Jimmy paid

19    $30,000, never agreed to pay more and only paid $30,000.  You

20    have no testimony that Jimmy ever paid more than that one kilo.

21    So there is no evidence that Jimmy paid the going rate for a

22    homicide.  He paid for a shooting.

23        Next the prosecutor argued that there was so much more

24    planning for this incident and this proves it was homicide and

25    not just a shooting.  Well, again, let's look at the evidence

1    and see what it proves.

2            The government is very good about making grandiose

3    statements and glossing over the evidence.  Like they said in

4    their summation, they never mentioned one G-Unit shooting.  But

5    we know G-Unit shot at Violator.  We know G-Unit never

6    threatened people at Violator and Jimmy but they don't mention

7    that because they don't want you to think about it.  So they

8    come out with a statement, the planning in that case proves a

9    homicide.

10           Let's go over the evidence.

11           McCleod told you on his direct testimony at page

12   973 -- this is when he is being questioned by the prosecutor --

13   that they went to Queensborough to see if anything could take

14   place that day.  So McCleod tells you pointblank, we went to

15   Queensborough to see if possibly we could do Jimmy's bidding

16   and it was such a great plan that they had come up with that

17   Derrick Grant, the alleged shooter, doesn't even bother to show

18   up.  Doesn't even come.  Never appears.  Great planning.

19           Jason testifies at page 950 he didn't know who sent

20   him there or why he was even there or what he was supposed to

21   do and doesn't even remember to bring a gun.  Plus, they both

22   get there too late to do anything any way because Mr. Fletcher

23   has already left the scene.  Great planning.  Lots of planning.

24   Really good job.

25           The government made it clear in their closing that

1    Jimmy gets angry when things don't go his way.  First of all, I

2    don't see any evidence of that any way.  If Jimmy really wanted

3    Lowell Fletcher killed, what more time to get angry than right

4    now?  They had him, could have followed him anywhere and shot

5    him and they don't.  The shooter doesn't show up.  They get

6    there too late.  Is there any testimony that Jimmy got angry at

7    that moment?  You could look as far as you want and as deep as

8    you want into the record.  There is none because Jimmy, just a

9    shooting.  We'll get him some other time.

10           And then remember my cross-examination of Mr. McCleod

11   who I granted was sparring with me a lot but take out that

12   sparring and he did give a lot of valuable evidence.  Talked

13   about the meetings.  Let's go through them a little bit.

14           The first meeting McCleod just tells Jimmy of his

15   connection to Lowell Fletcher.  I got a line on Lowell

16   Fletcher.  Jimmy says, Great.  No planning at all at that

17   meeting, just information.

18           Second meeting where Jimmy says he has $30,000 for

19   someone to bring Lowell Fletcher to him and McCleod says, What?

20   I just spoke to Derrick.  Why don't we see if he'll do it.

21   Jimmy says, OK.  We'll talk more about exactly what was said at

22   that meeting later on but there's no planning there.  No

23   planning, whatsoever, just Jimmy taking yourself out and

24   substituting -- in.

25           Then there is the meeting, the second meeting at Whole

Foods where Jimmy just asks, Are you sure you can handle this?
And then tells him to buy a separate phone so that that's the
only phone you should talk to Lowell Fletcher with.  No
planning.  What to do, how to do it.  Nothing.  How to do it.
And if you want to use the fact that he told Mr. McCleod to buy
a separate gun was planning, go right ahead.  They make a big
deal about that.  Only problem with that is witness after
witness told you they all have many phones because they have
one phone for one criminal activity, one for another criminal
activity, one phone for their family, a shooting, a criminal
activity.  You go to jail if you shoot at somebody.

        Jason Williams told you he went to jail just for
having a gun in the car.  If you get caught shooting at
somebody you go to jail.  You want to cover that up.  So the
fact that he told Mr. McCleod to go by a separate phone in the
context of this case means nothing when Stewart told you
everybody had separate phones.  Abdullah told you you have a
separate phone for each person you are doing a crime with.  I
think with Stewart, he says so nobody can tell on anybody else.
So that one fact that they made such a big deal about does not
prove any intent on Jimmy's part.  So, yes, you could say that
that is a planning part, but it doesn't push the needle toward
intent to kill at all.

        The next meetings are the two before and after the
dinner.  The prosecution talked about that it happened in

1    Barnes and Noble.  What happens at that meeting?  Jimmy takes

2    out a phone and says here is Lowell Fletcher's address.  I got

3    it from some inside source.  Here is his address.  Well,

4    there's no planning there.  It's just giving an address for

5    where there can find Lowell Fletcher because they blew it at

6    Queensborough.  He knows where he's living.  No planning, no

7    who should do what, what should happen, nothing.  Here's the

8    address.  Then they go and have dinner.  Nothing discussed at

9    the dinner.  After the dinner they walk, then they go to meet

10   this inside man.  There's conversation with the inside man

11   about how Lowell Fletcher is getting nervous about something.

12   And what does McCleod tell you after he leaves?  He tells

13   Jimmy, Don't worry.  That's not me.  He's not suspicious of me.

14   And then they work out a code.  And this is very important.

15           They work out a code so that when Mr. McCleod goes to

16   that 161 Street address he can text Jimmy back whether it's a

17   good spot or not and they explain to each other the code

18   because as it was testified to in this case, a code is only

19   efficient if both sides know what it means.  If one side

20   doesn't, know you have confusion and you might have something

21   done that you didn't mean to have done.

22           Now, what's important about that discussion about the

23   definition of a code is the government relates back to the

24   conversation about "I have been hitting them so hard" that

25   Jimmy had initially with Mr. McCleod that "hit" is the code for

1    kill.  And no where in that conversation do you hear any

2    testimony that either one had to explain to the other what

3    hitting meant.  Remember that when I talk about that later on.

4         Basically, he's telling Mr. McCleod to go up to the

5    161 Street address and see if the coast is clear.  How does

6    that prove a homicide?  There have been other shootings where

7    the coast wasn't clear and they didn't go ahead with it.  Times

8    when they were cops behind them on the highway, they pulled

9    off.  The time when they went to shoot Chris Lighty and the

10   police in the area they fled off.  That is what they do.  You

11   don't shoot at people if you are going to get caught on camera

12   if you.

13        Do, Stewart testified, checking out location after

14   location before shooting at him.  Obviously, you don't perform

15   a criminal act where there are cameras there.  McCleod himself

16   told you that.  So there's no real planning.

17        The next thing that occurs is McCleod tells you he

18   goes directly up to the address by cab and checks it out

19   himself.  Well, it's interesting to note that Jason Williams

20   testified at page 753 that he drove McCleod to Lowell

21   Fletcher's house that night.  McCleod tells you he took a cab

22   there, went by himself Jason Williams tells you at page 753, I

23   took him there.  You decide which one is telling the truth.

24   There are more examples of this later on.  We'll get to them.

25        So McCleod goes to the address says it's not good.

HBSAAROS4                    Summation - Touger

1    Sends the code they worked out, bad date or whatever it was.

2    Jimmy responds, OK.  Get with the other guys.  Pick another

3    spot.  That is really not planning either.  Just that's not a

4    good spot.  We've talked about how that's happened before.  So

5    the mere fact a shooter decided it was not a good location or

6    the right time to do a shooting is not proof of a homicide.

7    It's happened multiple times before in this case at shootings

8    we all know were not fully intended.

9            The next day is really the only day that the

10   government is correct that some planning takes place.  Can't

11   dispute that.  McCleod meets with Derrick and Jason.  They

12   canvass a few spots and they pick out one.  So some planning

13   obviously took place.  But what is most important is who is not

14   involved in that day in that meeting or texting or call.  There

15   is no testimony that any event involved this man.  James

16   Rosemond is not involved in that day at all.  He is not

17   contacted by anyone.  He is not involved in the decision

18   making.  This meeting is solely between McCleod, Williams and

19   Grant.  And remember their motive is totally unimportant to

20   you.  Only Jimmy's motive is important.  And on the day when

21   the most planning is done Jimmy is not involved at all.

22           Now the government will also argue as they have that

23   the fact that Lowell Fletcher is lured to the shooting spot and

24   an inside spy is used, proves that this is a homicide.  How

25   many times do they say that in their openings and in their

closing?  I lost count.  Well, their own witnesses disprove
that theory also.  Remember Jason's Williams' testimony about
the attempted shooting on Chris Lighty?  Jimmy had an inside
source telling where Chris Lighty was going to be.  They lured
Chris Lighty to a dinner and they didn't do it because too many
police on the street.  And I would also add that there were
multiple cars and multiple shooters for that shooting.  More
than five people involved and we all know that wasn't the
killing.  So this whole argument about luring proves homicide
is defeated by their own witnesses.  Now let's move on.

        Williams testified at page 835 that Jimmy gave him no
instructions to give McCleod and most importantly didn't even
tell him who to give the .22 to.  Yes, he told him to bring the
22 but -- does he give him any other instructions?  No, not
one.  Who did he give the gun to, not what to be done when gets
there?  Just bring the gun.  The .22 has been used before in a
shooting.  They used a MAC-10 in shootings.  Didn't mean
homicide.

        So according to the government this incident is so
meticulously planned out by Jimmy but he gives no instructions
to his closest ally, to his closest friend, to his closest
confidant about ho it's supposed to be done or how it's
supposed to occur or who is even going to be the shooter.  And
what does McCleod tell you?  That when they do arrive Jason
tells him you, McCleod, are gonna do the shooting.  Oh, no, I

1    ain't gonna do the shooting.  Grant's doing the shooting.  So

2    this meticulously planned out homicide nobody even knows who is

3    gonna do the shooting.  That's meticulous planning is what was

4    going on in these meetings?  Nothing.  There was no planning.

5    Brian McCleod is supposed to be the chairman of board of the

6    shooting.  And he doesn't even know that Jason is telling him

7    to be the shooter.  So the evidence fails to prove that Jimmy

8    was involved in this at all.  There was no great planning of

9    this.

10           Incidentally McCleod came up with an idea.  Jimmy said

11   go with it and they went ahead and did what they do.  This was

12   just another shooting in a long line of shootings but,

13   unfortunately, for every one involved one the bullets had to

14   hit the target in the wrong spot.  A .22 shot from 15 feet on

15   the run and, unfortunately, for everyone involved, it happened

16   to the wrong spot.  This was not a planned homicide and the

17   evidence proves it.  If this was planned, the most important

18   role of who the shooter would be would have been established

19   beforehand and the evidence proves that it wasn't.  The only

20   thing planned here was where the shooting was going to take

21   place and ultimately that didn't even happen.  The shooting

22   didn't even take place, the evidence shows, where it was

23   supposed to take place.  There was never a plan to shoot Lowell

24   Fletcher to death.

25           Put up panel seven.

1          The Court:  No, you didn't do it or, no, he's not

2     right?

3          This is Brian McCleod testifying.

4     A.  No, I never had a conversation with Jason or Derrick or

5     Rodney Johnson telling them to kill Lowell Fletcher.

6          The next panel please.

7          Testimony of Jason Williams.

8     Q.  And you had no discussions with Jimmy about planning the

9     shooting of Lowell Fletcher?

10    A.  No.

11         So what does the evidence show -- if there was a plan

12    to kill why did McCleod just walk up and greet Fletcher, make

13    him comfortable, have Grant come and shoot him in the back of

14    the head?  That's a planned homicide.  That sounds like a plan.

15         But the reason is obvious why McCleod didn't do this

16    because the plan was for Lowell Fletcher to survive and that's

17    why Fletcher could never see McCleod.  If this was a planned

18    homicide why does Mr. McCleod go through such a great extent

19    never to go get Fletcher?  They can't get him to the point.

20    You heard that evidence and you saw the videotape.  They're

21    running back and forth calling him each.  Why doesn't McCleod

22    just say wait where you are.  I'll come get you.  Because the

23    plan is that he is to survive.  It's just a shooting and you

24    can't have the ID, the look on McCleod.

25         Remember, McCleod told you that Fletcher was trusting

HBSAAROS4                          Summation - Touger

him.  He was bringing 2500 bucks.  He was going to get him

women and alcohol.  He was trusting him.  So why not have

McCleod walk up to Fletcher, say hello, how do you do, shoot

him on the spot.  When he's unsuspected, get him to go into a

car or an apartment and kill him?  That's a planned homicide.

But luring someone onto a dark street and refusing to go and

meet him no matter how confused Fletcher got and shooting him

from at least 15 feet away from the smallest caliber weapon

available, yes, a .22 can kill obviously.  I'm not stupid.

        Obviously, a .22 can kill but if you believe their

testimony Jimmy had much more powerful weapons available to him

with silencers.  And it's only logical that a bullet coming

from a .45 which weighs five to seven times more than a .22

would have a better chance of killing someone than a .22 so if

they wanted him dead he doesn't bring the .22.  The plan was

never for Fletcher to die.  Yes, there was a message to be sent

and a reason for the shooting.  But the evidence clearly shows

it was not a homicide.

        Same amount of plan for the Chris Lighty shooting and

we know that is not a murder.  Luring him to a spot, multiple

shooters, multiple vehicles, surveillance of that spot and that

wasn't an intent homicide and the evidence demonstrates that

neither was the shooting of Lowell Fletcher.

        Stewart testified at page 194, question from the

prosecution.

1    Q.  Did you ever conduct surveillance of the G-Unit members?

2    A.  Yes.

3    Q.  Surveillance of G-Unit members, Stewart is saying yes.  So

4    how is this any different?  What did you do?

5    A.  I go to their houses.  Get their phone records.  Find, get

6    their phone numbers.  Get their call lists incoming and

7    outgoing call lists.  I would find addresses, go to their house

8    and take out their houses.

9          Page 194 of the record.

10          They were paying the phone companies to get the

11   records of G-Unit members but that's -- if that's the planning

12   I don't know what is.

13          There was a lot of planning being done for many of the

14   shootings, yet none of them were planned homicides and neither

15   does the evidence show was the shooting of Lowell Fletcher.

16          McCleod is the only one planning anything because for

17   him this is a big pay day.  He's just got out of jail.  He

18   needs money.  And also it's a way to get back into Jimmy's good

19   graces and maybe make some more money from Jimmy.  So he's the

20   one planning the Derrick Grant, Jason Williams does no

21   planning.  Only time Jimmy gets any strategizing was after the

22   shooting actually occurred.

23          The judge will tell you you can't join a conspiracy

24   for murder-for-hire once the act is done.  Once the act is done

25   you can't join that conspiracy.  It is important to know that

1   at the time Jimmy allegedly told Jason to get rid of the gun

2   though he doesn't know for sure that Fletcher is dead.  Jason

3   told you that he testified that he didn't know Fletcher was

4   dead until sometime the next day.  So the only time Jimmy does

5   anything about those involved, so he doesn't know a homicide

6   occurred.  The government wants you to take that message that

7   he sent Jason everything is all right as proof that it was a

8   homicide.  No.  Everything's all right.  He was shot.  We don't

9   know what happened.  But he is shot.  We did our job.  And it's

10  only logical that since somebody was actually shot for the

11  first time in all of Jimmy's shootings whether you believe he

12  ordered them or not, whether you believed did them or not, you

13  can believe that Jimmy ordered every shooting.  You can believe

14  that Jimmy did every shooting.  For first time somebody has

15  been hit.  Remember the one in which the guy got hit?  Jimmy

16  didn't order.  Jimmy didn't do that.  Abdullah did the whole

17  thing.  This is the first time in six years that somebody has

18  actually gotten shot.  Jimmy doesn't want to go to jail.  He

19  says get rid of the gun.  He doesn't care.  It's a gun.  So

20  that act does not prove that Jimmy knew this was a homicide.

21  It just proves that Jimmy didn't want to get arrested.

22          But wait, wait, wait the government will say.  What

23  about Rodney Johnson, the backup shooter?  That's the big

24  point.  There's the backup shooter.  Well, the first question

25  is who tells you Rodney Johnson is a backup shooter?  The

answer to that question is no one.  The government makes up

that theory out of thin air.  They say it but they provide you

no evidence to prove it.  Jason Williams tells you we had no

idea why Johnson was there.  None.  Brian McCleod, the alleged

orchestrator of the whole event, he also testified they had no

idea why Johnson was there and was shocked to even see him

there.  Any other witness?  Nope.  McCleod Stewart certainly

doesn't know.  Khalil Stewart certainly doesn't know.  The

government just says he's a backup shooter.  No evidence to

prove it but they want you to believe it.

There is some evidence to prove why Johnson was really

there.  He is really there to verify.  I'm not going to sit

here and tell you that's what it is because nobody said that

either.  But there is some evidence to back that up.  You heard

testimony from Stewart who told you about arguments he got into

with Jimmy about shootings that he alleged to have occurred and

you Jimmy said, no, that didn't happen.  And those arguments

called strife in their relationship.

So Rodney is there to verify Jimmy wants to make sure

before he pays $30,000 to these three guys if somebody was

actually shot.  That's what Rodney Johnson is there for.  Am I

correct?  I don't know.  Only Rodney Johnson could answer that

question.  But the evidence shows you that neither my argument

has a little support and their argument has no support.  If he

was the backup shooter, if that was his role that night to make

1    sure that Lowell Fletcher was dead then why when he walks by

2    Lowell Fletcher and doesn't know if he's dead does he not put

3    another bullet into him?  He knows he has a gun.  The

4    prosecution tells you that but he just walks by, verifies he's

5    on the ground not looking too good, but he doesn't shoot him.

6            The government will also argue that Jimmy paid for a

7    shooting so that proves he must have meant it to be a homicide.

8            Well, first of all -- this is the judge's charge --

9    you can't enter the conspiracy after the event occurred.

10           Second of all, Jimmy didn't raise his fee.  He paid

11   just the $30,000 which we've already showed does not prove the

12   case.

13           Second of all, Jimmy doesn't even pay that fee on

14   time.  The government admits that.  They come up with oh, it

15   wasn't my fault.

16           Well, Jimmy is not going to go tell the guy who did

17   the shooting at this point he knows it's murder.  So he knows

18   that guy can put him in jail.  I'm not paying you just yet

19   because of what you did but he doesn't pay him.  He waits a

20   while to pay him.

21           Finally, Stewart told you pointblank, Jimmy's paid for

22   shootings he didn't order, didn't want to have done but I paid

23   before for them.  The government brought up that up on their

24   closing also.  So the fact that Jimmy paid doesn't mean that --

25           Next, the government argues what about Jimmy saying

they won't be happy until they go to a funeral or they won't be
happy until they're carrying a coffin, spent a lot of time on
that.  This proves he intended to kill someone and specifically
Lowell Fletcher.  But look at the reason it was said, how it
was said and exactly what was said.  It was said after this
feud had gone on for years.  It was seemingly never going to
end one shooting after another.  If you add them up, get to 10
or 20 shootings over a six year period, one after another.

          Remember this feuding had been going on since at least
2003 both sides attacking each other.  Not just Violator.  Like
they want those, you believe G-Unit was shooting at people.  As
a matter of fact, Stewart told you the whole thing changed at
the Hot 97 shooting which was spurred on by G-Unit shooting
somebody that day.  And it was said with no joy, just matter of
fact, no threats, as a matter of fact statement.

          And what it says -- and we'll substitute G-Unit out
for the word day as of -- so then you have G-Unit won't be
happy until G-Unit goes to a funeral.  Well, obviously, G-Unit
wouldn't be happy going to one of their own funerals.  We are
not throwing a party going to one of their friends funerals.
The statement based on timing of when it was said could just
demonstrate Jimmy's exasperation with the feud and what G-Unit
might to do and to the lengths to which they might go.  In
other words, that Jimmy was expressing the fear that G-Unit was
going to put one of his guys into a coffin and there's

HBSAAROS4                    Summation - Touger

1   certainly plenty of evidence that G-Unit's people could do

2   that.  They shot at people.  They burned down businesses.  They

3   drive around in bulletproof vans.  And remember Stewart's

4   testimony about that they had those vans before the feud with

5   Jimmy's and Violator Records even began.

6           So G-Unit is used to people trying to shoot at them.

7   I am not saying as the government is that the evidence makes

8   out this clearly.  The evidence doesn't.  The evidence leaves

9   this statement up to you for interpretation but for the

10  government to come in here and claim this is the linchpin of

11  their case besides the testimony of Brian McCleod is frankly

12  insulting to you.  Because they don't knew what it means

13  either.  They weren't there.  They taking the statement out of

14  context and you can't base your verdict on that statement

15  because no one can tell exactly what that statement means.

16          The evidence shows you that.  The government has also

17  argued that Jimmy's statement to McCleod that he wanted McCleod

18  to bring Lowell Fletcher to him because he wanted to hit him so

19  hard and so fast that he wouldn't know what was coming.  This

20  proves Jimmy's intent to kill.  That's what they told you.  Hit

21  him so hard and so fast that he won't know what's coming.  The

22  government argues that this was Jimmy speaking in code and the

23  word "hit" in this sentence proves that is Jimmy was --

24          Well, where is the evidence that establishes that the

25  world "hit" is a code for murder?  Remember as established by

evidence that a code is only official if both sides understand

the code being used.  That is why McCleod and Jimmy

specifically discussed the meaning of the girlfriend code

before McCleod goes and investigates Fletchers address as a

location for the shooting.  So both he and Jimmy were under

the -- in this incident there is no testimony from McCleod that

when Jimmy used the word "hit" he explained that code to him

means kill.  So the code must have had its meaning from prior

use.  Prior use proves understanding of code just like stuff

and paper.  McCleod knew "stuff" was the drugs.  "Paper" was

money, and get it out of that house.  Just like Jason knew that

"bring the quiet" meant .22 because there was prior use of both

of those codes and they knew what they meant.

         Well, let's look at the evidence.

         Stewart, Abdullah, Williams all came before you and

told you they used the word "hit" to mean a shooting but not a

homicide.  Abdullah specifically stated that he would use the

word "hit" or "clap him up" to mean shoot at someone and he

never intended those shootings to be a homicide and most

importantly he never clarified those statements by adding

"don't kill".

         McCleod himself testified about having shot anyone

never being asked to shoot anyone in the past.  So how does he

know what "hit" means?  So the government's own witnesses don't

support that.  The government will argue Jimmy knows.  He meant

1   it that way.  Well, the evidence doesn't support that argument

2   either.  In the same conversation in which Jimmy told McCleod

3   he wanted to hit him so hard and so fast at page 930, as they

4   said in their closing, Jimmy said I have been going to war with

5   these clowns and hitting them at every turn.  So in that same

6   conversation Jimmy uses the word "hit" to describe the war he

7   has been having with G-Unit and we all know that in that war

8   there had been no homicides.  There have been no intended

9   homicides the evidence shows and that nobody was asked to kill

10  anybody.  And most importantly Abdullah, Stewart, the main

11  people in this war testified they never intended to kill anyone

12  and Jimmy never told them to kill anyone.  You have been told

13  this time and again.

14          So I ask you where is the proof that "hit" meant kill?

15  You can search the record but you'll not find anything because

16  there is none from the evidence in this trial and that is what

17  you must use to judge Jimmy, the evidence.  Not the movies you

18  have seen, not the books you have read, not the government's

19  unsupported arguments but the evidence that came from that

20  witness stand and the stipulations that were entered before.

21  And each witness told you "hit" the word "hit" only meant shoot

22  at without any intent to kill.

23          I know it's hard for you to comprehend but you must

24  take yourself out of your world and put you in the world of

25  G-Unit and Violator Records, worlds we are discussing, the

world we are operating in.  This is a world where people drive

around in bulletproof cars.  Do any one of you have a

bulletproof car?  No.  Because you're not in that world.  This

is a world where people shoot at people to send a message.

None of you have ever done that I bet.  But this world, they do

it all the time.  What does Jimmy say to Abdullah when he's

threatened at the Apollo Theater?  The government said that to

you in their closing, this happens all the time.  People get

threatened with guns.  People get shot at.  You have to take

yourself out of your world and enter into this world and in

this world as Abdul and Stewart told you "hit", "clap up" just

means shoot at, nothing more.

At page 1154 McCleod told you that Jimmy always gave

him the information necessary to complete the task.  And

Williams testified that Jimmy gave him just enough information

to complete the task.  So if this was going to be a murder in a

long line of shootings, something completely different than the

last six years and we won't go over all the shootings but count

them up 19 or 20 of them, over a six-year period, none of them

with the intent to kill, if this was going to be something

completely different from that it is only logical that

something would have been said to take this out of that realm.

(Continued on next page)

1         And the evidence shows you that nothing was, because,

2    as the evidence clearly shows, this shooting was no different

3    from the previous ones, and the evidence shows no one was meant

4    to die, which leads me to the first factor that proves this

5    wasn't a homicide.

6         First and foremost, there is history.  The government

7    ignores that history completely.  The feud at this time, as I

8    have said, has been going on for over six years, and between

9    the shootings that G-Unit did and Czar did and other people

10   did, there were at least 20 shootings, shooting at houses, at

11   people, at cars and people in them, hitting people, fire

12   bombings.  Yet, with all these incidents, the evidence shows

13   you nobody had the intent to kill anyone.

14        The perpetrators of many of these incidents, Mohammed

15   Stewart, Khalil Abdullah, and Jason Williams, all came before

16   you and told you they never intended to kill anyone.

17        Some of these scenes, you heard testimony of 20 or 30

18   bullets being fired.  These weren't boom, let's go.  20 or 30

19   bullets being fired in some of them, yet none of them were

20   done, as the evidence shows, with the intent to kill.

21        So what makes this shooting different from all the

22   other shootings after six years?

23        Why would everything suddenly change, and Jimmy wants

24   someone killed after never having killed anyone, as the

25   evidence shows, of never having ordered any killings as the

Hbsnros5                    Summation - Mr. Touger

1    evidence shows?

2            Remember these shootings didn't occur in a short time

3    period.  I know it seems that way, because you heard about them

4    in a condensed time of two weeks, but these shootings were

5    spread out over six years, sometimes with months or years going

6    between events.

7            Some of these shootings were done by people Jimmy

8    didn't even tell them to do, like the Apollo shooting, for

9    instance.  Jimmy didn't tell Abdullah to do that.  He told

10   Abdullah not to do it.  But Abdullah went and did it anyway.

11           Stewart shooting at Violator Records after the Hot 97

12   incident, Jimmy never told Stewart to do that.

13           Or the time Stewart just happened on one of Baja's

14   vehicles and decided to burn it up and shoot it for good

15   measure.  But, most importantly, almost 20 shootings in this

16   case prior to the Lowell Fletcher shooting, and the only person

17   ever hit was not even killed.  One person was hit by Violator

18   Records.  And that person didn't even want to file a complaint.

19           No one was killed the evidence shows, because, as each

20   witness told you, there was never an intent to kill, just send

21   a very powerful message.

22           Well, the prosecution will argue this one was

23   personal.  Lowell Fletcher was one of three grown men who

24   attacked his son with a gun, so this one was personal.

25           Well, right off the bat that argument disproves Count

Hbsnros5                  Summation - Mr. Touger

1    One, because Count One says conspiracy to murder for hire to

2    kill anybody of G-Unit, not just Lowell Fletcher.

3           So if the murder of Lowell Fletcher was personal, and

4    that's why it's a homicide, then you must acquit him of Count

5    One.

6           But, more importantly, the whole argument is proven to

7    be false by the evidence presented at this trial.

8           First, Lowell Fletcher wasn't the only perpetrator of

9    the assault.  There were two other individuals.

10          We know Yayo was one of the perpetrators, so how come

11   Jimmy never intended to kill him?  The evidence shows you that.

12   Quite clearly Stewart said it, never intended to kill him.  So

13   why does he not want to kill Yayo, but he want to kill

14   Fletcher?

15          Stewart came before you and testified that he shot at

16   Yayo and those close to him so many times he couldn't remember

17   them all, but he never intended to kill them.

18          Remember the government stands behind Stewart's

19   testimony, and he says he never intended to kill Yayo or anyone

20   related to him, and he says Jimmy never ordered him to kill

21   anyone.

22          Abdullah, same thing.

23          Williams same thing.

24          So why is Jimmy so intent on killing Fletcher and not

25   on Yayo?

1          It makes no sense.  It is not logical.

2          Second, the government wants you to believe that Jimmy

3     is a desperate man, this whole business about I couldn't sleep

4     for two years.  He is so desperate he is thinking of nothing

5     else for two years but killing Lowell Fletcher.

6          Well, again we have the Yayo problem.  Why isn't he

7     losing sleep over Yayo?

8          Then we also have the other problem the evidence

9     showed.  McCleod told you, page 1130, all Jimmy had to do was

10    go on the Department of Corrections' website, type in Lowell

11    Fletcher's name, and he would have found out where he was, and

12    when he was to be released.

13         No evidence to show that that ever occurred.  He

14    didn't need McCleod to tell him.  If he really was so

15    desperate, losing sleep every day, to find Lowell Fletcher, it

16    was right there on the Internet for everyone to see.  The

17    simple answer was he wasn't.

18         Even the testimony from McCleod disproves this

19    government's theory.  McCleod told us quite clearly that Jimmy

20    had let it be known in prison that there was a $10,000

21    reward -- and they brought this out in their closing -- for

22    anyone to mark Fletcher while he was in custody.  And McCleod

23    told you, and they admit, that mark only meant to cut, not

24    kill.

25         This is important for two reasons.

Hbsnros5                    Summation - Mr. Touger

1          One, why, if Jimmy wanted Fletcher killed, was the

2     price only to slash him?

3          But Jimmy only wanted to slashing him in jail and kill

4     him on the street?  That doesn't make any sense.

5          And, two, notice the price -- $10,000.  The same price

6     per person that Jimmy was paying for the shooting of Lowell

7     Fletcher that night.  Because the evidence shows you his intent

8     was the same.  The evidence shows you his intent was only to

9     shoot him and not to kill him.

10         Third, if the motive to kill was because it was

11    personal, then how do you explain the following incidents:

12         On the day of the attack itself, Jimmy's son comes

13    upstairs to the office.  He's in tears.  He tells everybody

14    what happened, everybody gets very upset, they are angry.

15         Do they rush downstairs at that point?

16         No.

17         Violator Records is right across the street.  Did they

18    rush downstairs and go put some bullets in their window or

19    anything?

20         No.

21         Time goes by, and they go downstairs and there is

22    Chris Lighty's brother, and Stewart says, Let's get him.  Let's

23    get our revenge.

24         And Jimmy's initial reaction is no.  He had nothing to

25    do with it.  That's what Stewart said.  The fact that Stewart,

in front of all the people he was with, convinces Jimmy to

shake his head and go, OK, is not as important as Jimmy's

initial reaction.

          Jimmy is angry.  He's fuming.  It's the day of the

incident, and his initial emotion is don't do anything.  The

fact that he didn't want to look bad in front of all his people

and argue with Stewart at that point doesn't mean he had the

intent to do anything at that moment.  It just shows you the

lack of control Jimmy had on Stewart.  And the evidence shows

you that, even with that lack of control, Stewart never kills

anyone.

          Plus, remember the testimony of Abdullah that day.

          Jimmy calls him.  He says, "My son was just attacked

by Yayo and his crew."

          Does Jimmy say, "Come on down here.  We've got to get

them?"

          No, there's no testimony to that.

          He just tells him what happened and hangs up the

phone, and Abdullah never even comes to the office.  This

bloodthirsty killer that the government wants you to believe

Jimmy is, the evidence shows you says, "Don't do anything."

          Then we have the Apollo incident.

          And, by the way, this is another example of two of the

government's witnesses testifying about the same incident, but

can't quite get it right.  Abdullah says he's there with Jimmy

1    from the very beginning, and Stewart makes it quite clear that

2    Abdullah didn't come until after they ran out of the Apollo.

3    I'll leave it to you to decide who's telling the truth, but

4    what is important is both say that Jimmy shows up at the Apollo

5    unarmed.  They all go through the metal detectors.  G-Unit

6    comes barreling through, and the government says -- I love this

7    in their closing -- Yayo approached Jimmy.

8          If that's not trying to cover up something, I don't

9    know what is.  Because their own witnesses said Yayo didn't --

10   yes, Yayo approached him.  But it's how he approached him

11   that's important.  He approached him in a very negative way.

12   Even though Jimmy was polite and greeted him politely, Yayo was

13   angry and yelling at him and embarrassing him in public and was

14   very forceful, so forceful that they decided they got to

15   skedaddle out.

16         So they run up to the mezzanine, because they are

17   outnumbered.  At that point, that same crowd of people come up,

18   and one takes out a gun points it at Jimmy and says, "Just give

19   me the word.  Just give me the word."

20         Here's a gun pointing at Jimmy's head, and the man

21   saying, "Just give me the word."

22         In the middle of the Apollo Theater, G-Unit is doing

23   this.  They hightail it out of there, they get out, and

24   Abdullah says, "Holy crap.  They just put a gun to our heads.

25   We got to do something, we got to do something."

1          And Jimmy says, "No, no.  This happens all the time."

2          This is the world they live in.

3          If Jimmy is this bloodthirsty killer who wants

4    everybody dead that they want you to believe he is, why is he

5    fighting with Abdullah?

6          What does Abdullah tell you?

7          Oh, no, that ain't working with me.  He calls his

8    people.  Gets his guns, drives his car, sees the van pull over.

9    People get out, standing around that van, and he tells his

10   boys, "Clap it up."

11         "Clap it up."

12         But he also tells you, and you've got to believe it's

13   the truth because they stand behind him, he didn't intend to

14   kill anybody when he said that.

15         So, "Hit that van, clap it up," doesn't mean kill at

16   the Apollo, but it means kill two years later.

17         Then there is the peace offering meal with Chris

18   Lighty that P Diddy was the moderator for.

19         What happens there?

20         There is no peace arrangement offered by Lighty.  The

21   exact opposite happens.  He stands up in the middle of this

22   meeting in front of everybody and mushes Jimmy in the face.

23         And Abdullah tells you, and you don't even need

24   Abdullah to tell you because you know that's highly

25   embarrassing to Jimmy, and what does Jimmy do?

1          Does he push back?  Does he fight back?  Does he do

2     anything?

3          No.

4          He turns around, literally turns the other cheek, and

5     walks out.  This man has just embarrassed him in front of

6     everybody who was important to him, including P Diddy, one of

7     the biggest stars in his industry, and Jimmy does nothing.

8          Let us not forget the New Year's Eve party that you

9     heard testimony about.  Jimmy is there with all of his buddies.

10    He's not outnumbered anymore.  He's there with all of his

11    buddies, Stewart, Abdullah.  He's drunk.  Everybody is a little

12    tipsy.  And they see Chris Lighty.

13         What happens?

14         You would think with all this going on, if Jimmy is

15    this guy bent on revenge and can't sleep and wants someone in

16    G-Unit to suffer and he's drunk, there would have at least have

17    been some pushing or shoving on insulting.  Maybe he goes over

18    and mushes Chris Lighty in the face.

19         What happens?

20         Nothing.  Chris Lighty comes over and says hello,

21    leaves.  Nothing.

22         The exact opposite of what you would expect happens.

23    Jimmy is nothing but the polite man, just as he was at Apollo.

24         So what do we have?

25         Yayo threatened Jimmy with a gun at the Apollo, but he

1    didn't want him killed for that.

2                Chris Lighty embarrassed Jimmy in public, but he

3    didn't want him killed for that.

4                Baja did all that he did, but Jimmy -- not only did he

5    not want to have him killed.  For the first time Stewart is

6    coming to him and saying, "Let's kill this guy."

7                And $75,000 means nothing to Jimmy if you believe the

8    evidence.  He's making millions if you believe the evidence.

9    So it's not the price that drives him away.  Jimmy just doesn't

10   want anybody killed.

11               And he says, "No, I'm not doing it."

12               The day of his assault, Jimmy's first response is,

13   "Don't do anything."

14               Yayo was not only involved in the assault on his son.

15   You have evidence that some people said he was the one who held

16   the gun the day of the assault.  But Jimmy doesn't want him

17   killed.  Jimmy doesn't want Lowell Fletcher killed in jail.

18               But the government wants you to say this shooting is

19   different.

20               Where is the evidence to back up their argument?

21               Also remember Mohammed Stewart's testimony.  They got

22   so angry at Jimmy because he wasn't taking a hard enough stand

23   against G-Unit.  He was begging Jimmy to do more, and Jimmy

24   just refused.

25               The man who the government wants you to believe

1  desires nothing but revenge on G-Unit is getting lectured by

2  his own man, Mohammed Stewart, that he's not doing enough.  He

3  says he can't even call Jimmy for bullets.  He can't even call

4  him for bullets.

5          The government will also argue that the proof that

6  Jimmy wanted Lowell Fletcher killed is because Jimmy tells

7  people that Lowell Fletcher was killed and that he set up the

8  shooting after the incident.

9          Well, that's the important fact.  That's the important

10 fact of all those postincident statements.  They happened after

11 the incident.

12         They were factual.  Jimmy did set up the shooting.  He

13 set up the shooting.  The fact is somebody was killed.  That

14 happened.  Can't deny it.  So all those postincident statements

15 saying someone was killed and that he set it up are true.

16         But that does not mean he entered that conspiracy with

17 the intent to kill.  Jimmy is just stating facts.

18         Remember Stewart's testimony about never wanting to

19 kill someone.  What did he add?  I wouldn't be so unhappy if

20 Baja or Yayo did die.

21         Was Jimmy angry or upset that Lowell Fletcher died?

22         The evidence doesn't show it one way or the another.

23 He is very even keeled the evidence shows.  But it doesn't show

24 that he's happy, and it doesn't show that he's upset.  It shows

25 that he's even keeled.  He's matter of fact.  He's stating the

1    obvious.  He didn't say it with any joy in his voice.

2             Abdullah made that quite clear during his testimony.

3             And Stewart, although he said that Jimmy came out of

4    the restaurant with, I think he said pep in his walk, also told

5    you that Jimmy didn't know that Stewart knew that Lowell

6    Fletcher was dead at that point.

7             When they got to talking about the incident, all he

8    said was, "Can we sleep?"

9             And Jimmy matter of fact said, "Yes, we can sleep."

10            That's true.  They can sleep.  Nothing has happened

11   since that shooting.  His six-year war seems to be over.  It is

12   nothing more than a statement of fact.  It is not proof.  It is

13   not an admission of a homicide.  The evidence does not show

14   that at all.  There was no joy in his voice when he said it.

15   It was just a statement of fact.

16            If Jimmy had really wanted Lowell Fletcher killed, the

17   evidence would show that there would have been more of a

18   matter-of-fact answer delivered in an even tone.

19            So these postevent statements are proof of nothing.

20   What is important is that up until the moment of the shooting

21   itself, every witness told you that Jimmy never ordered anyone

22   killed or killed anyone himself.  The word "hit" does not mean

23   kill in this case.

24            These four men, three of which have been granted their

25   freedom, and one more is hoping to walk out of jail in just a

1    couple of weeks, came in here to help the government with its

2    case.  The government has even gone as far as paying for

3    McCleod to go to college.  And none of them, as much as they

4    have tried to paint Jimmy as a killer, McCleod even changing

5    his answer to the ultimate question so he could get out of

6    jail, none of them has told you that Jimmy ordered a homicide

7    on the night in question or at any other time.

8         Do you want some water?

9         JUROR:  I'm OK.

10        MR. TOUGER:  That by itself is proof beyond a

11   reasonable doubt that the government has failed to meet its

12   burden of proving that Jimmy intended a homicide as opposed to

13   a shooting.  None of the witnesses put those words coming out

14   of Jimmy's mouth, no matter how much the government wanted them

15   to.

16        Let us not forget that the government has painted a

17   picture of Jimmy as a man hellbent on killing Lowell Fletcher.

18   He allegedly can't sleep for the past two years.  He has

19   thought of nothing else.

20        Yet, when McCleod comes to Jimmy with the idea to get

21   Lowell Fletcher, what is Jimmy's reaction?

22        Does he tell McCleod, Let's get right to it?  Let's

23   move on this?  Call him each day?  He's been waiting for two

24   years for this.  He can't sleep.

25        No, that's not his reaction.

1    McCleod tells you he waits ten days until he calls him

2    again.  Ten days, nothing happens.  Page 983.

3         Then another meeting takes place, and again there is

4    another week to ten days that go by.  This man who allegedly

5    hasn't slept in two years, has thought of nothing else, doesn't

6    do anything in a hurry.  Doesn't jump on it and say, Let's go,

7    let's go, let's go, doesn't hurry one bit.

8         Even after the disaster in Queensboro, which you have

9    to qualify as only a disaster Jimmy doesn't even get angry.

10   There is no reaction at all.

11        I suggest to you that the evidence doesn't support

12   that Jimmy is a man haunted by this incident to his son that is

13   waiting impatiently for something to gets done and is hellbent

14   on revenge.

15        The evidence does show that this is just another

16   shooting in a long line of shootings as I said before, inside

17   info paid for, luring him to the spot, multiple shooters,

18   multiple vehicles, surveillance of the spot; nothing different

19   from many other shootings that they've done on many other

20   occasions without the intent to kill as the evidence shows.

21        Now let's talk about these cooperators for a few

22   minutes.  I am not saying what he said I am going to say, that

23   they are all lying about everything.  They aren't.  I am not

24   saying that at all.  But none of them came before you and

25   testified out of the goodness of their heart either.  Each one

1    came here because they wanted to get out of jail or not go to

2    jail at all.

3         And it has worked.  Three of them are walking free,

4    and the fourth hopes to be very soon.

5         Each one testified about all the crimes they have

6    committed?  And why not?  They were given a free ride for every

7    one of them.  They weren't being prosecuted for those crimes.

8         And each one rattled off their crimes to the

9    government during their proffer sessions.  The government never

10    hesitated on their decision to let them cooperate.  No matter

11    how many shootings, no matter how many beatings, no matter how

12    many robberies.

13         How do you think Shaka feels?  They didn't go and

14    arrest Abdullah for the attempted murder of Shaka, did they?

15         How do you think Ocal feels?  They didn't go and

16    arrest Stewart for the attempted murder of Ocal.

17         No, because they didn't intend to kill those guys.

18    They told you that.

19         It doesn't matter how many incidents they talked

20    about.  The government said, Just tell us.  Keep on coming.  As

21    long as you say bad things about Jimmy, you're fine with us.

22         Mohammed Stewart, with all he has done, has not spent

23    one day in jail, not one day, just because he agreed to

24    cooperate.

25         Each one testified that they weren't supposed to

Hbsnros5                        Summation - Mr. Touger

1    commit any new crimes once they signed on as cooperators, and

2    each one has told you that they have, and the government has

3    done nothing about it.

4           Mohammed Stewart has committed crime after crime, been

5    involved in shootings, and has acted in a way that caused child

6    services to remove a 14-year-old girl and her mentally disabled

7    mother from his home.  Yet the government just says OK, just

8    keep coming in here and testifying against Jimmy.  We don't

9    care.

10          As far as the fact that they must tell the truth, I

11   ask you just to do one thing.  Their cooperation agreements are

12   in evidence.  Read them.

13          Read the cooperation agreement.  The language is

14   unequivocal.  If the government decides they are telling the

15   truth, the government agrees to write the get out-of-jail free

16   letter, or, as it is called in legal circles, the 5K1 letter.

17          The government decides, not you, not Judge Kaplan,

18   certainly not me, the government decides whether it will write

19   the 5K1 letter or not.

20          THE COURT:  And the judge decides the sentence, which

21   may be anything up to the statutory maximum.

22          MR. TOUGER:  That's correct, yes.

23          That's in the cooperation agreement.

24          So these four cooperators know who they have to

25   please, these four men and women sitting at that table.

1       That is how they get the 5K1 letter, and hope, as the

2  Court just told you, that the judge will give them a break.

3  And we know from McCleod and Abdullah that a Court has already

4  done that.

5       That is why McCleod's truthful testimony changes at

6  the infamous proffer sessions, because he knows who he has to

7  please to get out of jail.  So his truth miraculously changes,

8  and he told you -- he came up with a reason.  He told you the

9  reason that he changed it, not because anybody told him that it

10  was the only way to get out of jail, because he finally

11  realized after going it all over in his head that, yes, he was

12  involved in a murder.

13       Think about that.  He finally realized in January of

14  2014 that he was involved in a murder.  That means back in 2009

15  he didn't know he was involved in a murder, which is exactly

16  what we are saying the evidence shows.

17       Read the cooperation agreement.  See what it says.

18  And the evidence will become crystal clear to you who decides

19  if they get a 5K1 letter or not.

20       Now, to their credit, they have come in here and told

21  you mostly the truth.  They have.  But most of that truth

22  doesn't help the proof that Jimmy intended a homicide.  But at

23  certain key points they have added facts to stories or omitted

24  some facts at key times or just blatantly changed their answers

25  to help the government along.

Hbsnros5                    Summation - Mr. Touger

1            But just remember lying to these men is easy.  They

2    have lied all their lives to the government, to judges, parole

3    officers, police officers, under oath, not under oath.  They

4    have lied for their own benefit, and they will do that here

5    because they are lying for freedom.  Freedom instead of

6    spending the rest of their lives in jail -- and Abdullah and

7    McCleod are walking out in the street, sleeping with their

8    families.  So when McCleod or any other states a fact, just

9    remember why he is doing it.

10           But the government came in here and asked you not to

11   believe them because they are -- the government came in here

12   and says you have to believe them because they are the ones

13   calling them.  So when they tell you, when Stewart tells you

14   and Abdullah tells you that he never intended to kill anybody,

15   you've got to believe it.

16           And the government has written letters for two of them

17   saying how credible, honest, and trustworthy they are.  So,

18   when you consider their testimony, remember to look at it under

19   this microscope, that each one is up there trying to shape the

20   truth as best he can to help the government as best they can.

21           Yet, even with all that, not one, not one came in here

22   and told you that Jimmy intended to kill any member of G-Unit,

23   let alone Lowell Fletcher.

24           Each one has testified time and again that Jimmy never

25   said that, ordered that, did that, at all.

Hbsnros5                    Summation - Mr. Touger

1              There is your reasonable doubt staring you in the

2      face.  The evidence is your reasonable doubt.  But there are

3      more important times during this trial where the cooperators

4      testified to completely different facts, not inconsequential

5      facts, that attempted to make the government's case that much

6      better.

7              For instance, when it comes to the argument about

8      planning, the government does not want this to look like no

9      planning went into this, so Jason denies asking McCleod to be

10     the shooter.

11             Remember he said, No, I never did that.

12             But McCleod at page 1147 made it quite clear, that

13     that did happen.

14             Right after that there is again the difference between

15     Jason's testimony sand McCleod when Jason at page 766 said that

16     he gave the gun to grant after he left to get the bag of chips

17     and not until McCleod said Fletcher had arrived.  Remember?

18     That's what he testified to at page 746.

19             But 1148 McCleod says that Grant had the gun.  He

20     didn't see it, but everything, with the way he was moving and

21     everything led him to believe that grant had the gun when they

22     left to get the bag of chips.  Again, this shows the lack of

23     planning and the confusion of what was going on that night.

24             Then there is the fact that McCleod testified at page

25     1039 that he pointed out Rodney Johnson to Jason Williams when

1    they drove by Johnson's car when they first arrived on the

2    scene.  Not only did he point him out, he mentioned it to

3    Williams and was surprised that he wasn't surprised, that Jason

4    wasn't surprised to see Williams there -- I mean Johnson there,

5    trying to indicate in some way that Jimmy must have sent

6    Johnson because Williams knew about it.

7         There's only one problem with that.  Williams

8    testified at page 770 that he didn't know Johnson was present

9    at the scene of the shooting until after the shooting when they

10   met up at Johnson's apartment.

11        So who's making something up out of thin air?  McCleod

12   or Williams?  One of them is.

13        That is why it is important for you to understand,

14   just like the cooperation agreement says, it is the government

15   that decides if they are telling the truth.

16        Jason Williams testifies at page 753, as I said

17   before, that he drove with McCleod to check out Lowell

18   Fletcher's apartment in an attempt to make his testimony more

19   valuable.

20        But McCleod at page 994 says he went alone that night

21   by cab and called Jason and D afterwards to arrange the next

22   day's meeting.

23        And Stewart, in an attempt to make his testimony sound

24   more credible, testified that he worked for Jimmy in the music

25   business.  Remember the card he showed and the jacket.  One

1    problem with that, Jason Williams says at both page 667 and

2    825, that Stewart never worked for Jimmy in the music business.

3          And then finally we have the difference in the Apollo

4    incident that we have already discussed, where Stewart again

5    tries to make his testimony more valuable by making him alone

6    with Jimmy at the Apollo, but Abdullah disputes that testimony

7    quite clearly.

8          These differences just demonstrate how each cooperator

9    wanted to make himself sound better so the government would

10   sign them up and get them out of jail and how the government

11   doesn't really care what they are saying as long as they are

12   saying bad things about Jimmy.  It is important to consider the

13   order of when each became a cooperator.

14         Of course, Stewart was first, but he didn't have any

15   information about the shooting of Lowell Fletcher.

16         Then came Abdullah, but he had no direct information

17   about the shooting of Lowell Fletcher.

18         So the government was still looking for more people to

19   come aboard, which explains McCleod.  Finally, someone who was

20   involved in the shooting, yet even he could not put a homicide

21   on Jimmy's back, as the evidence shows, even though he changed

22   his answer in an attempt to do so.

23         Panel 9.

24         Jason Williams' testimony from 8/17.

25   "Q.  Now, April of 2017 you decided that you did want to

1    cooperate, right?

2    "A.  Yes.

3    "Q.  And I believe you just stated because you wanted to go

4    home just like Mr. Abdullah, Mr. McCleod, and Mr. Stewart,

5    right?

6    "A.  Yeah.

7    "Q.  And you knew that the government wanted you to cooperate

8    in this case, right?

9    "A.  Right.

10   "Q.  Did you know that the government wanted information about

11   the Lowell Fletcher shooting?

12   "A.  Yes.

13   "Q.  And you know that they wanted information about Jimmy's

14   role in that shooting?

15   "A.  Yes.  Yeah."

16           So the government, still desperate for that one

17   witness that would cover the gap in their proof, turned to

18   Jason Williams, who had refused their overtures to cooperate

19   for years but finally, when all his appeals and motions were

20   done and he was facing doing the next 20 or more years in jail,

21   and he saw how Stewart Abdullah and McCleod were walking around

22   as free men living and enjoying life with their families, he

23   decided to cooperate also, and the government, desperate for

24   that one witness to seal the deal, brought him on to their

25   team.

1          But he even couldn't provide the testimony that the

2     government so desperately needed, that testimony that once and

3     for all would prove Jimmy intended a homicide, and wanted it to

4     come from his closest associate.

5          But what happens?

6          Even Jason fails them.  He comes in here and quite

7     clearly says, as I showed you before, I had no idea whether

8     this was a shooting or a homicide, and Jimmy certainly never

9     told me to kill anyone.

10         So, despite their best efforts, the government has

11    fallen short in meeting their burden of proof of proving beyond

12    a reasonable doubt that Jimmy intended to kill anyone, even

13    Lowell Fletcher.

14         Each cooperator has made it crystal clear that every

15    shooting prior to the Lowell Fletcher shooting was not an

16    intended homicide and McCleod and Williams have provided no

17    evidence that the shooting of Lowell Fletcher was any

18    different.

19         Remember what Jason Williams said.  There is no doubt

20    from the evidence that Jimmy was a producer of music, videos

21    and movies.  There is no doubt that he had a legitimate

22    business that made a lot of money.  Every witness told you

23    that.

24         There is also no doubt that the business caused him to

25    travel quite often all around the country and that he conducted

1  this business even after his son was attacked when he was

2  alleged to have been so preoccupied with revenge that he was

3  doing nothing else.

4        There is evidence that shortly after his son was

5  attacked, he left the country for a month and went to visit

6  some holy sites in Africa.  All again when he was supposed to

7  be so preoccupied with events that he couldn't even sleep.

8        Does this prove that he didn't order Lowell Fletcher

9  to die?

10       No.

11       But it is proof you should consider when deciding if

12 the government and its witnesses aren't overplaying their truth

13 in this case about saying that Jimmy was so bent on revenge he

14 couldn't sleep.  This proves that that is not true.

15       The important question, as the Court has told you

16 during this trial and will continue to tell you during the

17 charge, and as the government told you in their closing, is did

18 Jimmy intend for Lowell Fletcher to be murdered.

19       The question is not, Was Lowell Fletcher killed?

20       This obviously occurred.  Although you might

21 sympathize with his family, you cannot base your verdict on

22 that emotion.

23       The question also is not is Jimmy a drug dealer.  It

24 does not matter if the government has proven to you that fact

25 or not.  It also does not matter if the government has proven

1    to you that Jimmy as ordered or committed violent acts.

2              It is also unimportant if Jimmy hired McCleod and

3    others to shoot Fletcher.

4              The one and only important question is, Did the

5    prosecution prove to you beyond a reasonable doubt, all

6    reasonable doubt that Jimmy intended anyone, including Lowell

7    Fletcher, to be killed?

8              Put another way, if the government has proven to you

9    that Jimmy was a drug dealer that Jimmy committed and ordered

10   violent acts, that Jimmy wanted Lowell Fletcher to be shot, but

11   has failed to prove to you that Jimmy wanted anyone killed, as

12   the Court will tell you, you must acquit him of these charges.

13             You might not like Jimmy.  You might not respect him.

14   You might feel he is a violent person who deserves to be

15   punished, but you as jurors have a sworn oath only to convict

16   him of charges brought against him if the government has proved

17   them beyond a reasonable doubt, and I submit to you that they

18   haven't.

19             The government wants you to forget that oath you swore

20   to.  They want you to convict Jimmy despite their lack of

21   proof.  They want you to be swayed by the testimony of his drug

22   dealing.  They want you to be blinded by his testimony of his

23   violent acts.

24             They want you to base your verdict on your emotions

25   for Lowell Fletcher and his family and the rest of the

1    emotionally charged evidence.  Look at all the time they spent

2    on those incidents.

3              But you did take an oath, and I know you will honor

4    it.

5              Now, you are about to enter the jury room after you

6    hear the government's response to my closing and the judge's

7    charge on the law.

8              You will notice in this courtroom and outside the

9    courthouse there's nobody banging on the wall saying you must

10   convict.  The only thing anybody wants from you in this case is

11   for you to follow the law as the judge gives it to you, look at

12   the evidence as it came from this witness stand, put it

13   together, and see if the government has made their case beyond

14   a reasonable doubt.

15             That is the only thing the public wants from you, to

16   honor your oath, and I ask you, when do you that, when you take

17   the charge as the judge gives you, when you review the evidence

18   as you heard it and you put the two together, you will come to

19   the only verdict that is possible.  Not guilty on all counts.

20   Thank you.

21             THE COURT:  Thank you, Mr. Touger.  Ladies and

22   gentlemen, we'll break for lunch.  3 o'clock.

23             (Luncheon recess)

24

25

A F T E R N O O N    S E S S I O N

(3:05 p.m.)

THE COURT:  Be seated, folks.

I just wanted to alert you we did have a note from Juror No. 12 this morning asking Andy to look up a phone number so she could tell somebody she couldn't make something.  It is the court exhibit next in order.

THE DEPUTY CLERK:  K.

THE COURT:  K.

If anybody is curious, you can get it from Andy later. OK.

Let's get the jury.

(Jury present)

THE COURT:  OK.  Welcome back, everybody.

The defendant and the jurors are present.  We will now here rebuttal argument by the government.

Mr. Enzer.

MR. ENZER:  Thank you, your Honor.

May it please the Court, ladies and gentlemen of the jury, Mr. Touger, defense counsel in his summation he just talked to you about another world that he wanted you to go to, a world that Rosemond lives in, a world that G-Unit lives in.

I submit to you it's really a world that Touger lives in.  It is a world where you can go to a restaurant and order a hamburger, a bacon cheeseburger, and there's no beef.  It is a

world where you can refer to meetings where people plan a
homicide and just say there was no planning at them, and all of
a sudden they magically transform into meetings without
planning because he said so.

It is a world where evidence disappears when Touger
discusses what happened.

It is a world where Mr. Touger gets to distort the
evidence and the facts of the case to fit his theory of what
happened.

It is a world where "hit" doesn't mean kill, as in
hitman or hit team.  In this world "hit" is something else.
It's whatever is convenient to Mr. Touger and Rosemond.

And it is a world where you can order a team of people
with a backup team to use a lethal weapon with a silencer, lure
somebody, shoot them, and under the circumstances you have
here, with all the planning and all of the statements Rosemond
makes, despite all of that, when somebody dies as a result of
that shooting, it is an accident.  It just a happenstance.

Ladies and gentlemen, you should not decide this case
in the world of Mr. Touger or the world he wants you to go to.
You should decide this case in this world.  This is the world
we live in.

You should decide this case based on the evidence and
what really happened in this world, in this trial, in this
courtroom.

1          I submit to you virtually everything Mr. Touger said,

2     not everything, but virtually everything was a

3     mischaracterization of the testimony, a mischaracterization of

4     the evidence and just simply turning a blind eye to what the

5     facts show.

6          I am going to walk through some of those

7     mischaracterizations in a moment.  This was not an accident.

8     This was an assassination.  It was an intended killing.  And

9     because of that, Rosemond is guilty.

10          Now, as Judge Kaplan has already told you, and I'm

11     sure he will instruct you again at the end of the trial, the

12     defense has no burden.  The government has the burden of

13     proving its case beyond a reasonable doubt.  The burden never

14     shifts to the defense.  We embrace that burden, and in this

15     case we have met it.

16          But when the defense makes arguments, as they have

17     done in their opening statement, in cross-examination, and now

18     in summation, you have the right to scrutinize those arguments.

19     You should scrutinize them.

20          I am not going to answer every argument Mr. Touger

21     made.  I don't have time to, and you don't need me to.  You do

22     not need me to answer many of the arguments he made because

23     they are so flatly ridiculous on their own face.

24          Let me give you an example.

25          Do you remember when Mr. Touger suggested to you in

his opening statement and then again in summation that Rosemond
is some kind of pacifist who turned the other cheek whenever he
was wronged by G-Unit?

         After all the evidence you heard, drive-by shootings
and fire bombings of cars and the plot that led to Fletcher's
death, do you real really need me to respond to this idea that
he's somebody who turned the other cheek; or, as Touger said in
his summation, that Rosemond is a polite man because he didn't
attack Chris Lighty at a Christmas party?  Do you really need
me to respond to that?

         Ladies and gentlemen, what you heard in this case is
Rosemond is too savvy, too sophisticated.  He's like a snake.
He doesn't attack in a public party where there are witnesses.
Like a snake, he lies in wait in the grass until the right
moment to strike.

         He doesn't have the courage to fight Lighty in a
party.  He waits until he can have people handle it in a
situation where it's unlikely that they will be caught.

         Defense arguments like these are so ridiculous, you
don't need me to respond, and I am not going to respond to many
of the other arguments he made.

         There is one thing that is important here.

         Defense counsel in his closing conceded, he conceded,
he said Rosemond did set up the shooting, and he's talking
about the shooting of Lowell Fletcher.

1          He expressed that idea through different variations.

2     He said it in different ways.

3          One way he said it was that the shooting was McCleod's

4     idea, and then Rosemond gave him the go-ahead and then what

5     happened happened, suggesting that the death Rosemond was not

6     responsible for.  The death of Fletcher was an accident.

7          But here is something he did not talk about, and he

8     talked about a lot of things, he talked about a lot of evidence

9     in this case, but you did not hear him at all in his summation

10    talk about one very critical piece of evidence:  "The bitch is

11    out of here."

12         Do you remember Mr. Skinner's summation, when he told

13    you the significance of that statement.  He told you that

14    statement alone is sufficient to prove that Rosemond intended

15    for Fletcher to be killed.

16         And not once did Mr. Touger talk about it.  Why?

17         There is no answer.  He can't answer it.  Let's just

18    go over what it means.

19         You have to look at the input and the output.  The

20    input, the information that Rosemond has when he makes that

21    communication, the input he's given is he gets an encrypted

22    e-mail message from Williams:  Everything is good, or

23    everything is all right.

24         That's the input.

25         The output:  "That bitch is out of here."  That's what

Hbsnros5                    Rebuttal - Mr. Enzer

1    he says the very next day.

2            He does not have any report from anyone confirming

3    certainly the details of the murder.  No one said Fletcher has

4    been murdered.  No one said to him Fletcher has been killed.

5    No one said Fletcher is in a body bag.  He doesn't have those

6    details.

7            He doesn't even know necessarily everything is good or

8    everything is all right means Fletcher.  The reason he is able

9    to take that input and come up with the output of "The bitch is

10   out of here" is that he knows before this whole thing happened,

11   from the get-go, from the moment he talked to McCleod at Whole

12   Foods in the downstairs, he knew from that moment that the

13   whole goal of this was to kill Fletcher.

14           Knowing that in advance, when he is told everything is

15   good by his driver, that is all he needs to know, that the goal

16   of what he set in motion weeks before had happened.  Fletcher

17   was dead; the bitch is out of here.

18           Mr. Skinner explain it.  He told you it's enough to

19   convict on.  Touger did not respond.

20           For that reason alone, ladies and gentlemen, we've met

21   our burden, and you can check guilty on every single one of the

22   counts that will be presented to you on the verdict form.

23           One of the things that happened in Mr. Touger's

24   summation, and frankly throughout the whole trial, he

25   mischaracterized the record.  I have to remind you, and Judge

Hbsnros5                        Rebuttal - Mr. Enzer

 1   Kaplan will instruct you, only testimony of witnesses and
 2   exhibits that are in evidence, that is the evidence.  Questions
 3   of a lawyer not evidence.  Arguments of a lawyer not evidence.
 4          Do not be misled by mischaracterizations.  If you're
 5   confused, if you want to see something, ask for the transcript
 6   or the exhibit or the stipulation.  You will be allowed to see
 7   it in the jury room.
 8          Let me go through some examples of
 9   mischaracterizations.
10          The point of this, ladies and gentlemen, is you cannot
11   rely on what Mr. Touger told you about what the record says.
12   You just can't.  He is too much of a freestyler.
13          The most memorable example of him misrepresenting the
14   record was when Abdullah was testifying, and Touger kept asking
15   him questions mischaracterizing the penalties that Abdullah
16   would face if he didn't testify.
17          And Abdullah tried to explain to him a few times.
18   Mr. Touger just didn't get it, and he kept asking him, Aren't
19   you going to have a mandatory minimum?  He wouldn't, because
20   he's already been sentenced.  He's already home.  He doesn't
21   have that mandatory minimum hanging over his head anymore.
22          Eventually Mr. Abdullah called him out and said,
23   You're just freestyling.  He is freestyling.  He freestyled
24   then.  He freestyled in other cross-examinations, and he just
25   freestyled in his closing.

1            What is another example of his freestyling?

2            Well, he told you that there is no evidence at all in

3    the record that Rodney Johnson was a backup shooter, that he

4    was sent as a backup shooter for the murder.

5            Wrong.

6            When you go back to the jury room, ask for page 538 of

7    the transcript.  That's Khalil Abdullah's testimony.

8            Can we bring it up.

9            Here is what Abdullah said.

10            Can we highlight it.

11            Abdullah's describing the meeting he had at Mobay

12    Restaurant with Rosemond and what Rosemond told him.

13            Rosemond said, "That's why I hit you and told you to

14    tell Toree to hit Jason up, because I had Toree up there as the

15    backup shooter.

16            And Abdullah asks Rosemond, "The backup shooter?"

17            He's like, "Yeah," Rosemond's like, "Yeah."

18            That is evidence of Rodney Johnson being there as a

19    backup shooter.  You know it's true.  He was there.  He did

20    have a gun.  Why was he there?

21            Defense counsel freestyled and told you he was there

22    as an observer to see if this shooting went down so that

23    Rosemond could confirm whether or not he needed to pay.  That

24    never happened in any of the other nonfatal shootings, but, in

25    any event, that was freestyling.  This is evidence.

1            It is in the record.  It is an example of Mr. Touger

2     mischaracterizing the record.

3            Here's another one.  Mr. Touger told you no one, and

4     he said this over and over again, Oh, by the way, the backup

5     shooter thing, do you remember how Mr. Touger said it?  Loud

6     and confident.

7            It didn't bother him.  He was either unaware or it

8     didn't matter to him that what he was saying was flatly wrong.

9     He can say something to you that is just flatly incorrect as

10    confidently as he says something to you that is true.

11           You can't rely on what he says.  Go to the evidence.

12           So he also told you that no one told you that Rosemond

13    ordered a murder.

14           Wrong again.

15           Let's go to page 878.  This is McCleod's testimony.

16           McCleod was asked:

17    "Q.  What was Rosemond's role in the murder?

18    "A.  Rosemond was the individual I went to to orchestrate the

19    whole thing.  He was -- I guess you could say he authorized

20    this whole thing."

21           Let's go to Jason Williams' testimony.

22           At page -- I can't really read my handwriting.  Is it

23    650?

24           650 of Jason Williams' testimony.

25           Williams was asked:

1    "Q.  What was Rosemond's role in the murder?

2    "A.  The orchestrator."

3           Those are two examples.  There are others.  You can

4    look at the transcripts yourself.  Do not rely on what

5    Mr. Touger told you?  It is not true.

6           Another example.

7           Mr. Touger told you Rosemond didn't want to kill Baja.

8    He's a wealthy man.  He could have paid $75,000.  That's why he

9    didn't agree to a hit where people in Brooklyn would kill Baja

10   for $75,000.

11          Freestyling.  Nothing in the record to support that.

12          Go to page 220 of the transcript, please.

13          Here's Mohammed Stewart's testimony on this.  You can

14   read it in the jury room.

15          His testimony is that him and Rosemond are talking

16   about having Baja killed.  And the issue is not -- Rosemond

17   never says to him, he never says to him, I don't -- I'm not

18   going to agree to pay them.  I'm not going to agree to kill the

19   man.

20          Sorry.  I'm going to a different one.

21          221.  This is page 221.

22          Here's the discussion.

23          Stewart and Rosemond are talking.  Jimmy says to

24   Stewart:  That's too much.  What he's talking about is the

25   75,000 figure.

1           Stewart's upset.  And then the question:

2           "You said the guys in Brooklyn said 75 to tear his

3    head off?  At that moment it meant to, as you would say, park

4    him, kill him.  You said Jimmy said, Nah, it was too much.

5    "A.  Too much money.  He wasn't worth that."

6           This is not Rosemond saying, I don't want to kill

7    Baja.

8           What he's saying is I don't want to pay $75,000 for

9    it.  Mr. Touger told you the going rate for a murder is

10   $75,000.  There is no evidence of that.  The evidence is the

11   going rate is around $30,000.  Because Rosemond was willing to

12   pay 25.  That's Stewart's testimony, you can read it.  And

13   Rosemond in fact offered 30 for the killing of Fletcher and

14   ended up paying that much.

15          That's the evidence.

16          By the way, another mischaracterization that

17   Mr. Touger asserted, he said Stewart never wanted to kill

18   anyone.

19          Now, there were times when Stewart talked about

20   shootings, he had participated in and said he didn't intend to

21   kill anyone in those shootings.

22          But when it came to Baja, Stewart's testimony was he

23   did want to kill Baja.  He wanted to have the guys in Brooklyn

24   do it, and he had discussions with Rosemond and the guys in

25   Brooklyn about knocking the guy's head off, about killing him,

1  and they were talking about the price, another

2  mischaracterization of the record.

3           Here's another example.  Mr. Touger told you -- he put

4  up a big poster board of testimony from Jason Williams'

5  cross-examination.  I remember it.  It was the very last

6  question on cross-examination.

7           And he told you what this testimony showed is that

8  Williams was saying he never knew Fletcher would be killed on

9  the day of the murder.

10          It is a mischaracterization of Williams' testimony.

11          So, here is the actual testimony.

12          On direct examination, Williams testified that he knew

13  this was going to be a murder.  That is at page 775 of his

14  testimony.  Can we please pull it up.

15  "Q.  You testified earlier that you and others, including

16  Rosemond, participated in various aspects the fatal shooting of

17  Fletcher, is that right?

18  "A.  Yeah.

19  "Q.  When you agreed to participate in the attack on Fletcher,

20  did you have an understanding of the goal of the attack?

21  "A.  Yeah.

22  "Q.  What?

23  "A.  Murder."

24          That was his testimony on direct.

25          Then, on cross-examination at the very last question,

1    after Williams has been questioned for hours, he's tired, the

2    defense counsel asks him a confusing two-part compound

3    question, and Williams goes along with it because I submit to

4    you he was confused.  And that is the testimony he puts up on

5    the poster board.

6           Then on redirect -- that's why we have redirect

7    examination, because there are situations when a witness may

8    get confused or may get cut off in an answer or may give

9    testimony that they didn't intend to give on their cross.

10   That's why we have redirect.

11          On redirect he clarified that answer.  That's at page

12   865 of the transcript.

13          Williams was asked:

14   "Q.  When you brought the gun that day, as Jimmy asked you to,

15   and went to Mt. Eden Avenue on the day of the murder, what did

16   you believe what is going to happen to Fletcher?

17   "A.  That he would be killed."

18          That's his testimony, not the misleading excerpt that

19   Touger showed to you.

20          Ask yourself, when Touger showed you that excerpt, did

21   he give you the whole context?  Did he show you the direct and

22   the redirect?

23          No.

24          What he does is he takes the little piece out of

25   context that he likes and he presents it to you as though it is

Hbsnros5                    Rebuttal - Mr. Enzer

1    a fact.  It is something he does throughout this entire trial.

2         That is why you cannot rely on the defense

3    presentation.

4         THE COURT:  Members of the jury, I have to interrupt

5    counsel here.

6         It is entirely proper for Mr. Enzer to argue that the

7    evidence was different than Mr. Touger argued it was.  You

8    heard it all.  You get to decide what the evidence was and so

9    forth.

10         If there's any suggestion here by Mr. Enzer that

11    Mr. Touger in some way behaved unethically or improperly, just

12    put that out of your mind.  That would not be an appropriate

13    suggestion, and to avoid your misconstruing anything he said as

14    that, I thought I would bring it to your attention.

15         MR. ENZER:  Mr. Touger talked about testimony from

16    Brian McCleod regarding what the $30,000 would cover.

17         He told you McCleod had testified that $30,000 would

18    be the price even if Fletcher was going to be shot in the leg.

19         I direct your attention -- you should look at pages

20    970 to 972, page 1113, and page 1169 of McCleod's testimony,

21    and you will see that is not an accurate summary of McCleod's

22    testimony.

23         Those pages give you an accurate summary.  What he was

24    saying in a nutshell, and your recollection controls, and you

25    should look at the transcript, what he was saying was, $30,000,

Hbsnros5                      Rebuttal - Mr. Enzer

1  the initial offer, the initial concept was $30,000 McCleod

2  would bring Fletcher to Rosemond, Rosemond will shoot and kill

3  Fletcher himself.  McCleod felt that was a bad idea because of

4  all the surveillance on Rosemond, so he suggested Derrick Grant

5  as the shooter, and he recruited Derrick Grant as the shooter

6  with Rosemond's approval.  So he was not saying $30,000 would

7  cover a leg shot.

8       All the testimony about McCleod and Grant wanting more

9  money that was about the increased work they had to do in

10  executing this plan, because the $30,000 when it was initially

11  offered up contemplated Rosemond being the shooter, and now you

12  have McCleod not only luring but also recruiting the shooter

13  and you have the shooter, Grant, instead of Rosemond.

14       Another thing defense counsel talked about in his

15  closing was he pointed to the situations where Abdullah and

16  Stewart participated in shootings in which they were not trying

17  to kill anyone, and I argued to you that that casts doubt on

18  whether Rosemond intended for Fletcher to be killed.

19       This is a distraction.  Whether or not Abdullah or

20  Stewart acted with the intent to kill and did nonfatal

21  shootings that they committed is not the issue before.

22       There is no evidence that Abdullah or Stewart ever

23  committed a fatal shooting or ever ordered a shooting that

24  resulted in somebody's death.  And, in any event, as Mr. Touger

25  acknowledged, the cooperating witnesses are not on trial in

1    this case.

2           There's only one person on trial.  That's the

3    defendant, James Rosemond.

4           The question for you is whether Rosemond intended for

5    Fletcher to be killed by the crew of men that he sent to ambush

6    and kill Fletcher, and I submit to you the answer is yes.

7           How do you know that?

8           Mr. Skinner spent a lot of time on how you know it in

9    his opening summation.  I am not going to repeat it.  But one

10   of the ways you can examine this is you compare the shooting of

11   Fletcher, which resulted in his death, and the nonfatal

12   shootings that Abdullah and Stewart did.

13          When you compare them, you look at the different

14   factors, you will see the factors collectively and as a whole

15   point to one thing:  That Rosemond acted with the intent to

16   kill Fletcher.

17          First, you have the statements that Rosemond made

18   beforehand, before ordering the fatal shooting of Fletcher.

19   Rosemond made the "carry a coffin" and funeral statements that

20   you have heard a lot about.  There is no evidence that Abdullah

21   or Stewart ever made a statement like that before any of the

22   shootings that they were involved in.

23          You have the number of participants to carry out the

24   fatal shooting of Fletcher.  Rosemond recruited four of his

25   criminal associates -- McCleod as a lure man, Grant as a

Hbsnros5                        Rebuttal – Mr. Enzer

trigger man, Jason Williams as a getaway driver, Rodney Johnson

as a backup shooter.

          There is no evidence that Khalil Abdullah or Stewart

ever had that many participants in any of the shootings that

they were involved in.

          You have the extensive and meticulous planning.  You

heard about this during Mr. Skinner's closing.  Rosemond

engaged in extensive and meticulous planning.

          About a month before the murder you have the meeting

inside the Whole Foods where Rosemond's plot to murder Fletcher

begins to unfold a few weeks before the murder.  You have the

communications and conversations in which Rosemond had McCleod

and Williams go to Queensboro Correctional Facility.

          (Continued on next page)

1          MR. ENZER:  Now I'm going to come back to that in a

2    moment.  Then you have the other meetings, the other calls,

3    other conversations that led up to the murder.  They were all

4    described in Mr. Skinner's closing.  There is no evidence that

5    Abdullah or Stewart ever engaged in such elaborate planning.

6    You have the payment Rosemond provided $30,000 worth of cocaine

7    to McCleod and Grant for their roles and Rosemond provided

8    eight thousand dollars as bonus to Jason Williams as payment to

9    him for his assistance in carrying out the murder for a total

10   of $38,000.

11         In the nonfatal shootings that Abdul and Stewart

12   committed they either didn't pay anyone anything or they paid

13   much, much less than the 30,000 in cocaine and eight thousand

14   bonus to Williams that Rosemond laid out for the murder of

15   Fletcher.

16         In the case of a limiting instruction.  Mr. Skinner

17   talked about this in summation.  Rosemond never said to anyone

18   involved in the murder of Fletcher, Don't kill the man.  Just

19   shoot him in the leg.  You didn't hear that because Rosemond

20   didn't want the man just shot in the leg and he didn't want

21   Fletcher to survive.  He wanted him to die.  However, if you

22   look at some of the shootings that Abdul and Stewart were

23   involved in there are times they are not looking to kill

24   anyone.  Abdullah told you when he had others shoot up Yayo's

25   white Bentley in Harlem, Abdullah told them clap the white

1    Bentley up.  Pages 502 and three of the transcript he didn't

2    say hit Yayo so fast and hard he won't see it coming because

3    all Abdullah wanted was for the car to get shot up.  He didn't

4    want the shooters to kill Yayo.  Contrast that.  Rosemond did

5    want Fletcher to end up in a coffin.

6            Another point defense counsel made is that there's a

7    gap in the government's proof.  He says because McCleod and

8    Williams told you Rosemond never said to kill or to murder

9    anyone.  In other words, he never used those specific words.

10   Let's be clear.  McCleod and Williams were not saying Rosemond

11   didn't order the murder of Fletcher.  What they are saying was

12   Rosemond never expressed or used words like "murder" or "kill"

13   in describing his intentions in describing what he wanted them

14   to do to Fletcher.

15           And you know by now why Rosemond avoided using words

16   like that.  Your common sense tells you that a sophisticated

17   and savvy criminal like Rosemond would never use such words

18   which would make it obvious to anyone listening and that then

19   he was speaking about, what he is speaking about with others

20   was a plot to hire hitmen to carry out a murder-for-hire.

21           You heard during this trial the lengths that Rosemond

22   went to, the number of precautions he took to make sure that it

23   was difficult for law enforcement to piece together the proof

24   that he was guilty.  He used trusted associates to carry out

25   the deed.  He engaged in tactics to avoid surveillance by law

1    enforcement.  Meeting at the lower level of Whole Foods, using

2    encrypted Blackberries, using phones that weren't register.

3    Even when he was speaking in these circumstances with these

4    trusted associates he spoke in code and innuendo.  That's not

5    somebody who is going to say murder or kill.  He is not going

6    to spell it out like that.

7            And by the way, for much the same reasons you would

8    not expect somebody like Rosemond to have a meeting in advance

9    of his murder conspiracy where they layout what code words

10   mean.  For the same reason that you are not going to tell

11   somebody, murder the guy, kill the guy, you are not going to

12   draw up a sheet or have a meeting where you say, hey, listen.

13   In the future sometime we're going to talk about a murder plot

14   and when I say "hit" what that means is kill and if I say

15   "quiet" means the .22 with silencer.  You are not going to say

16   anything expressly that could later be used in court to decode

17   what you are saying.  That's what your common sense tells you

18   about the way Rosemond practiced.

19           But speaking in code is not a defense to plotting a

20   murder-for-hire.  The law does not require any magic words to

21   show that a defendant like Rosemond was part of a conspiracy

22   with others to have a victim murdered for hire.  As Mr. Skinner

23   explained in his summation, the government need only prove that

24   there was a mutual understanding which can be an unspoken

25   understanding between two or more people to carry out a goal of

HBSAAROS6                    Rebuttal - Enzer

conspiracy which was to have a member of G-Unit murdered and we
have proven that.  We've proven through his actions both before
and after the murder.

          Defense counsel argued to you that there is no proof
that this was intended to be a murder because a small caliber
weapon was used and because the shooting was done from a
distance.  First, this is kind of like saying a shooter who
used a machine gun to murder somebody is not guilty of murder
because they could have used a bazooka or didn't, it's a
ridiculous argument.  Obviously, there are many weapons you
could use to kill somebody.  But he did pick a lethal weapon, a
silencer, one suitable to the circumstances and that is
evidence of his intent.

          If Rosemond had ordered Jason Williams to bring a BB
gun to kill Mr. Fletcher, then they would have an argument, but
he didn't pick a BB gun.  He picked a .22 caliber handgun with
a silencer.  You heard that it is a lethal weapon.  You heard
that from Dr. Smiddy that small caliber guns can be just as
lethal as large.  And Rosemond knew it.  You heard about the
conversation he had with Mohammed Stewart where he said to
Stewart he knew a .22 caliber handgun can be effective because
the bullets bounce around inside somebody's body because
they're small.  They don't pierce through.  They bounce around
inside once they enter the person's body and cut up arteries
and that's what happened here.  That testimony that I just

1    referred to from Stewart is at page 203 in the transcript.

2            Another argument the defense counsel made is that this

3    couldn't have been a murder because there was disorganization

4    and chaos on the day of murder.  For example, you have

5    McCleod's testimony that at one moment before Grant ultimately

6    kills Fletcher, Jason Williams turned to him and said, we were

7    thinking you would do it.  And you also have the fact that the

8    shooting happened a little bit further down the block from the

9    recess where McCleod had hoped and planned that the murder

10   would happen.  This is proof of nothing.  Just there is no

11   requirement that criminal conspiracies have to be perfectly

12   well organized.  If they were then they probably won't get

13   caught and prosecuted.  Obviously, not all criminal

14   conspiracies are executed with perfection.  That's why we end

15   up in criminal cases like this.  The point is although there

16   was some chaos, they got the job done.  And look at all the

17   planning and advance and care that is taken in advance to get

18   them to the point where they were able to lure Fletcher to the

19   spot where Grant shot and killed him with a weapon that

20   Williams brought a weapon that belonged to Rosemond.

21           You also have to keep in mind that while that was

22   happening on the ground, that is way below Rosemond's level.

23   Rosemond is the boss.  Defense counsel called McCleod the

24   chairman of the board of this murder conspiracy.  That is I

25   submit to you not an accurate way to look at this evidence.

1    Rosemond is the CEO.  He's the boss.  McCleod is the chief

2    operator.  The guy on the ground who is going to supervise.  He

3    takes care of logistics.  But from Rosemond's perspective he

4    sends his team to do it and then he goes to Miami.  He doesn't

5    worry about the details, which person shoots?  In his mind

6    Derrick Grant was going to do the shooting.  But at end of the

7    day he doesn't care.  As long as the deed is done, that's what

8    he cares about.  He wants the result.  He doesn't care how they

9    do it on the ground.  So disorganization among the troops

10   doesn't tell you anything about his state of mind.

11        I can't answer all the arguments.  I don't have the

12   time to answer all of the arguments that Mr. Touger made

13   regarding intent.  But I think you can look at all of them

14   through the lens by now -- to a puzzle.  I want you to imagine

15   just because Mr. Touger talked about hamburgers.  There's

16   puzzle.  When you put all the pieces together it makes out a

17   hamburger.

18        What happened in this case, what Mr. Skinner did in

19   his summation he showed you how all of the evidence together,

20   how all of the pieces fit together and showed you a hamburger

21   with beef, that's what happened when you put the pieces to go.

22   What Mr. Touger did in his summation is he took each individual

23   piece or at least some of them and he said, this is not a

24   hamburger.  This is part of the bun.  This a lettuce.  This is

25   tomato.  Each piece in isolation, not the context, not how they

HBSAAROS6                    Rebuttal - Enzer

all fit together.  He wants you to look at each piece in

isolation and say that is not evidence of intent.  Because

that's the only way he can distract you from the proof that

Rosemond did intend this murder because if you do put the

pieces together it's a clear picture.  The defendant is guilty.

        Your common sense tells you that's not how puzzles

work.  You can't look at them in isolation.  You put the pieces

together.  That's not how criminal cases work and that's not

how the real world works.  That is not how this world works.

What you should do and I expect Judge Kaplan will instruct you,

you should consider all of the evidence, direct and

circumstantial in deciding whether or not to convict Rosemond.

If you consider all of the evidence and how it all fits

together it is clear that Rosemond is guilty as charged.

Mr. Skinner already explained the way when you look at all the

evidence how it shows Rosemond intended the murder.  And then

what Mr. Touger did in his summation is he picked a few pieces

of it and tried nitpick them.

        One of them he says there's no physical evidence in

this case that proves Rosemond acted with the intent to murder.

Wrong.  .22 caliber bullets found in a person's body and shell

casings found at the scene, that's proof of intent.  If it was

BB bullets, if it was BBs I expect you would hear argument hey

this was an accident.  Rosemond only wanted the guy shot with a

BB gun.  You have physical evidence bullets were used.  It

confirms what cooperators told you and it shows you he picked a lethal weapon.

Mr. Touger he says hit in this case, doesn't mean a murder.  It could mean a nonfatal shooting.  There's a reason why people call a hired assassin "hitmen".  "Hit" it's a common term.  You can ask a kindergartener what's a hitman?  They'll tell you it's an assassin, somebody who kills.

Obviously, like any word, Rosemond may have used that word to mean other things at different times and there's a reason we have dictionaries and thesauruses.  What you have to do is look at the context.  We are not standing here and telling you because he said "hit" in that first meeting at Whole Foods, therefore, you know this is a murder alone.  What we are doing is telling you put all the puzzle pieces together.  But it's certainly probative that he meant kill the guy.  It's certainly consistent.  In fact, that's probably what's more likely to be interpreted as.

Another nitpick that you heard about, Mr. Touger said there were other shootings that were not fatal where Rosemond paid a lot.  He told you Grant was paid half a kilo to do the shooting at Violator's offices.  And he is only given a third of a kilo for shooting of Fletcher.  This misrepresents evidence.  It is a distortion.  So let me unpack it.

You have to look at this from Rosemond's perspective, the perspective of the CEO.  He offered 30,000.  He doesn't

HBSAAROS6                    Rebuttal - Enzer

care how it's divided.  He doesn't get into the weeds of how

it's divided.  He doesn't know whether Grant's going to get a

third or half or 90 percent of that 30,000 kilo payment.  He

doesn't care.  From his perspective he's a businessman, 30,000

is the right price for a murder.  He offered 30,000 which is

twice as much as he paid Grant for a nonfatal shooting and he,

in fact, paid the 30,000 after the deed was done.  That shows

you his intent was to kill.  It is one of many indicators, one

piece of the puzzle fit right in.  And the fact that Grant

ended up getting only a third was not the detail Rosemond

concerned himself with.  He didn't know and he didn't care.

        The other thing Mr. Touger said, another one of his

nitpicks is there were times Rosemond paid for things he didn't

authorize.  Well, we told you about the shooting that Mohammed

Stewart did for The Game right after the Hot 97 incident and

you heard what happened.  Did Rosemond orchestrate a payment

for that?  Yes, he did.  But did he do it quietly?  No.  He

told Stewart, listen, you should not do things like this

because should know your value.  You should make sure you are

going to get paid.  Let Game's people do things like this.  He

didn't like what Stewart had done.  So he didn't just pay him

and say nothing.  He complained.  He did not complain when

Fletcher was dead.  There was no complaint.  There was no, you

guys went too far or you shouldn't have kill the man.  I only

wanted him shot.  He provided the payment and he provided a

HBSAAROS6                    Rebuttal - Enzer

bonus payment to Williams and he made statements bragging about

it, like the bitch was out of here.  And his meeting at Mobay's

Restaurant where he told the details of the murder.  You have

the meeting where he discusses after the obituary was passed to

Stewart where he talks and says we can rest now.  This is not

the behavior of somebody who is upset about the murder.  This

is the behavior after the fact which shows you what his

intention was before the fact.

        Mr. Touger pointed out, after the murder of Fletcher

you can't join the conspiracy after that point.  We agree with

that.  But you can look at the statements and actions a person

makes after a murder and determine how, what it tells you about

their intent before the murder.  So the fact that Rosemond was

happy with the result, the fact that he paid for it, his

statement about the "Bitch is out of here", while they happened

after the murder in time, they are indicators of what his state

of mind was before the murder.  They show he intended this to

be a killing.

        Mr. Touger nitpicked the "carry a coffin" and

"funeral" statements, he took them total out of context.  If

you look at the "carry a coffin" statement at page 526 of the

transcript, lines 21 through 24.  This is Abdullah's testimony.

He is describing what Rosemond told him at the barbershop.

This is shortly after McCleod had come home from prison and had

begun setting in motion with Rosemond the plot to murder

1    Fletcher.  And here Rosemond is telling Abdullah at the

2    barbershop Lodi Mack is on his way home.  Slim is going to stay

3    in touch with him so he can possibly line him up when he gets

4    home because he says, These dudes ain't gonna be happy until

5    they go to a federal.  Let's say "these dudes" means G-Unit.

6    Until G-Unit goes to a funeral.  What funeral do you think they

7    are talking about?  Mr. Touger tried to suggest to you what

8    he's talking about is G-Unit going to the funeral of somebody

9    in Rosemond's group.  Would that make any sense?

10             MR. TOUGER:  Objection.  I didn't even say that.  I

11   can't let him misstate may comments.

12             THE COURT:  Overruled.

13             MR. ENZER:  Would G-Unit members go to a funeral if

14   Rosemond or somebody in his crew died?  No.  They're enemies.

15   That's one of the ways you know what he is saying here is he

16   wants somebody from G-Unit to end up in a coffin.  He wants

17   Fletcher in a coffin.  That's Lodi Mack.  It's the context of

18   that statement, another statement that Stewart told you about,

19   page 196.

20             He told me those dudes ain't gonna be happy until

21   they're carrying a coffin.  Those dudes are G-Unit.  G-Unit

22   dude aren't gonna be happy until G-Unit dudes are carrying a

23   coffin.  Would they be carrying a coffin?  If somebody in

24   Rosemond's crew got killed would the G-Unit dudes go to the

25   funeral and carry the coffin?  No.  They would attend the

HBSAAROS6                      Rebuttal - Enzer

1    funeral of the death of one of their own.

2              MR. TOUGER:  That's exactly what I said and he

3    misstating --

4              THE COURT:  All right.  That's enough out of you,

5    Mr. Touger.  Don't do that again.

6              MR. ENZER:  He's saying he wants a G-Unit dude to

7    carry coffins.  In other words, he wants a G-Unit member dead

8    in a coffin and the other members have to go to the funeral and

9    carry the coffin.

10             Mr. Touger told you that the testimony about Rosemond

11   instructing Williams to get rid of the gun after the murder is

12   not probative evidence of Rosemond's intent.  I think

13   Mr. Touger's argument ignores the context.  On the night of

14   murder Rosemond is in Miami.  Shortly after the murder, still

15   that day Williams tells him everything is good or everything is

16   all right over encrypted e-mail.  No other information is given

17   to Rosemond.  Same night Rosemond responds, Make sure you get

18   rid of that.  He has the presence of mind when all is told

19   everything is all right or everything is good to say get rid of

20   the weapon.  It's similar to the bitch is out of here.  The

21   input is not enough for him to know Fletcher is dead and that a

22   murder has occurred unless he knew that going into it.  So he

23   must have known going into it this was going to be a murder.

24   Now that he's gotten the confirmation in code he says get rid

25   of the murder weapon.  And he didn't do that for any of the

HBSAAROS6                    Rebuttal - Enzer

1   other shootings.  None of the other shootings resulted in

2   somebody's death.  This one did.  This is unique.  It's

3   evidence, again, that he intended to murder.

4           THE COURT:  Let's try to confine this to rebuttal, all

5   right and draw it to a close in some reasonable amount of time.

6           MR. ENZER:  Mr. Touger told you that mostly you can

7   believe him, just not when it hurts his case.  He told you

8   they're corroborated.  He told you the cell sites, he doesn't

9   disagree that those meetings happened.  Well, but then he tries

10  to tell you they must be lying.  On what?  On the points that

11  hurt the defense.  On the points that show Rosemond acted with

12  the intent to kill.

13          Ladies and gentlemen, I submit to you that's because

14  he knows if he concedes that, the trial is over with.  You

15  believe what the cooperators told you, if you believe it in

16  whole as you should, then have you to convict because their

17  testimony shows Rosemond acted with the intent to kill, shows

18  he is guilty as charged.

19          Now the first thing you should remember is Mr. Touger

20  spent a lot of time talking about how bad these people are and

21  the bad facts that they committed.  But we did not choose them.

22  We did not choose those witnesses.  The defendant did.

23  Rosemond close Abdul.  He chose when he chose to make him a

24  leader of the drug organization that Rosemond led.  Rosemond

25  chose to brag to Abdullah that, the bitch is out of here.

HBSAAROS6                    Rebuttal - Enzer

Rosemond chose to brag to him about the details of the murder
and their meeting.

Government Exhibit 1004.  Rosemond chose Stewart.  We
didn't choose him.  Rosemond chose hem to commit shootings and
acts of violence in a street war against G-Unit.  Rosemond
chose to make statements to Stewart that Stewart testified
about.

Government Exhibit 6.

Rosemond chose Jason Williams.  Rosemond is the one
who hired him as a driver.  Rosemond is the one who enlisted
him to do driveby shootings.  Rosemond is the one who had him
bring the quiet.  And Rosemond is the one who had it thrown in
the river afterward.

Please publish Government Exhibit Nine.

Rosemond chose to befriend Brian McCleod when they met
in jail.  Rosemond chose to send him money when McCleod was in
jail after his drug stash house bust.  And Rosemond close to
make Brian McCleod a chief operating officer of this murder
conspiracy.

If we have to pick our witnesses we would pick good
samaritans like Elizabeth Marte.  But the problem is people
like that don't know the intricacies of a murder conspiracy
because Rosemond doesn't tap people like that to do a murder
conspiracy.  He taps people like the cooperators.

How do you know they're telling the truth, not about

1    some of it but about all of it?  First their demeanor.  First,

2    think about how they looked, sounded and acted when they're on

3    the stand.  Do they avert eyes when they testified?  Did they

4    shift in their chairs?  Did they refuse to answer any questions

5    about their past crimes?  Were they flustered?  No.  Never.

6    Each of them calmly gave their testimony even when defense

7    counsel shouted at them or repeated questions at them or tried

8    to interrupt them.

9             And in particular, Mr. Skinner pointed this out,

10   Williams' demeanor spoke volumes.  He was uncomfortable

11   testifying.  Why?  Rosemond is like family to him.  Rosemond is

12   like a father to him.  He did not want to hurt Rosemond.  But

13   he had to tell the truth.  That's the only way for him to get

14   out of his sentence and so he did and the truth is damning.  He

15   wasn't lying.  He wasn't going to embellish any detail but the

16   truth speaks volumes and the truth itself shows Rosemond is

17   guilty.

18            Second, reason.  Think about the how cooperating

19   witnesses were with you.  Each of them got on the stand and

20   they laid out everything to you.  They didn't hold back.  They

21   told you about crimes they were arrested for and got out of.

22   Crimes they were never caught for.  McCleod told you about drug

23   dealing that he was never caught for.  He even told you about

24   embarrassing details about how he urinated in course of the

25   murder on the night of, he urinated while he was talking to

Fletcher.  How do you know those details?  Because McCleod told you.

Williams told you about the shooting that he did with Tef's friend where somebody got shot in the leg, a bystander. They want to shoot at a relative of Baja.  Didn't find that person and the guy that Williams drove there got out and shot a random person.  No one else knew that detail.  The only reason you know about it is because Williams told us about it.  He told the truth.  He told the truth about himself and about Rosemond.

Abdullah told you about the -- incident, how he ordered the shooting, how he got arrested and how he got out of it by getting a false affidavit from the victim.  Given that the case was dismissed, how would you know?  How would any of us know that he actually was guilty of that crime and how he got out of it?  You know because he told you the truth about it.  He told you the truth about that, just as he told you the truth about Rosemond.  Why did they tell you the truth?  That's what they were required to do.  They told the truth about that and everything else.

The third reason you know the cooperators were telling the truth is the incentives that they have.  Let's start with under the incentives that, that they have nothing to gain and everything to lose by lying.  Let's start with Williams and Stewart.  Williams was sentenced to 24 years in prison.

HBSAAROS6                    Rebuttal - Enzer

Stewart has pleaded guilty to crimes carrying a mandatory
minimum of 20 years and up to life in prison.  If they
cooperate and tell the truth they get a motion from the
government to a judge like Judge Kaplan and that motion allows
the judge to lower their sentence but it doesn't require it.
It doesn't guarantee it.  The government may make an assessment
about whether or not a cooperator told the truth and thus, you
get the motion but we don't decide what sentence they get.  The
judge decides that.

        So the cooperators pleasing us is irrelevant.  If they
don't tell the truth or if they do bad things, the judge will
have all of that information and will make the appropriate
determination about what sentence to make, not the government.
If they lie, their agreements get ripped up and they could
spend decades in prison.

        For Williams if he lies, he gets ripped up.  He does
the remainder of his 24 year sentence.  He could face
additional prison time for perjury and on top of that he is now
out as a cooperator.  He testified at a public trial and he is
going to have to live those decades in prison as somebody who
is known as a rat.

        And for Stewart, if he lies he could do at least 20
years and up to life in prison.

        The motion again is not tied to the outcome.  Stewart
explained that to you.  Whether or not your verdict is guilty,

HBSAAROS6                      Rebuttal - Enzer

regardless of the outcome in this case has no impact on whether these cooperators get a motion.  It's determined and based on whether or not they told the truth, not your verdict.  And as such, they have no incentive.  They have no reason to embellish or make up details that help the government's case.  It doesn't matter whether the government prevails in this case and they know that.

          You have to look at the risk of lying.  Would they risk lying when they know how easy it would be to get caught?  They know other cooperators, other people were insiders in Rosemond's inner circle were cooperators.  That means they know the government could talk to those people and learn if they lied about some detail.  The federal investigators could doing things a like checking cell sites, cellphone evidence, talking to civilian witnesses.  Given the resources the federal government has to investigate them, do you think they would risk lying in here when it would be so easy to --

          THE COURT:  Let's move along.

          MR. ENZER:  McCleod and Abdullah, they have nothing to gain.  They're already home.  For them at this point what they get for testimony or truthful testimony is a little bit of a reduction if the judge grants it in the amount of time they're on supervised release.  But if they lie they have to go back to prison and everything they did to cooperate is for non.  Who would risk lying in that situation?

1    Another way you know they are telling the truth, the

2    cooperators did not embellish.  Ask yourself did they blame

3    everything on the defendant?  Were they trying to frame the

4    defendant?  Absolutely, not.  Here is an example.  If McCleod

5    and Williams, for example, were lying to you how easy would it

6    have been for them to get on the stand and say, yeah, when I

7    met with Rosemond he said murder.  He said kill.  They could

8    have easily said that.  And then this trial would have been a

9    lot shorter.  He didn't do that.  They did not because that's

10   not what happened.  They told the truth.  The truth is this was

11   a murder conspiracy but it was done through covert means, code

12   and innuendo and that's what they told you because that's the

13   truth.

14        Fifth way you know that the cooperators were telling

15   the truth, there's no collusion between them.  You know that

16   the cooperators have not seen each other or spoken to each

17   other in years.  And in some cases they've never met or spoken

18   to each other at all.  If the cooperators were lying, as

19   defense counsel has argued, how exactly were they able to

20   present such coherent interlocking accounts of the crimes the

21   defendant committed?  It couldn't possibly be that they got

22   together to get their stories straight.  You heard they have

23   been separated from each other for years.  Do you remember at

24   the end of each examination, when did you last speak to them?

25   The reason we were doing that is to establish to you the fact

to show they haven't spoken to each other in years.  They could

not possibly have gotten the story together for their

testimony.  People who were -- from each other all came in here

and gave you consistent accounts on main details that matter.

why?  Because they're telling the truth.

Sixth way you know they are telling the truth is the

level of detail in their testimony.  And here just focus on

McCleod's testimony.  Who could make up such detail about when

meetings happened, when calls happened, when text messages

occurred?  Who could do that and then have it match up with

other records unless they were actually telling the truth?  No

one could keep that number of details straight.  The fact that

the testimony was detailed is another indicator they were

telling the truth.

The seventh way is the corroboration.  They

corroborated each other on various accounts.  When you look at

how their testimony matches up on various things they told you

it was corroborated by other independent evidence like the cell

sites, video, physical evidence.

Another way the defense admitted it, they told you

they're mostly telling the truth.  Why?  Because he knows he

has to do that.  He can't refute it.  But what the defense

really tried to do is have it both ways.  There are some things

he admits they're telling the truth on which is the stuff that

the defense feels doesn't hurt their case.  But so when it's

HBSAAROS6                    Rebuttal - Enzer

1    helpful for them the cooperators are telling the truth but when

2    it hurts them like on the issue of intent, then the cooperators

3    must be lying.

4           And you saw this over and over again in the defense's

5    summation, there were times when the defense is citing to the

6    cooperators to prove a point.  They are endorsing the

7    cooperator but then turning around and saying to you don't

8    believe them on the other stuff that hurts the defense's

9    argument.

10          Ladies and gentlemen, they can't have it both ways.

11   The simple fact is the cooperators told the truth about all of

12   it and it demonstrates the defendant is guilty.

13          The defense spent a lot of time telling you that there

14   are times when the cooperators have lied in the past.  There is

15   no dispute that the cooperators before he entered into

16   cooperation agreements with the government, each of them have

17   lied at times when they thought it would help them.  But to be

18   clear, you have to keep straight in your mind what they're

19   talking about.  There is no evidence that McCleod or Williams

20   has ever lied to a jury.  There is no evidence that McCleod or

21   Williams ever lied to a judge.  There is no evidence that

22   McCleod or Williams ever lied under oath.  What Mr. Touger

23   tried to do is lump all of them together because Stewart and

24   Abdullah did lie under oath in various circumstances that they

25   told you about but that's not true of McCleod and Williams and

HBSAAROS6                    Rebuttal - Enzer

1    you should keep that straight in your mind.

2            Let me McCleod focus on Williams and McCleod for a

3    minute.  Both of them told you about times in the past when

4    they had lied.  Williams told you about a time in 2010 he

5    hadn't been charged with the murder yet.  Agents showed up at

6    his home and asked him to confess to the murder and he did not

7    admit to it.  He lied to them because he didn't want to get

8    arrested.

9            Then Stewart and Abdullah told you about various time

10   when they had lied including when they had pleaded guilty to

11   crimes they didn't commit.  Ask yourselves, how did you learn

12   that the cooperators had lied in the past?  You learned because

13   the cooperators told you.  They disclosed it to you.  They bore

14   their souls to you because they were telling the truth.

15           In addition, you have to ask yourself why they lied in

16   the past.  Because it was in their interest to do so but that

17   is not true any more.  Under the arrangements they now have --

18           THE COURT:  You've made this argument.  Now, let's do

19   your best to wrap it up and you are at the hour mark.

20           MR. ENZER:  I have four more pages, your Honor.

21           THE COURT:  I'm not interested in pages.  Move it

22   along.

23           MR. ENZER:  All right.  Mr. Touger told you that the

24   cooperators contradict each other, pointed to situations where

25   various things they told you did not match up.  And I submit to

1    you that that is perfectly normal.  It is normal because

2    cooperators -- and different people have different

3    recollections of varying details.  It doesn't mean anyone's

4    lying to you.  There's a reason we have a court reporter in

5    this room to take down the transcript of what happened in the

6    proceeding.  That's because when you go back to the jury room,

7    I expect different people will remember different things that

8    happened even in this room differently.  Does that mean

9    somebody's lying?  No.  It means humans don't remember every

10   detail the same.  What they remember consistently are the big

11   events, the main events, the things that matter.

12       And what you look at the cooperators and what they

13   talked about, if you look at where they differ and where they

14   were the same, where they matched up, where they differed on

15   were insignificant details.  Did Grant have the gun before or

16   after he had the bag of chips?  What were they consistent on?

17   The things that mattered.  The main mattered.  That's what you

18   should look at.

19       Also you can look at civilians in this case illustrate

20   people, even noncooperators make mistakes.  Crooks, his

21   testimony is that the victim had a bag of chips and dropped

22   them.  The person with the bag of chip was Derrick Grant, the

23   shooter.  Does at mean he was lying to you?  No.  He doesn't

24   remember the details of who had the bag of chips.  He remembers

25   a bag of chips was dropped.  He can't keep straight who did it.

HBSAAROS6                    Rebuttal - Enzer

He does he remember?  The main event, that there was a shooting he saw.

I'm almost done.

Mr. Touger talked about McCleod and how he had on two occasions changed his testimony, told the government that this was just going to be a shooting not a murder.  During his direct-examination and this is the pages 1112 and 1113 of McCleod's testimony.  He explain to you why this happened.  He told you he did not want to admit to himself that this is going to be a murder because there's a history in his family of men being murdered in Baltimore.  It had a serious impact on his mother and his family.  His brother was murdered.  So he didn't want to admit to himself that he had participated in the same kinds of acts that caused so much pain to his family.  But ultimately he told the truth that he did participate in the murder, that he knew it was a murder from the get.  And that's at page 1113 of testimony.

He said the truth was I knew I was participating in a murder.  He pleaded guilty to conspiracy to commit murder.  And he faced, to do that he had to testify under oath at a plea allocution before a federal judge.  What's important here, ladies and gentlemen, this is a sideshow.  McCleod's state of mind doesn't matter.  What matters is the facts.  McCleod's facts have never wavered.  He has never wavered on who said what at what meeting, what meetings occurred, how it is, so

HBSAAROS6                    Rebuttal - Enzer

1    when did the meetings occur, who said what, the statements, the

2    actions the actual events?  The only thing he wavered on in the

3    past was his own state of mind about whether in his mind he was

4    admitting to himself that this was a murder. that's irrelevant.

5    What matters is what was Rosemond's state of mind?  And if you

6    look at the meetings, the facts, if you look at the actual

7    facts of what happened, what Rosemond said and did.

8              I'm going to wrap up now.

9              The defense said that the government has tried to

10   manipulate you, that we are trying to twist your emotions.

11   Don't act on your emotions.  We are not trying to manipulate

12   you.  We don't want you to convict James Rosemond because he's

13   a bad man or because -- You should decide this case only on the

14   evidence and the law as the judge gives it to you.  It can be

15   hard to judge somebody else but the judge will instruct you,

16   your oath in this case is to decide the case without bias,

17   without prejudice, without sympathy.  You have to decide the

18   case on the evidence presented and on the law.

19             And if you do that, if you decide the case just on

20   facts, the facts in this world, the evidence in this case and

21   you apply the law as the judge gives it to you, I submit there

22   is only one verdict you can reach and that is the defendant is

23   guilty on all counts.

24             THE COURT:  Thank you, Mr. Enzer.

25             We are going to take ten minutes, folks.  You are not

HBSAAROS6                    Rebuttal - Enzer

1    to discuss the case until I tell you you may later and then

2    we'll come back and I will instruct you.

3              (Jury not present)

4              (Recess)

5              (Jury present)

6              THE COURT:  OK.  Folks, it's been a long day.  It's

7    not going to get any shorter here.

8              The jurors and defendant are all are present.

9              Members of the jury, you are now going to perform your

10   final function as jurors.

11             My instructions are going to be in four parts.  I'm

12   going to start by describing the law that you must apply to the

13   facts as you find the facts to have been established by the

14   evidence.  That will be about half of what I have to say.

15             Second, I'll instruct you about the trial process.

16             Third, I'll talk to you about your evaluation of the

17   evidence.

18             And finally, I'll say a few words about the conduct of

19   your deliberations.

20             Just to alert you, I may not stay standing the whole

21   time.  I may push this contraption down at some point.  It's

22   been a long day.

23             Now the indictment in this case charges the defendant,

24   James Rosemond, in four separate counts as you have heard.

25   Each of those four counts charges a separate and different

HBSAAROS6                        Rebuttal - Enzer

crime.  You must consider each count separately and you return

a separate verdict of guilty or not guilty on each of the four

counts.  Whether you find the defendant guilty or not guilty as

to one offense should not affect your verdict as to the other

of offenses except to the extent that I tell you otherwise

which I'm going to do in two instances.  I'll explain it.

You're welcome to take notes I should say.  Feel free

but I will also send the type written charge into the jury room

so you will have it for your reference.  So suit yourself.  Do

whatever you think is best for you.

Now the fist thing I want to say is that the

indictment itself is not evidence.  It is not proof of the

defendant's guilt.  It doesn't create any presumption.  It

doesn't permit any inference that the defendant is guilty.  It

is simply an accusation.

I'm now going to summarize the charges in the

indictment.  You've heard this before but it's been a long

trial and a long day.

Count One charges that the defendant participated in a

conspiracy to commit the crime referred to as murder-for-hire.

Count Two charges him with the murder-for-hire of

Lowell Fletcher.

Count Three charges the defendant with using, carrying

or possessing and discharging a firearm and aiding and abetting

the same during and in relation to the conspiracy charged

HBSAAROS6                    Rebuttal - Enzer

1    that's in Count One.

2              Count Four charges the defendant with committing a

3    murder through the use of a firearm and aiding and abetting the

4    same during and in relation to the crime charged in Count Two,

5    the murder for hire of Lowell Fletcher.

6              Now as I think I told you the day we picked a jury in

7    this case, the defendant has pleaded not guilty to all of the

8    charges in the indictment.  The burden is on the prosecution to

9    prove guilt beyond a reasonable doubt.  The burden never ever

10   shifts to the defendant.  The law presumes the defendant to be

11   innocent of all of the charges against him.  I therefore

12   instruct you that he is presumed innocent throughout your

13   deliberations until such time, if ever, that you as a jury are

14   satisfied that the government has proved the defendant guilty

15   beyond a reasonable doubt.  If the government fails to sustain

16   that burden on one or more than one count you must find the

17   defendant not guilty on that count or those counts.

18             Now, I've said that the government must prove the

19   defendant guilty beyond a reasonable doubt.  A reason

20   reasonable doubt is a doubt based on reason and common sense.

21   It is a doubt that a reasonable person would have after

22   carefully weighing all of the evidence or lack of evidence.  It

23   is a doubt that would cause a reasonable person to hesitate to

24   act in a matter of importance in his or her personal life.

25   Proof beyond a reasonable doubt therefore is proof of such a

HBSAAROS6                    Rebuttal - Enzer

1    convincing character that a reasonable person would not

2    hesitate to rely on it in the most important of his or her

3    important decisions, his or her own affairs.

4         If after fair and impartial consideration of all of

5    the evidence, you have a reasonable doubt about the defendant's

6    guilt with respect to a charge in the indictment, it is your

7    duty to acquit the defendant on that charge.  On the other

8    hand, if after fair and impartial consideration of all the

9    evidence or lack of evidence you are satisfied of the

10   defendant's guilt on a particular charge beyond a reasonable

11   doubt, you should vote to convict on that charge.

12        Now let me go on to the specific counts of the

13   indictment.  I am going to discuss each one.

14        Count One charges the defendant with conspiring with

15   others to commit the crime that I've referred to as

16   murder-for-hire and that this conspiracy resulted in the death

17   of Lowell Fletcher.

18        I'm going to read to you from part of Count One of the

19   indictment.

20        It charges, from at least on or about May 20, 2007 up

21   to and including in or about September 2009 in the Southern

22   District of New York and elsewhere James Rosemond, a/k/a "Jimmy

23   the Henchman", the defendant, and others known and unknown

24   willfully and knowingly did combine, conspire, confederate and

25   agree, together and with each other to travel in and cause

1    another to travel in interstate commerce and to use and cause

2    another to use the mail and a facility of the interstate

3    commerce with intent that a murder be committed in violation of

4    the laws of a state of the United States as consideration for

5    the receipt of and as consideration for a promise and agreement

6    to pay a thing of pecuniary value.  To wit, Rosemond and others

7    known and unknown agreed and did pay others known and unknown

8    to murder members of a rival music management business in

9    exchange for narcotics and money which arrangements depended in

10    part upon communications through a facility of interstate

11    commerce and which resulted in the death of Lowell Fletcher.

12           That's the language in the indictment.  So let me

13    start by telling you what "conspiracy" means.

14           A conspiracy is kind of a criminal partnership, an

15    agreement of two or more perps to join together to accomplish

16    some unlawful purpose.  Conspiracy is an entirely separate and

17    different offense from the substantive crime or crimes which

18    may be the goal or the object of the conspiracy.  The essence

19    of the crime of conspiracy is an agreement or understanding to

20    violate the law.  Thus, if a conspiracy exists it's a crime

21    regardless of whether the conspirators accomplish their illegal

22    purpose.  Consequently, in a conspiracy charge there is no need

23    to prove that the crime or crimes that were the objective or

24    the objectives of the conspiracy actually were committed.  Let

25    me give you a simple example unrelated to this case to

HBSAAROS6                    Rebuttal - Enzer

illustrate at that point.

        If two people agree to rob a bank they have formed a
conspiracy to rob a bank.  That's true even if nobody ever robs
the bank.  Of course, if they then go out and rob the bank they
may be guilty both of conspiracy to commit bank robbery and the
separate crime of bank robbery.

        That is the distinction I am drawing.

        By the same token, you may find a defendant guilty of
the crime of conspiracy to commit murder-for-hire even if the
substantive crime of murder-for-hire actually was not
committed.

        In order to sustain its burden of proof with respect
to the allegation of conspiracy to commit murder-for-hire, in
other words, Count One, the government must prove beyond a
reasonable doubt each of the following two elements:

        First, the existence of the conspiracy charged in the
indictment.  That is, an agreement or understanding that
someone would commit the crime of murder-for-hire.

        Second, that the defendant knowingly, willfully and
voluntarily became a member of the conspiracy.  That is, that
he knowingly, willfully and voluntarily associated himself with
and participated in the alleged conspiracy to commit
murder-for-hire.

        Now, I am going to discuss in turn how you determine
whether the government has satisfied its burden of proving each

HBSAAROS6                    Rebuttal - Enzer

of these two elements beyond a reasonable doubt.

The first element as I said that the government must prove beyond a reasonable doubt is that the alleged conspiracy existed. Just to remind you, a conspiracy is defined as an unlawful agreement between two or more people to accomplish an unlawful purpose charged in the indictment.

Now, to prove a conspiracy the government is not required to show that two or more people sat around a table and entered into a solemn pact orally or in writing. What the government must prove is that there was a mutual understanding either spoken or unspoken between two or more people to accomplish the unlawful purpose alleged in the indictment.

Since conspiracy by its very nature is characterized by secrecy, you may infer its existence from the circumstances and the conduct of the parties involved that are allegedly involved. The old adage "actions speak louder than words" may be applicable here. In terming whether there has been an unlawful agreement, you must may judge the acts and conduct of the alleged co-conspirators, as well as those of the defendant that are done to carry out an apparent criminal purpose.

Now the conspiracy charged in Count One of this indictment has a single object. That is, a single unlawful purpose that the co-conspirators are alleged to have hoped to accomplish which was to violate the federal law that prohibits murder-for-hire.

1          Now I am going to explain the element of

2    murder-for-hire in a few minutes when I instruct you on the

3    substantive murder-for-hire crime charged in Count Two.  You

4    should apply those instructions when you consider whether the

5    government has proved beyond a reasonable doubt that the

6    conspiracy charged in this Count One existed.

7          If upon consideration of all the evidence, direct and

8    circumstantial, you find beyond a reasonable doubt that the

9    minds of two or more of the conspirators met.  That is, they

10   agreed as I have explained a conspiratorial agreement to you to

11   work together in furtherance of the unlawful object charged in

12   the indictment, then proof of existence of the conspiracy is

13   established.

14         If you are satisfied that the government has proved

15   the existence of the alleged conspiracy, you must consider

16   whether the government's proved the second element, whether the

17   defendant participated in the conspiracy with knowledge of its

18   unlawful purpose and with an intent to aid in the accomplish of

19   its unlawful objective.  Briefly, stated, the murder-for-hire

20   of members of a rival music management business.

21         In this regard, the government must prove beyond a

22   reasonable doubt that the defendant unlawfully, knowingly and

23   willfully entered into the conspiracy with a criminal intent.

24   That is with a purpose to violate the law and that is the

25   defendant agreed to take part in the conspiracy to promote and

HBSAAROS6                    Rebuttal – Enzer

1    cooperate in its unlawful objective.

2             An act is done knowingly and willfully if it's done

3    deliberately and purposefully.  That is, the acts of the

4    defendant must have been the product of his conscious objective

5    rather than the product of mistake or an accident or mere

6    negligence or some other innocent reason.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              The term "unlawfully" means contrary to law.  The

2    defendant does not have to be aware that he was breaking any

3    particular law or any particular rule.  The defendant need have

4    been aware only of the generally unlawful nature of his acts.

5              Now, obviously science has not yet devised a way of

6    looking into someone's mind and knowing what that person is or

7    was thinking.  A defendant's knowledge is a matter of inference

8    from the facts that have been proved.  To become a member of

9    the conspiracy, the defendant need not have known the

10   identities of each and every other member, nor need he have

11   known of all of their activities.  Moreover, the defendant need

12   not have been fully informed as to all of the details or the

13   scope of the conspiracy in order to justify an inference of

14   knowledge on his part.  The defendant need not have been a

15   person who agreed to make or to receive a payment in exchange

16   for the commission of murder.  Proof of a financial interest in

17   the outcome is not essential, but if you find that a defendant

18   had such an interest, that is a factor you may consider in

19   determining whether the defendant was a member of the

20   conspiracy.

21             The duration and extent of a defendant's participation

22   has no bearing on the issue of a defendant's guilt.  Each

23   member of a conspiracy may perform separate and distinct acts

24   and may perform them at different times.  Some conspirators

25   play major roles, while others play only minor parts.  An equal

1    role is not what the law requires.  In fact, even a single act

2    may be sufficient to draw a defendant within the ambit of a

3    conspiracy.

4            A defendant need not have joined the conspiracy at its

5    inception.  He or she may have joined it at any time, and if he

6    or she joined, he or she still will be held responsible for the

7    acts done before or after he or she joined.  In the case of a

8    conspiracy to commit murder for hire that results in death,

9    however, the latest time at which a person can join the

10   conspiracy is the time of the victim's death.

11           However, I want to caution you that mere association

12   does not make a person a member of a conspiracy, and even when

13   coupled with knowledge that a crime is taking place, a person

14   may know or be friendly with or related to a criminal without

15   being a criminal himself.  Mere presence at the scene of a

16   crime, even when coupled with knowledge that a crime is taking

17   place, is not enough to support a conviction.  Moreover, mere

18   knowledge of or acquiescence without participation in an

19   unlawful plan is not sufficient.  Finally, the fact that the

20   acts of a defendant without knowledge merely happened to

21   further the purposes or objectives of a conspiracy does not

22   make a defendant a member.

23           What's necessary is that defendant must have

24   participated with knowledge of the unlawful purpose of the

25   conspiracy, in this case, the commission of the crime of murder

for hire as I'll explain that concept to you, and with the

intention of aiding in the accomplishment of its unlawful

objective, in this case the commission of such murder for hire.

In sum, then, the government must prove beyond a

reasonable doubt that the defendant, with an understanding of

the unlawful nature of the conspiracy, intentionally engaged,

advised or assisted the conspiracy in order to promote its

unlawful goal.  The defendant thereby becomes a knowing and

willing participant in the unlawful agreement -- that is to

say, a conspirator.

A conspiracy, once formed, is presumed to continue

until either its objective is accomplished or there is some

affirmative act of termination by its members.  So, too, once a

person is found to be a member of the conspiracy, he or she is

presumed to continue membership in the venture until its

termination or unless it is shown by some affirmative proof

that he or she withdrew and disassociated from it.

The conspiracy charged in Count One of the indictment

is alleged to have existed from at least on or about March 20,

2007, up and to including in or about September 2009.

It is not essential that the government prove that the

alleged conspiracy started and ended on any specific date.  The

law requires only a substantial similarity between the dates

alleged in the indictment and the dates established by the

evidence.

1              If you find that the government proved each of the two

2     elements that I have described beyond a reasonable doubt, then

3     you should find the defendant guilty of the crime charged in

4     Count One.

5              If, however, you are not satisfied as to the existence

6     of both of the elements, then you may not find the defendant

7     guilty on Count One.  You must in that event find him not

8     guilty on Count One.

9              That brings me to Count Two, which charges that on or

10    about September 27, 2009, the defendant committed the crime of

11    murder for hire of Lowell Fletcher resulting in the death of

12    Lowell Fletcher.

13             Again I read from the indictment:

14    "On or about September 27, 2009, in the Southern

15    District of New York and elsewhere, James Rosemond, also known

16    as Jimmy the Henchman, the defendant, willfully and knowingly

17    traveled in and caused another to travel in interstate commerce

18    and used and caused another to use the mail and a facility of

19    interstate commerce with intent that a murder be committed in

20    violation of the laws of a state and the United States, as

21    consideration for the receipt of and as consideration for a

22    promise and agreement to pay a thing of pecuniary value, to

23    wit, Rosemond, and others, known and unknown, paid others,

24    known and unknown, to murder Lowell Fletcher, in exchange for

25    narcotics and money, which arrangements depended in part upon

Hbsnros7                    Charge

communications through a facility of interstate commerce, and
which resulted in the death of Lowell Fletcher."

With respect to the murder for hire charge, you should
be aware that there are two alternative theories on the basis
of which you may find the defendant guilty.  While I will
explain both theories in detail, I want to just take a quick
second to outline them in the briefest terms so you can better
follow what I'm about to say.

The government's first theory is that the defendant
either committed or caused someone else to commit the crime of
murder for hire.  I'm going to refer to that theory for short
as a theory that relates to a claim that the defendant is
guilty of murder for hire as a principal.  "Principal" is the
key word there, so you follow what comes.

The second theory is that someone other than the
defendant committed the crime of murder for hire and that the
defendant aided and abetted the commission of that crime.  I'll
refer to that second theory as a claim that the defendant is
guilty of murder for hire as an aider and abettor.

So now I return to the first theory of liability,
liability as a principal.

In order to prove that the defendant himself committed
or caused someone else to commit the crime of murder for hire
of Lowell Fletcher, the government must establish beyond a
reasonable doubt each of the following three elements of the

offense:

First, that the defendant used or caused someone else to use, a facility of interstate commerce -- I should say interstate or foreign commerce.

Second, that the defendant did so with the intent that Lowell Fletcher be murdered in violation of the laws of any state or the United States; and,

Third, that the defendant intended that the murder of Lowell Fletcher be carried out in exchange for something of pecuniary value or a promise or agreement to pay something of pecuniary value.

Please note that proof of the crime of murder for hire does not require that anyone in fact be murdered. The crime of murder for hire has been committed if each of the three elements I just outlined is proven. In other words, if the government proves beyond a reasonable doubt that the defendant used or caused someone else to use a facility of interstate or foreign commerce with the intent that Lowell Fletcher be murdered in exchange for something of value, I will now explain each of these three elements in a little bit more detail.

The first element that government has to prove beyond a reasonable doubt on this principal theory is that the defendant used, or caused someone else to use, a facility of interstate or foreign commerce to facilitate or further the commission of the crime of murder for hire. That need not have

1    been the only reason or even the principal reason for the use

2    of a facility of interstate or foreign commerce, but it needs

3    to have been one of the reasons for that use.

4            What's a "facility of interstate or foreign commerce"?

5            That term includes certain means of communication or

6    transportation.  Using the Internet, making or receiving a

7    telephone call, whether a cell phone or a landline, and sending

8    or receiving a text message or sending or receiving an e-mail

9    all are uses of facilities of interstate or foreign commerce

10   regardless of whether the particular communication crossed a

11   state line.  So, too, is traveling on any portion of the

12   interstate highway system, even if the use of the highway does

13   not involve crossing a state line.

14           To meet its burden of proof on this element, the

15   government need prove beyond a reasonable doubt only that the

16   defendant either himself used or caused someone else to use a

17   facility of interstate or foreign commerce.

18           The second element that the government must prove on

19   this first theory of liability beyond a reasonable doubt is

20   that the defendant acted with the intent that Lowell Fletcher

21   be murdered in violation of the laws of the State of New York

22   in using, causing someone else to use -- I should have included

23   the word "or" -- using or causing someone else to use a

24   facility of interstate or foreign commerce.  I instruct you

25   that under the laws of New York a murder occurs when a

Hbsnros7                    Charge

defendant with intent to cause the death of another person

causes the deaths of that person.  Under New York law, a person

acts with intent to cause the death of another when the

person's conscious objective or purpose is to cause the death

of another, regardless of whether or not the person who dies is

the same person whose death was intended to be caused.

          In order to satisfy this element, the government does

not have to prove that the murder was committed or even that it

was attempted, as I said.  It must prove, however, that the

defendant acted with the intent to further or facilitate the

commission of such a murder in using or causing the use of a

facility of interstate commerce.

          You thus are being asked to look into the mind of the

defendant and to ask what was the purpose of the defendant in

using or in causing another to use a facility of interstate or

foreign commerce?  You may determine that intent from all the

evidence that's been placed before you, including any

statements of the defendant as well as his conduct both before

and after the use of interstate facilities.

          The third and final element that the government must

prove beyond a reasonable doubt in order to convict on Count

Two on the first of the two theories is that the intent was

that Lowell Fletcher be murdered in exchange for something of

value.

          This requires that the government prove that there was

Hbsnros7                    Charge

a mutual agreement, understanding, or promise that something of

value would be exchanged for committing the intended murder.

"Anything of value" or "something of value" includes, for

example, any amount of money, drugs or other property.

Now, that concludes my instructions on the first of

the two theories on which the defendant may be convicted on

Count Two.

If you all agree that the government has proven the

defendant guilty beyond a reasonable doubt on Count Two on this

theory, the principal theory, the first of the two theories,

you need not consider the second theory at all.  In that case

you will forget about the second theory, and move on to Count

Three.  But if you do not convict the defendant on this first

theory, you then will consider the second theory with respect

to Count Two, which is called aiding and abetting.

It's not necessary that the government show that the

defendant himself committed or caused someone else to commit

the crime of murder for hire as charged in Count Two in order

for you to find the defendant guilty on Count Two.

If the government proves beyond a reasonable doubt

that the defendant aid and abetted another to commit the

offense charged in Count Two, the defendant is just as guilty

of that offense as if he committed it himself.

In order to convict the defendant as an aider and

abettor, the government must prove beyond a reasonable doubt

two elements:

First, it must prove that a person other than the defendant and other than some person he caused to do so, committed the crime charged.

Now, obviously, nobody can be convicted of aiding and abetting the criminal acts of another person if that other person committed no crime in the first place.

Accordingly, if the government has not proved beyond a reasonable doubt that someone other than the defendant committed the crime charged in Count Two, then you need not consider the second element under this theory, this aiding and abetting theory. But if you do find that a crime was committed by someone other than the defendant, and someone other than a person he caused to commit the crime, then you must consider whether the defendant aided or abetted the commission of that crime.

The second element on the aiding and abetting theory is this: The government, to satisfy the second element, must prove that the defendant willfully and knowingly associated himself in some way with the crime and that he willfully and knowingly engaged in some affirmative conduct or some overt act for the specific purpose of bringing about that crime. Participation in a crime is willful if it's done voluntarily and intentionally and with the specific intent to do something which the law prohibits.

As I said I think a moment ago, the mere presence of a
defendant where a crime is being committed, even coupled with
knowledge by a defendant that a crime is being committed, or
merely associating with others who are committing a crime is
not enough to establish aiding and abetting.  One who has no
knowledge that a crime is being committed or is about to be
committed but inadvertently does something that aids in the
commission of that crime is not an aider and abettor either.
An aider and abettor must know that the crime is being
committed and act in a way that is intended to bring about the
success of the criminal venture.

To determine whether a defendant aided or abetted the
commission of the crime with which he's charged, ask yourself
these questions:

Did he participate in the crime charged as something
he wished to bring about?

Did he knowingly associate himself with the criminal
venture?

Did he seek by his actions to make the criminal
venture succeed?

If he did, then the defendant is an aider and abettor.

If, on the other hand, your answer to any one of those
questions is no, then the defendant is not an aider and
abettor.

Now, I understand that, depending on your view of the

evidence, there may be a subtle distinction to whether the

defendant is guilty, if at all, as a principal or an aider and

abettor.

The question is what's the difference between a

defendant causing someone else to commit a crime as opposed to

aiding and abetting someone else to do so.

If this question should come up in your deliberations,

you should think of it in terms of the difference between

causing someone to do something versus facilitating or helping

someone to do it. If you're persuaded beyond a reasonable

doubt that the defendant caused someone else to commit the

crime of murder for hire, you should convict him as a

principal. If, on the other hand, you are persuaded beyond a

reasonable doubt that the defendant, with the knowledge and

intent that I have described, sought by his actions to

facilitate or assist that other person in committing the crime,

then he's guilty as an aider and abettor.

If you find beyond a reasonable doubt that the

government has proved that another person actually committed

the crime of murder for hire of Lowell Fletcher and that the

defendant aided and abetted that person in the commission of

that offense, you should find the defendant guilty of Count Two

on an aiding and abetting theory. If, however, you do not so

find, you should find the defendant not guilty on Count Two and

move on to Count Three.

Hbsnros7                    Charge

1          However, before we get to Count Three, I'm going to

2     ask Rachel to distribute the verdict form to you and to counsel

3     so you will better understand what I am about to tell you as

4     the last part of my instructions on Counts One and Two, which

5     is more than halfway through my instructions on the law.

6          While Rachel is doing that, the verdict form is a very

7     simple document on the whole.  For each count, Count One, Two,

8     Three, and Four, it asks whether you find the defendant guilty

9     or not guilty, but there are two other questions on this form,

10    and I am going to explain them to you now.

11         Now, if we don't have enough -- do we have enough?

12         THE LAW CLERK:  Yes.

13         THE COURT:  OK.

14         Now, everybody have one or one you can look at?

15         OK.  Great.

16         Now, as you know, the government contends that Lowell

17    Fletcher, in fact, was murdered in furtherance of the

18    conspiracy charged in Count One and as a result of the murder

19    for hire charged in Count Two.  Nevertheless, as I instructed

20    you earlier, the government does not have to prove that Lowell

21    Fletcher actually was murdered in order to convict on either

22    Count One or Count Two.  That said, this indictment charges

23    that the crimes charged in Counts One and Two "resulted in the

24    death of Lowell Fletcher."

25         For that reason, I am going to be submitting to you,

Hbsnros7                    Charge

and you will see them on the verdict form, two special

questions, Questions 1A and 2A on the verdict form.

            Now, this is important.  The instructions are printed

on the verdict form, and they will be in my written

instructions that go into the jury room.  It's important that

you follow them.

            You will answer Question 1A if and only if you find

the defendant guilty on Count One.

            You will answer Question 2A if and only if you find

the defendant guilty on Count Two.

            If you find him not guilty on both Count One and Count

Two, you will not answer either of the special questions, 1A or

2A.

            This reminds me of high school getting ready for the

SAT exams.  You do have to pay attention to the instructions.

            Question 1A asks whether the government has proved

beyond a reasonable doubt that the conspiracy charged in Count

One resulted in the death of Lowell Fletcher.  You will answer

it yes or no as appropriate, if you answer it at all.

            Question 2A asks whether the government has proved

beyond a reasonable doubt that the murder for hire charged in

Count Two resulted in the death of Lowell Fletcher.  You will

answer yes or no if you answer it at all.

            Of course, your answer has got to be unanimous in

either case.

Hbsnros7                       Charge

1          OK.  That's Counts One and Two.  We are done with that

2     part.

3          I turn to Count Three.

4          The first thing I need to tell you is that you are

5     going to consider Count Three if and only if you have found the

6     defendant guilty of participating in the conspiracy to commit

7     murder for hire that is charged in Count One.

8          So, if you acquit the defendant on Count One, that is,

9     if you find him not guilty on Count One, the conspiracy count,

10    you are going to skip Count Three.

11         Count Three charges the defendant with using,

12    carrying, or possessing firearms or causing another to use,

13    carry or possess firearms in connection with the murder for

14    hire conspiracy charged in Count One.

15         Count Three charges the defendant also with aiding and

16    abetting the use or carrying of a firearm during and in

17    relation to the murder for hire conspiracy charged in Count

18    One.

19         I am now going to read from Count Three of the

20    indictment.

21         "From at least on or about March 20, 2007, up to and

22    including on or about September 27, 2009, in the Southern

23    District of New York, James Rosemond, also known as Jimmy the

24    Henchman, the defendant, and others known and unknown, during

25    and in relation to a crime of violence for which he may be

prosecuted in a court of the United States, namely, the offense

charged in Count One of this indictment, knowingly did use and

carry firearms and in furtherance of such crime did possess

firearms and did aid and abet the use, carrying, and possession

of firearms, at least one of which firearms was discharged."

Now, on Count Three there are also two theories of

liability, alternative theories of liability on the basis of

which you may find the defendant guilty.

The first is that the defendant himself unlawfully

used, carried, or possessed a firearm in relation to or in

furtherance of the conspiracy alleged in Count One or caused

another to do so.

The second is that the defendant aided and abetted

someone else who unlawfully used, carried, or possessed a

firearm in relation to or in furtherance of the conspiracy

alleged in Count One.

As to the first theory of liability, in order to prove

that the defendant himself unlawfully used, carried, or

possessed a firearm in relation to or in furtherance of the

conspiracy charged in Count One, or caused another to do so,

the government must prove beyond a reasonable doubt the

following two elements:

First, that at any point during the period from at

least on or about March 20, 2007, up to and including on or

about September 27, 2009, the defendant knowingly used or

Hbsnros7                         Charge

carried or possessed a firearm or knowingly caused another to do so;

Second, that the defendant used or carried the firearm during and in relation to the murder for hire conspiracy charged in Count One or possessed the firearm in furtherance of that crime, or, in either case, that he caused another to do so.

Let me explain these elements.

The first element the government must prove beyond a reasonable doubt is that the defendant knowingly used, carried, or possessed a firearm during the period charged in Count One of the indictment or caused another to do so.

So now let me define terms.

A firearm means any weapon which will or is designed to or readily may be converted to expel a projectile by the action of an explosive, or the frame or receiver of any such weapon. It doesn't matter whether the firearm was operable at the time the defendant possessed it.

"Use" of a firearm means active employment of a firearm by the defendant. This does not mean that the defendant necessarily must have actually fired or attempted to fire the weapon, although those obviously would constitute uses of the weapon. Brandishing or displaying or even referring to the weapon so that others know that the defendant has the firearm available if needed all constitute use of a firearm.

Hbsnros7                    Charge

But the mere possession of a firearm at or near the site of a

crime without active employment as I just described it is not

enough to constitute use of the firearm.

          Now, "carrying" a firearm is different from "use."

While use requires active employment of a firearm, carrying

does not.  A defendant carries a firearm when he has the weapon

within his control in such a way that it furthered the

commission of the murder for hire conspiracy.  The defendant

did not necessarily have to hold the firearm physically, that

is, to have had actual possession of the firearm on his person.

If you find that the defendant had dominion and control over

the place where the firearm was located and had the power and

the intention to exercise control over it in such a way that

furthered the commission of the murder for hire conspiracy, you

may find that the government has proved that the defendant

carried the firearm.

          The legal concept of "possession" may differ from the

everyday use of the term, so I need to explain that to you

also.  Actual possession is what most of us think of as

possession, that is, having physical custody or control of an

object in the sense that I possess this pen that I am holding

up in front of me.  If you find that the defendant had the

firearm on his person you therefore may find that he had

possession of it.

          But a person does not have to have had actual physical

possession, that is, physical custody of an object, in order to
be in legal possession of it.  If an individual has the ability
to exercise substantial control over an object, even if the
individual doesn't have the object in his physical custody at a
given moment and that person has the intent to exercise such
control, then the person is in legal possession of that
article.  We lawyers and judges call that "constructive
possession," but legally, it's possession, whether it's actual
or constructive.  Control over an object may be demonstrated by
the existence of a working relationship between one person
having the power or the ability to control the item and another
person who has actual physical custody.  The person having
control possesses the object because that person has an
effective working relationship with whoever has actual physical
custody and because he can direct the movement or transfer or
disposition of the object.

        Let me give you a couple of examples of possession.

        Actual possession is the most simple.

        First, the way we use the word every day.  The example
here is the pen that I held up a minute ago.

        As for constructive possession, here's a good example:
Let's say I loaned a book to one of my law clerks.  Rachel
sitting over there, my law clerk, has immediate physical
control of the book.  It's in her hand, so she has actual
possession of it.  But if my law clerk would bring me the book

1   or do whatever else I might want her to do with it, I too would

2   have possession through my relationship with Rachel, my law

3   clerk.

4           Possession of a firearm means that the defendant

5   either had physical possession of the firearm or that he had

6   the power and intention to exercise control over the firearm.

7           Now, the government must prove also beyond a

8   reasonable doubt that the defendant knew that what he was

9   carrying or using was a firearm as that term is generally used

10  and that he acted willfully.

11          You will recall that I instructed you earlier that to

12  determine that someone acted knowingly requires that you make a

13  finding as to the person's state of mind. An act is done

14  knowingly if it's done purposefully and voluntarily, as opposed

15  to mistakenly or accidentally. For the government to satisfy

16  this element, it must prove that the defendant knew what he was

17  doing -- for example, that he knew that he was carrying or

18  using a firearm during and in relation to the commission of the

19  murder for hire conspiracy. It's not necessary, however, for

20  the government to prove that the defendant knew that he was

21  violating any particular law.

22          Now, before I go on to the second element, I think

23  it's time for me to have a seat for a while, if you'll bear

24  with me. This was Andy's wonderful idea, and it helps.

25          The second element the government must prove beyond a

reasonable doubt with respect to Count Three is that the

defendant used or carried a firearm during and in relation to

the murder for hire conspiracy in Count Two, or that he

possessed a firearm in furtherance of that crime, or, in either

case, that he caused another to do so.

The phrase "in relation to" means that the firearm

must have had some purpose or effect with respect to the

charged conspiracy.  The firearm's presence or involvement

cannot have been the result of an accident or coincidence.

The phrase "in furtherance of a crime" means that the

possession of the firearm was incident to and an essential part

of the charged conspiracy.  The mere possession of the firearm,

even at the scene of the murder, is not sufficient under this

definition.  The firearm must have played some part in

furthering the crime to meet this definition.

Those remarks conclude my instructions on the first of

the two theories on which the defendant may be convicted Count

Three.

If you all agree that the government has proved each

of those two elements beyond a reasonable doubt, then you

should find the defendant guilty on Count Three on this theory,

and you need not consider the aiding and abetting theory.

In that case, you will skip aiding and abetting and

move on to Count Four.  But if you do not convict the defendant

on this theory, you will consider the second theory, aiding and

abetting.

You should find the defendant guilty of Count Three if you find beyond a reasonable doubt that the government has proved that another person actually unlawfully used, carried, or possessed a firearm in relation to or in furtherance of the conspiracy charged in Count One, and that the defendant aided or abetted that person in the commission of the offense.

You should use the instructions I gave you on aiding and abetting liability in relation to Count Two, but I need to give you an additional instruction that applies to aiding and abetting the use, carrying, or possession of a firearm.

To convict the defendant on a theory of aiding and abetting another's use, carrying, or possession of a firearm in relation to or in furtherance of the conspiracy charged in Count One, the government must establish also that the defendant actively participated in the underlying conspiracy to commit the murder for hire of members of a rival music management business and that he did so with advance knowledge that a participant in the conspiracy would use, carry, or possess a firearm in relation to or in furtherance of the charged murder for hire conspiracy.

Now, what do I mean by actively participated? I mean that the government must prove beyond a reasonable doubt that the defendant did something to participate actively in the conspiracy charged in Count One, that is to say the conspiracy

1    to murder for hire members of a rival music management

2    business, resulting in the death of Lowell Fletcher.

3         The defendant does not need to have facilitated every

4    part of the criminal venture charged in Count Three in order to

5    be found guilty as an aider and abettor.  Furthermore, the

6    defendant does not need to have done something to further

7    another's use, carrying, or possession of a firearm in relation

8    to or in connection with the conspiracy charged in Count One.

9    As long as the defendant facilitated some part of the

10   underlying murder for hire conspiracy, for example, by ordering

11   the alleged murder for hire, he will be deemed to have

12   satisfied the active participation requirement for aiding and

13   abetting liability.

14        As to the second part, in order for the defendant to

15   have had advance knowledge of another's use, carrying, or

16   possession of a firearm in relation to or in furtherance of the

17   murder for hire conspiracy, the defendant needs to have had

18   that knowledge at a point before the commission of that crime

19   when the defendant still had the opportunity to walk away from

20   participating in the offense if he chose to do so.  If a

21   defendant who has an opportunity to walk away from

22   participating in an offense chooses to continue to participate

23   in the offense after learning that another participant will

24   use, carry, or possess a firearm in relation to or in

25   furtherance of a murder for hire conspiracy, that defendant has

Hbsnros7                          Charge

the advance knowledge required to make him an aider and abettor
of the crime.

         I remind you that knowledge, like other elements of a
crime, can be proved either directly or by circumstantial
evidence.  The government is not required to prove knowledge by
direct evidence.

         If you find beyond a reasonable doubt that the
government has proved that another person actually committed
the crime charged in Count Three and that the defendant aided
or abetted that person in the commission of the offense, you
should find the defendant guilty of Count Three on an aiding
and abetting theory.  If, however, you do not so find, you
should find the defendant not guilty on Count Three and move on
to Count Four.

         Now, as I read from the indictment with respect to
Count Three, you may remember the indictment alleges that the
firearm that was allegedly used, carried, or possessed was
discharged.  The government does not have to prove that any
firearm was discharged for you to convict the defendant on
Count Three.  But, that said, the indictment alleges that a
firearm was discharged, so I'm submitting to you again on the
verdict form a special question asking whether you find beyond
a reasonable doubt that at least one of the firearms used,
carried, or possessed in relation to or in furtherance of the
conspiracy charged in Count One actually was discharged in

Hbsnros7                    Charge

1    connection with that crime.  That special question is question

2    3A.  You will answer question 3A if and only if you find the

3    defendant guilty on Count Three on either of the two theories

4    of liability I've discussed already.

5             If, on the other hand, you find that the government

6    has not proved beyond a reasonable doubt that the defendant is

7    guilty of the Count Three, you should skip question 3A and go

8    on to Count Four.

9             The first thing I need to tell you about Count Four is

10   that you will consider Count Four if and only if you found the

11   defendant guilty of Count Two.

12            If you find him not guilty on Count Two, you will skip

13   question 4, and indeed at that point you will be done.

14            Count Four charges the defendant with using or

15   carrying a firearm during and in relation to or possessing a

16   firearm in furtherance of a crime of violence that can be

17   prosecuted in a federal court -- specifically, the murder for

18   hire of local Fletcher that's charged in Count Two -- and that

19   in the course of committing that crime of violence caused the

20   murder of a person through the use of a firearm or caused

21   another to do so.  Count Four charges the defendant also as an

22   aider and abettor.

23            As I now read from the indictment, Count Four charges

24   specifically, and I quote:

25            "On or about September 27, 2009, in the Southern

Hbsnros7                    Charge

District of New York, James Rosemond, also known as Jimmy the
Henchman, the defendant, and others known and unknown, during
and in relation to a crime of violence for which they may be
prosecuted in a court of the United States, namely, the offense
charged in Count Two of the indictment, willfully and knowingly
did use and carry a firearm, and, in furtherance of such crime,
did possess a firearm and did aid and abet the use, carrying,
and possession of a firearm, and in the course of that crime
did cause the death of a person through the use of a firearm,
which killing is murder as defined in Title 18, United States
Code, Section 1111(a); to wit, Rosemond and others caused the
death of Lowell Fletcher, who was shot and killed in the
vicinity of Jerome Avenue and Mt. Eden Avenue in the Bronx, New
York."

          Now, as I indicated, you must not consider Count Four
unless you first have determined that the defendant is guilty
on Count Two.  However, if you convict the defendant on Count
Two, you must then consider whether the government has proved
beyond a reasonable doubt that the defendant is guilty of Count
Four.  On this Count Four there are two theories of liability
on the basis of which you may find the defendant guilty.

          The first is that defendant himself committed murder
through the use of a firearm or caused another to do so in
relation to or in furtherance of the murder for hire alleged in
Count Two.

1              The second is that the defendant aided and abetted

2    someone else who committed murder for hire through the use of a

3    firearm in relation to or in furtherance of the murder for hire

4    alleged in Count Two.

5              To prove the defendant guilty of the Count Four on the

6    first theory of liability, the government must prove each of

7    the following elements beyond a reasonable doubt:

8              First, that or on about September 27, 2009, the

9    defendant used, carried, or possessed a firearm or caused

10   another to do so.

11             Second, that the defendant used or carried the firearm

12   during and in relation to the murder for hire of Lowell

13   Fletcher charged in Count Two, or possessed a firearm in

14   furtherance of such crime or caused another to do so;

15             Third, the defendant caused the death of a person

16   through the use of a firearm or caused another to do so;

17             Fourth, the death of Lowell Fletcher was murder as I

18   will define that term for you in a moment;

19             Fifth, that the defendant acted knowingly, unlawfully,

20   and willfully in using or carrying a firearm (or in causing

21   another to use or carry a firearm) during and in relation to,

22   or in possessing (or in causing another to possess) a firearm

23   in furtherance of the murder for hire of Lowell Fletcher

24   charged in Count Two.

25             Let me talk about the first element, which requires

the government to prove beyond a reasonable doubt that on or
about September 27, 2009, the defendant used, carried, or
possessed a firearm or caused another to do so.

I previously defined the terms "firearm," "use,"
"carry," and "possess" in Count Three.  You apply those
definitions here.  I won't repeat them.

The second element of Count Four that the government
must prove beyond a reasonable doubt is that the use or
carrying of a firearm occurred during and in relation to the
substantive murder for hire charged in Count Two or that the
possession of a firearm was in furtherance of -- which means
incident to and an essential part of -- the substantive crime
for murder for hire charged in Count Two.

I previously explained the terms "in relation to" and
"in furtherance of" in Count Three.  You will apply those
definitions here, too.

The third element of Count Four that the government
must prove beyond a reasonable doubt is that the defendant
caused the death of a person through the use of a firearm or
caused another to do so.

A person causes the death of another if his conduct
has such an effect in producing that individual's death as to
lead a reasonable person to regard the defendant's conduct as a
cause of death.

The death of a person may have one or more than one

1    cause.

2              You need not find that the defendant shot the victim

3    or that he committed the final fatal act in order to find that

4    his conduct was a cause of death.  The government need prove

5    only that the conduct of the defendant was a substantial factor

6    in causing the victim's death.

7              The fourth element the government must prove beyond a

8    reasonable doubt is that the death of Lowell Fletcher

9    constituted murder.  For purposes of Count Four, murder is the

10   unlawful killing of a human being with malice aforethought.

11   Every murder perpetrated by lying in wait or any other kind of

12   willful, deliberate, malicious, and premeditated killing or

13   committed in the perpetration of or attempt to perpetrate any

14   arson or perpetrated from a premeditated design unlawfully and

15   maliciously to effect the death of any human being other than

16   him who is killed is murder.

17             Malice is the state of mind that would cause a person

18   to act without regard to the life of another.  A killing is

19   done with malice aforethought if it is done deliberately and

20   consciously and with the intent to kill another person.  The

21   government, however, need not prove a subjective intent to

22   kill.  It would be sufficient to satisfy this element if the

23   government proved reckless and wanton conduct on the part of

24   the defendant which grossly deviated from a standard of care

25   such that he was aware of the serious risk of death.

1          In order to establish this element, the government

2     must prove also that the defendant acted willfully, with a bad

3     or evil purpose to violate the law.  However, the government

4     need not prove spite, malevolence, hatred, or ill will toward

5     Lowell Fletcher.

6          Finally, I note that this definition of murder is a

7     little bit different than the definition of murder that I

8     instructed you upon when I explained Count Two.  If anybody

9     wants to know why when the case is over, I will be happy to

10    explain it.  But, trust me, that's the way it is.  You should

11    take care to use this definition when you consider whether the

12    defendant is guilty or not of Count Four.

13         The final element the government must prove beyond a

14    reasonable doubt in order to convict on Count Four on the first

15    of the two alternative theories is that the defendant knew that

16    he was using, carrying, or possessing a firearm, and that he

17    acted willfully in doing so.  To satisfy this element, the

18    government must prove that the defendant knew that what was

19    being carried or used was a firearm as that term is generally

20    understood.

21         As I mentioned earlier, an act is done knowingly if

22    it's done purposely and voluntarily, as opposed to mistakenly

23    or accidentally.  The government must prove that the defendant

24    knew what he was doing -- for example, that he knew that he was

25    carrying or using a firearm, or causing another to do so, in

1    the commission of the murder for hire of Lowell Fletcher.  It

2    is not necessary, however, for the government to prove that the

3    defendant knew that he was violating any particular law.

4           Now that concludes my instructions on the first of the

5    two theories on which the defendant may be convicted on Count

6    Four.

7           If you all agree that the defendant has proved -- I

8    misspoke.  If you all agree that government has proved the

9    defendant guilty beyond a reasonable doubt on Count Four on

10   this first theory, you will not consider the second theory,

11   which is aiding and abetting.  But if you do not convict the

12   defendant on the first theory, you will consider the second

13   theory, aiding and abetting.

14          You should find the defendant guilty of Count Four if

15   you find that the government has proved beyond a reasonable

16   doubt that another person actually committed murder through the

17   use of a firearm during and in relation to or in furtherance of

18   the murder for hire of Lowell Fletcher and that the defendant

19   aided or abetted that person in the commission of the offense.

20          If you consider this second theory of liability, you

21   should use the instructions I gave you earlier on aiding and

22   abetting liability in Count Two and the additional instructions

23   as to active participation and advance knowledge that I gave

24   you with respect to Count Three.

25          If you find beyond a reasonable doubt that the

Hbsnros7                    Charge

government has proved that another person actually committed

the crime charged in Count Four and that the defendant aided or

abetted that person in the commission of that offense, you

should find the defendant guilty of Count Four on an aiding and

abetting theory.  If, however, you do not so find, you should

find the defendant not guilty on Count Four.

You will note that the indictment charges that certain

act occurred on or about various dates.  It doesn't matter if

the evidence you heard at trial indicates that a particular act

occurred on a different date.  The law requires only a

substantial similarity between the dates alleged in the

indictment and the dates established by the evidence.

Now, folks, those are the instructions on the law.

What remains is to talk to you about the trial

process, how you go about evaluating the evidence, and the

conduct of your deliberations.

I haven't intended to do this, but frankly I could use

a ten-minute break.  I am sure you could.

The rest is all important also, but it's not quite as

heavy going in terms of legal doctrine as what you have been

listening to, and I think it will in that respect be easier.

So, ten minutes, and we will go on.

(Recess)

1          (Jury present)

2          THE COURT:  OK.  Defendant and the jurors all are

3     present as defendant has been throughout.

4          OK.  So, let's get on to talk about the trial process.

5          I told you on day one that you are the sole and

6     exclusive judges of the facts.  I don't mean to indicate any

7     opinion about the facts or about what your verdict should be.

8     The rulings I've made during the trial, any questions that I've

9     asked if I did that usually do but I don't remember in this

10    case and any comments I may have made to the lawyers in

11    managing the trial are no indication of any views I might have

12    as to what the decision ought to be in this case or as to

13    whether or not the government has proved its case.

14          You're obliged as I told you at the start of the trial

15    to accept these instructions on the law and apply them to the

16    facts that you find the evidence to prove the facts regardless

17    of whether or not you agree with my instructions.  You're not

18    to show any prejudice against an attorneys or attorney's client

19    because the attorney objected to the admissibility of evidence

20    or asked for a side bar or asked me to rule on points of law.

21    In addition, the fact that I might have asked questions or made

22    comment to counsel was not intended to suggest that I believed

23    or didn't believe any witness or witnesses or have any views at

24    all about how this case should come out.

25          You are to disregard entirely the fact that I may have

HBSAAROS8                    Jury Charge

asked some questions though of course if I did and if the

witness answered the questions, you may consider the answers.

Any comments I made to counsel are to be disregarded.

You should find the facts in this case without

prejudice as to any party.  The fact that the case is brought

on behalf of the United States does not entitle the government

to any greater consideration than is accorded to the defendant.

By the same token, the government is entitled to no

less consideration.  Both sides stand equal before the law.

Let's talk about your evaluation of the evidence.

The evidence in this case as I've told you and as

you've heard from counsel I think at least one of them and they

were right in this, the evidence in this case is the sworn

testimony of the witnesses, the exhibits that were received in

evidence and the stipulations between the parties.

The indictment as I told you is not evidence.  Nor is

any question, any argument or any objection by a lawyer

evidence.  Any statements that I struck or told you to

disregard must be disregarded.  It's for you alone to decide

the weight, if any, to be given to the testimony you've heard

and the exhibits you've seen.  Now there are two kinds of

evidence that you may use in reaching your verdict.  Anybody

who has watched much television in the last 30 years certainly

knows it, at least if you are addicted to lawyer shows as

believe it or not I am -- holiday far me.  One type is known as

1    direct evidence.

2         Direct evidence is when a witness testifies about

3    something the witness knows by virtue of having perceived it

4    with his own senses or her own senses, something the witness

5    saw, felt, touched, heard or I suppose in another coin of case,

6    tasted.

7         The direct evidence may also be in the form of an

8    exhibit.  Example, I'm holding up a folio of transcript.

9    Imagine it were an exhibit in this case.  Imagine it were

10   somehow relevant to know what color the backer is.  You can all

11   look at it.  You can all perceive with your senses that it's

12   red.  That's direct evidence.  The exhibit itself is direct

13   evidence of its color.  Likewise, a document is direct evidence

14   of what's in the document not necessarily the truth of what's

15   in it but the word on the printed page.

16        OK.  That's direct evidence.  Assuming the document is

17   of course in evidence.

18        The other kind of evidence is circumstantial evidence.

19   So let me tell you what that's all about.  It is evidence that

20   continues to prove some disputed fact by proof of another fact

21   or facts.  In other words, it refers to the process of

22   inferring on the basis of reason and experience and common

23   sense from one or more established fact or facts the existence

24   or nonexistence of something else.  Now, there's an example

25   that judges have been using in this court forever.  This

1    Court's been in business since 1789 and has been in business

2    within a couple of blocks of here for over 200 years and I

3    rather imagine this goes back most of the way.

4          Suppose, just imagine hard it is to believe we've all

5    been sitting here since ten o'clock this morning.  When we all

6    came in this morning it was a beautiful day, as indeed it was

7    and now night has fallen and we can't see out of the room.

8    There are shades up and suppose it felt to you to determine

9    whether the weather was still beautiful, maybe not sunny any

10   more, maybe that we can all figure out but whether it was still

11   clear.

12         Now you can't tell that by direct evidence because you

13   can't lookout the window.  Have you no idea from direct

14   evidence.  But imagine people starting walking in through those

15   doors in back with dripping umbrellas and raincoats.  Ah-hah

16   you would say.  I can see those are all wet.  They're dripping.

17   It's pretty reasonable you might think to infer from the wet

18   umbrellas and wet raincoats that the weather had changed and

19   that it was raining.  The wet and dripping umbrellas and

20   raincoats are circumstantial evidence with respect to whether

21   the weather had changed.  A process of reasoning from one to

22   the other, that's what circumstantial evidence is all about.

23         Now, the reason I take care in explaining that

24   distinction and exactly what the difference between the two

25   kinds of evidence is is because I've heard more nonsense on TV

HBSAAROS8                        Jury Charge

lawyer shows about direct and circumstantial evidence than I'd want to shake a stick at.  Much of it is wrong.  And so I have explain it to you and the punchline, the money line here is that circumstantial evidence is of no less value than direct evidence.  The general rule is that the law makes no distinction between the two.  It's simply required that you base your verdict on your conscientious and careful evaluation of all the evidence, direct and circumstantial.

Now, a word about the stipulations.  I remind you there are two kinds.  A stipulation of testimony is a stipulation that someone an imaginary John Jones or Jane Jones if called as a witness would testify X, Y and Z.  In the case of a stipulation of that kind and there were several in this case, you must accept that the witness if called would have taken the oath and sworn to what the stipulation says.  You must accept that the witness would have said that.  It's up to you however, to decide what, if any, effect you give to that testimony.  Do you buy it?  Do you think it's important or not important?  All matters for you.

There's also been a stipulation, indeed, more than one stipulation, that certain facts were agreed to be true.  In those cases as distinguished from stipulations as to what someone would have testified, you must accept the fact is true.

Just to take an example that wasn't used here if it were somehow an issue in this case what day of the week

HBSAAROS8                          Jury Charge

November 17th of this year fell on and the parties stipulated
that it was Tuesday, even though we all know it was Friday, you
would be obliged to accept that it was Tuesday for purposes of
deciding the case.  Different kind of stipulation, different
effect.

          Now of course lawyers don't normally stipulate to
facts that are blatantly wrong like that and there's certainly
no suggestion that they've done so.  Here, I'm just
illustrating the principle that in that kind of stipulation you
must accept it as true.

          OK.  Now, you've heard an awful lot in the course of
today about the credibility of witnesses and you have had the
opportunity to observe a goodly number of them.  It is now your
job to decide to the extent that it matters and you are the
judge of that, how believable each witness was in the witness's
testimony.  You are the sole judges of the credibility, in
other words believability but credibility of each witness and
of the importance of each witness's testimony.

          In making that judgment you should use your common
sense and apply all of the tests for truthfulness and accuracy
that you would apply with respect to important matters in your
everyday life.  Your decision whether or not to believe a
witness may depend on how the witness impressed you, was the
witness candid, frank and forthright or did the witness seem as
if he or she was hiding something, being evasive or suspect in

HBSAAROS8                    Jury Charge

1     some way?  How did the witness testify on direct-examination

2     compared with how the witness testified on cross-examination?

3     Was the witness consistent in his or her testimony or did the

4     witness contradict himself or herself?  Did the witness appear

5     to know what he or she was talking about?  Did the witness

6     strike you as someone who was trying to report his or her

7     knowledge accurately or not?

8            Now, if you find that any witness willfully lied to

9     you about a material matter you may either disregard all of

10    that witness's testimony or you may accept whatever part of it

11    you think deserves to be believed and disregard the rest.

12           In other words, if you find that a witness lied under

13    oath about a material fact, you can treat it as a slice of

14    toast which has been partially burned.  You can either throw

15    the whole piece of toast out or you can scrape off the burned

16    bits and eat the rest.  Ultimately, the determination of

17    whether and to what extent you accept the testimony of any

18    witness is entirely up to you.

19           In evaluating the credibility of witnesses you should

20    take into account any evidence that a witness may benefit in

21    some way from the outcome of the case.  An interest in the

22    outcome may create a motive to testify falsely and it may sway

23    a witness to testify in a way that the witness perceives as

24    advancing the witness's own interests.  Keep in mind though

25    that it doesn't automatically follow that the testimony given

HBSAAROS8                    Jury Charge

by an interested witness should be disbelieved.  It's for you
to decide based on your own perceptions and common sense to
what extent, if at all, the witness's interest has affected his
or her testimony.

Now you've heard the testimony of law enforcement
officials in this case.  Some of it you heard in person.  Other
testimony was stipulated.  The fact that a witness may be or
may previously have been employed by the government in law
enforcement doesn't mean that that witness's testimony is
necessarily more or less deserving of credit or of
consideration or of weight than any other witness.  At the same
time in considering the credibility of law enforcement
witnesses you're entitled to consider whether the testimony may
be colored by a professional or personal interest in the
outcome.  It's up to you after reviewing all the evidence
whether and to what extent to accept the testimony of law
enforcement or government employee witnesses and to give that
testimony whatever weight you think it deserves.

Now, you've heard testimony from certain government
witnesses who testified that they were actually involved in
planning and carrying out certain of the crimes charged in the
indictment.  There has been a great deal said about these
so-called cooperating or accomplice witnesses in the summations
of counsel and whether or not you should believe them.

Let me say some things about that.  Experience will

1    tell you that the government frequently must rely on the

2    testimony of witnesses who participated in the criminal

3    activity about which they testified in a trial.  For those very

4    reasons the law allows the testimony of cooperating or

5    accomplice witnesses.  In fact in federal court the law is that

6    the testimony of a cooperating or accomplice witness in itself

7    may be enough for conviction if the jury believes it proves

8    guilt beyond a reasonable doubt.  So the testimony of the

9    cooperators, the accomplice witnesses is properly considered by

10   you.  The government argues as its entitled to do that if such

11   testimony couldn't be used there would be many cases in which

12   there was real guilt and conviction should be had but in which

13   convictions would be unattainable.

14        However, the testimony of accomplice witnesses,

15   cooperators, should be scrutinized with special care and

16   caution because such witnesses may believe that it's in their

17   interests to give testimony favorable to the government.  The

18   fact that a witness is an accomplice or a cooperator can be

19   considered by you as bearing upon his or her credibility.  It

20   does not follow however that simply because a person has

21   admitted to participating in one or more crimes that the person

22   is incapable of giving a truthful version of what happened.

23        Like the testimony of any other witness, accomplice or

24   cooperator testimony should be given the weight that you think

25   it deserves in light of the facts and circumstantial before you

1    taking into account the witness's demeanor, candor, strength

2    and accuracy of recollection, their backgrounds and the extent

3    to which their testimony is or is not corroborated by other

4    evidence in the case.

5            You may consider whether an accomplice witness or a

6    cooperator or anybody else has an interest in the outcome of

7    case and if so, whether it has affected his or her testimony.

8            You heard testimony about various agreements between

9    the government and these witnesses.  I must caution you that it

10   is of no concern to you why the government made an agreement

11   with a particular witness.  Your sole concern is whether the

12   witness has given truthful and accurate testimony here in this

13   courtroom before you.  In evaluating the testimony of these

14   witnesses you should ask yourselves whether they would benefit

15   more by lying or more by telling the truth.  Was their

16   testimony made up in any way because they believed or hoped

17   that they would somehow receive favorable treatment by

18   testifying falsely or did they believe that their interests

19   would be served best by testifying truthfully?

20           If you believe that a witness was motivated by hopes

21   of personal gain, was the motivation one that would cause him

22   to lie or was it one that would cause him to tell the truth?

23   Did that motivation color the witness's testimony?  If you find

24   that the testimony was false, you should reject it.  If

25   however, after a cautious and careful examination of the

HBSAAROS8                       Jury Charge

1    testimony of such a witness and the witness's demeanor, you're

2    satisfied that the witness told you the truth, you should

3    accept it as credible and act on it accordingly.

4         As with any witness, let me emphasize that the issue

5    of credibility does not have to be decided on an all or nothing

6    basis.  Even if you find that a witness testified falsely in

7    one part you still may accept their testimony in other parts or

8    you may disregard all of it.  That's entirely up to you.

9         You've heard testimony from government witnesses who

10   pled guilty to charges arising out of the same facts that are

11   at issue in this case.  You are not to draw any conclusions or

12   inferences of any kind about the guilt of the defendant on

13   trial here from the fact that one or more prosecution witnesses

14   pled guilty to similar charges.  The decision of those

15   witnesses to plead guilty was a personal decision they made

16   about their own guilt.  It may not be used by you in any way as

17   evidence against or favorable to the defendant on trial here.

18        You've heard evidence during the trial that some

19   witnesses have discussed the facts of the case and their

20   testimony with lawyers before the witnesses appeared in court.

21   Although you may consider that when you are evaluating a

22   witness's credibility, I should tell you that there is nothing

23   either unusual or improper about a witness meeting with lawyers

24   before testifying so that the witness can be aware of the

25   subjects that the witness will be questioned about, focus on

1   those subjects and have the opportunity to review relevant

2   exhibits before being questioned about them.  Such consultation

3   helps conserve your time and the Court's time and in fact I can

4   tell you that it would be very unusual for a lawyer to call a

5   witness without such consultation.

6         Again, the weight you give to the fact or the nature

7   of the witness's preparation for testimony and the inferences,

8   if any, that you draw from such preparations are matters

9   entirely up to you.

10         We're all awake are we?

11         THE JUROR:  Yes.

12         THE COURT:  Just checking.  I rest my eyes sometimes

13   too.  Take no offense.

14         Now, you've heard reference in testimony and in the

15   arguments of counsel to the fact that certain investigative or

16   other techniques weren't used by the government.  There's no

17   legal requirement that the government prove its case through

18   any particular means.  While you are to consider carefully the

19   evidence that the government as presented, you are not to

20   speculate about why it used the techniques it did or why it

21   didn't use others.  The choice of law and techniques is not

22   your concern.

23         Now, you're all aware at this point that the defendant

24   did not testify here.  Under our Constitution a defendant never

25   is required to testify or present any evidence because it's the

HBSAAROS8                        Jury Charge

government's burden to prove a defendant guilty beyond a

reasonable doubt.  A defendant never is required to prove that

he is innocent.  You may not attach any significance at all to

the fact that the defendant didn't testify.  You may not draw

any adverse inference against the defendant because he didn't

do so.  You may not consider this in any way in your

deliberations.

        Now, you've already heard evidence that the defendant

on earlier occasions engaged in a variety of crimes or other

misconduct that are not charged in this indictment.  And you've

heard also that he was incarcerated at one point.  The

defendant is not on trial for committing those other acts or

the acts that led to the incarceration.

        Accordingly, you may not consider the evidence about

other uncharged bad acts or of prior incarceration as a

substitute for proof that he committed the crimes with which he

is charged in this case.  Nor may you consider that evidence as

proof that he has a criminal personality or a bad character.

That evidence was admitted in for limited purposes and you may

consider it only for those purposes.

        So let me explain.  The evidence you've heard

concerning an alleged narcotics organization of which the

defendant allegedly was the leader may be considered by you

only as it relates to whether the defendant was in a position

to do what the government alleges in this case he did.  For

example, order associates in his alleged drug organization to
commit a murder.  You may consider it also to explain whether,
why and how the defendant knew and trusted the people he
allegedly recruited to commit the alleged murder and how
payment was to be made for the murder.  Finally, you may
consider it to explain why and how people who allegedly were
parts of that drug organization knew and trusted one another.

You've heard evidence also concerning an alleged feud
between the defendant and his music management business Czar
Entertainment and a rival business known as G-Unit and the acts
of violence that were allegedly were part of that feud.  Apart
from the four counts of this indictment, Mr. Rosemond is not
charged in this case with crimes that may have been committed
part of that alleged feud.  Accordingly, that evidence may be
considered by you only for certain purposes.

First, you may consider it as evidence of the
background and context of Lowell Fletcher's death.  You may
consider it insofar as it establishes the relationships among
the alleged conspirators.  You may consider it also as
suggesting a motive for the defendant to commit or cause the
commission of the murder of Mr. Fletcher.

You may consider it also to explain why and how the
defendant knew and trusted the people he allegedly recruited to
commit the alleged murder and how payment was to be made for
that murder.

That evidence, all of that evidence I've just referred to may be considered by you only on the issues I've just mentioned and not for any other purpose.  Specifically, you may not consider as evidence that the defendant has a bad character or has a propensity to commit crime.

Now, some of the people who may have been involved in the offense leading to this trial obviously are not on trial here today.  You may not draw any inference favorable or unfavorable toward the government or the defendant from the fact that any person other than the defendant is not on trial in this case.  Nor may you speculate as to the reasons that is so.  Those matters are wholly outside your concern.  You may not consider them in any way in reaching your verdict as to the defendant in this case.

I should have said those "matters" are wholly outside your concern.

Your task is limited to considering the charges in the indictment and the defendant before you.

The question of possible punishment of the defendant is not a concern of you, the jury, and it should not in any sense enter into your deliberations.  The duty of imposing a sentence rests exclusively upon the Court.  Under your oath as jurors you cannot allow a consideration of punishment that may be imposed in the event of conviction to influence your verdict in any way.

1       OK.  We are now down to the last part of your

2   deliberations.

3       In just a few minutes you are going to retire to

4   decide the case.  It's your duty as jurors to consult with one

5   another and to deliberate with a view to reaching an agreement.

6   Each of you must decide the case for yourself.  But you should

7   do so only after considering the case with your fellow jurors

8   and you should not hesitate to change an opinion if you're

9   convinced that it is erroneous.  Your verdict whether guilty or

10  not guilty must be unanimous but you are not bound to surrender

11  your honest convictions concerning the effect or the weight of

12  the evidence for the mere purpose of returning a verdict or

13  solely because of the opinion of other jurors.

14      Discuss and weigh your respective opinions

15  dispassionately without regard to sympathy and without regard

16  to prejudice or favor for or against either side and come to

17  the conclusion which in your good conscious appears from the

18  evidence to be in accordance with the truth.

19      I need to say a word about your notes.  Your notes are

20  for your personal use only.  You each may consult your own

21  notes during deliberations but any not you may have taken are

22  not to be relied upon in deliberations as a substitute for the

23  collective memory of the whole jury.  Your notes should be used

24  add memory aid but should not be given precedence other your

25  independent recollection of evidence.  If you didn't take

1  notes, you should rely on your own independent recollection of

2  the proceedings and you should not be influenced by the notes

3  of other jurors.  I emphasize that notes are not entitled to

4  any greater weight than the recollection or impression of each

5  of you as to what the testimony and the evidence may have been.

6        Now as I told you, you'll be having written copies of

7  my instructions in the jury room for your reference.  You will

8  find that they contain at various points legal citations.  I

9  don't think we have a lawyer on the jury and unless we have a

10  lawyer on the jury, you're not going to understand them anyway

11  and it doesn't matter.  You are to disregard them entirely.

12  They are there for my convenience and the convenience of the

13  lawyers.  They are in affect an audit trail.  They are what I

14  relied upon in formulating each section of the instructions and

15  you must accept my instructions as correct in any event whether

16  you agree with them or not.  So they are of no concern to you.

17  Ignore them.

18        You're not to discuss the case unless all jurors are

19  present.  When you retire you should elect one member of the

20  jury as your foreperson.  That person will preside over the

21  deliberations and speak for you here in open court.  The

22  foreperson will send out any notes and when you have reached a

23  verdict will notify the officer that the jury has a verdict.

24        Let me speak to you for a brief moment about the

25  mechanics of a verdict.

HBSAAROS8                    Jury Charge

1          You also have the verdict form.  First of course,
2    follow the instructions to the letter.  They're in the written
3    charge.  They are on the verdict form.  Follow them to the
4    letter.  When you've reached a unanimous decision, you are to
5    record your answers on one copy of the verdict form.  Please do
6    not add anything that's not called for by the verdict form.  I
7    can tell you from past experience it only causes trouble.  No
8    editorial comments.  Don't answer questions that the
9    instructions dictate should not be answered.  Just check the
10   right boxes as you decide the evidence warrants.  Once you have
11   a verdict the foreperson should fill-in the form.  Then each of
12   you should review it and sign at the bottom.  The foreperson
13   should hold onto the verdict form.  Put it in an envelope.  You
14   will not give it to the officer.  The foreperson will simply
15   tell the officer there is a verdict, not what the verdict is,
16   just there is a verdict.  We will then assemble everybody in
17   court.  We'll bring you into the courtroom.  The foreperson
18   will clutch to his or her breast the envelope with the verdict
19   until I ask for it.
20         I stress to you that each of you should be in
21   agreement with the verdict when it's announced in court.  Once
22   it's announced by the foreperson in open court and officially
23   recorded it ordinarily cannot be revoked or changed.
24         Now, if during your deliberations you want me to
25   discuss further any of the instructions on the law that I've

1    given you, the procedure is that the foreperson will write a

2    note, put it in a sealed envelope, give it to the officer and

3    the note will explain in as much detail as you can what the

4    question is.

5           You will see when you get the written jury

6    instructions that every page and every line is numbered.  And

7    if the question relates to a passage in the instructions and

8    you can do so, indicate by page and line numbers what the

9    question's about and then explain the question.

10          The reason for that is that when we get a question

11    from a deliberating jury, the first thing we have to do is

12    understand what you're really driving at.  The lawyers then

13    have a right to be heard about what they think the right answer

14    is.  If they don't agree or if I don't agree, I then have to

15    decide the right answer and the more clearly I understand just

16    exactly what it is you're asking, that process will go much

17    quicker and you will be much more likely to get a precise

18    answer to just what you need to know.

19          If during your deliberations you want me to discuss --

20    I skipped something.

21          If during your deliberations want to have any

22    testimony read back or you want to see any of the exhibits, you

23    will let me know.

24          Now two different procedures.  Once you retire to

25    deliberate, the parties will go over the exhibits that are in

evidence with Andy and with one possible exception, I believe

they will be brought into the jury room for you. That may take

a little time because they have to go and make sure they've got

the right ones but they'll do their best to do it promptly.

The only exception that I have in mind though is that you saw

some video and we have to make special arrangements if we are

to send a video into the jury room because it has to go in on a

computer that we're sure is clean of anything else, and I don't

think we have one here at this moment. So if a video is

important and you want to see a video, send out a note saying

you want to see it and either we'll have a clean machine at

that point or we'll bring you in and show you the video here in

court.

        So far as testimony is concerned, you are well aware

from the summations that there is a transcript. So if you want

any testimony reviewed or want to review any testimony, the

procedure is the same as with notes. The foreperson will send

a note saying with as much precision as you can exactly what

you want to hear, what witness, what subject, direct or

cross-examination if you can remember. Just be as precise as

you can. We have to agree or I have to decide what the

relevant passage is.

        The other thing that of course has to happen is

although there is a transcript, the transcript has to be

scrubbed before we can send it in to you to eliminate colloquy

1    or any side bars that were deliberately out of your hearing.

2    You know sometimes we get a request for a read back and it's a

3    matter of giving you two pages and it takes three minutes and

4    other times there is a lot of colloquy and side bars and it

5    takes longer.  Just be aware that if there is a request like

6    that, we'll get it to you as fast as we can.  That's the best I

7    can do.

8         With respect to hours tonight, once you retire I'm

9    going -- I normally keep the lawyers here in case there's a

10   verdict or in case there's a question.  But they have had a

11   long day as we all have.  And for one hour after you retire,

12   we're not going to respond to questions and we will not take a

13   verdict for the first hour should you reach a verdict and I'm

14   not suggesting you should or shouldn't.  That's up to you.

15   Just to everybody can catch a sandwich or something.

16   Thereafter, we'll be ready to respond very promptly and we

17   won't sit later than eight o'clock and the cars are being

18   arranged and so forth.

19        OK.  I remind you folks that you have taken an oath to

20   render judgment impartially and fairly without prejudice or

21   sympathy and without fear solely on the evidence in the case

22   and the law as I've given it to you.  It would be improper for

23   you are to consider in coming to your conclusion about whether

24   the government has sustained its burden of proof, any personal

25   feelings you may have about race, religion, national origin,

HBSAAROS8                    Jury Charge

gender or age of the defendant.  If you let prejudice or

sympathy interfere with clear thinking there is a risk that you

will not arrive at a just verdict.  Both sides are entitled to

a fair trial here and you must come to a fair and impartial

decision in order that you do justice in this case.  If you

have a reasonable doubt as to the defendant's guilt you should

not hesitate for any reason to find a verdict of acquittal, in

other words, not guilty.

Indeed, if you have a reasonable doubt as to guilt on

a particular charge, you must find the defendant not guilty of

that charge.  On the other hand, if you find the government has

met its burden of proving guilt beyond a reasonable doubt, you

should not hesitate because of sympathy or any other reason to

render a verdict of guilty.

Now, counsel, are there any objections that I haven't

heard previously to the charge as I have given them?  If so,

side bar.

MR. JOHNSON-SKINNER:  One very short thing.

(Continued on next page)

1                  (side bar)

2                  MR. JOHNSON-SKINNER:  If you want to say the sentence

3     on page 49, lines eight to ten about if you communicate with

4     the Court before reaching a verdict, don't indicate how you're

5     divided.

6                  MR. TOUGER:  No objection.

7                  THE COURT:  Do you have any objections?

8                  MR. TOUGER:  Only thing I would say, your Honor, is

9     when you were doing the aiding and abetting, seemed like -- I

10    don't know if I was hearing it differently but seemed like it

11    wasn't the same -- charge when you did the aiding and abetting

12    act and I think that's part of it no matter what the proof is.

13    I know it was a long time ago.

14                 THE COURT:  Well, I gave it as written.

15                 MR. TOUGER:  Right.  It just --

16                 THE COURT:  And we had a charge conference and you

17    made your objection.

18                 MR. TOUGER:  It just didn't sound the same when --

19                 MR. JOHNSON-SKINNER:  We think it was legally and

20    properly given.

21                 THE COURT:  I think the objection at this point is

22    untimely and in any case I would overrule it on to the merits.

23                 (Continued on next page)

24

25

1       (In open court)

2       THE COURT:  Counsel have drawn to my attention that I

3   skipped one sentence when I was talk to you about any notes

4   that might be sent in during your deliberations, and it's this.

5       If you communicate with the Court before you come to a

6   verdict, you must never indicate in a note to the Court or in

7   open court how you are divided, what the vote is, unless I ask

8   you for it.  Never.

9       OK.  Now, we come to the trusty alternates who have

10  been here faithfully throughout and paying careful attention.

11      You are not going to retire to deliberate now and I'm

12  going to let you go home now, but I am not discharging you.

13  You remain alternates.  You may not discuss this case with

14  anyone.  You may not read anything about it.  You may not do

15  any research about it.  You may not allow anybody to talk to

16  you about it unless and until you know that the jury has been

17  discharged.

18      The reason for that is that in rare circumstances but

19  circumstances that do occur and happened in the New York area

20  recently in another case in another court, you may be called-in

21  to deliberate if for example something happened to one of the

22  deliberating jurors and therefore, that's the reason for the

23  instruction.

24      At this time I'll ask the alternates to go into the

25  jury room with Andy, give your notes to Andy and I hope we meet

1    again under more distinguishable circumstances and pleasant

2    circumstances.  Thank you much very much for your service and

3    possible future service.

4            As soon as Andy comes back he will swear the officer

5    and you will retire.

6            (Alternates dismissed)

7            THE COURT:  All right.  Andy, swear the officer

8    please.

9            COURTROOM DEPUTY:  (Marshal sworn)

10           THE COURT:  Members of the jury, you will now retire

11   to deliberate upon your verdict.

12           (Jury retired to deliberate; 6:20 p.m.)

13           THE COURT:  All right.  Be seated folks.

14           I'm going to ask Andy to mark as Court Exhibit L, I

15   think one copy of the charge.  And assuming everyone agrees, we

16   will send other copies into the jury room.

17           You are welcome to review them if you want.

18           MR. JOHNSON-SKINNER:  No, we don't need to.

19           MR. TOUGER:  No, your Honor.

20           THE COURT:  On the exhibits counsel will before I

21   disappear here go over with Andy the exhibits that go in.  If

22   there's any disagreement, obviously, I will resolve it.  If

23   there's no disagreement, is it acceptable to both sides for

24   Andy to take in the exhibits upon which you do agree to the

25   jury room without any on the record proceedings?

HBSAAROS8                    Jury Charge

1          MR. JOHNSON-SKINNER:  It is to the government.

2          MR. TOUGER:  Yes, your Honor.

3          THE COURT:  All right.  We'll proceed in that way and

4   we will not have anything from the jury before 20 after seven

5   at the earliest.

6          OK.  Thank you, folks.

7          (Deliberations)

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hbsnros9

1          (In open court; jury not present)

2          (7:51 p.m.)

3          THE COURT:  OK.  We, as you know, had a note asking

4    for the direct testimony of the witness Crooks, which will be

5    Court Exhibit M.

6          And I have just been handed proposed -- I assume

7    counsel have seen the note, right?

8          MR. TOUGER:  Yes, your Honor.

9          THE COURT:  And I have just been handed -- I am told

10   we have a verdict.  Bring in the jury.

11         Hold one minute.  We are going to wait a moment before

12   taking the verdict.  I will find out if the cars are here.  I

13   will return as soon as we iron out an issue.

14         (Recess)

15         THE COURT:  OK.  Let's bring in the jury.

16         The defendant is present.

17         (The jury entered the courtroom at 7:59 p.m.)

18         THE COURT:  Be seated.

19         The defendant and the jurors all are present.  Who is

20   the foreperson.  Have you reached a verdict?

21         THE FOREPERSON:  Yes.

22         THE COURT:  Would you please pass the envelope to

23   Andy.

24         The clerk will publish the verdict.

25         THE DEPUTY CLERK:  As the Count One, conspiracy to

Hbsnros9

commit --

          THE COURT:  The defendant will rise.  Excuse me.

          THE DEPUTY CLERK:  Conspiracy to commit murder for hire, guilty.

          As to Count Two, murder for hire, guilty.

          As to Question 1A, Has the government proved beyond a reasonable doubt that the conspiracy charged in Count One resulted in the death of Lowell Fletcher?

          Answer:  Yes.

          Question 2A.  Has the government proved beyond a reasonable doubt that the murder for hire charged in Count Two resulted in the death of Lowell Fletcher?

          Answer:  Yes.

          Count Three, firearm possession during the murder-for-hire conspiracy.

          Answer:  Guilty.

          Question 3A.  Has the government proved beyond a reasonable doubt that at least one of the firearms used carried or possessed in relation to or in furtherance of the conspiracy crime charged in Count One actually was discharged in connection with that crime?

          Answer:  Yes.

          Count Four, murder through the use of a firearm.

          Answer:  Guilty.

          THE COURT:  Is there a request for a poll?

Hbsnros9

1        MR. TOUGER:  Yes, your Honor.

2        THE COURT:  Poll the jury please.

3        THE DEPUTY CLERK:  Juror No. 1, is that your verdict?

4        JUROR:  Yes.

5        THE DEPUTY CLERK:  Juror No. 2, is that your verdict?

6        JUROR:  Yes.

7        THE DEPUTY CLERK:  Juror No. 3, is that your verdict?

8        JUROR:  Yes.

9        THE DEPUTY CLERK:  Juror No. 4, is that your verdict?

10       JUROR:  Yes.

11       THE DEPUTY CLERK:  Juror No, 5 is that your verdict?

12       JUROR:  Yes.

13       THE DEPUTY CLERK:  Juror No. 6, is that your verdict?

14       JUROR:  Yes.

15       THE DEPUTY CLERK:  Juror No. 7, is that your verdict?

16       JUROR:  Yes.

17       THE DEPUTY CLERK:  Juror No. 8, is that your verdict?

18       JUROR:  Yes.

19       THE DEPUTY CLERK:  Juror No. 9, is that your verdict?

20       JUROR:  Yes.

21       THE DEPUTY CLERK:  Juror No. 10, is that your verdict?

22       JUROR:  Yes.

23       THE DEPUTY CLERK:  Juror No. 11, is that your verdict?

24       JUROR:  Yes.

25       THE DEPUTY CLERK:  Juror No. 12, is that your verdict?

Hbsnros9

1          JUROR:  Yes.

2          THE DEPUTY CLERK:  Verdict unanimous, your Honor.

3          THE COURT:  All right.  Counsel, any reason why the

4    jury shouldn't be discharged.

5          MR. JOHNSON-SKINNER:  None, Judge.

6          THE COURT:  Mr. Touger?

7          MR. TOUGER:  No, your Honor.

8          THE COURT:  Members of the jury, in just a moment I'm

9    going to discharge you and send you on your way.  I just want

10   to say a couple of things before I do that.

11         First of all, it was the invariable practice of

12   probably the greatest judge ever to sit on this Court never to

13   thank juries.  It was his view that this is a privilege of

14   citizenship, and it's just doing your part in this great

15   country of ours.  I agree with him about that, but I don't

16   think he got to the right answer on that one.

17         Of course we thank you.  I thank you, I know counsel

18   thank you because you have taken time out of busy lives to do

19   something that is really vitally important and that is

20   virtually unique in the world.

21         You've all come here out of your everyday life to

22   decide this case.  I didn't decide this case.  You decided it.

23         It's essential to our system, and I thank you for your

24   time and your effort.  I make no comment on the verdict one way

25   or the other.  That is your business.  Not mine.  But you

Hbsnros9

1    certainly have my thanks, and, I'm sure, thanks of counsel.

2    You did your duty, and that is all we can reasonably ask.

3         Now, once you leave here, you will leave your notes,

4    whatever they are, in the jury room, and once you walk out that

5    jury room door it is up to you whether you discuss this case

6    with anyone or not.  You are entirely free to do so if you

7    wish.

8         I would just say this to you.  Number one, it is

9    possible that lawyers or other people associated in some way

10   with one side or the other in this case may approach you and

11   may want to talk to you.  What you do about that is up to you,

12   but if you don't want to talk or you want to stop talking once

13   you start and whoever it is doesn't take no for an answer,

14   please call Andy, and I'm reasonably confident I can take care

15   of that problem very quickly.

16        Secondly, I would just urge upon each of you, if you

17   discuss anything that happened in the jury room or your service

18   as a juror just to bear in mind the golden rule, if you talk

19   about your fellow jurors or anybody on the jury, just think

20   about the fact that you all have a right to privacy about this,

21   and just think before you speak as to anything you might want

22   to say about any other individual or the whole process.

23        With that, I repeat my thanks to you, and you now are

24   free to go up get anything you have in the jury room other than

25   the notes, and good wishes for the holiday season.

Hbsnros9

```
1              Thank you.

2              (Jury excused)

3          THE COURT:  Be seated, folks.

4          Anything else before setting a sentencing date?

5          MR. JOHNSON-SKINNER:  Nothing from the government.

6          MR. TOUGER:  No, your Honor.

7          I assume we will do motions on the sentencing date.

8          THE COURT:  Not necessarily.  There are time limits
```
under the rules, and you will make any motions you want within
the time limits or you will seek an extension.

          Obviously, I am not too likely to sentence before any
motions have been decided.

          Are we going to have a new PSR in this case?

          MR. JOHNSON-SKINNER:  I would think so, Judge.

          THE COURT:  All right.  So I'll set sentencing for --
let me just check my calendar -- March 13 at 3 o'clock.

          Defense submissions are to be filed at least two weeks
before sentencing; any response from the government at least a
week before sentencing.

          Anything else?

          MR. JOHNSON-SKINNER:  Nothing from the government.

          THE COURT:  OK.  Thanks, folks.

          (Trial concluded)