I95QROSC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA
 3
                v.                        10 CR 431 (LAK)
 4                                        Oral Argument
     JAMES J. ROSEMOND
 5
                    Defendant
 6   ------------------------------x
 7                                        New York, N.Y.
                                          September 5, 2018
 8                                        4:30 p.m.
 9
     Before:
10
                        HON. LEWIS A. KAPLAN
11                                        District Judge
12
                            APPEARANCES
13
     GEOFFREY S. BERMAN
14        United States Attorney for the
          Southern District of New York
15   ELIZABETH HANFT
     DREW JOHNSON-SKINNER
16        Assistant United States Attorney
17   JAMES E. NEUMAN
          Attorney for Defendant Rosemond
18
19
20
21
22
23
24
25
```

I95QROSC

| | |
|---|---|
| 1 | (Case called) |
| 2 | DEPUTY CLERK:  Government, are you ready? |
| 3 | MS. HANFT:  I didn't.  Good afternoon, your Honor. |
| 4 | Elizabeth Hanft and Drew Skinner for the government. |
| 5 | THE COURT:  Good afternoon. |
| 6 | DEPUTY CLERK:  Defendant, are you ready? |
| 7 | MR. NEUMAN:  Yes.  Good afternoon, your Honor. |
| 8 | James Neuman for Mr. Rosemond. |
| 9 | THE COURT:  Mr. Neuman, I'm sorry I kept you.  That |
| 10 | took longer than anticipated, but such is life. |
| 11 | Mr. Neuman, your motion. |
| 12 | MR. NEUMAN:  Thank you, your Honor. |
| 13 | Your Honor, I think the papers are pretty thorough on |
| 14 | both sides about what our positions are.  So I'm going to go |
| 15 | through them somewhat succinctly, and I'm happy to answer |
| 16 | questions along the way, of course.  Let me first begin by |
| 17 | addressing the timeliness. |
| 18 | THE COURT:  Go over to the lectern, please. |
| 19 | MR. NEUMAN:  Sure. |
| 20 | Regarding the timeliness of the motion, Mr. Rosemond |
| 21 | was convicted on November 28.  He continued to be represented |
| 22 | by his trial attorney until March 20.  That's when I came into |
| 23 | the case.  And then the decision that we're basing this whole |
| 24 | motion on by the Supreme Court was issued on May 14.  My motion |
| 25 | was then filed, I think it was August 1, so it was about two |

I95QROSC

 1    and a half months later.

 2            So Rule 45 discusses motions can be extended for --

 3    the deadlines can be extended for excusable neglect.  The

 4    Second Circuit talks about four different factors.  So the

 5    first factor, your Honor, is the reason for the delay.  And

 6    there have been many cases that have talked about when an

 7    argument is based on ineffective assistance, that in itself is

 8    reason for delay, while the original trial counsel continues to

 9    represent the client.

10            THE COURT:  Well, what's the argument that it was

11    ineffective assistance?  Mr. Touger supports it.

12            MR. NEUMAN:  Judge, in fairness, I think -- I would

13    say this is a species of ineffective assistance because we're

14    not really alleging prejudice under the *Strickland* standard.

15    The argument really is what I would call a right to autonomy

16    that they discuss in *McCoy*.

17            THE COURT:  I'm sorry, a what?

18            MR. NEUMAN:  A right to autonomy, A-U-T-O-N-O-M-Y.

19            THE COURT:  Yes, I understand that.

20            MR. NEUMAN:  Right.

21            THE COURT:  But you were relying on the ineffective

22    assistance cases for the purpose of saying that the fact that

23    your client blew the Rule 33 deadline should be excused.

24            MR. NEUMAN:  Well, Judge, I think those are relevant

25    only because this motion, although it's not a classic

I95QROSC

1    ineffective assistance motion, it is based upon a dispute with

2    the trial counsel.  So I think they're analogous, is what I'm

3    saying.

4            THE COURT:  That's exactly the point I'm focusing on.

5    There was a disagreement, if I accept your client's version of

6    affairs and Mr. Touger's version of affairs, with respect to

7    whether Mr. Touger should have tried the case the way your

8    client claims he wanted it tried, but there's no dispute

9    between them, or at least not much of one, with respect to

10   whether once he was convicted, the claim that there was a

11   violation of his right to autonomy was there and should have

12   been asserted or could have been asserted.  There's no dispute

13   on that, right?

14           MR. NEUMAN:  I think that's true, your Honor.

15           THE COURT:  OK.

16           MR. NEUMAN:  And, so, yes, I think the more relevant

17   point really is when the Supreme Court decision did come down,

18   and I have cited some cases to say that, you know, a new

19   decision even if you know it's pending, it's fair to take that

20   as a starting point and claim excusable neglect.

21           I'm aware -- obviously, Mr. Rosemond, he was aware of

22   the Supreme Court case and made me aware of it when I came into

23   the case, but until that decision was rendered, it was

24   speculation whether there would be an argument there.

25           THE COURT:  He was aware of it before the Supreme

1    Court decided it, right?

2              MR. NEUMAN:  He was aware that there was a case

3    pending, but he could not know --

4              THE COURT:  In the Supreme Court.

5              MR. NEUMAN:  Yes, in the Supreme Court.  But he did

6    not know what the decision was going to be.  And I think

7    that -- you know, we're talking about excusable neglect here.

8    I think that is an excuse for delaying the motion to the point

9    of when the Supreme Court made their decision.

10             Now, I will also acknowledge, I waited a couple of

11   months to file the motion, and that had to do with my own

12   schedule, my own unfamiliarity with the record, problems I had

13   to talk with the trial counsel and Mr. Rosemond.  I don't think

14   that's an inordinate amount of time.  And that goes to the

15   reason for the delay, your Honor.

16             The other factors have to do with the prejudice to the

17   government.  I don't see that given how old the case is in the

18   first place, that the delay in filing the motion, that delay

19   really is going to prejudice the government.

20             I should also say I don't see this as requiring an

21   extended proceeding at this point if you accept the premise of

22   the argument.  You know, I don't see that there's a dispute

23   here about what transpired in conversations between my client

24   and his former lawyer.  If there is some hearing, I just can't

25   imagine it's going to be lengthy one.  So I don't think we're

I95QROSC

        1    talking about a great amount of additional delay.  And I assume

        2    the government is not claiming there's any bad faith on our

        3    part in bringing this at this stage.  That is one of the

        4    factors the Second Circuit cites.

        5         So, my position is that this can easily be considered

        6    excusable neglect.  I'd encourage you to reach the merits of it

        7    because I think that if we don't do it now, there's going to be

        8    a proceeding down the road probably by way of a 2255

        9    application.

       10         So, unless you want to hear any more on the reasons

       11    for the delay, I'll talk about the merits of this, Judge.

       12         THE COURT:  Go ahead.

       13         MR. NEUMAN:  I think it's plain from what happened in

       14    the summation, that Mr. Touger did make a concession.  He did,

       15    as a matter of strategy, concede that our client paid people to

       16    do a shooting.  I've cited language from the summation.  I

       17    cited the government's rebuttal where they make that same

       18    observation.

       19         THE COURT:  It wasn't a federal crime, right?

       20         MR. NEUMAN:  It was not a federal crime, and, Judge,

       21    that goes really to the heart of the motion.  I understand that

       22    *McCoy* was a death penalty case, and I understand there are

       23    other distinctions one can draw, but my position would be that

       24    you can't concede that a crime has been committed; and even if

       25    it's not the crime that's been charged, if this was a crime, it

I95QROSC

would have been a state crime what he was conceding, and the

Supreme Court didn't deal with this in that same context, but I

think it's a reasonable argument, and I have to start

somewhere. You know, these arguments have to begin at some

level. So that's my position, Judge. I think that we can

extend *McCoy* to this circumstance.

THE COURT: Why should we do it?

MR. NEUMAN: Well, because the Supreme Court, I

believe, is going into this what, again, they call a right to

autonomy, and I think they've recognized that certain positions

-- I guess they're expanding what should be in a defendant's

control, and they started by saying, well, you've got a right

whether to plead guilty, a right to testify, a right to appeal,

and now they're going with a right to concede guilt. And I

think I'm making the next logical step, Judge, and I understand

the policy reasons that might suggest otherwise, but that's my

position. I think it's consistent with their logic talking

about the right of autonomy.

THE COURT: Suppose defense counsel, for reasons that

the defense counsel thinks appropriate, such as, for example,

getting a very damaging witness off the stand before he hurts

you even more, elects not to cross-examine, and the defendant

claims after conviction, "I told him he was to cross-examine

that witness. I told him I wanted him to cross-examine along

the following lines, and he refused." How about that?

I95QROSC

     1    Violation of the right of autonomy?

     2              MR. NEUMAN:  I would say no.  I would think that that

     3    would fall within the classic matters that are within the

     4    province of trial counsel for strategy because it's not an

     5    actual concession of a crime.

     6              For my argument to succeed, Judge, I'll recognize it

     7    right away, lines are going to have to be drawn.  I'm asking

     8    for them to be drawn in one place, and I'm not suggesting it

     9    opens the door for defendants to control all strategic

    10    decisions.  That's obviously not my position.

    11              THE COURT:  Well, but what divides the sheep from the

    12    goats?

    13              MR. NEUMAN:  Well, I think when it's an actual

    14    concession of something that constitutes a crime.  When they

    15    actually -- their argument in summation, Judge, I think

    16    summation is different than what happens during

    17    cross-examination.  There's a lot of things that happen during

    18    the course of the trial that really don't end up being

    19    important by the time the argument is submitted.  But summation

    20    is special.  So I think if someone gets up and concedes a crime

    21    during summation, that's in a different category.

    22              THE COURT:  Even a crime under the laws of a

    23    jurisdiction in which a defendant is not being prosecuted.

    24              MR. NEUMAN:  That's my position.

    25              THE COURT:  Well, I understand that's your position,

I95QROSC

1   and you're sticking to it.

2           MR. NEUMAN:  I am, Judge.

3           THE COURT:  OK.  If that's the best I can do, it's the

4   best I can do.  Anything else?

5           MR. NEUMAN:  Not unless you have any questions, your

6   Honor.

7           THE COURT:  OK.  Thank you.

8           Ms. Hanft.

9           MS. HANFT:  Thank you, your Honor.

10          As defense counsel noted, the parties have submitted

11  fairly extensive briefs, so I'll try to keep my points brief,

12  here unless the Court has any questions.

13          I have three main points, your Honor, and I think that

14  all three of these points are demonstrated by the Court's

15  holding in *McCoy*, which I want to start with.  And the Supreme

16  Court held in *McCoy* that:  "A defendant has the right to insist

17  that counsel refrain from admitting guilt even when counsel's

18  experience-based view is that confessing guilt offers the

19  defendant the best chance to avoid the death penalty."

20          Three important words or phrases there.  One is the

21  words "insist."  Second is the word "admitting guilt."  And the

22  third is the phrase "death penalty."  And, so, for those three

23  reasons, that case plainly does not apply here.  It's

24  distinguishable from this case.

25          As to insistence, there is no insistence here.  There

I95QROSC

1    was no raising of the issue of Mr. Rosemond's dispute with his

2    defense counsel at any point prior to trial, the day of trial,

3    the first day of trial, at trial, at sidebar, out of the

4    presence of the jury -- never.  No objections on the record

5    from a defendant who has, of course, demonstrated that he's not

6    afraid to alert the Court to issues when he thinks it's

7    appropriate.

8            THE COURT:  And the record is full of that, isn't it?

9            MS. HANFT:  It certainly is, your Honor.

10           THE COURT:  Am I correct in remembering that on at

11   least one, and possibly more than one, occasion, since I'm on

12   the case, which is only lately in the broad scheme of this 2010

13   case, rejecting a pro se motion by the defendant on the ground

14   that he was represented by counsel and that he was not entitled

15   both to counsel and to represent himself.  Am I not right about

16   that?

17           MS. HANFT:  That's correct, your Honor.

18           THE COURT:  Once or more than once?

19           MS. HANFT:  I recall that happening once before your

20   Honor shortly before we had a Curcio hearing in this case,

21   which I believe was approximately March of 2017.

22           THE COURT:  Which had to do with Mayer Brown who was

23   involved with defense for awhile.  Yes, I remember that one.

24           MS. HANFT:  Correct.

25           THE COURT:  And then, of course, we had the dialogue

1    about the defendant having the right to testify in his own

2    defense if he wishes to do so, regardless of his attorney's

3    advice; that he had the right to the attorney's advice, but

4    ultimately it was his call, and he said he understood that.

5    Does that have a bearing here?

6         MS. HANFT:  It certainly does, your Honor.  We cited

7    that colloquy in our brief, and I think the Court made it

8    abundantly clear to the defendant that that is something that

9    would be the defendant's choice, not his attorneys', and your

10   Honor I think developed a signal the defendant should use at

11   that particular moment in the trial.

12        I think this defendant is clear from the record was on

13   notice about that and certainly on notice about his rights to

14   effective representation.

15        THE COURT:  Yes, that's why the Curcio ties in, right?

16        MS. HANFT:  I'm sorry?

17        THE COURT:  That's why the Curcio hearing in your view

18   ties in.

19        MS. HANFT:  Exactly, your Honor.

20        THE COURT:  Because he was allocuted on the fact that

21   he had a right to unconflicted representation by counsel.

22        MS. HANFT:  Correct, your Honor, and I think the

23   defendant was well aware of the lawyers that existed that

24   are -- that practice before this Court that are available if

25   the defendant has a conflict with his counsel, whether in that

I95QROSC

1    case the conflict was based on his defense counsel being paid

2    by someone else or for some other reason; but this defendant

3    has had multiple counsel, he has had counsel representing him

4    and other counsel, prior counsel sitting in the well of the

5    courtroom during proceedings in this case.  He is well aware of

6    his right, frankly, to get new counsel.  He retained new

7    counsel in this case, to have counsel appointed where

8    necessary, and I think the report is rife with examples of how

9    he is aware of that.

10            THE COURT:  OK.

11            MS. HANFT:  So, your Honor, my three main points have

12    to do, again, with insisting, with admitting guilt, and with

13    the death penalty issue, and I'll take those in reverse order.

14    Again, these are reasons why *McCoy* is distinguishable from this

15    case.

16            *McCoy* was focused on the discrepancy between defense

17    counsel's objectives and a client's objectives in a death

18    penalty case.  That was the primary concern animating the

19    Court.  The Court held the defendant was entitled to determine

20    the objective of his defense, to admit guilt in an effort to

21    avoid the death penalty, or to maintain his innocence.  Those

22    are not the two conflicting objectives here.

23            No one is claiming, neither Rosemond nor Mr. Touger,

24    that acquittal was not their shared objective and the record

25    supports that.  The court in *McCoy* was concerned that a

1    defendant might view the possibility of acquittal, even if it's

2    very remote, as more valuable than the difference between life

3    and death.  And their point was that must be an individual

4    judgment.  It's not for counsel to make; it's for the defendant

5    to make.

6            But here that is precluded.  There is no such

7    objective at play.  There is one issue here, and it was guilty

8    or not guilty.  Which one would the jury return, which verdict?

9    And so there's no potential for these conflicting objectives.

10            Second, there was no concession of guilt here.

11            THE COURT:  Before we go on to that point, what would

12   you do with this case, hypothetical case:  It's a shooting.

13   It's a death, all right?  The eye witness testimony is iffy,

14   sufficient to convict maybe, but not indisputable as to the

15   identity of the shooter.  It's dark.  It's rainy.  It's a

16   wind-swept night, you know, the whole drill.

17            There's also forensic evidence about the angle of the

18   shots, various other things that make an arguable case for

19   self-defense on the part of the shooter.  Victim had a knife,

20   you know, imagine we could write the TV show.

21            Now, the defense lawyer decides the better argument is

22   self-defense.  The defendant's position is it wasn't me.  I

23   wasn't there.  And the defendant insists that the lawyer defend

24   on the ground of mistaken identity and the lawyer insists on

25   trying the case on the basis of self-defense.  Is there a *McCoy*

I95QROSC

1    problem?

2              MS. HANFT:  I think that's a much closer question than

3    we have here, your Honor.

4              THE COURT:  That's why I asked it.

5              MS. HANFT:  Of course.  And as your Honor may know,

6    that precise hypothetical was before the Court or was mentioned

7    to the Court and discussed at oral argument in the *McCoy* case.

8              THE COURT:  I had no idea, but I'm glad to know.

9              MS. HANFT:  And I think that's important, your, Honor

10   because the Court didn't address that issue.  So I don't think

11   that *McCoy* governs that situation.  I think it would frankly be

12   a complicated situation.  I think it would depend on a number

13   of factors including the other factors at issue here.

14             For example, is your Honor's hypothetical a death

15   penalty case?  What is the defendant's position as --

16             THE COURT:  Let's take the death penalty out of this

17   so as not to muddy up the analysis.

18             MS. HANFT:  So I think also relevant then would be:

19   Did the defendant make a contemporaneous objection here.

20             THE COURT:  Let's take that out of it too.

21             MS. HANFT:  I'm fighting the hypothetical, your Honor.

22             THE COURT:  Sure, you are.  Of course.  That's your

23   job.

24             MS. HANFT:  It's a difficult one.  I think it also

25   depends on the nature of what counsel says.  I think that there

I95QROSC

1    is a difference between focusing on a self-defense defense and

2    putting it forward and making affirmative concessions the other

3    way.  But, again, in that case, I don't think that is this case

4    at all.

5           THE COURT:  I know it isn't, but what it goes to is

6    this concept of the objective of the defense, which could be a

7    matter of characterization.  If I were arguing the case on

8    appeal for the defendant, I might put the argument that the

9    objective of the defense was to avoid any adjudication that the

10   defendant engaged in an unjustified shooting; that there was a

11   homicide, and the objective was to avoid what would follow in

12   the event of conviction in terms of stigma and opprobrium and

13   whatever, and the lawyers objective is acquittal by any means

14   possible.  That's what I'm getting at.  What about it?

15          MS. HANFT:  Certainly, I understand your Honor's

16   point, and I think that the Supreme Court -- there is dicta in

17   *McCoy* that speaks to the issue of creating opprobrium and

18   defendant being entitled to not have his client -- not have his

19   counsel make certain arguments, but I don't think the Court

20   goes all the way there, your Honor.  I don't think the Court

21   says counsel is never allowed to make a concession as to a fact

22   that would cause opprobrium, any fact whatsoever.  I think

23   that's a section of *McCoy*'s holding and I think it's a slippery

24   slope from there, because there may always be some facts that

25   particular defendants may believe cause opprobrium or that are

1    shameful to them.

2          Everyone's view of what's shameful is relative and is

3    personal and is their own, and I think if we were to say that

4    counsel could never concede a fact that caused a defendant any

5    shame whatsoever, for example, you know, the defendant, he

6    admits that he went to the bank that day because he owed money

7    to someone, but he's so ashamed that he owes money to that

8    person, that he doesn't want to admit that.  So in a bank

9    robbery case, we're not even going to say that he was there and

10   use that alibi.  I think at the point that -- I'm getting a

11   little tangled up here, but at the point where we're telling

12   defense counsel they can't make certain arguments like that, I

13   think we've taken trial management and strategy outside of the

14   purview of defense counsel, and *McCoy* and other cases are very

15   clear that trial counsel has to be given a little bit of a

16   longer leash than that in order to provide an effective

17   representation which is of course ultimately the goal here.

18         THE COURT:  So to draw a line under that, I take it

19   that the government's position is that this can't be made to

20   turn on the characterization of outcomes as objectives or

21   something short of objectives or else there's no longer any

22   principle.  Is that fair?

23         MS. HANFT:  I think that's a fair statement, your

24   Honor.

25         THE COURT:  And objective is acquittal or something

1    else.  That's what it means.

2              MS. HANFT:  I think that's fair because that's what,

3    you know, the objective is in any criminal trial really:  The

4    defendant wants to be acquitted.  And, again, save death

5    penalty cases, which are a special breed.

6              THE COURT:  OK.

7              MS. HANFT:  As to my second point that there was no

8    concession of guilt here, I think it's important that we look

9    at what happened in *McCoy* and the facts of *McCoy* and just how

10   different they are.

11             In that case, counsel repeatedly informed the jury

12   that his client was guilty, guilty of the charged crimes.  He

13   said "The evidence is unambiguous.  My client committed three

14   murders."  He actually used the word "murders".  My client was

15   the killer."  He used the word "killer."  There was no such

16   concession here.  Never did Mr. Touger say, "My client,

17   Mr. Rosemond is guilty."  He never even said, "My client

18   Mr. Rosemond is guilty of facts that would amount to some

19   lesser included offense of the charged crimes."

20             If the jury had bought the argument that Mr. Touger

21   was making, the argument that Mr. Rosemond is complaining of

22   now, the jury would have been required to return a verdict of

23   not guilty on all counts.  Your Honor will recall Rosemond's

24   attorney vigorously cross-examined the witnesses in this case.

25   In certain cases certain cooperating witnesses were

I95QROSC

cross-examined for hours.  The jury addresses focused primarily

on the prosecution's failure to meet its burden of proving

intent to murder.  So it was about the burden, not as in *McCoy*,

which is in stark contrast telling, the jury that he was

relieving the prosecution of its burden as to any particular

issue.

Now, in summation -- and this is what defense counsel

obviously harps on -- there were a few affirmative concessions

as to certain facts but those concessions, again, were not

enough to demonstrate guilt of any of the charged crimes.  This

was trial strategy.  It wasn't an admission of guilt.  Even

Mr. Rosemond in his affidavit and in counsel's motion concedes

that he wanted to concede certain facts too.  He just wanted

his lawyer to argue that those facts should be interpreted

differently.

Mr. Rosemond is saying that he wanted to make an

argument that bringing Lowell Fletcher to Mr. Rosemond was

about a peaceful conversation, not a shooting.  But just as a

conspiracy to bring Lowell Fletcher to Rosemond to have a

conversation is not a federal crime, so bringing Lowell

Fletcher to Rosemond for the purpose of a shooting is not a

federal crime.  So the difference here between Mr. Rosemond and

counsel was one of which facts to concede and what arguments to

make from that.  And, again, the case law is crystal clear that

what arguments to make are in the province of the trial

attorney.

And, finally, my third point is just about, we started
on this issue. Mr. Rosemond never alerted the Court to his
disagreement with counsel, and he was never forced over his
objection to proceed with that counsel. As we said, he's had a
number of attorneys at his disposal over the course of his
cases, he could have gotten a new attorney, this attorney
Mr. Touger, was a retained attorney, so somebody was paying for
him. Rosemond or the person paying for defense attorney did
not threaten to withhold payment if he didn't make those
particular arguments.

And counsel's reply to the defendant's opposition
suggests that, well, there was no reason for him to put a
disagreement or alert the Court on the record because the state
of the case law was different and the Court wouldn't have done
anything anyway, but that's not necessarily so. I think there
are facts in the record that show that that is not necessarily
so; that the Court very well may have appointed a new attorney
for Mr. Rosemond or adjourned the trial.

There is any number of possibilities. That is also
not how making a record works, and that's not how *McCoy*
contemplated it would work. *McCoy* talks over and over about
the defendant's vociferous objections, and the court's
basically overruling him and saying this is your lawyer's
decision, not yours. That never happened here. And, as I

I95QROSC

1    said, Rosemond is a defendant who has not been afraid to seek

2    relief from the Court in the past and he didn't do so here.

3            So, your Honor, I wasn't going to speak to timeliness

4    or our point about an evidentiary hearing if the Court

5    determines that there are factual determinations that need to

6    be made.  I think those arguments are laid out in our briefs

7    unless the Court has questions about them.

8            But I think ultimately I want to direct the Court to

9    the standard for a new trial, which is whether there was a

10   miscarriage of justice in this case or whether an innocent man

11   has been convicted, and that's decidedly not the case here.

12   And so Rosemond's motion should be denied.

13           THE COURT:  Yes, and going to the timeliness

14   forfeiture arguments, my recollection is that there were

15   several, or at least two, decisions by state supreme courts

16   that went the same way that *McCoy* ultimately went at the time

17   this case was tried, right?

18           MS. HANFT:  Your Honor is referring to pre-*McCoy*

19   cases?

20           THE COURT:  Pre-*McCoy* cases.

21           MS. HANFT:  That's correct.

22           THE COURT:  So, it's not like got to wait for the

23   Supreme Court because nobody knows anything about this issue.

24   There was at least a split between Louisiana and two other

25   state courts of last resort on the *McCoy* question and *McCoy* had

 1    been cert. granted and probably argued at the time of this

 2    trial.

 3              MS. HANFT:  That's correct, your Honor.  I think as we

 4    argue in our brief there are various increments of time

 5    where -- there are multiple measurements, and Rosemond's motion

 6    is dilatory under any of those measurements, whether during the

 7    time in which he was still represented by Mr. Touger but his

 8    disagreement was clear and was patent, he should have raised it

 9    then.  After he was convicted, and he certainly became aware,

10    as demonstrated by his letter to the Court that this case was

11    pending and was percolating through the courts, could have

12    filed a motion then, whether with new counsel or with

13    Mr. Touger because, as your Honor pointed out, they're

14    essentially in agreement as to what happened there.

15              Then he had new counsel appointed.  At that point,

16    again, he had expressed that he would be making a motion but

17    there was no notification to the Court and no filing of the

18    motion.

19              And then there was May 14 when *McCoy* was decided,

20    certainly at that point, Mr. Rosemond's motion was ripe to be

21    made, and I understand -- and certainly I'm not claiming that

22    defense counsel did anything wrong in this case, but two and a

23    half months is, I think, longer than the scope of the cases

24    cited in our brief, save one, I think which has unusual

25    circumstance -- or not unusual circumstances, but there was

I95QROSC

1    more required.  There were subpoenas to be served.  There were

2    records to be obtained in order for counsel to make the motion

3    here.  The motion was ready to go, and I think that it was

4    certainly incumbent upon Rosemond to make that motion by

5    May 14, and so I think the period of delay here cannot be

6    attributed to excusable neglect.

7              THE COURT:  OK.  Thank you, Ms. Hanft.

8              MS. HANFT:  Thank you, your Honor.

9              THE COURT:  Mr. Neuman, anything else?

10             MR. NEUMAN:  Yes.  Judge, I just wanted to address one

11   small, discrete point about.

12             THE COURT:  One?

13             MR. NEUMAN:  One discrete point about Mr. Rosemond's

14   failure to say anything in open court.  I don't think *McCoy*

15   requires that.  There's some language in *McCoy* where they

16   distinguish, I think it's *Nixon v. Florida* or *Florida v. Nixon*

17   I'm not sure which one it is, where in that case there was a

18   similar dispute between the defendant and attorney, but there

19   the defendant refused to speak to his lawyer, and was

20   disruptive, and missed some of the proceedings and never even

21   communicated to his lawyer what he wanted to do.

22             And *McCoy* makes a point of explaining that's the

23   distinction, and the court is saying, yes, he made it clear

24   both in private and in open court what his view was, but I

25   don't think that they were necessarily saying it has to be said

I95QROSC

1   in open court.  I think that it's sufficient if he makes his

2   point clear to his trial counsel, which is what the affidavits

3   do show here.

4               THE COURT:  OK.  Thank you.

5               MR. NEUMAN:  Thank you.

6               THE COURT:  My tentative view is I'm going to deny the

7   motion, but I'm going to think about it a little more, and

8   probably see if some other court grasps the nettle between now

9   and sentencing.  I may write; I may not.  But I'll think about

10  that.

11              MR. NEUMAN:  Judge, I'm sorry, I mentioned the

12  scheduling issue about sentencing before the Court started.

13  Today in another case I had a trial was scheduled for

14  September, late September, a racketeering case.  There have

15  been some pleas and the government today in that case submitted

16  a letter asking to consolidate the trial with another group of

17  defendants, and have everyone start on November 13.  So that

18  request went in today before Judge Stein.  I think everyone

19  there consented or did not oppose it.  I'm guessing the judge

20  will go along with that, but it hasn't been decided yet.

21              THE COURT:  Let me just look at my own calendar.

22  Certainly we have these government buy these high-class

23  computers that take five minutes to open a page.  What is our

24  sentencing date now?

25              MR. NEUMAN:  I think it's November 15.

I95QROSC

1          MS. HANFT:  That's correct, your Honor.

2          THE COURT:  How do you like that?  I have it down on

3     November 8.  Our mistake.  Why don't we move it up to

4     November 8.

5          MS. HANFT:  That's fine with the government, your

6     Honor.

7          MR. NEUMAN:  That's fine, your Honor.

8          THE COURT:  November 8, 4:00.  OK.  Thank you for

9     fixing my calendar.

10          MS. HANFT:  Thank you, your Honor.

11          THE COURT:  Good night.

12          (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25