HAPJROS1                          Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              S6 10 Cr. 431 LAK

5    JAMES J. ROSEMOND,

6                   Defendant.

7    ------------------------------x

8                                             October 25, 2017
                                              2:15 p.m.
9


10

11   Before:

12                        HON. LEWIS A. KAPLAN,

13                                            District Judge

14

15                             APPEARANCES

16

17   JOON H. KIM,
          United States Attorney for the
18        Southern District of New York
     SAMSON ENZER,
19   DREW JOHNSON-SKINNER,
     ELIZABETH HANFT,
20        Assistant United States Attorneys

21   PELUSO & TOUGER,
          Attorneys for defendant Rosemond
22   BY:  DAVID TOUGER, Esq.
                    Of counsel
23
     Also Present:
24        ERIC M. CREIZMAN, Esq.

25

HAPJROS1                    Conference

1              (In open court)

2              (Case called)

3              THE COURT:  Good afternoon, folks.

4              MR. TOUGER:  I am outnumbered.

5              THE COURT:  You're always outnumbered, you know?

6              Okay.  Thank you.  Let's talk about the trial schedule

7    first.  What is the best, most reliable estimate of how many

8    trial details are needed, soup to nuts, jury selection through

9    verdict?

10             MR. ENZER:  We estimate 10 days.

11             THE COURT:  Mr. Touger, do you share that estimate?

12             MR. TOUGER:  I think it is going to be definitely

13   shorter than the last one.  I know my cross-examination will be

14   shorter.  When I tell you after receiving your --

15             THE COURT:  Start by answering the question.

16             MR. TOUGER:  I think that is probably a good

17   estimation.

18             THE COURT:  Okay.

19             MR. TOUGER:  What I wanted to tell you, so you can put

20   it into your calculations, after receiving your order about

21   Friday, November 10th, I went back to my PT guy and sort of

22   begged him to give me a Friday time as opposed to a Thursday

23   time because what I figured the court is upset about losing a

24   day a week, two half days, almost two half days a week.

25             THE COURT:  "Upset" is not the relevant word, but it

HAPJROS1                    Conference

```
1    is a problem.
2              MR. TOUGER:  Right.  What I did, I went back to him
3    and said can you squeeze me in on your Friday, and I begged,
4    and since we have a long-standing relationship, he said he
5    could.  I would rather have Friday off, to be honest, for
6    multiple reasons.
7              THE COURT:  You're telling me you don't need Tuesday
8    time off?
9              MR. TOUGER:  I don't need Thursday time off.  Tuesday
10   I still need.  I have two days a week.
11             THE COURT:  This is the last information I did have.
12             MR. TOUGER:  You had Tuesday and Thursday was the last
13   information you had.
14             THE COURT:  I won't debate it.
15             MR. TOUGER:  That is what my letter said.
16             THE COURT:  Well, maybe.
17             MR. TOUGER:  I didn't get the Friday time until
18   yesterday when I went to see him yesterday.
19             THE COURT:  Now you're asking for Tuesday afternoons
20   and Friday afternoons off?
21             MR. TOUGER:  Exactly.  I would like to have Friday
22   mornings off also.
23             THE COURT:  I would like to have two weeks off, but --
24             MR. TOUGER:  Your Honor, technically I don't see
25   why -- to answer that question, I don't see why we are trying
```

HAPJROS1                    Conference

1    this case.  Mr. Rosemond told the prosecutor he would accept

2    the last offer they made prior to the second trial, and that is

3    no longer an offer.

4              THE COURT:  This is not my problem.

5              MR. TOUGER:  I don't understand the reason we are even

6    here.

7              THE COURT:  Look, yes, you do.  If I were to give you

8    Fridays off, are both sides prepared to guarantee, as much as

9    anybody ever can do these things, that we'll be done no later

10   than December 1st, all-in?

11             (Off-the-record discussion)

12             THE COURT:  I can count the days on my arm.  I asked a

13   different question.

14             MR. TOUGER:  There won't be a defense case at this

15   point in time.  The 10 days is a good prediction, so there is

16   no reason why we shouldn't be.  Let me talk to the government.

17             (Off-the-record discussion)

18             THE COURT:  I tell you what.  I'll do you one better.

19             I'll give you Friday, the 10th, off.  So that what we

20   would get in the week of the 6th is three and a half days.  We

21   get another three and a half days through Thursday in the week

22   of the 13th.  Now we're up to seven.  We'll leave open the

23   question whether we are going to sit on the 17th.

24             MR. TOUGER:  Okay.

25             THE COURT:  Then we would have two days the following

HAPJROS1                    Conference

week.  That's nine.  If by the 16th we're in a position where I
can reasonably assume that I'll be charging the jury no later
than the 28th, then maybe we can give you the 17th also.

            MR. TOUGER:  Thanksgiving is the 23rd.

            THE COURT:  Yes, I know that.

            MR. TOUGER:  We are not going to be on the 24th, I
presume?

            THE COURT:  That is also right, or the 22nd.

            MR. TOUGER:  Or the 22nd?

            THE COURT:  We are not going to sit on the 22nd.

            MR. TOUGER:  Maybe what I could do for that week if we
are not going to meet on the 22nd, I can schedule my PT from
Tuesday, the 21st, to Wednesday, the 22nd.

            THE COURT:  Yes.  I am planning a full day on Tuesday,
the 21st.

            MR. TOUGER:  We can get two full days in on that week.
That is what I am saying.

            (Off-the-record discussion)

            THE COURT:  If we're still going, we are going to sit
on December 1st.

            MR. TOUGER:  I think we'll make it.

            MR. ENZER:  The proposal your Honor just laid out is
fine with the government.

            THE COURT:  Just to make clear on the record that we
have, we're going to sit full days November 6, 8 and 9, half a

HAPJROS1                    Conference

1  day on November 7th.  We're going to sit full days on the 13th,

2  15th and 16th, half a day on the 14th.  The 17th is open.  I'll

3  decide during the week of the 13th.

4          We'll sit full days on the 20th and 21st.  If we're

5  still in session on the 27th, we'll see what we do about the

6  28th when we're there.  If I have to, if we all have to, we

7  will just sit every day thereafter till we have a verdict,

8  including Fridays.

9          MR. ENZER:  That's correct.  That is fine with the

10  government.  Just for clarity's sake on the half days, what

11  hours are we going to sit?

12          THE COURT:  What times are your appointments?

13          MR. TOUGER:  I assume we are going to sit in the

14  morning and have afternoons --

15          THE COURT:  What times are your appointments?

16          MR. TOUGER:  We can I can work until 3:15, your Honor,

17  as I said in my letter.

18          THE COURT:  That takes care of the schedule.  Andy,

19  you can call off the troops for Veterans Day, okay?

20          Now, I have next on my list Mr. Touger's October 19th

21  letter and the government's response of October 20th.  I have

22  just one question for you.  Has the government disclosed the

23  identity and whereabouts of CS?

24          MR. JOHNSON-SKINNER:  We have not, Judge.

25          THE COURT:  Then explain your argument to me here.

HAPJROS1                    Conference

1           Your argument is that you've disclosed the Giglio

2    material in plenty of time for them to use it.  The only thing

3    you haven't told them is who the witness is.

4           MR. JOHNSON-SKINNER:  We know the identity of the

5    person, obviously.  The defense, they made no requests.

6    Nothing in the letter said what they want to do to investigate.

7    If they do want to speak to that person, we will facilitate

8    reaching out to that person, whether the defense wants to serve

9    a subpoena or wants us to contact that person.

10          THE COURT:  Mr. Touger.

11          MR. TOUGER:  What I asked for and what I would still

12   want is because here is the problem about me talking to that

13   witness off the record, is if he says anything to me, then I

14   could possibly --

15          THE COURT:  Be a witness?

16          MR. TOUGER:  -- be a witness, and we have a problem.

17   I would rather do this in a hearing situation before the court

18   and talk to him then, which is what I requested.

19          THE COURT:  Well, you're not going to get that.  I was

20   probably practicing law 30 days when I first encountered that

21   problem and somebody said so you get an investigator.

22          MR. TOUGER:  If that is where the court wants me to

23   go --

24          THE COURT:  That is not where I want you to go.  I am

25   not going to have a hearing on this in these circumstances.

HAPJROS1                    Conference

1   Where you go from there is up to you.

2           MR. TOUGER:  I would like the prosecution to produce

3   the person for me.

4           THE COURT:  What does that mean?

5           MR. TOUGER:  I don't know where the person lives.

6           THE COURT:  So ask them.  There is also a question of

7   timing.  I am not saying when it has to be given to you,

8   either.  You haven't asked.  That is what I have just been

9   told.

10          MR. TOUGER:  I am going to ask.

11          (Off-the-record discussion)

12          MR. TOUGER:  The answer I've gotten is that they will

13  communicate to the person that I wish to speak with them, him

14  or her –- I don't know if it is a him or her –- without a

15  subpoena, and then if they say yes, then that makes things

16  easy.  They don't know his actual location at this point.  So

17  they're going to find all that information out and I guess

18  we'll get back to the court if there are any problems.

19          THE COURT:  I am sure you will, okay?

20          The next item I have is a letter from Mr. Touger,

21  dated October 23rd, with respect to a witness whose initials

22  are KA.  Does the government have anything to say to this?

23          MS. HANFT:  We do, your Honor.  As an initial matter,

24  that witness' attorney is here today, and I understand that

25  that attorney would like to be heard as well if your Honor

HAPJROS1                         Conference

 1   would so indulge him.

 2                THE COURT:  Counsel.

 3                MR. CREIZMAN:  Thank your Honor.  Eric Creizman, on

 4   behalf of my client KA.

 5                THE COURT:  You need no introduction.

 6                MR. CREIZMAN:  My client is seeing a licensed

 7   psychiatrist and would invoke the privilege as to any

 8   communications between him and the psychiatrist.  It seems to

 9   me that defense counsel's request is speculative at best about

10   what the communications between my client and the psychiatrist

11   are and they wouldn't be any different than just subpoenaing

12   any of my client's friends in terms of getting the same

13   information.

14                I don't know how it would be more probative, why they

15   would expect it would be any more likely that he would talk

16   about whether he testified truthfully or not at trial.

17                THE COURT:  You're getting way ahead of us.  You are

18   getting way ahead of us.

19                Are the records that Mr. Touger wants me to order

20   produced within the possession, custody or control of the

21   government, Mr. Enzer?

22                MR. ENZER:  No, they are not.

23                THE COURT:  So, Mr. Touger, where does that leave you?

24                MR. TOUGER:  Your Honor, on information and belief,

25   talking to somebody who supposedly has this knowledge, Mr. KA

is seeing a psychiatric professional for a specific reason,

because of post-traumatic stress disorder due to his testimony

in these cases.

That, to me, is sort of enough in my mind that the

court should look at that for the obvious reasons that if he is

on any psychiatric drugs that impair his ability in any way, we

should be able to bring that out when he is testifying.

If he has said to his psychiatrist the reason I am

suffering post-traumatic stress disorder is because I lied and

I am afraid of getting caught in my lie --

THE COURT:  Mr. Touger, let's get back to first

principles, right?

This is a bilateral litigation, United States of

America versus your client.  The United States of America

doesn't have the records.

MR. TOUGER:  Yes, but they don't have the records for

particular reasons because they don't want to give them over.

They know if they looked at them, they would have to give them

over.

THE COURT:  Which rule of procedure says that a

District Court has the right to direct the government to turn

over records that they don't have and don't want?

MR. TOUGER:  I just want to know the name of this

psychiatrist so I can subpoena records from him, and the court

can decide when the psychiatrist makes a motion to quash,

HAPJROS1                    Conference

1    then --

2              THE COURT:  Perhaps I overlooked or misread the

3    sentence in your letter.  "I am writing to respectfully request

4    that the court order the government to deliver a copy of this

5    witness' psychiatric records to the court."

6              MR. TOUGER:  I figured that the government, having

7    calling a witness, would have the records of the witness

8    they're calling.

9              THE COURT:  You know now otherwise.

10             MR. TOUGER:  Now I would ask the name of the

11   psychiatrist; and, therefore, I could issue a subpoena to them,

12   and then the psychiatrist can come in and make a motion to

13   quash that subpoena, and then the court can decide whether he

14   wants to order the psychiatrist to follow the subpoena or not.

15             THE COURT:  Why don't you take a moment and nicely ask

16   Mr. Enzer if he wants to tell you the name, if he knows.

17             MR. TOUGER:  I don't know if he knows.  He doesn't

18   know, your Honor.  Can I ask the lawyer if he knows the --

19             THE COURT:  You can ask him.

20             MR. CREIZMAN:  I don't know.

21             MR. TOUGER:  You know what?  It is frustrating as a

22   defense counsel to be --

23             THE COURT:  That is characteristics of many parts of

24   life.

25             MR. TOUGER:  Believe me, I know that all too well,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    your Honor, but it seems unfair.  A trial in the Southern

2    District of New York should be a fair exchange.

3            THE COURT:  Absolutely.

4            MR. TOUGER:  If the government --

5            THE COURT:  If there is a witness with material

6    information in a prison in Siberia, the fair thing would be to

7    have him here.  I can't order Vladimir Putin to produce him.

8            MR. TOUGER:  He has no testimony to give in this case.

9    This is not a person in Russia.

10            THE COURT:  It may be, for all practical purposes.

11            MR. TOUGER:  We know it is not.  We know the person is

12    here probably in New York City because this is where Mr. KA is

13    living.

14            THE COURT:  I say this not in a nasty or belligerent

15    way, but also do your job.  Figure out how to do this.

16            MR. TOUGER:  You want me to --

17            THE COURT:  I just want you to do your job.  Whenever

18    you're frustrated, the answer is not come to me and ask me to

19    figure out how to do it.  I am out of the practice of law.  I

20    have been for 23 years.

21            MR. TOUGER:  Fine, your Honor.

22            THE COURT:  Okay.

23            MR. CREIZMAN:  Thank your Honor.

24            THE COURT:  Mr. Creizman, just so we're here, you're

25    here on behalf of KA?

1          MR. CREIZMAN:  Yes, your Honor.

2          THE COURT:  Whoever that is.  All right.

3          Now, I have these motions in limine, and let me see

4    whether we can't deal with them now.  First of all, am I

5    missing anything if I have concluded that these motions, the

6    government's on the one hand and the defendant's on the other,

7    are in effect something like mirror images of each other?

8          The government wants in limine rulings that seven

9    categories of evidence set forth in its motion in limine should

10   be admitted at trial, and the defense wants an in limine ruling

11   that at least part of those seven categories and maybe more

12   should be excluded, and that is the sum total of the two

13   motions, right?

14         MR. TOUGER:  I believe so.

15         MR. ENZER:  That is essentially accurate.  There is

16   just one thing the government moved on that is not really

17   opposed.

18         THE COURT:  That is Point 7.

19         MR. ENZER:  The last one.

20         THE COURT:  Yes, okay.  I am referring to the

21   government's motions in limine, dated October 2, and

22   specifically to the table of contents.

23         Now, let me give you my preliminary reaction to the

24   motions and to give you an opportunity to respond to what I've

25   got to say, and maybe you'll change my mind.

1          As I understand it, again referring to the

2     government's motion, just for the sake of convenient reference,

3     Points 3, 4, 5 and 6 are all matters on which Judge McMahon

4     ruled in limine prior to the most recent trial and ruled in the

5     government's favor.  Am I right so far?

6          MR. ENZER:  You are right, your Honor, but there are a

7     few incidents of violence that we are introducing in this

8     trial, we are asking to introduce that were not specifically

9     contemplated in the prior trials or in Judge McMahon's ruling

10    because they arise from a new witness who was not available to

11    the government before.

12         THE COURT:  We'll come back to that.

13         Is there anything else, anything, putting aside Point

14    7 altogether, is there anything in Points 1 and 2 on which

15    Judge McMahon previously ruled?

16         MR. ENZER:  Point 2, Judge McMahon excluded any

17    reference to the Miami shooting.

18         THE COURT:  Thank you.  Yes, you're right.  I remember

19    that.  Point 1 she didn't rule on.

20         MR. ENZER:  Correct.

21         THE COURT:  Okay.  Now, the initial reaction to No. 1,

22    having reviewed her rulings, is that I am unpersuaded that I

23    should depart from her rulings as far as they went at all,

24    which takes care of most of Points 3, 4, 5 and 6 as well as 2.

25         Does either side wish to be heard further on any of

HAPJROS1                    Conference

1      that?

2              MR. ENZER:  Your Honor, we want to see where the shoe

3      drops on No. 1 before coming back to that.  We may have an

4      issue with not departing on the Miami shooting.

5              THE COURT:  All right.  Well, my predilection on No. 1

6      is to exclude it.  So if you want to be heard on No. 1 and 2,

7      this would be the moment.

8              MR. ENZER:  If we can be heard, your Honor?

9              THE COURT:  Yes.

10             MR. ENZER:  I am going to hand up what we could call

11     Court Exhibit 1 or Government Exhibit 1, which is a transcript

12     of the call that we are seeking to introduce.

13             THE COURT:  Okay.

14             MR. ENZER:  And I think the important part to look at

15     is on Page 6.  This is summarized in our brief, but here you

16     have the plain words.  I know your Honor's familiar with the

17     brief, but this is one of the key segments of this call, and we

18     submit it is a direct admission to the charged murder for hire

19     conspiracy, the conspiracy from '07 to '09 to murder members of

20     G Unit, a conspiracy that resulted in the death of

21     Mr. Fletcher, but which was broader than just the conspiracy to

22     kill Fletcher, it was a conspiracy to kill anyone associated

23     with G Unit that happened to result in that particular G

24     Unit --

25             THE COURT:  Direct my attention, please, to the

HAPJROS1                         Conference

1    specific lines on Page 6, and if need be over to the next page

2    that you say are the direct admissions.

3                  (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HAP5rosC2                          conference.

1              MR. ENZER:  7 through 20, and I will explain.

2              THE COURT:  Let me just read it again first.

3              MR. ENZER:  Sure.

4              THE COURT:  And in your submission in this part, it is

5     referring to whom?  Who is the "he" who could have just come

6     out and said that?

7              MR. ENZER:  I believe he is referring to an individual

8     named Zoe who is in federal custody or in law enforcement

9     custody and he suspects is cooperating.

10             THE COURT:  Okay.  Let me read.  Thank you.

11             (Pause)

12             THE COURT:  Okay.  Go ahead and explain.

13             MR. ENZER:  So, what is going on in this discussion,

14    Rosemond is talking to our cooperating witness.  He is

15    mentioning the shooting in Miami which is a shooting that he

16    did with the witness and he says:

17             If that's our only worries, nigga, if that's my only

18    worry, I'll take that face to face.  I ain't got a problem with

19    that.

20             Then he says:

21             All that -- all that extra shit, all that Black and

22    all of that other shit I -- I -- I -- that's the shit I don't

23    want to fuck with, man.

24             So, we submit "the Black shit," Black is an individual

25    named Henry Butler, a cocaine supplier who provided cocaine to

HAP5rosC2                          conference.

Rosemond's drug organization so "the Black shit" is his concern

about being prosecuted for narcotics but "other" has to be

something different than that.  Other, by definition, is

something different than the narcotics exposure.  From the

context of what is going on in this call, he is talking to an

individual who works for him mainly as an enforcer.  He even

refers to the individual as an enforcer later in the call.

      THE COURT:  Well, he says -- I think if I remember

your brief accurately -- he says that the government wants to

think he is the enforcer.

      MR. ENZER:  Right.

      THE COURT:  As opposed to he is the enforcer.

      MR. ENZER:  He doesn't actually say "I admit you are

my enforcer," he says the government -- or "they say you are my

enforcer and they are trying to make me a boss."  The testimony

from the witness will be that the witness' main connection to

Rosemond, the main thing he did for Rosemond was shootings and

other acts of violence.  "That other shit," we should be able

to argue to the jury, what that is talking about is the

violence that these guys committed together as part of the feud

with G-Unit, that's part of the charged conspiracy, and there

is no reason he would be talking to this witness about things

other than that.  This is a witness who did some drug activity

with Rosemond, but not much.  The main, the bulk, the focus of

their relationship is on violence, this is his enforcer.  He is

HAP5rosC2                            conference.

1    concerned that this enforcer is going to get arrested and

2    cooperate and if this guy cooperated what he would have to talk

3    about, as in fact has happened, is violence, is his

4    participation in charged acts of violence with Rosemond.  And I

5    don't think you can understand that, without the reference to

6    the Miami shooting.  In order to put this statement in context,

7    "the other shit," you have to know what the cross-reference is.

8          The other part of this call that I think is also

9    directly relevant to the charges, later in the call is page 11,

10    lines 5 to 11.

11          THE COURT:  Yes.

12          MR. ENZER:  Here, Rosemond is essentially telling this

13    guy, look, if you get arrested, don't talk.  It shows

14    consciousness of guilt.  The question is, what is he conscious

15    of?  And from the context of the call, including the discussion

16    of the Miami shooting, the portion we just talked about, the

17    part of the call where Rosemond says the government views this

18    witness as his enforcer and him as a boss, when you understand

19    that context -- and the jury will hear testimony for hours from

20    this witness about violence that he committed for Rosemond --

21    given that context when Rosemond says to this guy don't tell

22    anybody anything, what he is telling him is don't tell the

23    government about the violence.

24          That is the bulk of their relationship, that is the

25    bulk of their criminal dealings together.  The amount of drug

HAP5rosC2                              conference.

1    activity that that witness did for Rosemond is very minimal and

2    witnesses, other cooperators, including KA who we heard about

3    today, he will say that the drugs that he gets, the witness on

4    this call gets from Rosemond --

5          THE COURT:  And how do you now tie it back to the

6    Fletcher shooting?

7          MR. ENZER:  I can't tell you -- well, the don't

8    talk -- the don't talk is tied to the Fletcher shooting because

9    this witness receives a coded confession from Rosemond

10   regarding the Fletcher shooting.  This witness will testify

11   that at some point in 2009, after the murder was completed, he

12   went to Alphabet City in Manhattan, he met with Rosemond and

13   Rosemond's driver.  Rosemond's driver handed a pamphlet which

14   was like an obituary handed out at Lowell Fletcher's funeral.

15   They have a discussion and then Rosemond comes out and the

16   witness says to Rosemond, So, we can finally rest?  And

17   Rosemond says Yes.  And the witness will testify he understood

18   that to mean Rosemond was responsible for the murder.

19         THE COURT:  How is he going to testify he understood

20   it to mean?  Why is that ever going to be admissible?

21         MR. ENZER:  We think it is admissible because -- at a

22   minimum, the statement should come in and we should be able to

23   argue from it.

24         THE COURT:  What statement?  Rosemond's?

25         MR. ENZER:  Rosemond's statement "We can rest now."

HAP5rosC2                          conference.

1   We think his interpretation of what Rosemond is telling him is

2   admissible.  He has got a course of dealing with Rosemond, he

3   is part of this war with G-Unit.

4           THE COURT:  You better start reading your rules of

5   evidence.

6           MR. ENZER:  Well, whether or not that segment, his

7   interpretation of it comes in, certainly Rosemond's statement

8   comes in.  We are going to argue to the jury this was

9   essentially a confession to the murder.  It is not the only

10  confession but it is one, and given that this recorded call

11  happens in sequence after that meeting, that conversation, when

12  Rosemond says to the guy, "don't talk," what he could be saying

13  here and what we should be allowed to argue to the jury is part

14  of what he didn't want the witness to tell the government

15  about, didn't want the witness to tell the jury about, is his

16  statements to the witness about this murder.

17          THE COURT:  Okay.  Let me hear from Mr. Touger on

18  this.

19          Thank you, Mr. Enzer.

20          MR. TOUGER:  If you are not going to change your mind,

21  I don't need to respond, your Honor.

22          THE COURT:  You never know.

23          MR. TOUGER:  Then, your Honor, what the government

24  fails to tell you is the context of this.  What is happening

25  now is Mr. Butler has been arrested, he is cooperating on a

HAP5rosC2                           conference.

1    drug case that stems out of California that has to do with

2    Mr. Rosemond's brother which has nothing to do with anything

3    else but drugs.  He is telling him and this --

4                THE COURT:  Well, how do I know that?

5                MR. TOUGER:  Well, you don't.  But you don't know it

6    has anything to do with the murder either.  Butler had nothing

7    to do with this murder whatsoever.  Butler is a drug dealer and

8    that's what Butler has to do with it, from Los Angeles.

9                THE COURT:  Well, the government hangs much of the

10   argument on lines 18 and 19 on page 6, "All that Black and all

11   of that other shit" and Black is the drug business.

12               MR. TOUGER:  Right -- no, Black is only the drug

13   business which pertains to his brother in Los Angeles.  He has

14   nothing really to do with his drug business here in New York

15   City.  That's what he is trying to save from and that's what he

16   gets indicted for in the Eastern District of New York and

17   that's what he is doing six life terms for.

18               That's what he is worried about, your Honor, in this

19   conversation.  It has nothing to do with the Lowell Fletcher

20   murder at all because this witness had nothing to do with that

21   murder.

22               THE COURT:  All right.  I have your positions on this.

23   I am going to reserve on points one and two in the government's

24   brief.  With respect to points three, four, five and six,

25   unless anybody has anything else to say, I will adhere to Judge

HAP5rosC2                               conference.

1   McMahon's rulings.

2           MR. TOUGER:  You will adhere to exactly what Judge

3   McMahon has ruled?

4           THE COURT:  On three, four, five, and six.

5           MR. TOUGER:  And six.

6           THE COURT:  Yes.

7           Now, Mr. Enzer, you said there were a couple of things

8   covered in three, four, five and six that were not within the

9   scope of Judge McMahon's rulings.  What were they?

10          MR. ENZER:  If your Honor goes to page 9 of our

11  submission, bullet no. 4 --

12          THE COURT:  Just a minute now.

13          (Pause)

14          THE COURT:  Okay.

15          MR. ENZER:  There was evidence at the prior trials

16  that an associate of CW-3 did a shooting for Rosemond but what

17  is new here, because CW-2 has now become a cooperator, is what

18  happened in that shooting which is somebody got hit.

19          THE COURT:  But the evidence concerning the shooting

20  came in in the last trial?

21          MR. ENZER:  What CW-3 knows about this incident came

22  in.  He did not know that somebody got shot.  It was CW-3's

23  understanding that this act of violence -- that an attempt was

24  made to do this but he didn't know anybody actually got shot.

25  CW-2, who was actually there, will say, yeah, somebody got shot

HAP5rosC2                              conference.

1   in this incident.

2           THE COURT:  So, CW-2 and CW-3 go to this location and

3   CW-3 previously received they did that looking for this G-Unit

4   member for the purpose of shooting him and that's where CW-3

5   left off and now you are proposing to call CW-2 to say, yeah,

6   he shot at somebody, hit a bystander, and the gun belonged to

7   Rosemond; is that right?

8           MR. ENZER:  Slight twist, Judge.

9           Rosemond arranges with CW-3 to have this act of

10  violence committed.  CW-3 doesn't go, it is an associate of

11  CW-3 who is named "Life."

12          THE COURT:  Named what?

13          MR. ENZER:  "Life."  They call him Life.

14          THE COURT:  Life?

15          MR. ENZER:  Life goes with the driver, CW-2.  The

16  driver drives to this location.  Life gets out of the car.  He

17  is trying to find and associate of G-Unit, doesn't find him,

18  shoots a random person.  Gets back in the car, and they go.

19          THE COURT:  So CW-2 is the driver?

20          MR. ENZER:  Correct.  CW-2 is Rosemond's chauffeur.

21          THE COURT:  And CW-3 testified in the previous trial?

22          MR. ENZER:  He did.

23          THE COURT:  And he was the source of the evidence in

24  the previous trial?

25          MR. ENZER:  Correct.

HAP5rosC2                              conference.

1              THE COURT:  Mr. Touger, why shouldn't this come in, if

2     at all?

3              MR. TOUGER:  I am just trying to remember the

4     testimony, your Honor.  Just give me a minute?

5              If I understand what the government is saying, and I

6     want to make sure I understand it before I argue it, is that if

7     I remember correctly, CW-3 testified that at some point there

8     was a decision to try to shoot this Walter guy, "Baja," and he

9     doesn't know what happened, and now they're saying that a new

10    cooperator has come in who was there and actually witnessed the

11    shooting?  Or was told by Life that the shooting occurred?

12             THE COURT:  Witnesses a shooting.

13             MR. TOUGER:  That's what I am saying, did he witness

14    the shooting or is he told by Life that it occurred?

15             MR. ENZER:  He is told by Life.  He doesn't see it.

16             MR. TOUGER:  So he doesn't witness the shooting.

17             MR. ENZER:  He gets a statement which I think is a

18    co-conspirator statement.

19             MR. TOUGER:  I think we need to wait and see exactly

20    what --

21             THE COURT:  I think we need to wait and see on this.

22             What else, Mr. Enzer?

23             MR. ENZER:  Page 10, fourth bullet from the top.

24             THE COURT:  This comes in why?

25             MR. ENZER:  We submit it is part of the charged

HAP5rosC2                            conference.

1      conspiracy to murder members of G-Unit.

2                  THE COURT:  Lighty is a G-Unit person?

3                  MR. ENZER:  Chris Lighty is the manager of G-Unit, he

4      is associated with them.  And so to get at them, a member of

5      Rosemond's --

6                  THE COURT:  Got it.

7                  Mr. Touger, why not?

8                  MR. TOUGER:  Your Honor, there is no allegations that

9      Mr. Rosemond ordered Winston Harris to do anything.  All it

10     says is that Winston Harris did something and then bragged

11     about it to Mr. Rosemond.

12                 THE COURT:  I am not going to rule on that now either.

13                 What else?

14                 MR. ENZER:  Those are the only new acts of violence.

15                 THE COURT:  Okay.  All right.

16                 Now, so far as the other point, point seven, the

17     government is looking for a ruling that Rosemond's proffer

18     statements about the murder-for-hire come in if Rosemond opens

19     the door.  Well, the answer to that is, yeah, sure --

20                 MR. TOUGER:  Obviously.

21                 THE COURT:  -- if he opens the door.  The real

22     question is is he going to open the door, right?

23                 MR. TOUGER:  Certainly not.

24                 THE COURT:  Well, we will see.  So, I don't need to

25     rule on that right now.

HAP5rosC2                        conference.

 1              Anything else we need to do today?

 2              MR. TOUGER:  Yes, your Honor.  One thing.

 3              I don't use a computer during trial because I find it

 4     another heavy thing to lug around.  What I would like to use is

 5     my iPad.

 6              THE COURT:  You want an iPad, I know.

 7              MR. TOUGER:  It is much lighter and much more

 8     efficient for me.

 9              THE COURT:  Andy, didn't I rule on this already?

10              THE DEPUTY CLERK:  You denied the iPad, Judge.

11              THE COURT:  I denied the iPad.

12              MR. TOUGER:  My computer doesn't carry the same -- I

13     don't have an office portable computer, what I brought in was

14     my wife's computer.  She is not going to want me to take that

15     from her every day.  The only portable thing I have is the

16     iPad.  It is no different than a computer, your Honor.  Matter

17     of fact, this one doesn't even have --

18              THE COURT:  Actually, it is.

19              MR. TOUGER:  It doesn't have a router.

20              THE COURT:  And, Apple thinks so.  They really do.

21              MR. TOUGER:  It doesn't have a router.  Unlike the

22     computer, this doesn't have a router.

23              THE COURT:  You think the computer has a router?

24              MR. TOUGER:  It does, that's how it connects to the

25     Internet.  The iPad doesn't connect to anything, it is just

HAP5rosC2                            conference.

 1    going to have paperwork on it.

 2                THE COURT:  Mine does.

 3                MR. TOUGER:  Well, mine doesn't.  That's what I am

 4    trying to tell you, your Honor.  Mine doesn't connect to

 5    anything.  It is just going to have my whole files on it that I

 6    use instead of having to lug more paperwork.

 7                THE COURT:  You are telling me it has no cell

 8    connectivity and no wireless capability?

 9                MR. TOUGER:  It has no plug-ins.

10                THE COURT:  That's not what I asked you.  It has no

11    cellular roaming capability and wireless capability?

12                MR. TOUGER:  Only if I set it up with my iPhone to

13    have as a hot spot.  Other than that, no.

14                THE COURT:  Well, if you can connect to your cell

15    phone why have a hot spot?

16                MR. TOUGER:  For Bluetooth, your Honor.  But I don't

17    do that.  I don't need it, I don't want it for the Internet.  I

18    just need it --

19                THE COURT:  I need more detailed technical information

20    about --

21                MR. TOUGER:  I will not connect it to the Internet

22    once.  On my license as a lawyer.

23                THE COURT:  I need more technical information than you

24    are giving me.

25                MR. TOUGER:  Well, what do you need?

HAP5rosC2                            conference.

 1          THE COURT:  I need to know what the communications

 2    capabilities of the device are.

 3          MR. TOUGER:  It can only connect to the Internet

 4    through Bluetooth.

 5          THE COURT:  And you are telling me that if you were

 6    sitting in Starbucks, Starbucks with a public, open, wi-fi, you

 7    could not connect to the Internet?

 8          Is that what you are telling me?

 9          MR. TOUGER:  No, wi-fi I could, but so could my

10    computer.  It has to router to connect through the --

11          THE COURT:  Look.  Let's go back to first principles,

12    right?  You get to bring a computer in if, and only if, A, I

13    permit it; and B, it's got no wi-fi and no cellular

14    connectivity.  I want the specs for this iPad.

15          MR. TOUGER:  And I will tell that you it can connect

16    through wi-fi just like my computer can.

17          THE COURT:  I want the specs.

18          MR. TOUGER:  Okay.

19          THE COURT:  All right?

20          MR. TOUGER:  It just would save me having to lug boxes

21    and boxes of materials.

22          THE COURT:  We are not understanding each other,

23    Mr. Touger.  I know it would save you lugging.

24          MR. TOUGER:  What I am saying, your Honor, you allowed

25    me to bring a computer and it is no different than that.

HAP5rosC2                                conference.

1              THE COURT:  Well, the trouble is that after six years

2      on the Judicial Conference Committee on Information Technology

3      and close to 20 years as the Chair of the IT Committee of this

4      Court, I think you are mistaken.

5                                    o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25